IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRA HAUTE DIVISION

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | No. ___ |
| | ) | |
| v. | ) | SCHEDULED FOR EXECUTION |
| | ) | **July 15, 2020** |
| WARDEN USP TERRE HAUTE, | ) | |
| MICHAEL CARVAJAL, WILLIAM | ) | |
| BARR | ) | |
| Respondents. | ) | |

**MR. WESLEY PURKEY'S MOTION TO STAY HIS EXECUTION PENDING FINAL DISPOSITION ON THE MERITS**

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 5

    I.      Procedural Posture ........................................................................................................ 5

    II.     Mr. Purkey's Incompetency ......................................................................................... 9

    III.    The Government's Continued Refusal to Provide Mr. Purkey Information Relevant to His Competency ........................................................................................................... 14

ARGUMENT ................................................................................................................................ 22

    I.      This Court May Enter an Order to Preserve its Jurisdiction ...................................... 22

    II.     Mr. Purkey is Entitled to a Stay Pending a Decision on the Merits Under *Lonchar v. Thomas*. 23

        A.   Mr. Purkey's Federal *Ford* Claim is a "First Habeas" Claim ...................................... 23

        B.   The Court Cannot Dismiss Mr. Purkey's *Ford* Claim on the Merits Because He Has Exceeded the Threshold Showing of Incompetency and Is Entitled to Due Process .................................. 24

    III.    Mr. Purkey is Entitled to a Stay Under *Hill v. McDonough* and *Nelson v. Campbell* ................ 29

        A.   Mr. Purkey Demonstrates a High Likelihood of Success on His Claims ................................. 29

        B.   Mr. Purkey Will Suffer Irreparable Harm Without a Stay ............................................. 30

        C.   Mr. Purkey Has Not Delayed His *Ford* Claim in Any Way ......................................... 32

CONCLUSION ............................................................................................................................. 34

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdur'Rahman v. Bell*,
  927 F. Supp. 262 (M.D. Tenn. 1996) ...................................................................................... 25

*Amaya-Ruiz v. Stewart*,
  136 F. Supp. 2d 1014 (D. Ariz. 2001) .............................................................................. 24, 25

*Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
  398 U.S. 281 (1970) ................................................................................................................ 22

*Barefoot v. Estelle*,
  463 U.S. 880 (1983) .......................................................................................................... 24, 29

*Barr v. Lee.*,
  591 U.S. __ (2020) (per curiam) .............................................................................................. 6

*Barr v. Lee.*,
  591 U.S. __ (2020) (Sotomayor, J., dissenting) (per curiam)................................................... 1

*Battaglia v. Stephens*,
  824 F.3d 470 (5th Cir. 2016) .................................................................................................. 30

*Bedford v. Bobby*,
  No. 1:11-cv-311, 2011 U.S. Dist. LEXIS 52228 (S.D. Ohio May 16, 2011)......................... 25

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)................................................................................................ 31

*Commonwealth v. Banks*,
  943 A.2d 230 (Pa. 2007)......................................................................................................... 33

*Cone v. Bell*,
  956 F. Supp. 1401 (W.D. Tenn. 1997) .................................................................................... 25

*Eldridge v. Thaler*,
  No. H-05-1847, 2009 U.S. Dist. LEXIS 106991 (S.D. Tex. Nov. 17, 2009)......................... 28

*Ford v. Wainwright*,
  477 U.S. 399 (1986) .........................................................................................................*passim*

*Harris v. Johnson*,
  323 F. Supp. 2d 797 (S.D. Tex. 2004)..................................................................................... 32

*Hill v. McDonough*,
  547 U.S. 573 (2006) ........................................................................................................ 4, 23, 29

1

*House v. Bell*,
    547 U.S. 518 (2006) ...................................................................................................... 24

*Ex parte Jordan*,
    758 S.W.2d 250 (Tex. Crim. App. 1988) (en banc) .............................................................. 33

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................................................ 31

*Lonchar v. Thomas*,
    517 U.S. 314 (1996) ........................................................................................... 4, 23, 24

*Madison v. Alabama*,
    139 S. Ct. 718 (2019) .......................................................................................... 2, 26, 28

*Nelson v. Campbell*,
    541 U.S. 637 (2004) ..................................................................................... 4, 23, 29, 32

*Nika v. Baker*,
    No. 3:09-cv-00178-JCM-WGC, 2015 U.S. Dist. LEXIS 84121 (D. Nev. June 18,
    2015)................................................................................................................................ 25

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................................ 31

*Nooner v. Norris*,
    No. 5:06CV00110 SWW, 2006 U.S. Dist. LEXIS 96183 (E.D. Ark. June 26, 2006) ......................... 31

*Nowakowski v. Maroney*,
    386 U.S. 542 (1967) ........................................................................................................ 24

*Osorio-Martinez v. Attorney Gen. of the U.S.*,
    893 F.3d 153 (3d Cir. 2018) ............................................................................................. 31

*Panetti v. Quarterman*,
    551 U.S. 930 (2007) ..............................................................................................*passim*

*Pennsylvania Bureau of Corr. v. U.S. Marshals Serv.*,
    474 U.S. 34 (1985) .......................................................................................................... 22

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ........................................................................................................ 31

*Simon v. Epps*,
    463 F. App'x 339 (5th Cir. 2012)...................................................................................... 28

*Slack v. McDaniel*,
    529 U.S. 473 (2000) ........................................................................................................ 24

*Stanley v. Davis*,
    No. C-07-4727 EMC, 2015 WL 435077 (N.D. Cal. Feb. 2, 2015) ....................................... 5

*Stewart v. Martinez-Villareal*,
   523 U.S. 637 (1998) ............................................................................................................. 23, 24

*Stokes v. Stirling*,
   No. 1:16-mc-00073-RBH, 2016 U.S. Dist. LEXIS 33618 (D.S.C. Mar. 16, 2016) ............................ 24

*United States v. Shipp*,
   203 U.S. 563 (1906) .................................................................................................................... 23

*Wood v. Quarterman*,
   572 F. Supp. 2d 814 (W.D. Tex. 2008), *aff'd sub nom. Wood v. Stephens*, 619 F.
   App'x 304 (5th Cir. 2015) ............................................................................................................ 28

**Statutes**

28 U.S.C. § 2241 .............................................................................................................................. 8, 9

28 U.S.C. § 2253 (1996) ...................................................................................................................... 24

All Writs Act, 28 U.S.C. § 1651(a) (1949) .......................................................................................... 22

**Other Authorities**

*BOP Implementing Modified Operations*, Fed. Bureau of Prisons,
   https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 12, 2020) ............................. 20

Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of
   Psychology (4th ed., vol. 1 2010) ................................................................................................. 11

## INTRODUCTION

Mr. Wesley Purkey is a 68-year-old man suffering from progressive dementia, schizophrenia, complex-Post Traumatic Stress Disorder ("PTSD"), and severe mental illness including significant delusions and paranoia, rendering him unable to comprehend the reason for his execution. He is scheduled to be executed tomorrow. Yet Mr. Purkey is incompetent and has not been afforded the right to federal review pursuant to *Ford v. Wainwright*, 477 U.S. 399 (1986), despite an abundance of evidence presented in his *Ford* competency proceedings in the United States District Court for the District of Columbia ("D.C. District Court") that has been pending since November 2019. *See Purkey v. Barr*, No. 1:19-cv-03570-TSC (D.D.C. Nov. 26, 2019) ("*Purkey* DC *Ford* Matter"); *see* Complaint, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1, attached hereto as Ex. A.

Respondents in that action have manufactured a race to execution in the middle of a global pandemic, and, adding insult to injury, have stonewalled all of Mr. Purkey's diligent attempts to obtain information regarding his current competency since August 2019. To execute him now would be a blatant and unconscionable constitutional violation, "illustrating just how grave the consequences of such accelerated decision making can be." *See Barr v. Lee.*, 591 U.S. __ (2020) (Sotomayor, J., dissenting) (per curiam).

This Court has already directed Mr. Purkey to file his stay motion in conjunction with a § 2241 habeas petition in this Court. *See* Order, *Purkey v. Barr*, No. 2:19-cv-00517-JMS-DLP (S.D. Ind. July 14, 2020), ECF No. 83. This venue is Mr. Purkey's only option to vindicate his Eighth Amendment rights. Mr. Purkey is also entering a Notice of Related case in this Court based on the related issues in Mr. Purkey's *Bivens* case pending in this Court, *Purkey v. Barr*, No. 2:19-cv-00517-JMS-DLP (S.D. Ind. filed Oct. 28, 2019) ("*Bivens* case").

It is incumbent upon this Court to immediately stay the execution and ensure the most drastic and irreversible outcome does not occur before there is a fair and orderly *Ford* hearing and a decision on the merits. Mr. Purkey has presented extensive evidence of his current incompetency to be executed and has diligently pursued these claims since November 2019. *See, e.g.*, Ex. A; Plaintiff's Renewed Motion for a Preliminary Injunction, *Purkey* DC *Ford* Matter (D.D.C. June 22, 2020), ECF No. 23, attached hereto as Ex. C.[1] He has the right to have the merits of his long-pending claim heard *somewhere* before he is executed.

Mr. Purkey is not currently competent to be executed under Eighth Amendment constitutional standards articulated by the Supreme Court in a host of cases dating as far back to *Ford*, 477 U.S. 399, and as recently as *Madison v. Alabama*, 139 S. Ct. 718 (2019). Since August 2019, Respondents have repeatedly obstructed Mr. Purkey's efforts to acquire critical evidence relevant to his constitutional claims. This course of conduct has been consistent both prior to and during the COVID-19 pandemic. *See, e.g.*, Ex. C at 24–32 (Memorandum in Support of Motion for Renewed Preliminary Injunction), 150–68 (R. Woodman Declaration); Plaintiff's Motion for Expedited Discovery, *Purkey* DC *Ford* Matter (D.D.C. June 23, 2020), ECF No. 24, attached hereto as Ex. F; Defendants' Opposition to Plaintiff's Motion for Expedited Discovery, *Purkey* DC *Ford* Matter (D.D.C. June 29, 2020), ECF No. 27, attached hereto as Ex. G; Reply in Support of Plaintiff's Motion for Expedited Discovery & Supporting Documents, *Purkey* DC

---

[1] All pagination pincites to Exhibits A–I refer to PDF page numbers. Exhibit C is a single document that includes: (1) Plaintiff's Renewed Motion for a Preliminary Injunction (Ex. C at 2–5); (2) Plaintiff's Memorandum in Support of His Renewed Motion for a Preliminary Injunction (Ex. C at 6–49); (3) June 14, 2020 Letter from Jonathan DeRight requesting another in-person examination and contemporaneous testing (attached to Plaintiff's Renewed Motion as Ex. 1) (Ex. C at 51); (4) Declaration of Dr. Joe Goldenson regarding the risk of COVID-19 at USP Terre Haute (Ex. C at 52–71); (5) Declaration of Dr. Thomas Hyde regarding Mr. Purkey's progressive dementia and the need for recent imaging and in-person examination (Ex. C at 72–109); (6) Supplemental Declaration of mitigation expert, Elizabeth Vartkessian, Ph.D. (Ex. C at 110–149); and (7) Declaration of Mr. Purkey's counsel, Rebecca Woodman and supporting exhibits (Ex. C at 150–379).

*Ford Matter* (D.D.C. July 2, 2020), ECF Nos. 30, 30-1, 30-2, attached hereto as Ex. H;[2] *see generally* R. Woodman Suppl. Decl.

Respondents have engaged in this conduct despite Mr. Purkey's counsel's warnings that there would be insufficient time to review the necessary information and test results if the Respondents waited to grant access to the evidence until Mr. Purkey was under a time-compressed warrant of Attorney General Barr's design. Mr. Purkey is now in exactly such a situation—Attorney General Barr issued a 30-day execution warrant and yet has still failed to produce any of Mr. Purkey's records. Although BOP Legal Counsel finally indicated, eleven days before Mr. Purkey's scheduled execution, that Mr. Purkey's own records were provided to the Assistant United States Attorneys ("AUSAs") in the *Purkey* DC *Ford* Matter who have agreed to provide them "under the rules for discovery," as the day of Mr. Purkey's execution, the records remain unproduced. R. Woodman Suppl. Decl. ¶¶ 5, 7. There is now insufficient time before the scheduled execution to allow Mr. Purkey's experts to meaningfully review the documents.

Now, Mr. Purkey faces even more significant roadblocks given that the United States remains in the throes of the ever-worsening COVID-19 pandemic. Concerns regarding the pandemic resulted in USP Terre Haute ceasing all in-person visitation since March 13, 2020. *See* Ex. C at 111 (E. Vartkessian Suppl. Decl.); *id.* at 164–65 (R. Woodman Decl.). Although BOP has begun allowing visitors for inmates with execution dates, there remain scant protections or policies in place, and certainly no formal, written procedures, to ensure the safety of visitors,

---

[2] Exhibit H is a single document that includes: (1) Mr. Purkey's reply in support of his Motion for Expedited Discovery (Ex. H at 2–19); (2) a chart documenting Mr. Purkey's requests to the Bureau of Prisons and defense counsel for information, records, testing, and imaging relating to claims and issues in his *Ford* case (from August 2019 to July 1, 2020) (attached as Appendix A to Mr. Purkey's reply in support of his Motion for Expedited Discovery) (Ex. H at 20–28); and (3) Supplemental Declaration of Rebecca Woodman and supporting exhibits (Ex. H at 29–70).

staff, prisoners, or the community from the danger posed by re-instituting visitation. Moreover, the execution process itself, which involves hundreds of people arriving from all parts of the country, many by air travel, who will be required to stay in hotels, and forced to be in close proximity in areas with poor ventilation and air flow during the execution, poses grave risk to all involved. *See* Ex. C at 52–64 (J. Goldenson Declaration); R. Woodman Suppl. Decl. ¶ 8, Ex. 5 (attaching declaration of BOP Regional Counsel disclosing that individual involved in execution preparation tested positive for COVID-19). The essential point here bears repeating—Mr. Purkey has presented extensive evidence of his current incompetency to be executed and he has the right to have the merits of his long-pending claim heard *somewhere* before he is executed.

A stay order is unquestionably warranted given that *no* judicial review of Mr. Purkey's timely-presented *Ford* claim has occurred despite Mr. Purkey's diligence and his requisite showing of incompetence. Mr. Purkey has far exceeded the standard for a stay of execution under *both* (1) *Lonchar v. Thomas*, 517 U.S. 314, 320 (1996) and (2) *Hill v. McDonough*, 547 U.S. 573, 584 (2006) and *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004). The Court must stay Mr. Purkey's execution under *Lonchar* because his *Ford* claim is a first habeas claim and the Court cannot dismiss his claim on the merits before his scheduled execution given his extensive presentation of facts and evidence demonstrating his current incompetency to be executed (and lack of any subsequent process). Further, Mr. Purkey is entitled to a stay because he not only is likely to succeed on the merits but will otherwise suffer *the most* irreparable of harms—death—and he has shown only diligence in pursuing his claims. Any delay has been caused by Respondents, who waited years to set an execution date and then refused to comply with requests for information and urged the D.C. District Court to dismiss Mr. Purkey's complaint at every turn.

The Court should stay Mr. Purkey's execution to ensure Mr. Purkey ultimately receives constitutionally required process and a fair hearing to determine his competency to be executed, whether in this Court under habeas or in the *Purkey* DC *Ford* matter.[3]

## BACKGROUND

### I.   PROCEDURAL POSTURE

On November 26, 2019, Mr. Purkey filed a civil complaint in the D.C. District Court, including extensive factual allegations and evidentiary support, challenging the constitutionality of his execution during his period of incompetency pursuant to *Ford*. *See* Ex. A. Mr. Purkey's *Ford* civil complaint did not challenge his conviction or sentence but, rather, his current competency to be executed and the failure of Respondents to effectuate *any* process under *Ford*. Mr. Purkey first brought his *Ford* complaint after the issuance of a warrant scheduling his execution for December 13, 2019 (and not before) because a competency to be executed claim is not ripe until the execution is imminent. *See Panetti v. Quarterman*, 551 U.S. 930 (2007) (citing *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644–45 (1998)).

The original warrant was stayed for other reasons. *See* Memorandum Opinion, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145-TSC (D.D.C. Nov. 20, 2019), ECF No. 50. Thereafter, Respondents repeatedly urged the D.C. District Court to dismiss the *Ford* case because, since there was no live warrant, the claim was no longer ripe. *See, e.g.*, Defendants' Opposition to Plaintiff's Motion for Preliminary Inj., *Purkey* DC *Ford* Matter (D.D.C. Dec. 11, 2019), ECF No. 10. Mr. Purkey did not withdraw his *Ford* claim, however, but instead diligently continued to pursue it to ensure that orderly disposition of that claim could

---

[3] Courts can consider both actions at the same time. *See Stanley v. Davis*, No. C-07-4727 EMC, 2015 WL 435077, at *4 (N.D. Cal. Feb. 2, 2015) (noting in habeas case that § 1983 may be a proper vehicle for prisoner's *Ford* claim seeking declaratory relief because "it is difficult to discern a meaningful difference between a *Ford* challenge and a methods challenge"); *Stanley v. Martel*, No.3:14-cv-4108-EMC (Complaint for Declaratory Relief for *Ford* violations still pending in same court).

occur, given the Respondents' implication that they intended to proceed full speed ahead with an execution as soon as possible.

The D.C. Court, however, ordered briefing *sua sponte* related to the court's jurisdiction over a civil rights *Ford* claim brought outside habeas, which the parties completed on January 28, 2020. *Purkey* DC *Ford* Matter, ECF Nos. 14–17. Respondents then filed a Motion to Dismiss or, in the alternative, to Transfer (to this Court), which was fully briefed. *Id.*, ECF Nos. 18–21.[4] On June 15, 2020, the next business day after an injunction in a separate case was vacated,[5] Attorney General Barr issued a new warrant scheduling Mr. Purkey's execution date for July 15, 2020. *See id.*, ECF No. 22. The warrant issued with only 30-days' notice despite Mr. Purkey's unresolved and substantiated *Ford* claim, a lack of promulgated federal *Ford* procedures in any form (draft or otherwise), a global pandemic that caused USP Terre Haute to prohibit visitations, and documented COVID-19 cases in the prison, including at least one COVID-19-related death.[6]

At the time the new warrant was issued, the prison itself remained on lockdown, and neither the Attorney General nor the BOP had promulgated any procedures to ensure critical visitors could consult with Mr. Purkey safely without unnecessary risk of exposure to a deadly virus that is known to be present inside the prison. All visits, which were critical to assess Mr. Purkey's rapidly deteriorating mental state, had been cancelled by prison staff. Ex. C at 119–25

---

[4] Counsel in the *Ford* litigation has repeatedly asked Respondents when an execution date would be set and were informed that it was entirely Attorney General Barr's decision. *See* Ex. C at 163 ¶¶ 29, 31 (R. Woodman Decl.).

[5] Mr. Purkey is a plaintiff in a related case in the D.C. District Court that challenges the constitutionality of the government's proposed lethal injection protocol. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 1:19-mc-00145-TSC (D.D.C. Aug. 20. 2019). On July 13, 2020, the Court in that case issued a preliminary injunction temporarily enjoining Mr. Purkey's and three other prisoners' executions. *See* Memorandum and Opinion, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 1:19-mc-00145-TSC (D.D.C. July 13, 2020), ECF No. 135. The D.C. Circuit upheld the injunction on July 13, 2020. Order, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.C. Cir. July 13, 2020). On July 14, 2020, the Supreme Court vacated the "preliminary injunction so that the plaintiffs' executions may proceed as planned." *See Barr v. Lee.*, 591 U.S. __ (2020) (per curiam).

[6] The COVID-19 outbreak also means that Mr. Purkey has had no in-person access to his spiritual advisor, Seigen Hartkemeyer, who is especially vulnerable to contracting COVID-19. *See* Complaint for Declaratory and Injunctive Relief, *Hartkemeyer v. Barr*, No. 2:20-cv-00336-JMS-MJD (S.D. Ind. July 2, 2020).

(E. Vartkessian Decl.); *id.* at 152, 164–65 (R. Woodman Decl.). Over the course of the past three weeks, since the issuance of the warrant, the BOP and its lawyers have indicated that the prison will allow such visits for inmates with scheduled execution dates and that some *ad hoc* minimal safety measures would be followed. *See id.* at 164–66 (R. Woodman Decl.); Ex. H at 30–34 (R. Woodman Suppl. Decl.). The prison has still provided *no* formal, written, or even credible or tangible means of ensuring visits and evaluations will be managed in a way that would meaningfully protect Mr. Purkey or his legal and medical expert visitors from the serious health and safety risks posed by travel and in-person contact at USP Terre Haute during the pandemic. Ex. H at 32 (R. Woodman Suppl. Decl.)

In the nearly nine months since he filed his *Ford* complaint, Mr. Purkey's competency has continued to decline and Mr. Purkey's counsel has continued to seek information from Respondents that is directly relevant to his current incompetency. *See* Ex. C at 152 (R. Woodman Decl.). The records in Respondents' sole possession include Mr. Purkey's updated BOP medical and mental health records, disciplinary records, and administrative records. *Id.* Access to Mr. Purkey himself is necessary for medical experts to conduct in-person assessments of his declining mental competency as well as the ability to conduct neurological testing. Ex. B (Dr. Agharkar Report); Ex. C at 51 (Dr. DeRight June 14, 2020 Letter); *id.* at 74–82 (T. Hyde Report). Respondents have repeatedly refused to provide any of this information, despite numerous requests beginning in August 2019. Ex. C at 152 (R. Woodman Decl.); Ex. H at 20–28 (Chart of Discovery Requests). On July 4, 2020, BOP Legal Counsel—after months of ignoring Mr. Purkey's requests and only eleven days before his scheduled execution—indicated that the critical medical and psychological records were provided to the AUSAs in the *Ford* litigation and would be provided "through the discovery process." R. Woodman Suppl. Decl. ¶ 5. But the referenced records do not include all requested information, such as video

records and administrative file and disciplinary records, and remain unproduced to this day—the day of Mr. Purkey's execution. Respondents finally arranged for necessary testing that was first requested in October 2019, scheduling it one week before the scheduled execution, but only some of the data was then sent to Mr. Purkey's experts and only after a week's delay. R. Woodman Suppl. Decl. ¶ 7.

Due to the imminence of the newly issued execution warrant and Defendants' continued delay and refusal to provide relevant materials, Mr. Purkey moved the D.C. District Court in the *Purkey* D.C. *Ford* matter for an injunction of the scheduled execution in order to ensure he receives (a) a fair hearing on the issue of his competency to be executed; (b) a determination of his competency *vel non* to be executed; and (c) the completion of expedited discovery in advance of a *Ford* hearing to which he is entitled based on his substantial threshold showing of incompetency. *See generally* Ex. C (Memorandum in Support of Motion for Renewed Preliminary Injunction). Mr. Purkey also moved the D.C. District Court for expedited discovery. *See* Ex. F. Both motions were fully briefed. *See* Exs. C-H.

Because Mr. Purkey's execution was only one day away, on July 14, 2020, Mr. Purkey filed a protective Motion to Preserve This Court's Jurisdiction and to Stay Execution of Wesley Purkey Pending Final Disposition on the Merits in the *Bivens* case, on the basis that the *Bivens* case is related to the pending *Purkey* DC *Ford* matter and to preserve this Court's jurisdiction over Mr. Purkey's competency claim should that matter be dismissed or transferred. *See Bivens* case (S.D. In. July 14, 2020), ECF No. 80. Shortly thereafter, also on July 14, 2020, this Court denied that motion solely on the basis that Mr. Purkey did not have a *Ford* claim in a § 2241 petition filed in this Court. *Bivens* case, (S.D. In. July 14, 2020), ECF No. 83.

On July 15, 2020, at 5:09 a.m., the D.C. District Court issued its ruling, enjoining Mr. Purkey's execution, scheduled for today. The D.C. District Court correctly held that Mr. Purkey

was likely to prevail on his claims. The court found that, because Mr. Purkey's claim is of constitutional dimension and falls outside the core of habeas, jurisdiction is appropriate under 28 U.S.C. § 1331. Order at 9, *Purkey* DC *Ford* Matter, ECF No. 36. Even if the claims were core habeas, the court found that it would still have jurisdiction because "the question of personal jurisdiction or venue" was not raised by the Government in their motion to dismiss and was therefore waived. *Id*. The court also correctly found that "Plaintiff has made the substantial threshold showing required by *Ford*, and in doing so, has demonstrated a likelihood of success on his claim for a competency hearing." *Id.* at 11. The same day, July 15, 2020, the Government filed motions to stay the preliminary injunction pending appeal in the D.C. District Court, the D.C. Circuit, and the Supreme Court of the United States, which Mr. Purkey opposed. *See Purkey* DC *Ford* Matter, ECF No. 39; *Purkey v. Barr*, No. 20-5207 (D.D.C. July 15, 2020); *Barr v. Purkey*, No. 20A-9 (July 15, 2020). Although the D.C. District Court denied the motion to stay before it (*Purkey* DC *Ford* Matter Minute Order, July 15, 2020), the injunction was vacated on review. The Government continues to seek to execute Mr. Purkey *today*.

As this Court has already directed, *see* Order, *Purkey v. Barr*, No. 2:19-cv-00517-JMS-DLP (S.D. Ind. July 14, 2020), ECF No. 83, Mr. Purkey now files the instant motion in connection with his § 2241 petition, filed herewith and presented in this Court on the basis of his *Ford* claim, as described herein.

## II.     MR. PURKEY'S INCOMPETENCY

Mr. Purkey's thought processes are not rational but the stuff of a "bizarre conspiracy," as explained by Respondents. Resp. to Mot. to Stay at 2, ECF No. 77. Mr. Purkey is not competent to be executed because he is unable to rationally understand the reason for his execution. Mr. Purkey's mental condition, described by the lawyers and investigators on his defense team, as well

as by experts who have evaluated him over decades, reveals cognitive deterioration, paranoia, and delusion. *See, e.g.*, Ex. B at 10 (explaining Mr. Purkey's longstanding belief that the prison and guards are poisoning him in retaliation for his legal work); Complaint, Exhibit 13 at 561, *Purkey DC Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-8 (May 15, 1981, psychiatric evaluation reporting auditory hallucinations as Mr. Purkey held two conversations at the same time, "whisper[ing] in an entirely different conversation from what he was talking aloud."); *Id.* at 345, ECF No. 1-6 (May 1998 emergency room record noting Mr. Purkey was admitted because he "started to act paranoid," stating that "they" were watching him at all times and sprayed him with "poisonous mist several times" while he was sleeping"); Complaint, Exhibit 5 at 40, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1 ("Early in my involvement [as Wes's mitigation specialist], Wes began exhibiting delusional thinking"); Complaint, Exhibit 7 at 74, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1 ("Wes was constantly paranoid that various prison officials were trying to harm him in retaliation for his 'jailhouse lawyering,'" and his "paranoia also increased over time."); Ex. C at 110–17, 119–35 (E. Vartkessian Decls.); *id.* at 152 (R. Woodman Decl.).

Mr. Purkey's cognitive decline, including memory loss, delusions, and confusion, is evident from neuropsychological testing administered in 2003 and 2016, from expert evaluations in 2016 and 2019, and continues to be observed up to his most recent visitations. Ex. C at 77–79 (T. Hyde Report). The 2003 testing revealed moderate microsomia on the Smell Identification Test (SIT)—an early marker of dementia, including Alzheimer's Disease. Complaint, Exhibit 3 at 12, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1. Additionally, a brain scan from 2003 "indicated abnormalities in the area of the brain involved in memory and typically implicated in Alzheimer's disease." *Id.* at 20. Thirteen years later, in 2016, neuropsychological testing revealed that Mr. Purkey was suffering from frontal lobe deficits and progressive

dementia consistent with Alzheimer's disease. Complaint, Exhibit 9 at 88, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1. The testing revealed that Mr. Purkey had experienced significant declines in both memory and executive functioning since previous testing in 2003. *Id.* A follow-up report in 2018 revealed that Mr. Purkey's condition had continued to deteriorate since 2016, and the report recommended a further neurology work-up, including brain imaging, and a reassessment of his neurological status. Complaint, Exhibit 15 at 120, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-18.

Dr. Jonathan DeRight, a neuropsychologist, administered additional testing in August of 2019. Based on this evaluation, Dr. DeRight diagnosed Mr. Purkey with Alzheimer's disease, a progressive neurodegenerative disease that impacts memory, intellectual function, and behavior. Complaint, Exhibit 3 at 28, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1; Complaint, Exhibit 6 at 89, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1 (testing, medical and family history "strongly suggest" in 2016 that "Mr. Purkey is currently suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia"); Complaint, Exhibit 12 at 120, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-2 (describing the reports of cognitive, physical and psychiatric decline and finding that this "reported pattern of change is very much consistent with progression of a cortical dementia"); Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of Psychology at 71 (4th ed., vol. 1 2010) (describing Alzheimer's Disease). Dr. DeRight opined that collateral information about Mr. Purkey's decline was also highly consistent with Alzheimer's disease. Mr. Purkey's worsening cognitive symptoms, including paraphasic word efforts, word loss, impaired recall of information he knew before, and incontinence, are indicative of the progression of Alzheimer's disease. *See* Complaint, Exhibit 3 at 27.

Dr. Thomas Hyde, a neurologist, similarly concluded that there is "substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder," based on a close review of Mr. Purkey's extensive records that are available, including medical records, family birth and death records, and expert reports. Ex. C at 76. While unable to make a definitive diagnosis without the benefit of an in-person visit (which has been impossible due to the COVID-19 pandemic) or a review of recent medical records or current diagnostic testing (which have been obstructed by Respondents), Dr. Hyde nevertheless concludes that Mr. Purkey's "intellectual deficits, paranoia, and delusional beliefs, and the course of his progressive deterioration are consistent with the diagnosis of dementia." *Id.* at 81.

Furthermore, Mr. Purkey's mitigation specialist, Dr. Elizabeth Vartkessian, PhD, who has had constant contact with Mr. Purkey for the last five years, has witnessed Mr. Purkey's recent, continual, and rapidly declining cognitive abilities both in-person before the USP Terre Haute lockdown and even by telephone since the lockdown began, despite the severe limitations of telephonic consultations. *See generally* Ex. C at 110–35. In Dr. Vartkessian's most recent visits with Mr. Purkey—the last one being in early March 2020—he struggled to remember words for simple items and could not recall names that he knew well (including fellow inmates, his own grandson, and his long-time defense attorneys). *Id.* at 111–14.

Very recent testing done on Mr. Purkey further confirms his mental deterioration. On July 14, 2020, when Dr. Hyde was finally provided testing results for an MRI performed on Mr. Purkey on July 8, 2020, he was able to conclude that the MRI "reveals significant structural abnormalities in the brain that are consistent with cognitive impairment such as vascular dementia or other conditions." Declaration of Dr. Thomas M. Hyde, M.D., PhD. ¶ 9 (July 15, 2020). These

relevant records and Dr. Hyde's review of the same conclusively establish the substantial showing that has been made regarding Mr. Purkey's incompetency to be executed.

Finally, Dr. Bhushan Agharkar, a neuropsychiatrist, concluded to a reasonable degree of medical certainty that Mr. Purkey "lacked a rational understanding of the basis for his execution." Ex. B at 13. While Mr. Purkey could recite the Government's position that his execution is for the murder of Jennifer Long, this was merely "parroting," meaning he can repeat what others say but cannot rationally understand what it means. Mr. Purkey holds "a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government." *Id*. This is not a standalone belief but rather serves as a foundation for an entire delusional system involving conspiracies of retaliation, making it impossible for Mr. Purkey to have "a rational understanding of the purpose of his execution." *Id*. at 12, 13 ("The lack of rationality from Mr. Purkey's delusional thoughts and paranoia are compounded by the deterioration of his brain from his dementia."); Complaint, Exhibit 3 at 20, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1 (noting that Alzheimer's disease "can lead to more marked problems with confusion, delusions, paranoia, problems with communication, and recall for personal details"); Ex. C at 77 ¶ 14 ("Mr. Purkey has demonstrated a progressive decline in his cognitive abilities over the past 4–5 years, characterized by memory deficits, problems with speech and language, impairments in reasoning and judgment, paranoia, and delusional beliefs . . . consistent with the diagnosis of dementia.").

Mr. Purkey holds an honest and deeply entrenched belief that the federal Government plans to execute him not as punishment for the murder of Jennifer Long, but because of his "protracted jailhouse lawyering." Complaint, Exhibit 15 at 994, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-18. In Mr. Purkey's mind, the voluminous grievances and lawsuits he has filed throughout his incarceration "have had a monumental impact in preventing correctional

officers from depriving prisoners of their constitutional rights." Complaint, Exhibit 5 at 41, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1. Mr. Purkey's ongoing paranoia and inability to connect cause and effect is demonstrated through his strong belief that Attorney General Barr and the BOP are plotting to kill him in retaliation for his litigation and to prevent him from future filings. *See, e.g.*, Ex. B at 12 (finding that Mr. Purkey insists the Government is "eager[] to be rid of him and his successful litigation"). Moreover, Mr. Purkey perceives his own counsel "as part of the conspiracy against him and his efforts to litigate against the prison"—a belief that prevents him from cooperating with them on matters related to his execution. Complaint, Exhibit 5 at 54, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1.

### III.     THE GOVERNMENT'S CONTINUED REFUSAL TO PROVIDE MR. PURKEY INFORMATION RELEVANT TO HIS COMPETENCY

The evidence of Mr. Purkey's incompetency has been collected and presented by Mr. Purkey despite Respondents' numerous impediments to the full and fair litigation of his *Ford* claim. Since August 2019, however, counsel for Mr. Purkey has made repeated efforts to obtain information from the BOP to further evaluate Mr. Purkey's competency. *See* Ex. C at 150–68 (R. Woodman Decl.); *see* Ex. H at 20–28 (Chart of Discovery Requests); R. Woodman Suppl. Decl. ¶ 28. Respondents have ignored or stonewalled these efforts, refusing to provide the requested information, moving the goalposts on access to expert testing, and withholding highly probative contemporaneous information about Mr. Purkey's mental and physical health. Mr. Purkey's counsel has still not received this requested information on the day Respondents plan to execute Mr. Purkey. *See* R. Woodman Suppl. Decl. ¶¶ 5–7. Respondents' months-long failure to provide this relevant information has now been exacerbated by the COVID-19 pandemic. Mr. Purkey's counsel and medical experts have been unable to visit Mr. Purkey for months. *See* Ex. C at 110–17 (E. Vartkessian Suppl. Decl.); *id.* at152, 157–58, 164–66 (R.

Woodman Decl.); Ex. H at 29–35 (R. Woodman Suppl. Decl.). These in-person visits by individuals who have long known Mr. Purkey and have witnessed his mental decline over the years are critical to understanding the trajectory of his progressive dementia and his present mental state. *See* Ex. C. at 51 (Letter from Jonathan DeRight, PhD, ABPP-CN, Woodbridge Psychological Associate, PC, to Rebecca E. Woodman, Esq., Attorney at Law, L.C. (June 14, 2020)); Ex. C at 75,–81 ¶¶ 11–12, 14 (Dr. Hyde expert report, noting observations over time by mitigation specialists Fox & Vartkessian); Ex. C at 119–25 ¶¶ 4, 11, 22–25 (E. Vartkessian's description of the kind of information only available through in person, face-to-face visits).

For almost ten months, Mr. Purkey's counsel has continually requested Mr. Purkey's updated BOP medical, administrative, and mental health records, the surveillance video from Mr. Purkey's cell, and the BOP death watch protocol—all of which are relevant to Mr. Purkey's current mental state and functioning. *See* Ex. H at 20–28 (Chart of Discovery Requests). The BOP first told Mr. Purkey's counsel that the information could only be obtained indirectly, such as through the Freedom of Information Act ("FOIA") process (even though the request was for Mr. Purkey's own records and made by Mr. Purkey's attorney of record). Ex. C at 152–55, 179 (R. Woodman Decl.). On October 9, 2019, Mr. Purkey's counsel submitted expedited FOIA requests for the information to the BOP when his execution was scheduled for December 13, 2019. Ex. C at 154, 183–96 (R. Woodman Decl.); Complaint, Exhibit 17 at 1456, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No 1-20. Counsel also sent a copy of this request to BOP Legal Counsel (from whom Mr. Purkey's counsel had also unsuccessfully requested the cell video footage on September 17, 2019). Ex. C at 154, 195–96 (R. Woodman Decl.). Expedited FOIA processing was granted but the BOP indicated that processing may nonetheless take up to six months. Complaint, Exhibit 16 at 1454–55, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-19; Ex. C at 155, 197–99 (R. Woodman Decl.). Counsel for Mr. Purkey

wrote again to BOP Legal Counsel on October 11, 2019 noting that the response time was "untenable" given Mr. Purkey's pending execution date only two months away. Ex. C at 155, 200–02 (R. Woodman Decl.). BOP Legal Counsel responded on October 16, 2019 that she would follow up to see about a more expedited time frame. *Id.* at 155 ¶ 13.

The records were not produced and counsel for Mr. Purkey again asked for the records on November 11, 2019. *Id.* at 155, 206–07 (R. Woodman Decl.). This time, counsel asked that BOP provide the records within ten days, given Mr. Purkey's then-pending execution date. *Id.* BOP Legal Counsel acknowledged that "everyone involved is cognizant that time is of the essence," and agreed to forward the communication to FOIA personnel. *Id.* No records were produced. *Id.*

Even after Mr. Purkey's initial execution warrant expired, Mr. Purkey's counsel continued to pursue these critical records and the BOP continued to refuse to provide them. On February 3, 2020, Mr. Purkey's counsel submitted updated and renewed FOIA requests seeking: (1) BOP policies and procedures pertaining to BOP surveillance of Mr. Purkey as well as copies of video surveillance tapes of his cell, and (2) Mr. Purkey's medical, mental health, and administrative BOP file (including disciplinary records). *See id.* at 161, 301–12 (R. Woodman Decl.). A supervisory attorney at the BOP acknowledged receipt of the requests and confirmed they would be forwarded to the FOIA processor who would reach out if they needed any more information to fulfill them. *See id.* at 161, 323–25 (R. Woodman Decl.). Mr. Purkey's counsel has received no requests for further information to facilitate the FOIA request and no records have been produced. R. Woodman Suppl. Decl. ¶ 7.

Respondents have, however, disputed that Mr. Purkey renewed his FOIA requests at all, and then, remarkably, represented that the BOP did not have any record of the updated or renewed FOIA request. *See* Ex. C at 161–63, 330–33 (R. Woodman Decl.). Mr. Purkey's

counsel again pressed the complete failure to provide Mr. Purkey's records or grant access for testing in the *Purkey* DC *Ford* Matter pleadings. Purkey's Opp'n to MTD (D.D.C. Mar. 16, 2020), ECF No. 20.[7] On June 15, 2020, shortly before receiving notice of the new warrant, and on June 25, 2020, Mr. Purkey's counsel *again* followed up with BOP Legal Counsel about the 2020 FOIA requests. *See* Ex. C at 163–64 ¶ 32, 336–81 (R. Woodman Decl.); Ex. H at 30–31, 33–34 (R. Woodman Suppl. Decl.). On June 26, 2020, BOP Legal Counsel claimed that she was "unaware of any outstanding requests for medical and psychological records" and that "the two quickest ways" to obtain "medical and psych" files were to ask Mr. Purkey to request them or "through the discovery process." Ex. H at 34, 47–48 (R. Woodman Suppl. Decl.). As recently as June 29, 2020, Defendants in the *Purkey* DC *Ford* Matter refused to provide the relevant records to Mr. Purkey and failed to address why, after eight months, Mr. Purkey has not received the materials through the "expedited" FOIA process. *See* Ex. G at 2–12; *see also* Defendants' Opposition to Plaintiff's Motion for Renewed Preliminary Inj., *Purkey* DC *Ford* Matter (D.D.C. June 26, 2020), ECF No. 26, attached hereto as Ex. D at 29–32. On July 4, 2020, a federal holiday, BOP Legal Counsel inexplicably changed position, responding that "I have provided Mr. Purkey's entire medical and psychological files to the AUSAs involved in his case (copied here). They have agreed to produce the same to you under the rules for discovery." R. Woodman Suppl. Decl. ¶¶ 5,7. These records have not been produced and there is now insufficient time before the scheduled execution to meaningfully review the documents. *See id.*

---

[7] Counsel specifically argued that Respondents should grant access to the necessary materials because waiting for a short warrant period would impose an "'unrealistic time-frame' to allow counsel to obtain the information it needs to prepare for a competency hearing, this court to conduct it, and an appellate court to review it." Memorandum in Support of Plaintiff's Opposition to Defendants Motion to Dismiss, *Purkey* DC *Ford* Matter (D.D.C. Mar. 16, 2020), ECF No. 20.

The reports from Dr. DeRight and Dr. Agharkar and declaration from Dr. Hyde illustrate that important questions of fact regarding Mr. Purkey's competency cannot be fully assessed without the withheld BOP records. For example, Mr. Purkey's legal team reports that Mr. Purkey appears to be incontinent. Complaint, Exhibit 3 at 25, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1. This is an important marker of Alzheimer's Disease. *Id.* at 28. The medical records may shed light on when Mr. Purkey's incontinence began and the extent of his loss of this biological function. Dr. Agharkar noted that Mr. Purkey has less movement on the right side of his face, as if he had suffered a stroke. Ex. B at 11. Without the medical records, counsel lacks information about whether Mr. Purkey has had a stroke that could indicate further cause for his cognitive decline. These questions are merely illustrative, not exhaustive, of the information withheld. The need for the withheld medical records is especially pressing because neither Mr. Purkey's counsel nor his expert witnesses have been able to visit Mr. Purkey in-person since March 2020. Continuous observation is imperative to identify the declining functions and cognitive awareness that are hallmarks of persons with dementia. This is one reason the surveillance footage from Mr. Purkey's cell is so critical in addition to his medical and administrative records. Range video surveillance, which shows Mr. Purkey in his typical prison setting, will provide for observation of Mr. Purkey's condition in a way that the somewhat artificial setting of a visitation cannot.

Respondents have also prevented Mr. Purkey's access to highly probative testing ordered by his experts. On September 26, 2019, Dr. Agharkar ordered brain image testing based on Mr. Purkey's history of cognitive deficits and the need to rule out an intracranial process. *See* Ex. C at 155–56, 208–11. After months of refusals and claiming a lack of ability or authority to allow the testing, the BOP finally performed the tests on July 8 and July 10. *See* R. Woodman Suppl. Decl. ¶¶ 6–7. But, despite being informed by BOP that the requested scans

and imaging were conducted on or after July 8, 2020 and that one of Mr. Purkey's experts would receive those scans and imaging from BOP by July 11, 2020, the expert did not receive them until July 14, 2020, i.e., the day before the Mr. Purkey's scheduled execution. He has yet to receive the EEG results. Even though the testing was paid for and requested by Plaintiff's counsel and their experts, the results were initially delivered only to the Government last week.

On the day of Mr. Purkey's scheduled execution, Mr. Purkey's counsel learned that, since the testing occurred last week, the Government appears to have had in their possession scientific confirmation of Mr. Purkey's mental impairments. Upon reviewing a written report prepared regarding an MRI performed on Mr. Purkey on July 8, 2020, Dr. Hyde concluded that the MRI "reveals significant structural abnormalities in the brain that are consistent with cognitive impairment such as vascular dementia or other conditions." Hyde Decl. ¶ 9 (July 15, 2020). Dr. Hyde's conclusions derive from a report that was long overdue and that the BOP itself transmitted, albeit untimely.

On June 15, 2020, Mr. Purkey's counsel had requested that Dr. DeRight be allowed to visit and evaluate Mr. Purkey in person. *See* Ex. C at 163–64, 336–38. Dr. DeRight had last conducted an in-person examination of Mr. Purkey in August of 2019. *See* Ex. C at 51. Standard best medical practices require repeated neuropsychological examinations, including up-to-date neuroimaging and blood laboratory tests, to assess Mr. Purkey's current abilities and the progression of his dementia. *Id.* Dr. Hyde also made clear that additional examination and testing is necessary but has been unable to safely examine Mr. Purkey in person due to the prison closure and the pandemic. *See id.* at 74 ¶ 8 (stating that "a complete neurological assessment includes a face-to-face interview and physical neurological examination of Mr. Purkey, and follow-up with relevant diagnostic testing," to include an MRI, EEG, a variety of blood tests, spinal tap, and PET scans).

Respondents have also interfered with counsel's access to Mr. Purkey during this critical period before and during the current pandemic and prison closure. *See id.* at 157–58 (R. Woodman Decl.). As a result of BOP's actions, the COVID-19 pandemic, the USP Terre Haute COVID-19 outbreak, and the BOP's lack of adequate preparation or procedures to facilitate safe visitations, let alone executions, during this extreme medical emergency, Mr. Purkey has been deprived of in-person meetings with legal counsel in addition to medical experts. *Id.* at 119 ¶ 3, 164.

COVID-19 Cases continue to rise in states across the country, including in the Midwest. *Id.* at 53 ¶ 8 (J. Goldenson Decl.). Prisons and other detention facilities pose heightened risks for COVID-19 exposure and transmission. *Id.* at 56 ¶ 17. The lack of adequate ventilation, inability of all prisoners and staff to practice social distancing, inadequate hand washing, and insufficient cleaning practices all contribute to the increased risk for the rapid spread of COVID-19 in prisons. *Id.* at 56–59.

In recognition of the threat of COVID-19, the BOP suspended all social and legal visits across the country.[8] All visitation at USP Terre Haute has been suspended since March 13, 2020. At the time of this filing, the BOP website still states that no visitors are allowed at USP Terre Haute and that all social and legal visits for all BOP facilities remain suspended. *Id.* at 61 ¶ 39. With scant testing, it is impossible to know the full scale of the infection. *Id.* ¶ 37. Mr. Purkey's counsel immediately contacted BOP Legal Counsel to discuss USP Terre Haute's visitation policy after receiving notice of Mr. Purkey's new execution warrant. *Id.* at 166, 363–64 (R. Woodman Decl.). BOP Legal Counsel expressed willingness for legal visits to resume for prisoners with scheduled executions but could not provide any official protocols regarding

---

[8] *BOP Implementing Modified Operations*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 12, 2020).

visitation or safety precautions. *See id.* at. 166, 365–66. Although BOP Legal Counsel stated that she would provide Mr. Purkey's counsel with a written policy the next day, June 17, 2020, Mr. Purkey's counsel has yet to receive any official documentation regarding safety protocols for legal or expert visits, despite multiple additional requests. *Id.* at 166, 367–69. This makes planning for any type of visit impossible, particularly since getting to the prison would require virtually every member of Mr. Purkey's defense team to travel hundreds of miles, some necessarily by plane, during a pandemic. *See id.* 166. There remains *no* coordinated or formalized plan to protect Mr. Purkey, his medical experts, and counsel, as well as prison staff, prisoners, and members of the community. The BOP has not explained how visitation is suddenly safe for the four inmates with execution warrants and their visitors, but still too dangerous for the over 1200 other prisoners at USP Terre Haute and their visitors. USP Terre Haute has reported cases of COVID-19 among its prisoner population, and, notably, it has recently been reported that a BOP staff member helping to coordinate the upcoming executions tested positive for COVID-19. R. Woodman Suppl. Decl. ¶ 8. The BOP's cursory and unplanned approach is entirely insufficient, particularly given the close quarters and limited ventilation and air flow within death row visitation rooms. Ex. C at 62 (J. Goldenson Decl.).

All three of Mr. Purkey's expert witnesses have made clear how vital it is for Mr. Purkey's legal team to have in-person visits, testing, imaging, and examinations to obtain an accurate assessment of the progression of his dementia. *See* Ex. B (Dr. Agharkar Report); Ex. C at 74–82 ¶¶ 8–9, 11–12, 15–17 (Dr. Hyde Report); Ex. C at 51 (DeRight June 14, 2020 Letter). By fast-tracking Mr. Purkey's execution, Respondents ignore the unfortunate realities of the COVID-19 pandemic, creating an impossible choice for Mr. Purkey's experts and counsel: in order to advocate for their client's constitutional rights and uphold the core values of the U.S. Constitution, they must risk their own lives and the lives of their family members or medically

vulnerable persons to whom they provide care. Mr. Purkey must face the prospect of dying without his legal and spiritual advisors, and without familial support by his side—either because they will not be permitted to visit him, or because they must risk their lives to do so. Even the family members of the *victim* of Mr. Purkey's crime must make this difficult decision, as it is their right to attend the execution.

Respondents' decision to schedule Mr. Purkey's execution with only one month's notice, after the months-long refusal to provide relevant materials and access to Mr. Purkey, and in the midst of a global pandemic that creates new difficulties and dangers associated with in-person visits, deprives him of his constitutional rights under the Fifth and Eighth Amendments and further illustrates the necessity and appropriateness of injunctive relief.

## ARGUMENT

**I.      THIS COURT MAY ENTER AN ORDER TO PRESERVE ITS JURISDICTION**

This Court has the authority to enter a stay to provide it adequate time to consider Mr. Purkey's petition if it is determined that this Court has sole jurisdiction over this claim. Given the pendency of the execution, this Court can enter a stay of limited duration in order to protect its jurisdiction. *See Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970). A federal court always possesses the jurisdiction to stay matters when it is necessary to maintain its jurisdiction over the entire matter. *See* All Writs Act, 28 U.S.C. § 1651(a) (1949).

The All Writs Act states in relevant part:

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

*Id.* The Act "is a residual source of authority to issue writs that are not otherwise covered by statute" when "extraordinary remedies" are needed. *Pennsylvania Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985). The Supreme Court has long recognized the

appropriateness of a stay of execution "to preserve the existing conditions and the subject of the petition," to enable the court "to take the time required for such consideration as it might need." *United States v. Shipp*, 203 U.S. 563, 573 (1906).

The Supreme Court has applied two standards for obtaining a stay of execution in capital cases:(1) the *Lonchar* standard and (2) the *Hill* and *Nelson* standard. Mr. Purkey easily meets both, and this Court should enjoin Mr. Purkey's execution until he is provided due process under *Ford*, including a competency hearing, and a decision on the merits.

## II.    MR. PURKEY IS ENTITLED TO A STAY PENDING A DECISION ON THE MERITS UNDER *LONCHAR V. THOMAS*

If habeas is deemed to be the sole vehicle for Mr. Purkey's *Ford* claims, this Court should unquestionably stay Mr. Purkey's execution pending a decision on the merits. A district court must stay an execution to prevent the case from becoming moot when: (1) the request is a "first federal habeas case," and (2) the court cannot dismiss the petition on the merits before the scheduled execution. *Lonchar*, 517 U.S. at 320. The rules and principles related to the Great Writ of Habeas Corpus "seek to maintain the courts' freedom to issue the writ, aptly described as the 'highest safeguard of liberty,' . . . while at the same time avoiding serious, improper delay, expense, complexity, and interference with a State's interest in the 'finality' of its own legal processes." *Lonchar*, 517 U.S. at 322–23.

### A.  Mr. Purkey's Federal *Ford* Claim is a "First Habeas" Claim

A *Ford* incompetency claim only becomes ripe when execution is imminent; therefore Mr. Purkey's *Ford* claim could not have been brought before his execution was scheduled. *See Panetti*, 551 U.S. at 947 ("The statutory bar on "second or successive" applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe."); *Stewart*, 523 U.S. at 643 (a *Ford* petition was not a "second or successive" application because although

it "may have been the second time that respondent had asked the federal courts to provide relief on his *Ford* claim, . . . this does not mean that there were two separate applications . . . ."); *see Amaya-Ruiz v. Stewart*, 136 F. Supp. 2d 1014, 1020–22 (D. Ariz. 2001) (a *Ford* petition is not "second or successive" petition even though the *Ford* claim was raised in the initial petition and dismissed without prejudice because it was not yet ripe).

Mr. Purkey raised his *Ford* claim upon issuance of his first execution warrant in 2019 and has been continually seeking review on the merits for the nearly nine months since. *See* Ex. A. It was in the midst of Mr. Purkey's diligence that Respondents issued a new execution warrant, scheduling his execution to occur within 30 days.

Mr. Purkey's *Ford* claims remain unresolved on the merits (or otherwise) and are newly ripe, and thus, remain "first habeas claims" pursuant to *Panetti* and *Martinez-Villareal.*

**B. The Court Cannot Dismiss Mr. Purkey's *Ford* Claim on the Merits Because He Has Exceeded the Threshold Showing of Incompetency and Is Entitled to Due Process**

Under *Lonchar*, a court must grant a request to stay an execution "in a first federal habeas case [and] the district court cannot dismiss the petition on the merits before the scheduled execution." *Lonchar*, 517 U.S. at 320; *see Nowakowski v. Maroney*, 386 U.S. 542, 543 (1967). "[A]pproving the execution of a defendant before his appeal is decided on the merits would clearly be improper." *Barefoot v. Estelle*, 463 U.S. 880, 889 (1983) (explaining that "there must be ample evidence that in disposing of the appeal, the merits have been addressed"), *superseded by statute*, 28 U.S.C. § 2253 (1996), *as recognized in Slack v. McDaniel*, 529 U.S. 473, 475 (2000); *House v. Bell*, 547 U.S. 518, 539 (2006) (citing *Lonchar*, 517 at 324) (the "[d]ismissal of a first federal habeas petition is a particularly serious matter"); *see also Stokes v. Stirling*, No. 1:16-mc-00073-RBH, 2016 U.S. Dist. LEXIS 33618, at *3–4 (D.S.C. Mar. 16, 2016) ("If the district court cannot dismiss the petition on the merits before the scheduled execution, it is

obligated to address the merits and must issue a stay to prevent the case from becoming moot.") (citation omitted); *Nika v. Baker*, No. 3:09-cv-00178-JCM-WGC, 2015 U.S. Dist. LEXIS 84121, at *3 (D. Nev. June 18, 2015) (same); *Bedford v. Bobby*, No. 1:11-cv-311, 2011 U.S. Dist. LEXIS 52228, at *5–7 (S.D. Ohio May 16, 2011) (same); *Cone v. Bell*, 956 F. Supp. 1401, 1405–06 (W.D. Tenn. 1997) (same); *Abdur'Rahman v. Bell*, 927 F. Supp. 262, 263–64 (M.D. Tenn. 1996) (same).

To dismiss Mr. Purkey's *Ford* claim on the merits, the Court would need to find that, despite the ample evidence of incompetency presented, Mr. Purkey has failed as a matter of law to state a claim entitling him to process under *Ford* and *Panetti*. Pursuant to *Panetti*, upon a sufficient threshold showing of incompetency, a petitioner is entitled to a stay of execution to afford him due process to demonstrate his incompetency to be executed, including the rights to present evidence to an impartial tribunal through a fair hearing. *Panetti*, 551 U.S. at 949 (Upon a prisoner's "'substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness . . . This protection means a prisoner must be accorded an 'opportunity to be heard') (citations omitted); *see also Amaya-Ruiz*, 136 F. Supp. 2d at 1028–30 (holding that petitioner was entitled to an evidentiary hearing and stay of execution to resolve petitioner's *Ford* claim). Here, Mr. Purkey has raised a timely *Ford* claim that he is not currently competent to be executed because he cannot rationally understand the reason for his execution and has submitted extensive evidence to demonstrate as much (far exceeding the "threshold showing" requirement). Further, he has not received any *Ford* competency process or other opportunity to be heard and his claims have never been decided on the merits. The Court therefore cannot dismiss Mr. Purkey's petition on the merits, and he is entitled to a stay of execution.

The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti,* 551 U.S. at 934; *Ford*, 477 U.S. at 409–10; *Madison*, 139 S. Ct. at 722. A condemned prisoner is incompetent when he cannot rationally understand his punishment or the reason for it or comprehend "why he has been singled out" to die. *Panetti*, 551 U.S. at 958–60; *Ford*, 477 U.S. at 409.

> The critical question is whether a '"prisoner's mental state is so distorted by a mental illness" that he lacks a "rational understanding" of 'the State's rationale for [his] execution." . . . Or similarly put, the issue is whether a "prisoner's concept of reality" is "so impair[ed]" that he cannot grasp the execution's "meaning and purpose" or the "link between [his] crime and its punishment."

*Madison*, 139 S. Ct. at 723 (quoting *Panetti*, 551 U.S. at 958–59).

Incompetency to be executed may be demonstrated with evidence of delusional disorders, dementia, or other cognitive disorders if the result is that the petitioner is prevented from rationally understanding the reasons for the punishment. *Madison*, 139 S. Ct. at 728. "[A] delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'— that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Id.* at 729 (citing *Panetti*, 551 U.S. at 958; *Ford*, 477 U.S. at 409). The Supreme Court has specifically recognized that dementia "can cause such disorientation and cognitive decline as to prevent a person from sustaining a rational understanding of why the State wants to execute him." *Id.* Importantly, the precise diagnosis is not the ultimate question when determining competency but, rather, the "consequence—to wit, the prisoner's inability to rationally understand his punishment." *Id.* at 728.

Under *Ford*, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Panetti*, 551 U.S. at 959. Thus, even if "the prisoner knows that the State has identified his crimes as the reason for his execution," if "delusions . . . so impair the prisoner's concept of reality that he cannot reach a rational

understanding of the reason for the execution[,]" then the prisoner nonetheless is incompetent to be executed. *Id.* at 958, 960.

Here, Mr. Purkey presents a strong factual basis regarding his current mental incompetency from numerous sources, including: a report of a neuropsychiatrist concluding that Mr. Purkey—by virtue of his dementia, cognitive impairments, and severe mental illness— "lack[s] a rational understanding of the basis for his execution," Ex. B at 12–14 (Dr. Agharkar Report); a report of a neuropsychologist diagnosing Mr. Purkey with Alzheimer's disease, *see* Complaint, Exhibit 3 at 27–28, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1 (Dr. DeRight Report); a declaration by a neurologist concluding that there is "substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder," Ex. C at 76-77 (Dr. Hyde report); and reports of the investigators on his case who have witnessed his recent, rapid, cognitive decline and deterioration, Ex. C at 79–80 (Dr. Hyde report noting observations of E. Vartkessian & J. Fox), 110–35 (E. Vartkessian Decls.).

As in *Panetti*, Mr. Purkey "can recite the fact that his execution is for the murder of Jennifer Long, [but] he lacks rational understanding of that fact." Ex. B at 13; *Panetti*, 551 U.S. at 938. "This," Dr. Agharkar explains, "is an example of parroting, rather than having a rational understanding." Ex. B at 13. Much like Scott Panetti, Mr. Purkey misunderstands the real reason for his execution, instead believing it is a "conspiracy of retaliation . . . for his legal work." *Id.* This "fixed belief" is "part of his long-standing delusions" (*id.*), which have persisted over decades, and are evidenced by numerous prior evaluations and institutional records as well as contemporaneous observations and opinions rendered by experts and defense team members. *See, e.g.*, Complaint, Exhibits 1, 3, 7, 12–15, *Purkey* DC *Ford* Matter (D.D.C. Nov. 26, 2019), ECF No. 1-1; Exs. B, C at 110–35, H at 29–35.

In *Panetti*, the evidence presented as to Panetti's lack of understanding of the reasons for his execution that established a "substantial threshold showing" included merely "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row." *Id.* at 932, 938. In *Madison*, the petitioner similarly presented two affidavits from the legal team and references to prior medical records. Petition for Suspension of Mr. Madison's Death Sentence Pursuant to Alabama Code § 15-16-23 Because He Is Incompetent to be Executed, *Madison v. State of Alabama*, No. CC-85-1385.80 (Ala. Cir. Ct. Feb. 12, 2016). The Court ruled that the evidence was sufficient to establish a prima facie case of incompetency. *Madison*, 139 S. Ct. 718. Like the petitioners in *Panetti* and *Madison*, Mr. Purkey has made a substantial threshold showing as to whether he possesses the "requisite comprehension" of his punishment. *Madison*, 139 S. Ct. at 722; *Panetti*, 551 U.S. at 960; *see also Eldridge v. Thaler*, No. H-05-1847, 2009 U.S. Dist. LEXIS 106991, at *11 (S.D. Tex. Nov. 17, 2009) (finding a substantial threshold showing of *Ford* insanity where the petitioner "submitted evidence from lay observers about his bizarre behavior and his delusional statements," including a belief his food is poisoned, evidence that his mental health has deteriorated in the last few years, and expert evidence corroborating those observations and opining on incompetence); *Wood v. Quarterman*, 572 F. Supp. 2d 814, 819 (W.D. Tex. 2008), *aff'd sub nom. Wood v. Stephens*, 619 F. App'x 304 (5th Cir. 2015) (petitioner was entitled to a *Ford* hearing based on his record of suicide attempts, prior mental health problems, paranoia, and delusional statements to counsel).

As such, Mr. Purkey is entitled to process under *Ford* and the Court cannot dismiss a petition on the merits before Mr. Purkey receives that process. *See Simon v. Epps*, 463 F. App'x 339, 349 (5th Cir. 2012) (finding that state court erred in denying *Ford* claim "by failing to apply fundamental due process principles to the first stage of Simon's competency evaluation," thereby

depriving him "of a meaningful opportunity to make a substantial threshold showing of incompetence"). Because Mr. Purkey has made the required threshold showing that he does not understand why he has been singled out for execution, the Constitution entitles him to "a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (citing *Ford*, 477 U.S. at 426, 424). Carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency violates the Due Process Clause of the Fifth Amendment. *See id.*

III.    **MR. PURKEY IS ENTITLED TO A STAY UNDER** *HILL V. MCDONOUGH* **AND** *NELSON V. CAMPBELL*

Mr. Purkey also meets the test for a stay of execution under *Hill v. McDonough* and *Nelson v. Campbell*. A stay of execution is warranted where there is a "presence of substantial grounds upon which relief might be granted." *See Barefoot*, 463 U.S. at 895. To decide whether a stay is warranted, the federal courts consider the petitioner's likelihood of success on the merits, the relative harm to the parties, and the extent, if any, to which the prisoner has delayed his claims. *See Hill*, 547 U.S. at 584; *Nelson*, 541 U.S. at 649–50. Each factor weighs heavily in favor of a stay in this matter.

**A. Mr. Purkey Demonstrates a High Likelihood of Success on His Claims**

Mr. Purkey is likely to succeed on the merits of both his underlying *Ford* incompetency claim and his claim that, at minimum, he is entitled to process under *Ford*. Under *Panetti*, upon a substantial threshold showing of incompetency—which Mr. Purkey has more than demonstrated—a petitioner is entitled to "the protection afforded by procedural due process," including the opportunity to present evidence on the ultimate issue of competency. *Panetti*, 551 U.S. at 948–49 ("'Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution

contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being.'") (quoting *Ford*, 477 U.S. at 411–12).

Mr. Purkey's extensive evidence of lay and expert observations of his significant mental and cognitive decline and current state of mental incompetency, as well as a wealth of corroboration of his deteriorating mental health and cognitive impairments, are more than sufficient to demonstrate a likelihood to succeed on the merits that he is entitled to process under *Ford*, that he is currently incompetent, and that his execution would violate the Eighth Amendment. *See Panetti*, 551 U.S. at 952; *Ford*, 447 U.S. at 399 (due process on the issue of competency to be executed was not satisfied where there was no meaningful opportunity to substantiate the claim before it was rejected, there was no opportunity to confront state's evidence, and there was no judicial factual determination of competency to be executed).

### B. Mr. Purkey Will Suffer Irreparable Harm Without a Stay

Unquestionably, Mr. Purkey will suffer "categorically irreparable injury—death" if the Court denies Mr. Purkey's motion for a stay. *See* Notice of Recent Decision, Exhibit A at 26, *Purkey v. Barr*, No. 1:19-cv-03570-TSC (D.D.C. July 3, 2020), ECF No. 31-1. "[I]rreparable harm [that] will result if stay is not granted . . . is *necessarily present* in capital cases." *Ford*, 473 U.S. at 935 n.1 (Powell, J., concurring) (emphasis added). Indeed, in *Battaglia v. Stephens*, where the petitioner presented "some evidence of mental illness and delusions," the Fifth Circuit granted a stay of execution to afford the petitioner the opportunity to develop his *Ford* claim with new counsel. 824 F.3d 470, 475 (5th Cir. 2016). Because the irreparable injury factor weighed so heavily in the petitioner's favor, it was enough that there was a possibility that his claim had some merit. *See id.* at 475–76.

Like others facing imminent execution, Mr. Purkey has alleged a harm that, if realized, cannot be corrected. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. The threatened harm is "beyond remediation," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016), because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation and internal quotation marks omitted). For Mr. Purkey, there is no later date. His claims are therefore "categorically irreparable." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A stay or injunction maintains the status quo, and is subject to future correction or even reversal, while the denial of a stay or injunction is not susceptible to correction. The proper course is to maintain the status quo, so that life is sustained, because the decision to allow Mr. Purkey to die is irreversible. Due process places a heightened burden of proof on the Government where the "individual interests at stake . . . are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (quoting *Addington v. Texas*, 441 U.S. 418, 423 (1979)). As Respondents intend to extinguish Mr. Purkey's life, such a heightened burden is necessarily present here.

Even where the government has a "strong interest in enforcing its criminal judgments," that interest is outweighed by the public's interest in a "humane and constitutional" application of the federal execution protocol. *Nooner v. Norris*, No. 5:06CV00110 SWW, 2006 U.S. Dist. LEXIS 96183, at *11 (E.D. Ark. June 26, 2006). "[T]he fact that the government has not— until now—sought to" schedule Mr. Purkey's execution "undermines any urgency surrounding" its need to carry out Mr. Purkey's sentence. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018). A stay will therefore "not substantially injure other interested parties," the public, or the Government. *Chaplaincy of Full Gospel Churches*, 454

F.3d at 297. Indeed, a stay in this matter to ensure an incompetent person is not executed by the U.S. government, in violation of the U.S. Constitution:

> [W]ill not substantially harm the government, which has waited at least seven years to move forward on Purkey's case. Finally, the public interest is surely served by treating this case with the same time for consideration and deliberation that we would give any case. Just because the death penalty is involved is no reason to take short-cuts—indeed, it is a reason not to do so.

Notice of Recent Decision, Exhibit A at 26–27, *Purkey v. Barr*, No. 1:19-cv-03570-TSC (D.D.C. July 3, 2020), ECF No. 31-1. Other courts have similarly found "little potential for injury" as a result of a delayed execution date. *See*, *e.g.*, *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004). Any potential harm to the Government caused by a delayed execution is outweighed by the obvious harm to Mr. Purkey and by the public's interest in a constitutional application of the execution protocol. And not delaying the execution undermines the rule of law as pronounced by *Ford* and *Panetti*—that we as a society do not execute the incompetent.

## C.  Mr. Purkey Has Not Delayed His *Ford* Claim in Any Way

It is also clear that Mr. Purkey has made the requisite showing that he did not delay bringing this claim. *See Nelson*, 541 U.S. at 649–50. This case falls into a category of cases where filing is not ripe until execution is imminent. *See Panetti*, 551 U.S. at 947 (citing *Stewart*, 523 U.S. at 644–45 (a competency to be executed claim is not ripe until it is time to execute the sentence)).[9] As discussed in Part II.A, supra, Mr. Purkey's *Ford* claim is a first habeas petition which he brought initially under his prior execution warrant. Indeed, Respondents have been adamant throughout Mr. Purkey's D.C. District Court litigation that not only is his *Ford* claim

---

[9] In holding that *Ford* claims are not ripe until the time of execution, the Supreme Court recognized that mental status is not static; "[a]ll prisoners are at risk of deteriorations in their mental state." *Panetti*, 551 at 943. Mr. Purkey is no exception. His mental status has declined over the years, including in the months and weeks leading up to his initial execution date, and has declined even more since. Ex. C at 111–16, 155–60. It is due to this decline, Mr. Purkey's current mental incompetency, and the imposition of the sentence, that the matter is now properly presented for adjudication.

not late, it was filed too early and only became ripe when an execution warrant was in effect and his execution imminent.[10] Mr. Purkey's execution warrant issued 30 days ago and he is now scheduled to be executed in today. He has diligently attempted to litigate his claim for nine months. Respondents must now concede that his claim is ripe and cannot seriously contend that he is in fact too late given their previous arguments.

Further, as noted above, the only delays in this matter have been caused by Respondents. Since August 2019, despite repeated requests and efforts by Mr. Purkey's counsel, Respondents have continuously refused to provide counsel his medical, mental health, and administrative records or to furnish (or possibly even preserve) video evidence depicting Mr. Purkey's dementia, all of which is integral to Mr. Purkey's claim. *See generally* Ex. C at 150–68.[11] Additionally, due to the COVID-19 pandemic, the BOP prohibited all visitations to USP Terre Haute beginning March 13, 2020, and even now is only allowing visitors for prisoners with execution dates. *See id.* at 111. USP Terre Haute is known to have cases of COVID-19 and at least one death within the prison, and to date, the BOP has released only cursory guidance regarding necessary safety protocol. *See id. at* 164–66 ¶¶ 33–38. Most recently, Respondents

---

[10] Respondents have argued consistently that Mr. Purkey's *Ford* claim was not ripe even though Respondents knew they intended to imminently issue an execution warrant. Defendant's Motion to Dismiss at 10, *Purkey* DC *Ford* Matter (D.D.C. Feb. 24, 2020), ECF No. 18; *see also* Reply in Support of Defendant's Motion to Dismiss at 12*, Purkey* DC *Ford* Matter (D.D.C. Mar. 30, 2020), ECF No. 21 (arguing that Purkey's *Ford* claim is not ripe until a new warrant of execution issues).

[11] Respondents have also failed to provide Mr. Purkey with any adequate mechanism to gather, assess, and present information relevant to his current competency in violation of his federal due process rights. Indeed, Respondents have failed to establish *any* federal process at all to allow for the adequate review of Mr. Purkey's *Ford* competency claim. There are no federal procedures or regulations to facilitate access to necessary information by federal prisoners for investigating and litigating *Ford* claims. *Cf. Ex parte Jordan*, 758 S.W.2d 250, 252–53 (Tex. Crim. App. 1988) (en banc) (highest Texas criminal court noting that Texas had an "alarming lack of any Texas statute specifying the procedures to be followed in raising and determining a defendant's execution competency," in contrast to the vast majority of states, and inviting the legislature to adopt standards); *Commonwealth v. Banks*, 943 A.2d 230, 234 n.7 (Pa. 2007) (there "is not currently in place a specific procedure for the timely handling of *Ford v. Wainwright* claims").

admitted that a member of the execution preparation team has tested positive for COVID-19, and that they are still in the process of tracing others with whom he may have come into contact. R. Woodman Suppl. Decl. ¶ 8. Any alleged concern about the victims rings hollow given Respondents' choice to recklessly execute Mr. Purkey on an expedited timeline, during a global pandemic, with minimal safety procedures in place, thus putting the victim's family in a position in which if they choose to attend the execution (as is their right), they risk their health and safety (and quite possibly their life). *See id.* at 164–66 ¶¶ 33–38.

By contrast, Mr. Purkey has acted diligently to protect his constitutional rights. He has diligently pled his claims and supported them with reports from expert and lay witnesses. He has doggedly requested records and information from Respondents and their agents, using every means available. Even under COVID-19 restrictions and bans on visitation, counsel have attempted to keep as much contact with their client as possible. But Mr. Purkey's current competency is squarely at issue in the instant matter, and the ability to present a full picture of his current mental state is undermined by the lack of access to him as well as his most up to date medical records and doctor-ordered brain imaging, both of which are exclusively in Respondents' possession and control, and which Respondents continue to refuse to provide to Mr. Purkey. *See* Exs. B, C at 150–68, 184–94.

### CONCLUSION

The Court should stay Mr. Purkey's execution pending (a) fair process on the issue of Mr. Purkey's competency to be executed, including a hearing and opportunity to obtain and examine relevant evidence in advance of such a hearing; and (b) a determination on the merits of Mr. Purkey's competency to be executed.

DATED: July 16, 2020

Respectfully Submitted,

/s/Rebecca E. Woodman
Rebecca E. Woodman (Court appointed)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

/s/Michelle M. Law
Michelle M. Law, MO Bar No. 45487
(Court appointed) (*pro hac vice*)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

Charles F.B. McAleer, Jr. (DC Bar
#388681) (*pro hac vice* motion to be filed)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

Brian Fleming (DC Bar #974889) (*pro hac
vice* motion to be filed)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

**Counsel for Petitioner**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 16th day of July, 2020, I caused Mr. Wesley Purkey's

Motion to Stay His Execution Pending Final Disposition on the Merits to be filed electronically

with the Clerk of the Court via CM/ECF, with all authorized parties being served electronically

via CM/ECF.

/s/Rebecca E. Woodman
Rebecca E. Woodman (Court appointed)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

**Counsel for Petitioner**