# Exhibit B

Complaint, Exhibit 1, Purkey DC Ford Matter
(D.D.C. Nov. 26, 2019), ECF No. 1-1



November 19, 2019

Michelle Law, Esq.
Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Re: Mr. Wesley Purkey
DOB: 1/6/52

Dear Ms. Law:

Enclosed is my report concerning Mr. Wesley Purkey. This report was produced pursuant to your request, in order to assess Mr. Purkey's competency to work with counsel and to understand the basis for his execution. The opinions expressed in my report represent my professional opinion to a reasonable degree of psychiatric certainty, based upon my clinical interviews with Mr. Purkey and a review of relevant records you provided.

**Summary of Qualifications**

I am a medical doctor, who is licensed to practice medicine in Georgia since 2002. I am a psychiatrist in private practice with Comprehensive Psychiatric Services of Atlanta. I treat a wide variety of conditions including ADHD, Depression, Bipolar Disorder, Anxiety, Schizophrenia, Post-traumatic Stress Disorder, Panic Disorder, and Substance-related illnesses.

I earned my Doctor of Medicine degree from the State University of New York Health Science Center at Syracuse, and completed my residency at Emory University School of Medicine Department of Psychiatry and Behavioral Sciences where I was Chief Resident. I also completed a Forensic Psychiatry Fellowship at Emory University School of Medicine. I hold dual board certification as a Diplomate of Adult Psychiatry (AP) and Forensic Psychiatry (FP) of the American Board of Psychiatry and Neurology (ABPN).

Ex_1-000001

Re:  Wesley Purkey
Competency to be Executed

In addition to my private practice, I am an Adjunct Assistant Professor of Psychiatry at Morehouse School of Medicine and a Clinical Assistant Professor with the Emory University School of Medicine.

I am a Distinguished Fellow of the American Psychiatric Association. I have served as a consultant to various school systems in the Atlanta area, Emory University Hospitals, Georgia Tech Athletic Department, Georgia Composite State Board of Medical Examiners, the Federal Bureau of Investigation (FBI), the United States Armed Forces, and the Department of Defense (DoD). My *curriculum vitae* is attached.

I have experience testifying in criminal and civil cases nationwide. I perform independent medical examinations and medical record reviews for psychiatric malpractice and disability cases. I am able to provide professional opinions on an array of legal questions, including criminal and civil competencies, criminal responsibility (insanity defense), personal injury, medical malpractice, and fitness for duty.

**Additional Sources of Information:**

I conducted a face-to-face clinical interview of Mr. Purkey on November 8, 2019, at USP-Terre Haute, for approximately 2 hours. I had previously conducted an in-person interview of Mr. Purkey on September 8, 2016, for approximately 3 hours. I have also reviewed voluminous documentary evidence in this case, attached as an index.

**Notification of rights:**

At the outset of the evaluation, I reminded Mr. Purkey of the nature of this evaluation. This included informing him that his competency to be executed would be evaluated, that the evaluation was not confidential, and that anything he told me I might be asked to testify about in court.

**Referral questions:**

I have been asked to evaluate Mr. Purkey in light of the standard for competency to be execution under *Ford v. Wainwright* and *Panetti v. Quarterman*, namely, whether Mr. Purkey has a rational understanding of the basis for his execution. I have also been asked to evaluate whether Mr. Purkey is competent to work with counsel.

**History of Presenting Problem:**

Mr. Purkey is a 67-year old white male currently under sentence of death at the USP Terre Haute. He was diagnosed in 2017 with progressive dementia and, since that time, his legal team reported a noticeable decline in memory, agitation, and his ability to work

Ex_1-000002

with counsel. The investigators on his defense team have reported instances where he is unable to remember important people, like his ex-wife, forgets important life events, and cannot remember or uses the wrong words. He repeats the same story in the same conversation, often using the exact same phrases. He describes, and is committed to, false memories – like a 13 to 14-hour deliberation period by his capital jury at the guilt phase, which in fact was only a 2 hour period. They report that this decline has accelerated in the last year and that he is visibly fatigued and frail in meetings, often persistently stuttering and slurring words. His hands shake and his balance is noticeably impaired. They describe that his thought processes are highly tangential and that he is fixated on retaliation by prison guards.

A review of the records indicated a number of longstanding significant psychiatric symptoms as well as a number of serious mental health diagnoses, including Schizophrenia Reaction, Schizo-Affective Type, Depression, Psychosis, and Bipolar Disorder. Mr. Purkey has also experienced a number of serious head injuries.

In 2016, Dr. Frederic Sautter diagnosed Mr. Purkey with lifelong complex-PTSD (Post-Traumatic Stress Disorder) as a result of severe trauma from his experiences of extreme physical, sexual, and emotional abuse throughout his childhood and adolescence, and Major Depressive Disorder secondary to his PTSD. I was retained by Mr. Purkey's counsel that same year to evaluate how Mr. Purkey's history of traumatic brain injury and substance abuse affect and interact with his complex-PTSD, and how this history, along with Mr. Purkey's bio-psycho-social history, affected his then-current functioning. I interviewed Mr. Purkey for these purposes at USP-Terre Haute on September 8, 2016, for three hours. I concluded that Mr. Purkey's history was consistent with a complex-PTSD diagnosis. I also concluded that it should be anticipated that Mr. Purkey would be "hard to work with" because of his complex-PTSD. At the time of my evaluation in 2016, I was not asked to assess or opine on Mr. Purkey's competency to be executed or other potential psychiatric diagnoses.

In my meeting with Mr. Purkey on November 8, 2019, Mr. Purkey voiced his belief that he is going to be executed in retaliation for his legal work. Mr. Purkey's psychotic thought process was evident in our conversation. He was tangential and he voiced paranoid delusions.

Much of the discussion of his working relationship with counsel was convoluted, confusing, and overtly paranoid. He was unable to shift topics in discussion and perseverated throughout my meeting with him.

***Social History*:**

Mr. Purkey suffered pervasive and extraordinary childhood physical, sexual, and emotional abuse. Both of his parents were alcoholics, and institutional records describe

3

Ex_1-000003

Re:  Wesley Purkey
Competency to be Executed

the home as violent, dirty, and chaotic. Mr. Purkey's father was physically abusive to his wife, often in the presence of Wes and his brother. He was also physically abusive to Mr. Purkey, beginning when he was 5 years old. His parents divorced when he was 9 years old.

In addition to significant physical abuse by his father, his mother began sexually abusing him around the age of 10, a period of abuse which did not end until he was 22. His mother made him sleep with her as a boy and inappropriately touched his genitals. She would instruct him to stimulate her sexually and penetrate her with a hairbrush. As he grew older, she would force him to perform oral sex on her, would stimulate him to orgasm, and forced him to have intercourse with her. His maternal grandmother sexually exploited him and his brother by walking around the house naked in front of them and making them watch her shower.

His mother was frequently gone from the house for several days at a time and was openly promiscuous with men in the home.

Mr. Purkey was also sexually molested by a parish priest from his church, from ages 11-13.  He became even more isolated and fearful. Mr. Purkey attended a Catholic school where he was punished and humiliated for his stuttering. Mr. Purkey received low grades and he ultimately dropped out of school in the ninth grade.

Mr. Purkey's onset of alcohol use was at a young age, 10 years, and his drug abuse began at age 14. There is contemporaneous documentation of Mr. Purkey's persistent alcohol and drug use into adulthood, including use of methamphetamines, cocaine, and heroin.

Mr. Purkey had two serious relationships, with his ex-wives Claire Berry and Jeanette Broyles. He had a child with Ms. Berry, Angie Purkey, with whom Mr. Purkey maintains a close relationship. Both of his former wives were also heavy drug users.

Velma Purkey, Ms. Purkey's mother, died of cancer when Mr. Purkey was 29 years old. Jack Purkey, Mr. Purkey's father, committed suicide when Wes Purkey was 32 years of age.

Mr. Purkey has been incarcerated most of his adult life, including continuous periods from 1970 to 1972, from 1977 to 1980, from 1981 to 1997, and then from 2000 to the present.

*Medical and Psychiatric History:*

Extensive and contemporaneous records show that Mr. Purkey has a long history of head injuries. He was in serious automobile related accidents involving a loss of consciousness in March of 1968, April of 1968, and in 1972. He had a major fracture of his face from a

4

Ex_1-000004

Case 2:19-cv-03570-PTSC   Document 11-1   Filed 11/26/19   Page 6 of 14   PageID #:

Re:  Wesley Purkey
Competency to be Executed

fight with the Wichita Police in 1976, and he was attacked in prison with a lead pipe. Mr. Purkey reported to me in our 2016 meeting that he was struck in the head more than 10 times in his life.

Mr. Purkey's speech was severely delayed as a child. He did not begin speaking until age 6. A medical evaluation from 1971 reports that Mr. Purkey "had 'polio,' which effected the use of his left leg 'he drug it around.'"

Beginning in childhood and continuing through his arrest for these charges, Mr. Purkey was referred for psychiatric treatment and in-patient hospitalization because of his delusions, hallucinations, bizarre behaviors, paranoia, anxiety and depression. He sought psychiatric assistance and treatment on multiple occasions. In 1971, at 19 years of age, Mr. Purkey was diagnosed with Schizophrenia Reaction, Schizo-Affective Type, and Depression; in 1998 with Psychosis; in 1999 with Bipolar Disorder. He has attempted suicide on multiple occasions.

Mr. Purkey's evaluations and psychiatric treatment history include:

- 1966, at 14 years of age, Wes Purkey was referred to the Wichita Psychiatric Center for headaches, dizziness, blackouts and behavior issues. He was referred for an EEG for possible "temporal lobe syndrome" or tumor. The images were suggestive of possible impairment in the left frontal and temporal region.

- 1968, at 16 years of age, Wes Purkey was admitted to St. Francis Hospital "disheveled and dirty- shaking and nervous." He reported experiencing blackouts and amnesia.

- 1971, at 18 years of age, Wes Purkey was sent to the Kansas State Reception and Diagnostic Center ("SRDC") where he was diagnosed by the Kansas Department of Corrections with Schizophrenia Reaction, Schizo-Affective Type, Depressed superimposed upon a pre-existing antisocial personality. Treatment notes reported he had a "wild, bizarre" expression on his face; noted that while he doesn't appear to be actively hallucinating and reports no delusional thinking he appears to be minimizing symptoms; and described "weird and unpredictable behavior" that is "often impulsive." He was treated with Mellaril, a drug prescribed for schizophrenia.

- 1972, at 20 years of age, Mr. Purkey was admitted for an acute concussion and the treatment team noted that Mr. Purkey "has had a severe emotional unstable background, both genetic and environmental" and recommended that Mr. Purkey see a psychiatrist, noting that he "needs psychiatric treatment much and has needed it for some time." Mr. Purkey checked out of the hospital against medical advice.

5

Ex_1-000005

Re: Wesley Purkey
Competency to be Executed

∞ 1972, after his concussion, Mr. Purkey was admitted to Larned State Hospital for treatment, because of his "bizarre" behavior, where he remained for four months. Mr. Purkey was administered Sinequan (a tricyclic antidepressant) and Thorazine (an antipsychotic) while there.

∞ 1976, Mr. Purkey was admitted to the Wesley Medical Center in January 1976 for an overdose, believed to be from alcohol and Tranxene, an alcohol withdrawal medication. "It took approximately 18 hours for the patient to wake up, be coherent and to carry on an intelligent conversation." Before he was awake, he was confused and hallucinated.

∞ 1976, Mr. Purkey was again evaluated by the Kansas Department of Corrections at the SRDC. He admitted auditory and visual hallucinations but blamed them on drug use. He showed signs of distrust of others and attempted to conceal his internal anxiety.

∞ In 1979, Mr. Purkey cut his wrists and reported feeling anxious and depressed. Mr. Purkey was taking Sinequan and Valium.

∞ In May 15, 1981, Mr. Purkey was again evaluated by the Kansas Department of Corrections at the SRDC. The SRD evaluator did not assign Mr. Purkey a diagnosis but noted that Mr. Purkey appeared to be holding two conversations at the same time, in different voices: "At times in his inability to speak out his mind he whispers at the same time he makes efforts to lets himself be heard. He whispered in an entirely different conversation from what he was talking aloud." The evaluator noted, similar to prior evaluators, that Mr. Purkey "tried hard to hide his emotions."

∞ In May of 1998, Mr. Purkey was admitted to Via Christi Hospital and was diagnosed with Psychosis not otherwise specified after ruling out psychosis due to substance abuse. Mr. Purkey described a host of delusional and paranoid beliefs, including that "there were people were on the roof last night spraying a chemical in his room," that "prior to [his] arrival [at the hospital] the chemical was activated by a beam," and that "and that people "are planning to kill [him]". His wife brought him to the emergency room because he "started to act paranoid and told [her] that somebody is trying to poison him, he also woke up his wife saying that while he was asleep he was sprayed with a poisonous mist several times and now his blood has poison in it...He also told his wife that his house is wired and 'they' can see his wife and children and himself all the time." While at the emergency room, he was "extremely anxious and suspicious of everybody." During an evaluation with a physician, "he suddenly got up and left the room saying they 'are spraying me with their mist,' and he started to rub his skin

6

Ex_1-000006

Re:  Wesley Purkey
Competency to be Executed

vigorously as he stated he could feel the thin layer of the mist that is penetrating his skin and entering his blood stream." He was assessed with incoherent and tangential speech, delusions, illogical racing bizarre paranoid thought content and perceptions, auditory and visual hallucinations. Mr. Purkey denied past psychiatric history.

∞ In September of 1998, Mr. Purkey was admitted to the Kansas University Medical Center. Although Mr. Purkey later characterized this admission as for a heart attack induced by Ritalin and methamphetamine, and poisoning by his wife, the toxicology screen was negative, other than for dehydration.

∞ In 1999, at Larned State Hospital, Mr. Purkey was diagnosed with Depressive Disorder NOS and Antisocial Personality Disorder. The nursing personnel indicated that Mr. Purkey "would become angry easily."

∞ In 2002, the Bureau of Prisons medical personnel diagnosed Mr. Purkey with Bipolar Disorder and prescribed Klonopin, Depakote, Buspar, and Tegretol/ Carbamezepine, anti-anxiety and anti-seizure medications, often used to treat Bipolar disorder and seizures.

Mr. Purkey was out of prison for relatively brief periods of time, including in the late 1990s from 1997 until his arrest in 1999. During this period, Mr. Purkey became fixated on his delusional beliefs about an extensive poisoning conspiracy. A psychiatric evaluation from 1999 described his ex-wife's account that Mr. Purkey called the KBI to report that "chemicals were coming through the vents and ceiling and had planted something in his chest and were using remote things to increase it." She reported that he got that way when he was on drugs but he stays the same even "when he doesn't have nothing in his system."

Mr. Purkey remained fixated on the poisoning conspiracy for years. When he felt his lawyers had inadequately investigated this poisoning, he responded by contacting – without counsel – the FBI to confess to the murder of Jennifer Long.

Dr. Sautter evaluated Mr. Purkey in 2016 and diagnosed him with complex-PTSD, a diagnosis that I confirmed that same year. Mr. Purkey's psychiatric history and head injuries increased his risk for PTSD. Dr. Sautter identified eleven separate categories of traumatic events: (1) repeated physical assaults by his father; (2) witnessing of the repeated physical assaults of his mother by his father; (3) humiliation and verbal threats by his father to himself; (4) witnessing verbal threats of violence from his father to his mother; (5) sexual abuse by his mother; (6) sexual abuse by a priest over a period of three years; (7) childhood sexual abuse by a teen, a friend of his older brother's; (8) molestation by prostitutes at his father's request; (9) physical beatings by his older brother; (10) car accidents with head traumas and loss of consciousness; and (11)

7

Ex_1-000007

emotional and physical abuse from the staff at his school. Dr. Sautter administered the Clinician Administered PTSD Scale (CAPS); the PTSD Checklist (PCL), and the Structured Clinical Interview for DSM-IV-R (SCID). Mr. Purkey's results on this testing were consistent with the long-documented history of symptoms of avoidance and significant problems with emotional regulation. The results supported a diagnosis of complex-PTSD. Mr. Purkey's clinical interview reported symptoms of psychosis, including paranoid thinking, visual hallucinations and disordered, illogical thoughts.

Dr. Sautter's findings were consistent with my evaluation of Mr. Purkey in 2016 for the interaction of his brain injuries and PTSD. In our 2016 interview, he described himself as an anxious and "on edge" child. There was no adult in his life he could confide in or trust so he learned to cope by abusing illicit drugs. By the time he was a teenager, Mr. Purkey was regularly using alcohol, sniffing paint thinner and taking sedatives to calm himself and keep him "numb." As his moods would vacillate in response to life stressors, so would his substance use. In other words, under times of greater stress, Mr. Purkey's substance use would similarly increase in order to quell his emotions. The use of substances to treat oneself is called "self-medication," and it is common in my experience for traumatized individuals to turn to substances to "numb" or "quell" their internal mood states. Although substance use can certainly become its own problem, failure to identify and understand the traumatic underpinnings of substance use leads to treatment failure.

As Dr. Sautter's April 26, 2018 report details, Mr. Purkey had been diagnosed on multiple occasions with personality disorders, including Antisocial Personality Disorder. None of the evaluators had first ruled out PTSD, the more appropriate diagnosis, despite the fact that Mr. Purkey had reported symptoms and completed testing suggestive of a PTSD diagnosis.

**Prior Neuropsychological Testing**

Neuropsychological testing in 2003 and in 2016 shows evidence of brain damage, particularly frontal lobe damage, and indicates learning and memory deficits. This brain damage further limits Mr. Purkey's capacity to regulate his thoughts, emotion, and behavior, which has significantly deteriorated over time. In all of the neurological testing, the examiners found that Mr. Purkey put forth good effort.

In addition, Mr. Purkey had brain imaging from 2003 that revealed temporal lobe abnormalities, consistent with the deficits observed in neurological testing. The report indicated moderate to marked decrease activity in the temporal lobes and potential deficit functioning in the right parietal and frontal lobes. These damaged areas of his brain are responsible for effective weighing and deliberating, working memory, emotional regulation, impulse inhibition, freedom from perseveration, and understanding the future consequences of their behavior. If one conceptualizes the frontal lobes as the major inhibitory mechanisms in the brain, i.e., the "brakes," one can see how damage to this

Ex_1-000008

area would negatively impact behavior. Traumatized individuals will often react to stressors, even neutral stimuli, as threatening when they are not. Over-reaction with impulsiveness is more often the rule rather than the exception. The combination of hypersensitivity to stress, substance abuse (which causes disinhibition), and faulty "brakes" is a recipe for disaster. It makes it far more likely that bad outcomes will result from emotionally stressful or threatening environments.

On September 29, 2019, I ordered brain image testing of Mr. Purkey to further assess his current frontal lobe and executive function deficits, a recommendation based on the more recent neuropsychological testing. Specifically, I ordered an MRI w/ and w/o contrast, PET scan (brain), and a DTI scan (brain), in light of Mr. Purkey's history of cognitive deficits and the need to rule out an intracranial process. As of the date of this report, such testing has not yet been performed.

**Dementia**

In 2017, Mr. Purkey was diagnosed with the beginning stages of dementia, likely Alzheimer's disease. An update in 2018 indicated that patterns of change observed by Mr. Purkey's defense team since the initial diagnosis were consistent with progression of a cortical dementia, and that Mr. Purkey was not receiving the required standard of care for a person with dementia. It was anticipated that, without proper medical care, Mr. Purkey would decline further and faster, given his multiple risk factors and the initial test findings.

Three of the most important risk factors for dementia -- age, family history and head injuries -- are all present in Mr. Purkey's case. There is a significant presence of neurodegenerative disease later in life among several family members on both the maternal and paternal sides of Mr. Purkey's family.

**Longstanding Delusional and Paranoid Thinking**

In addition to Mr. Purkey's longstanding poisoning delusions, he has for many years adhered to a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work. Mr. Purkey has been a prolific filer of legal grievances and pro se lawsuits. A review of these grievances from 2010 to today shows the breadth and depth of his fixed belief that a host of actions (including the search of his cell, granting of library privileges, denial of library privileges, shortening his rec time, nighttime bed checks, discharge from the library, denial of a religious diet request, throwing away or tearing up legal material, and cursing by guards) were carried out against Mr. Purkey in "retaliation" for his legal work on behalf of himself and other prisoners. These grievances are repetitive and tangential, often lacking coherence and at times in direct contravention to each other.

Ex_1-000009

In several instances, Mr. Purkey describes cursing or negative reactions by guards, attorneys, or other individuals that did not occur. John Fox, one of the mitigation investigators from his case, describes an incident where Mr. Purkey complained bitterly about a guard for an incident that Mr. Fox, although present, saw no sign had occurred. Elizabeth Vartkessian, another mitigation investigator, recounted how Mr. Purkey said that another lawyer had told him "F-ck you," and that Mr. Purkey said this reminded him of her. Neither Dr. Vartkessian nor the lawyer had ever said that to Mr. Purkey. In yet another example, Mr. Purkey complained in one of his grievances from this year that in retaliation for his legal work "all visitors" would be, and had been, denied. In fact, he had had a number of visitors in that period.

One of the manifestations of Mr. Purkey's paranoia is difficulty in working with his counsel. Mr. Purkey has attempted to fire a long list of his attorneys, and he is often suspicious that they are working against him. Throughout his federal case, he has demonstrated rigid ideas about the best claims, and was not able to accept or process the contrary opinions of his lawyers. He focuses on minor or irrelevant details and is not able to change topics. In one example, he became angry with his prior counsel for not litigating the fact that his potato chips were stale.

His commitment to false memories that relate to his case also impaired his ability to work with counsel. He insisted that his lawyers research the jail logs to prove that his trial counsel did not prepare him to testify. When the jail logs suggested the opposite, Mr. Purkey insisted that the jail logs were false. Mr. Purkey has repeatedly stated that he believes his current counsel have lied to him and are working against him. Mr. Purkey makes requests of this legal team, and then becomes angry at them for not fulfilling the requests, not remembering that his counsel had already done so. Alternatively, he is angry and distrustful of his legal team because he believes they have made a promise they did not in fact make.

**Behavioral Observations and Mental Status:**

At the outset of my 2019 interview with Mr. Purkey, I observed a significant deterioration in his physical appearance and demeanor from my last visit with him in 2016. Mr. Purkey looked to have aged considerably. In addition, the right side of his face is no longer symmetrical with the left side, and only the left side of Mr. Purkey's face moves when he smiles, as if he had suffered a stroke at some point. He denied any feelings of weakness or pain. Mr. Purkey began stuttering immediately at the beginning of our visit and slurring his words. In addition, he had significant trouble pronouncing words, even easy words. He could not pronounce the word "Alzheimer's." I do not recall any of this happening when I last visited Mr. Purkey in 2016. Throughout my visit, Mr. Purkey repeated himself and reiterated the same things over and over. Mr. Purkey's affect was noticeably flatter compared to the 2016 evaluation.

Ex_1-000010

Mr. Purkey perseverated, rambled and displayed tangential thoughts. Notably, I did not bring money with me to purchase food during the visit, a fact that Mr. Purkey became irrationally and unreasonably fixated on. He was not able to change the topic for several minutes, rambling about his attorneys and threatening to end the visit.

When I was finally able to shift the topic to Mr. Purkey's execution, Mr. Purkey first stated that he knew what an execution was and said that he accepted that he was going to be executed for the murder of Jennifer Long. Mr. Purkey told me that he did not need my help with his case and that he didn't have any mental health issue. I asked Mr. Purkey about his legal filings and grievances, and he attempted to minimize their significance, saying they were not a big deal. It became clear that Mr. Purkey was attempting to "fake good" at the outset of our interview.

As the visit continued, however, Mr. Purkey began to talk about the "real reason" he was going to be executed. He told me that he was actually being executed because he is filing lawsuits for other people's cases. "I've helped so many people here. The lawyers suck. No one advocates for the inmates, they need me." Mr. Purkey described how he is the reason other prisoners are getting things filed in their case. He reports that the guards have told him that they know his legal filings are the reason for his execution, something they tell him all the time. It was clear in our conversation that Mr. Purkey sincerely believes these conversations with the correctional officers have occurred.

When I inquired further, Mr. Purkey also told me that he was given a date for execution unfairly and for reverse discrimination. He told me that we didn't need to talk about this because I could just read his filings. He was fixated that the guards also believed that his selection was unfair. He had brought some papers with him and he wanted to show me the filing as proof of the guards' conversations and the truth of the reasons for his execution. When he tried to take out his papers he was disorganized and confused, and couldn't find the papers he wanted. He blamed his lawyers for this problem.

Mr. Purkey's comments were not self-serving and he was not able to see the big picture. He said he would be happy if his lawyers stopped his execution but he is not okay with his attorneys raising any mental health issues. He expressed distrust and dislike of his attorneys.

Throughout the evaluation, Mr. Purkey wanted to talk only about what he sees as the important issues: the retaliation for his legal work, the government's eagerness to be rid of him and his successful litigation, the unfair selection of his case, and the fact that the guards can corroborate these wrongful bases for his execution.

**Opinions Regarding Competency to be Executed and Ability to Work with Counsel**

In my opinion, to a reasonable degree of medical certainty, at the time of the evaluation,

Ex_1-000011

Mr. Purkey lacked a rational understanding of the basis for his execution. While Mr. Purkey can recite the fact that his execution is for the murder of Jennifer Long, he lacks rational understanding of that fact. This is an example of parroting, rather than having a rational understanding. He lacks a true understanding or rationality that the murder is the basis for his execution. Instead, Mr. Purkey has a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government. This prevents him from having a rational understanding of the purpose of his execution. This belief is part of his long-standing delusions about the "conspiracy" of retaliation.

Mr. Purkey not only sees retaliation where it doesn't exist in his paranoia, but he also has a false understanding of the success of his legal work. Mr. Purkey cited, as an example of his legal skills, *Purkey v. Green*, a case that was dismissed. He has repeatedly filed pro se motions that worked to undermine, not advance, his legal case.

The lack of rationality from Mr. Purkey's delusional thoughts and paranoia are compounded by the deterioration of his brain from his dementia. As his brain deteriorates, the problems of paranoia worsen and become a self-reinforcing cycle. The paranoia makes it hard for him to deliberate and weigh new information. He does not trust anyone, and that distrust is heightened by his memory failings and complex PTSD. He lacks the ability to know who is trying to hurt and who is trying to help him.

Mr. Purkey's brain damage, dementia and delusions prevent him from working with counsel or working for his own interests. Mr. Purkey's irreversible brain damage, which affects his executive functioning and decision-making, causes him to perseverate on irrational thoughts and irrelevant issues and he becomes very agitated when others try to reason with him.

Mr. Purkey took pains to attempt to hide his symptoms and deny that his mental health is an issue. The fact that Mr. Purkey attempted to say that he understands the basis for his execution is consistent with his long history of attempting to "fake good" and minimize his psychiatric symptoms, including in evaluations in 1976, in 1981, and in 1998. Anosognosia, or lack of insight into the illness, is a key feature of schizophrenia, as are paranoid delusions. Both work together to prevent a Schizophrenic patient from revealing their illness. In short, Mr. Purkey denies that he is mentally ill because he truly believes that he is not based on the veracity of his delusions.

I considered the possibility that Mr. Purkey malingered his impairments but in my opinion, he did not. In my evaluations and in the records I reviewed, Mr. Purkey's presentation has remained consistent in all important respects for a number of years. He has a long and well documented history of psychotic behaviors, treatments, and diagnoses. He does not want to be found incompetent to proceed and minimized his psychiatric symptoms with me, something that he has consistently done throughout his

Ex_1-000012

Re:  Wesley Purkey<br>Competency to be Executed

psychiatric history. It is my opinion Mr. Purkey is not malingering.

The underlying brain damage and mental illness he has are long-standing, irreversible, and will continue to deteriorate as his dementia progresses.

If you have any questions about this report, I would be happy to answer them. Please feel free to telephone me at 404.939.6636.

Sincerely,

Bhushan S. Agharkar, M.D., D.F.A.P.A.
Distinguished Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology, with Added Qualifications in Forensic Psychiatry

Ex_1-000013