# Exhibit C

Plaintiff's Renewed Motion for a Preliminary Injunction & Supporting Documents, Purkey DC Ford Matter (D.D.C. June 22, 2020), ECF Nos. 23, 23-1, 23-2, 23-3, 23-4, 23-5, 23-6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WESLEY IRA PURKEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-03570-TSC |
| | ) |
| WILLIAM P. BARR, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION**
**BARRING EXECUTION OF WESLEY PURKEY PENDING**
**FINAL DISPOSITION ON THE MERITS**

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Civil Rule 65.1(c), Plaintiff

Wesley Ira Purkey ("Plaintiff") hereby moves this Court to issue a preliminary injunction

enjoining Defendants from executing Plaintiff pending final resolution of his claims or, at a

minimum, until the Court resolves this renewed motion for preliminary relief after Plaintiff has

been given an opportunity to gather additional evidence through expedited discovery, including

information Plaintiff previously sought from Defendants but as to which he has been denied

access, and after Plaintiff has been given an opportunity to supplement this motion with such

additional evidence. In support of this motion, Plaintiff relies upon the attached memorandum of

points and authorities and accompanying declarations and exhibits.

WHEREFORE, on the basis of this motion and any further argument or evidence

presented in support hereof, Plaintiff respectfully requests that the Court grant this motion,

preliminarily enjoin his execution presently scheduled for July 15, 2020, schedule a hearing to

determine Plaintiff's lack of competency to be executed, permit Plaintiff to conduct expedited

discovery in advance of the competency hearing, and award Plaintiff such other and further relief as the Court deems just and proper. A proposed Order is attached hereto.

DATED: June 22, 2020

Respectfully Submitted,

*/s/Charles F.B. McAleer, Jr.*
Charles F.B. McAleer, Jr. (DC Bar #388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

*/s/Brian Fleming*
Brian Fleming (DC Bar #974889)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

*/s/Rebecca E. Woodman*
Rebecca E. Woodman (*pro hac vice*)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

*/s/Michelle M. Law*
Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile: (417) 873-9038
Email: michelle_law@fd.org

**Counsel for Plaintiff**

**LOCAL RULE 7(m) CERTIFICATION**

I HEREBY CERTIFY, pursuant to Local Rule 7(m), that, on June 22, 2020, prior to the

filing of this renewed motion for preliminary injunction, I sought Defendants' position on this

renewed motion for preliminary injunction, and counsel for Defendants indicated that

Defendants will oppose the motion.

<div style="margin-left:50%">

*/s/Charles F.B. McAleer, Jr.*
Charles F.B. McAleer, Jr. (DC Bar #388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

</div>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on the 22nd day of June, 2020, I caused Plaintiff's Renewed Motion for a Preliminary Injunction Barring Execution of Wesley Purkey Pending Final Disposition on the Merits to be filed electronically with the Clerk of the Court via CM/ECF, with all authorized parties being served electronically via CM/ECF.

*/s/Charles F.B. McAleer, Jr.*
Charles F.B. McAleer, Jr. (DC Bar #388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESLEY IRA PURKEY,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR, *et al.*,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 1:19-cv-03570-TSC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR A
PRELIMINARY INJUNCTION BARRING EXECUTION OF WESLEY PURKEY
PENDING FINAL DISPOSITION ON THE MERITS**

**TABLE OF CONTENTS**

PAGE

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 5

    I.    Procedural Posture of This Case ..................................................................................... 5

    II.   Mr. Purkey's Incompetency ............................................................................................ 9

    III.  The Government's Continued Refusal to Provide Mr. Purkey Information Relevant to His Competency ............................................................................................................... 14

ARGUMENT ............................................................................................................................. 22

    I.    This Court Should Issue a Preliminary Injunction to Stay the Proceedings. .............. 22

        A.   Mr. Purkey Demonstrates A High Likelihood of Success on His Eighth Amendment and Due Process Claims. ............................................................................................. 23

            1.   Mr. Purkey Is Likely to Prevail On His Due Process Claim. .................................... 24

            2.   Mr. Purkey Is Likely to Prevail On His Eighth Amendment Claim ......................... 29

        B.   Mr. Purkey Will Suffer Irreparable Harm Without an Injunction .............................. 31

        C.   The Balance of The Equities and Public Interest Weigh in Favor of A Preliminary Injunction. 32

    II.   Expedited Discovery Is Required To Support an Evidentiary Hearing ....................... 36

CONCLUSION .......................................................................................................................... 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amaya-Ruiz v. Stewart,*
136 F. Supp. 2d 1014 (D. Ariz. 2001) ................................................................................ 33

*Barefoot v. Estelle,*
463 U.S. 880 (1983) ........................................................................................................... 24

*Battaglia v. Stephens,*
824 F.3d 470 (5th Cir. 2016) ........................................................................................ 31, 38

*In re Beatty,*
No. WR-59,939-04, 2020 WL 1329145 (Tex. Crim. App. March 19, 2020) ....................... 36

*In re Busby,*
No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. April 27, 2020) .......................... 36

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ...................................................................................... 32, 35

*Charles v. Stephens,*
612 Fed. App'x 214 (5th Cir. 2015) ................................................................................... 26

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.,*
317 F. Supp. 3d 555 (D.D.C. 2018) ............................................................................... 22, 23

*Commonwealth v. Banks,*
943 A.2d 230 (Pa. 2007) .................................................................................................... 25

*Eldridge v. Thaler,*
Civil Action No. H-05-1847, 2009 WL 3856672 (S.D. Tex. Nov. 17, 2009) ....................... 27

*In re Fed. Bureau of Prisons' Execution Protocol Cases,*
Case No. 19-mc-145 (TSC) (D.D.C. Nov. 20, 2019) .......................................................... 5

*Ferguson v. Sec'y for Dept. of Corr.,*
716 F.3d 1315 (11th Cir. 2013) .......................................................................................... 33

*Ford v. Wainwright,*
477 U.S. 399 (1986) .................................................................................................... passim

*Harris v. Johnson,*
323 F. Supp. 2d 797 (S.D. Tex. 2004) ................................................................................ 33

*In re Hearn,*
376 F.3d 447 (5th Cir. 2004) .............................................................................................. 24

ii

*In re Hernandez*,
No. WR-81,577-02, 2020 WL 1645052 (Tex. Crim. App. April 1, 2020)............................................ 36

*In re Hummel*,
No. WR-81,578-02, 2020 WL 1268970 (Tex. Crim. App. March 16, 2020)....................................... 36

*Ingraham v. Wright*,
430 U.S. 651 (1977) ....................................................................................................................... 28

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
849 F.3d 1129 (D.C. Cir. 2017)...................................................................................................... 22

*Ex parte Jordan*,
758 S.W.2d 250 (Tex. Crim. App. 1988) (en banc) ........................................................................ 25

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......................................................................................................... 24

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................................................................................................... 31, 32

*Madison v. Alabama*,
139 S. Ct. 718 (2019) .............................................................................................................. 2, 29, 30

*Miller v. Stewart*,
231 F.3d 1248 (9th Cir. 2000) ................................................................................................... 23, 24

*In re Moser*,
69 F.3d 690 (3d Cir. 1995) ........................................................................................................ 23, 24

*Nat'l Parks Conservation Ass'n v. Semonite*,
No. 17-CV-01361-RCL, 2018 WL 3838809 (D.D.C. July 3, 2018) ............................................ 22, 23

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987)................................................................................................... 24, 31

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................................................. 22, 32

*Nooner v. Norris*,
No. 5:06CV00110 SWW, 2006 WL 8445125 (E.D. Ark. June 26, 2006) .......................................... 35

*Osorio-Martinez v. Attorney Gen. of the U.S.*,
893 F.3d 153 (3d Cir. 2018) ........................................................................................................... 35

*Panetti v. Quarterman*,
551 U.S. 930 (2007) ................................................................................................................. *passim*

*Population Inst. v. McPherson*,
797 F.2d 1062 (D.C. Cir. 1986)...................................................................................................... 23

*Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*,
No. 19-1348 (U.S. June 5, 2020) ........................................................................................ 8

*Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*,
No. 19A1050 (U.S. June 10, 2020) ..................................................................................... 8

*Santosky v. Kramer*,
455 U.S. 745 (1982) ......................................................................................................... 32

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .......................................................................................... 22

*Smith ex rel. Smith v. Armontrout*,
626 F. Supp. 936 (W.D. Mo. 1986) ................................................................................... 33

*Steele v. United States*,
287 F. Supp. 3d 1 (D.D.C. 2017) ................................................................................ 22, 23

*Wainwright v. Booker*,
473 U.S. 935 (1985) (Powell, J., concurring) ........................................................... 4, 31, 32

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) .......................................................................................... 23

*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
791 F. Supp. 309 (D.D.C. 1992) ................................................................................... 4, 31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................................ 22

*Wood v. Quarterman*,
572 F. Supp. 2d 814 (W.D. Tex. 2008), *aff'd sub nom. Wood v. Stephens*, 619 F.
App'x 304 (5th Cir. 2015) ................................................................................................ 27

**Other Authorities**

*BOP Implementing Modified Operations*, Fed. Bureau of Prisons,
https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 21, 2020) ............... 20

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 6

Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of
Psychology (4th ed., vol. 1 2010) ..................................................................................... 11

U.S. Const. amend. V ..................................................................................................... 4, 28

**INTRODUCTION**

Mr. Wesley Purkey is a 68-year-old man suffering from progressive dementia, schizophrenia, complex-Post Traumatic Stress Disorder (PTSD), and severe mental illness. He has experienced multiple, extensive traumatic brain injuries throughout the course of his life. These assaults on his brain are layered on top of a life history of atrocious trauma, including repeated sexual abuse and molestation by those charged with caring for him as a child. Yet despite the extensive evidence of Mr. Purkey's mental illness and current incompetency, at the personal instruction of United States Attorney General William Barr in Washington D.C., a death warrant has been issued to execute Mr. Purkey on July 15, 2020 at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute") in violation of Mr. Purkey's Fifth and Eighth Amendment rights.

This is the second execution warrant Attorney General Barr has personally directed at Mr. Purkey in the past year. The first was prior to the current COVID-19 pandemic, but it was enjoined by this Court on other grounds and that warrant has since expired. Now, Attorney General Barr has issued the second warrant immediately upon the lifting of this Court's order, even though the United States remains in the throes of a global pandemic in which prisons are bearing a disproportionate share of the potentially deadly infections. The new warrant, issued in the midst of the outbreak, comes despite the fact that USP Terre Haute has not allowed any in-person visitation—legal or otherwise—in the months leading up to its issuance because of active infections in the prison and surrounding community. Indeed, Defendants scheduled Mr. Purkey's execution without adopting or implementing any written protections or policies to ensure the safety of visitors, staff, prisoners, or the community from the danger posed by purporting to re-institute visitation for just those with execution warrants during the COVID-19 outbreak.

1

This civil rights lawsuit, filed by Mr. Purkey while the first warrant was pending, does not seek to invalidate his death sentence or alter his judgment of conviction. Instead, Mr. Purkey's suit seeks to have this Court enjoin Attorney General Barr's action on two grounds: (1) that Mr. Purkey is not currently competent to be executed under Eighth Amendment constitutional standards articulated by the Supreme Court in a host of cases dating as far back to *Ford v. Wainwright*, 477 U.S. 399 (1986), and as recently as *Madison v. Alabama*, 139 S. Ct. 718 (2019); and (2) that Attorney General Barr and the Bureau of Prison Director Michael Carvajal have not afforded Mr. Purkey due process in connection with this Eighth Amendment claim. Despite being in sole possession of evidence critical to that claim, Defendants have repeatedly stonewalled Mr. Purkey's efforts to acquire that evidence both previously and now, during the pandemic. They have done so despite explicit and repeated warnings from Mr. Purkey's counsel that there would not be sufficient time to obtain and review the necessary information and testing if the Defendants waited to grant access to the evidence until Mr. Purkey was under a time-compressed warrant.

Even at this stage, in the absence of any hearing on the claim and despite the Defendants' efforts (assisted by the pandemic) to stonewall the claim, the evidence of Mr. Purkey's incompetency to be executed is compelling. The record already before the Court contains evidence that Mr. Purkey suffers from brain injuries, severe mental illness, complex-PTSD, and advancing disease of dementia, all of which have caused significant memory impairments, grossly deteriorated cognitive function, paranoia, and delusions. As a result, there is significant evidence before the Court to suggest that Mr. Purkey does not currently have the ability to rationally understand the reason the United States seeks to execute him. As such, his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment. *Panetti*

*v. Quarterman*, 551 U.S. 930 (2007). Furthermore, under the Fifth and Eighth Amendments and upon a substantial threshold showing of incompetency—a threshold that has already been met here—Mr. Purkey is entitled to due process on the issue of his competence to be executed. *See Panetti*, 551 U.S. at 949. Mr. Purkey is further entitled to pre-hearing discovery, irrespective of this threshold showing, including his relevant Bureau of Prisons ("BOP") records (records entirely within the custody and control of the BOP), certain neurological testing that has already been ordered, and medical assessments by Mr. Purkey's expert witnesses. *See id.* at 952 (distinguishing between procedures required under *Ford* (namely, an impartial decision maker and an opportunity to offer evidence to counter government evidence of competency) and others that may be required under the Due Process Clause, such as "the opportunity for discovery or for the cross-examination of witnesses").

Because Mr. Purkey has a strong likelihood of success in this civil rights lawsuit and easily satisfies the other applicable preliminary injunction criteria, it is incumbent upon the Court to enter a preliminary injunction preventing his execution during the pendency of his lawsuit.

*First,* Mr. Purkey's likelihood of success on the merits is substantial, even on the basis of the evidence currently available to Mr. Purkey and without the additional information he has been denied by the Government to date. Under the Eighth Amendment, a condemned prisoner is deemed incompetent when he cannot rationally understand his punishment, or the reason for it. *Id.* at 958–60. A prisoner who makes a "substantial threshold showing of insanity," as Mr. Purkey has here, is entitled to a hearing on his claim of incompetency to be executed. *Id.* at 948–50. Mr. Purkey presents this Court with substantial evidence of his incompetency through an expert evaluation finding him incompetent as of the time of the evaluation as well as contemporaneous institutional records and psychiatric evaluations documenting decades of

3

delusional behavior and rapidly progressing dementia.[1] In the face of such evidence, carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate the Due Process Clause of the Fifth Amendment. U.S. Const. amend. V. Moreover, Mr. Purkey is, in fact, currently incompetent to be executed. By virtue of his dementia, cognitive impairments, and severe mental illness, he "lack[s] a rational understanding of the basis for his execution." Compl. Ex. 1 at 2, ECF No. 1-1.

*Second*, Mr. Purkey will undeniably suffer irreparable harm in the absence of preliminary relief. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury." *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992); *see also Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Mem.) (Powell, J., concurring) (irreparable harm that will result if stay is not granted "is necessarily present in capital cases").

*Finally*, the equities and the public interest favor a preliminary injunction. The Government's interests will not suffer if Mr. Purkey's execution is enjoined until his competency claim can be fairly litigated in an orderly fashion. Any exigency or need for expediency claimed by the Government simply does not exist, as evidenced by the Government's lengthy and self-imposed nearly two-decade moratorium on executions and the Government's failure to disclose highly-probative information necessary to resolve Mr. Purkey's claims, including failing to comply with document requests for the past ten months. In any event, such concerns are minimal compared to the harm Mr. Purkey will suffer should his execution move forward as scheduled on

---

[1] In contrast to the materials proffered by Mr. Purkey, Mr. Panetti, who was presumed without question to have met the substantial threshold showing, only provided the Court "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row." *Panetti*, 551 U.S. at 938, 950.

July 15, 2020. No public interest is served by executing an individual presenting a *prima facie* case of incompetency before he has had the opportunity to avail himself of fair procedures to challenge his competence as required by United States Supreme Court authority—let alone doing so during a global pandemic that has prevented him from seeing counsel and medical experts. Accordingly, the public interest is only served by preliminarily enjoining Mr. Purkey's execution.

The Court should enjoin Mr. Purkey's execution until Mr. Purkey receives a fair hearing to determine his competency to be executed and his competency to be executed is in fact determined. The Court should further grant expedited discovery so that Mr. Purkey may provide the Court relevant evidence of his incompetency, evidence that is solely within the Government's possession and control.

**BACKGROUND**

**I.       PROCEDURAL POSTURE OF THIS CASE**

This is the second time that Attorney General Barr has issued a warrant for Mr. Purkey's execution. Mr. Purkey's first execution warrant issued on July 25, 2019 and his execution was scheduled for December 13, 2019. This Court entered a preliminary injunction in a related matter preventing this execution date. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 19-mc-145 (TSC) (D.D.C. Nov. 20, 2019) (Protocol Case). On November 26, 2019, Mr. Purkey filed the complaint in this case (ECF No. 1), raising an Eighth Amendment claim challenging his competency to be executed. The lawsuit raises issues solely related to Mr. Purkey's competency to be executed in light of his current mental state; Mr. Purkey does not challenge his conviction or sentence, and he does not permanently seek to enjoin his execution. Instead, he seeks to enjoin Defendants from carrying out his execution for as long as doing so

5

would violate his Fifth and Eighth Amendment rights. This suit was brought after Mr. Purkey's

first execution warrant issued because a competency to be executed claim is not ripe until a time

is set to execute the sentence. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal,* 523

U.S. 637, 644–45 (1998)).

Even though this Court had already enjoined Mr. Purkey's execution in the related

Protocol cases, on December 4, 2019, Mr. Purkey filed a parallel protective Motion for a

Preliminary Injunction (ECF No. 7) out of an abundance of caution to ensure he would not be

executed while incompetent if the Protocol Case injunction was lifted.

On December 17, 2020, after the initial execution warrant had expired, and after the

Government had filed an opposition to Mr. Purkey's Preliminary Injunction Motion (ECF

No.10), Mr. Purkey filed a Motion to Withdraw the protective Motion for Preliminary

Injunction, since his execution was no longer imminent. *See* Mot. to Withdraw, ECF No. 11.

Soon afterwards, on December 31, 2019, this Court granted the motion to withdraw and *sua*

*sponte* ordered Mr. Purkey to respond to the Government's jurisdictional arguments raised in its

Opposition to Mr. Purkey's motion—namely that this case could only be brought as a habeas

corpus action because Mr. Purkey was in fact challenging his death sentence, despite his repeated

statements in his Complaint that he sought an injunction only unless and until he was restored to

competency. After this issue was fully briefed (ECF Nos. 14–17), the Government filed a Motion

to Dismiss or, in the alternative, to Transfer (ECF No. 18), reiterating its position that this case

could only be brought in habeas, but also arguing that Mr. Purkey's claims fail under Federal

Rule of Civil Procedure 12(b)(6) and that venue in the District of Columbia is either improper or

inconvenient (despite the extensive and admitted personal role that Washington D.C. participants

played in issuing Mr. Purkey's execution warrant and despite their responsibility for formulating

procedures to pursue competency-to-be-executed claims in the federal system). The Government's motion was fully briefed and remains pending.[2]

In the nearly seven months since he filed this case, Mr. Purkey's competency has continued to decline. Mr. Purkey's counsel has also used this time to attempt to secure the information that was sought in connection with the first filing, requesting (numerous times) Mr. Purkey's updated BOP administrative and health records, access to Mr. Purkey himself for medical experts to conduct in-person assessments of his declining mental competency, as well as the ability to conduct neurological testing. This information is all critical to enable this Court to make an informed decision about Mr. Purkey's current competency and, thus, the constitutionality of executing his sentence on July 15, 2020. The Government has refused to provide any of this information despite repeated requests beginning in August of 2019. R. Woodman Decl. ¶¶ 10–13. Meanwhile, due to the current COVID-19 global pandemic, the USP Terre Haute prison where Mr. Purkey is being held has been locked down with *no* visitors

---

[2] The Government's position that Mr. Purkey's *Ford* claim must be brought in habeas remains unsupported. The Government has never addressed the fact that Mr. Purkey's *Ford* claim is definitively *not* a challenge to his sentence or conviction and, thus, not core habeas. As the briefing in response to the Court's *sua sponte* order and on the Motion to Dismiss demonstrates, *Ford* claims *may* be brought independent of habeas where they do not challenge the sentence or conviction. *See generally* Pl.'s Br. Pursuant to This Court's Order of Dec. 31, 2019, ECF No. 14; Pl.'s Reply to Def.'s Resp. to this Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17. The lack of prior examples of independent federal *Ford* claims merely reflects that the federal government has only implemented three death sentences since *Ford* was decided, none of which involved *Ford* claims. Pl.'s Reply to Def.'s Resp. to This Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17. The lack of federal *Ford* claim examples is in no way reflective of anything else, especially where or how they may be raised. Moreover, since the parties' briefing on jurisdiction and venue, the Government has since reiterated numerous times that Attorney General Barr is the singular authority responsible for executing Mr. Purkey. *See* R. Woodman Decl. ¶¶ 29 (referencing Government correspondence that made clear that Mr. Purkey's new execution date will be determined "when the Attorney General makes a decision"), 31 (referencing Government correspondence that Mr. Purkey's execution was scheduled at the "Attorney General's direction"). The Government's own continued emphasis that Attorney General Barr, located in the District of Columbia, is the only person responsible for deciding when and how to execute Mr. Purkey's sentence reinforces the propriety of Mr. Purkey's choice of venue in the District of Columbia where both Defendants reside.

admitted into the prison, the BOP has acknowledged a potential virus outbreak in the prison, and Mr. Purkey's counsel and mental health experts have been denied access to Mr. Purkey for the last three months as a result.

On April 7, 2020, the preliminary injunction issued in the Protocol Case was vacated by the D.C. Circuit. *See* Judgment, *FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. Apr. 7, 2020).[3] On June 15, 2020, the next business day after the mandate issued in connection with the D.C. Circuit litigation, Attorney General Barr issued another warrant for Mr. Purkey's execution with only *30 days'* notice, setting his execution date for July 15, 2020—despite the current COVID-19 pandemic, the USP Terre Haute lockdown and COVID-19 outbreak, and the fact that Mr. Purkey's counsel, mitigation specialists, and mental health experts, necessary to ensure Mr. Purkey's constitutional rights are protected, have had *no* in-person and only telephonic access to Mr. Purkey since March 13, 2020. R. Woodman Decl. ¶¶ 7, 13, 33–35; E. Vartkessian Supp. Decl. ¶¶ 3, 12. All visits, which are critical to assess Mr. Purkey's rapidly deteriorating mental state, have been cancelled. R. Woodman Decl. ¶¶ 7, 33–35; E. Vartkessian Supp. Decl. ¶¶ 3, 12, 22–25. Moreover, the prison itself remains on lockdown and there are currently *no* procedures in

---

[3] Mr. Purkey sought rehearing *en banc*, which was denied by the D.C. Circuit on May 15, 2020. *See* Order, *FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. May 15, 2020). Mr. Purkey filed a petition for certiorari, which is currently pending at the Supreme Court. *See* Pet. for a Writ of Cert., *Bourgeois v. Barr*, No. 19-1348 (U.S. June 5, 2020). The D.C. Circuit issued the mandate on June 8, 2020. *See* Am. Order, *FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. June 8, 2020). On June 10, 2020, Mr. Purkey also filed an emergency application, seeking a stay of the D.C. Circuit's mandate pending disposition of the petition for certiorari. *See*, Emergency Appl. for a Stay of Mandate Pending Disposition of Pet. for a Writ of Cert., *Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19A1050 (U.S. June 10, 2020). The Government filed its response to the emergency stay application on June 15, 2020. *See* Resp. in Opp. to Appl. For a Stay of the Mandate Pending Disposition of the Pet. for a Writ of Cert. & for an Administrative Stay, *Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19A1050 (U.S. June 15, 2020). Mr. Purkey's emergency application and petition for certiorari remain pending. On an expedited briefing schedule, the Government filed its response to Mr. Purkey's petition for certiorari on June 19, 2020. *See* Br. for the Resp'ts in Opp., *Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19-1348 (U.S. June 19, 2020). Petitioners have until June 22, 2020 to file a reply. *See Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases*), No. 19-1348 (U.S. June 18, 2020).

place to ensure critical visitors can consult with Mr. Purkey safely without unnecessary risk of exposure to a deadly virus that is known to be present inside the prison. While a BOP Legal Counsel has indicated that the prison will allow such visits and some *ad hoc* minimal safety measures are purportedly (and hurriedly) being planned (less than three weeks before Mr. Purkey's scheduled execution date), *see* R. Woodman Decl. ¶¶ 33–38, the prison has provided *no* formal, written or even credible or tangible means of ensuring such visits will be managed in a way that would meaningfully protect Mr. Purkey or his legal and medical expert visitors (many of whom are particularly vulnerable to the virus due to their age and current medical conditions) from the serious health and safety concerns posed by travel and in-person contact during the pandemic, at a location with reported COVID-19 cases.

## II.    MR. PURKEY'S INCOMPETENCY

Mr. Purkey's mental condition, described by the lawyers and investigators on his defense team, as well as by experts who have evaluated him over decades, reveals deterioration, paranoia, and delusion. *See, e.g.*, Compl. Ex. 1 at 9, ECF No. 1-1 ("In addition to Mr. Purkey's longstanding poisoning delusions, he has for many years adhered to a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work"); Compl. Ex. 13 at 561, ECF No. 1-8 (May 15, 1981, psychiatric evaluation reporting auditory hallucinations as Mr. Purkey held two conversations at the same time, "whisper[ing] in an entirely different conversation from what he [was] talking aloud."); *id.* at 345 (May 1998 emergency room record noting Mr. Purkey was admitted because he "started to act paranoid," stating that "they" were watching him at all times and sprayed him with "poisonous mist several times" while he was sleeping"); Compl. Ex. 5 at 40, ECF No. 1-1 ("Early in my involvement [as Wes's mitigation specialist], Wes began exhibiting delusional thinking"); Compl. Ex. 7 at 74, ECF No. 1-1 ("Wes was constantly paranoid that various prison officials were trying to harm him in retaliation for his

9

'jailhouse lawyering,'" and his "paranoia also increased over time."); R. Woodman Decl. ¶ 7; *see generally* E. Vartkessian Supp. Decl.

Mr. Purkey's cognitive decline, including memory loss, is evident from neuropsychological testing administered in 2003 and 2016, from expert evaluations in 2016 and 2019, and continues to be observed up to his most recent visitations. While the 2003 testing did not reveal memory deficits, testing did reveal moderate microsomia on the Smell Identification Test (SIT)—an early marker of dementia, including Alzheimer's Disease. Additionally, a brain scan from 2003 "indicated abnormalities in the area of the brain involved in memory and typically implicated in Alzheimer's disease." Compl. Ex. 3 at 20, ECF No. 1-1.

Thirteen years later, in 2016, neuropsychological testing revealed that Mr. Purkey was suffering from frontal lobe deficits and progressive dementia consistent with Alzheimer's disease. The testing revealed that Mr. Purkey had experienced significant declines in both memory and executive functioning since previous testing in 2003. Compl. Ex. 9 at 88, ECF No. 1-1. A follow-up report in 2018 revealed that Mr. Purkey's condition had continued to deteriorate since 2016, and recommended a further neurology work-up, including brain imaging, and a reassessment of his neurological status. Compl Ex. 15 at 120, ECF No. 1-18.

In 2019, Mr. Purkey was diagnosed with Alzheimer's disease, a progressive neurodegenerative disease that impacts memory, intellectual function and behavior. Compl Ex. 3 at 28, ECF No. 1-1; *see also* Compl. Ex. 6 at 89, ECF No. 1-1 (testing, medical and family history "strongly suggest" in 2016 that "Mr. Purkey is currently suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia"); Compl. Ex. 12 at 120, ECF No. 1-2 (describing the reports of cognitive, physical and psychiatric decline and finding that this "reported pattern of change is very much consistent with progression of a cortical dementia");

10

Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of Psychology, p. 71 (4th ed., vol. 1 2010) (describing Alzheimer's Disease).

Dr. Bhushan Agharkar, a neuropsychiatrist, concluded to a reasonable degree of medical certainty that Mr. Purkey "lacked a rational understanding of the basis for his execution." Compl. Ex. 1 at 11–12, ECF No. 1-1. While Mr. Purkey could recite the Government's position that his execution is for the murder of Jennifer Long, this recitation was merely "parroting," as he can repeat what others say but cannot rationally understand what it means. Mr. Purkey holds "a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government." *Id*. This belief does not stand on its own but rather serves as a foundation for an entire delusional system involving conspiracies of retaliation. This entire delusional system makes it impossible for him to have "a rational understanding of the purpose of his execution." *Id*. at 12.

Dr. Jonathan DeRight, a neuropsychologist, administered additional testing in August of 2019. Based on this evaluation, Dr. DeRight diagnosed Mr. Purkey with Alzheimer's disease. Compl. Ex. 3 at 27–28, ECF No. 1-1. Dr. DeRight opined that the collateral information about Mr. Purkey's decline was also highly consistent with Alzheimer's disease. Mr. Purkey's worsening cognitive symptoms, including paraphasic word efforts, word loss, impaired recall of information he knew before, and incontinence, are indicative of the progression of Alzheimer's disease. *See id*. at 27.

Dr. Thomas Hyde, a neurologist, similarly concluded that there is "substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder," based on a close review of Mr. Purkey's extensive records, including medical records, family birth and death records, and expert

11

reports. T. Hyde Decl. ¶ 13. While unable to make a definitive diagnosis without the benefit of an in-person visit (which has been impossible due to the COVID-19 pandemic) or a review of recent medical records or current diagnostic testing (which have been blocked by the Government), Dr. Hyde nevertheless concludes that Mr. Purkey's "intellectual deficits, paranoia, and delusional beliefs, and the course of his progressive deterioration are consistent with the diagnosis of dementia." *Id.* ¶ 14.

Dr. Bhushan Agharkar, a neuropsychiatrist, concluded to a reasonable degree of medical certainty that Mr. Purkey "lacked a rational understanding of the basis for his execution." Compl. Ex. 1 at 11–12, ECF No. 1-1. While Mr. Purkey could recite the Government's position that his execution is for the murder of Jennifer Long, this recitation was merely "parroting," as he can repeat what others say but cannot rationally understand what it means. Mr. Purkey holds "a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government." *Id*. This belief does not stand on its own but rather serves as a foundation for an entire delusional system involving conspiracies of retaliation. This entire delusional system makes it impossible for him to have "a rational understanding of the purpose of his execution." *Id*. at 12.

Further, Mr. Purkey's mitigation specialist, Dr. Elizabeth Vartkessian, PhD, who has had constant contact with Mr. Purkey for the last five years, has witnessed Mr. Purkey's recent continual and rapidly declining cognitive abilities both in-person before the USP Terre Haute lockdown and even by telephone since the lockdown despite the severe limitations of telephonic consultations. *See generally* E. Vartkessian Supp. Decl. In Dr. Vartkessian's most recent visits with Mr. Purkey—the last one being in early March 2020—he struggled to remember words for simple items such as a long-sleeve t-shirt (instead calling it a tank top) and could not recall

names that he knew well (including fellow inmates, his own grandson, and his long-time defense attorneys). *Id.* ¶¶ 7, 11–21.

These conditions have rendered Mr. Purkey unable to understand the rationale for his pending execution. *See, e.g.*, Compl. Ex. 1 at 12, ECF No. 1-1 ("The lack of rationality from Mr. Purkey's delusional thoughts and paranoia are compounded by the deterioration of his brain from his dementia."); Compl. Ex. 3 at 20, ECF No. 1-1 (noting that Alzheimer's disease "can lead to more marked problems with confusion, delusions, paranoia, problems with communication, and recall for personal details."); T. Hyde Decl. ¶ 14 ("Mr. Purkey has demonstrated a progressive decline in his cognitive abilities over the past 4–5 years, characterized by memory deficits, problems with speech and language, impairments in reasoning and judgment, paranoia, and delusional beliefs . . . consistent with the diagnosis of dementia."). Mr. Purkey holds an honest and deeply entrenched belief that the federal Government plans to execute him not as punishment for the murder of Jennifer Long, but because of his "protracted jailhouse lawyering." Compl. Ex. 15 at 994, ECF No. 1-18. In Mr. Purkey's mind, the voluminous grievances and lawsuits he has filed throughout his incarceration "have had a monumental impact in preventing correctional officers from depriving prisoners of their constitutional rights." Compl. Ex. 5 at 41, ECF No. 1-1. Mr. Purkey believes that Attorney General Barr and the BOP, therefore, developed a plot to kill him both as retaliation against him for his previous litigation and to prevent him from future filings. *See, e.g.*, Compl. Ex. 1 at 11, ECF No. 1-1 (finding that Mr. Purkey insists the Government is "eager[] to be rid of him and his successful litigation"). Moreover, Mr. Purkey perceives his own counsel "as part of the conspiracy against him and his efforts to litigate against the prison"—a belief that prevents him from cooperating with them on matters related to his execution. Compl. Ex. 5 at 54, ECF No. 1-1.

13

**III.** **THE GOVERNMENT'S CONTINUED REFUSAL TO PROVIDE MR. PURKEY INFORMATION RELEVANT TO HIS COMPETENCY**

The evidence recited above has been collected and presented despite numerous impediments imposed by the United States to the full and fair litigation of this claim. Since August 2019, counsel for Mr. Purkey has made repeated efforts to obtain information from the BOP to further evaluate Mr. Purkey's competency. *See generally* R. Woodman Decl. . The Government has repeatedly stonewalled these efforts, refusing to provide the requested information and denying access to expert testing and highly probative contemporaneous information about Mr. Purkey's mental and physical health. Mr. Purkey's counsel still has not received any of this requested information with only 21 days remaining before the Government plans to carry out his execution. The Government's months-long failure to provide this relevant information has now been exacerbated by the COVID-19 pandemic. Mr. Purkey's counsel and medical experts have been unable to visit Mr. Purkey for months. As Drs. DeRight and Hyde stated, these in-person visits from individuals who have known Mr. Purkey for some time and have witnessed his mental decline over the years are critical to understanding the trajectory of his progressive dementia and his present mental state. *See* Letter from Jonathan DeRight, PhD, ABPP-CN, Woodbridge Psychological Associate, PC, to Rebecca E. Woodman, Esq., Attorney at Law, L.C. (June 14, 2020), attached hereto as Ex. 1; T. Hyde Decl. ¶ 14 (noting observations over time by mitigation specialists Fox and Vartkessian); *see also* E. Vartkessian Supp. Decl. ¶¶ 4, 11, 22–25 (describing the kind of information only available through in person, face-to-face visits).

For almost ten months, Mr. Purkey's counsel has continually requested Mr. Purkey's updated BOP medical and mental health records, the surveillance video from Mr. Purkey's cell, and the BOP death watch protocol—all of which are relevant to Mr. Purkey's current mental

state and functioning. Mr. Purkey's counsel first requested this information directly from the BOP and was told the information could only be obtained through the Freedom of Information Act (FOIA) process (even though the request was for Mr. Purkey's own records and made by Mr. Purkey's attorney of record). R. Woodman Decl. ¶¶ 9–12. On October 9, 2019, Mr. Purkey's counsel did submit FOIA requests for the information to the BOP. R. Woodman Decl. ¶ 12, Exs. 6–9. Counsel sought expedited FOIA processing in light of Mr. Purkey's then-scheduled execution date of December 13, 2019. Compl. Ex. 17 at 1456, ECF No 1-20; R. Woodman Decl. ¶ 12, Exs. 6–9. Counsel also sent a copy of this request to BOP Legal Counsel (from whom Mr. Purkey's counsel had also unsuccessfully requested the cell video footage on September 17, 2019). R. Woodman Decl. ¶ 12, Ex. 9.

In a letter from the BOP dated October 10, 2019, Mr. Purkey's counsel was notified that the request for expedited processing was granted and would be processed as soon as practicable, but that processing the request may nonetheless take up to six months. Compl. Ex. 16 at 1454–55, ECF No. 1-19; R. Woodman Decl. ¶ 13, Ex. 10. On October 11, 2019, counsel for Mr. Purkey wrote again to BOP Legal Counsel, noting that the response time was "untenable" given Mr. Purkey's pending execution date was two months away and requesting the records as soon as possible. R. Woodman Decl. ¶ 13, Ex. 11. BOP Legal Counsel responded on October 16, 2019 that she would follow up to see about a more expedited time frame. R. Woodman Decl. ¶ 13, Ex. 12.

On November 11, 2019, counsel for Mr. Purkey again asked for Mr. Purkey's medical records and video records. *Id.* ¶ 13, Ex. 13. This time, counsel asked that Defendant BOP provide the records within ten days in light of Mr. Purkey's pending execution date. *Id.* BOP Legal Counsel acknowledged that "everyone involved is cognizant that time is of the essence,"

15

and agreed to forward the communication to the FOIA personnel handling the request. *Id.* Despite this, no production of relevant records was made.

Even after Mr. Purkey's initial execution warrant expired, Mr. Purkey's counsel continued to pursue these critical records and the BOP continued to refuse to provide them. On February 3, 2020, Mr. Purkey's counsel submitted updated and renewed FOIA requests seeking: (1) BOP policies and procedures pertaining to BOP surveillance of Mr. Purkey as well as copies of video surveillance tapes of his cell, and (2) Mr. Purkey's medical, mental health, and administrative BOP file (including disciplinary records). *See* R. Woodman Decl. ¶¶ 25–26, Exs. 28–30. A supervisory attorney at the BOP acknowledged receipt of the requests and stated that the information would be forwarded to the FOIA processor who would reach out if more information was necessary to fulfill them. *See id.* ¶ 26, Ex. 35. Neither the FOIA processor nor any other person at the BOP has requested further information to facilitate the FOIA request and the requested information has still not been produced. Defendants, however, first disputed that Mr. Purkey had renewed his FOIA requests, and then remarkably represented that the BOP did not have any record of the updated or renewed FOIA request. *See* R. Woodman Decl. ¶¶ 27–29, Ex. 37.

Mr. Purkey's counsel pressed the issue of Defendants' failure to provide Mr. Purkey's records or grant access for testing in Mr. Purkey's March 16, 2020 Opposition to Defendant's Motion to Dismiss. Mem. in Supp. of Pl. Opp. to Defs.' Mot. to Dismiss 7–10, ECF 20.[4] As recently as June 15, 2020, shortly before receiving notice of the new warrant, Mr. Purkey's

---

[4] Counsel specifically argued that Defendants should grant access to the necessary materials because waiting for a short warrant period would impose "'unrealistic time-frame' to allow counsel to obtain the information it needs to prepare for a competency hearing, this court to conduct it, and an appellate court to review it." Mem. in Supp. of Pl. Wesley Purkey's Opp. to Defs.' Mot. to Dismiss 10, ECF No. 20.

counsel again wrote to BOP Legal Counsel to follow-up on the 2020 FOIA requests. *See* R. Woodman Decl. ¶ 32, Ex. 39. No response was received and, to date, *none* of the requested materials from either of the FOIA requests have been produced.

The reports from Dr. DeRight and Dr. Agharkar and declaration from Dr. Hyde illustrate that important questions of fact regarding Mr. Purkey's competency cannot be fully answered without the withheld medical and BOP records. For example, Mr. Purkey's legal team reports that Mr. Purkey appears to be incontinent. Compl. Ex. 3 at 25, ECF No. 1-1. This is an important marker of Alzheimer's Disease. *Id.* at 28. The medical records may shed light on when Mr. Purkey's incontinence began, and the extent of his loss of this biological function. Dr. Agharkar noted that Mr. Purkey has less movement on the right side of his face, as if he had suffered a stroke. Compl. Ex. 1 at 10, ECF No. 1-1. Without the medical records, counsel lacks information about whether Mr. Purkey has had a stroke. These questions are merely illustrative, not exhaustive, of the information withheld. The need for the withheld medical records is especially pressing because neither Mr. Purkey's counsel nor counsel's expert witnesses have been able to visit Mr. Purkey since March 2020 to evaluate whether Mr. Purkey's cognitive and physical impairments have worsened. Further, continuous observation is imperative to identify the declining functions and cognitive awareness that are hallmarks of persons with dementia. This is one reason the surveillance footage from Mr. Purkey's cell is so critical in addition to his medical and administrative records. Range video surveillance, which shows Mr. Purkey in his typical prison setting, will provide for observation of Mr. Purkey's condition in a way that the somewhat artificial setting of a visitation cannot.

Defendants have also prevented Mr. Purkey's access to highly probative testing ordered by his experts. On September 26, 2019, Dr. Agharkar ordered brain image testing based on Mr.

17

Purkey's history of cognitive deficits and the need to rule out an intracranial process. *See* R. Woodman Decl. ¶ 14, Exs. 14, 15. Counsel contacted appropriate authorities at USP Terre Haute to address institutional issues associated with carrying out such testing and were advised that such testing would require a court order, had to be conducted on-site by Defendant vendors, and that Mr. Purkey's defense counsel had to pay for the testing. R. Woodman Decl. ¶ 15, Exs. 16–17. Mr. Purkey's counsel filed an *ex parte* motion for brain imaging in October 2019 in Mr. Purkey's habeas case, requesting a Court order directing that such testing occur at no cost to the Court. *See* R. Woodman Decl. ¶ 15, Ex. 18. The motion was denied on November 20, 2019 because it was not related to a *Ford* claim. Order Denying Pet. for a Writ of Habeas Corpus, *Purkey v. United States*, Case No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019), ECF No. 76 (*Ex Parte*); *see* R Woodman Decl. ¶ 18.

On June 15, 2020, Mr. Purkey's counsel requested that Dr. DeRight be allowed to visit and evaluate Mr. Purkey in person. *See* R. Woodman Decl. ¶ 32, Ex. 39. Dr. DeRight last conducted an in-person examination of Mr. Purkey in August of 2019. *Id. See* Ex. 1. Standard best medical practices require repeated neuropsychological examinations, including up-to-date neuroimaging and blood laboratory tests, to assess Mr. Purkey's current abilities and the progression of his dementia. *Id.* Dr. Hyde also made clear that additional examination and testing is necessary. *See* T. Hyde Decl. ¶ 8 (stating that "a complete neurological assessment includes a face-to-face interview and physical neurological examination of Mr. Purkey, and follow-up with relevant diagnostic testing," to include an MRI, EEG, a variety of blood tests, spinal tap, and PET scans).

Defendants have also interfered with counsel's access to Mr. Purkey during this critical period before and during the current pandemic and USP Terre Haute's lockdown. In October

18

2019 Mr. Purkey filed, among other filings, a *pro se* request to withdraw pending litigation. R. Woodman Decl. ¶ 16, Exs. 19–21. The Southern District of Indiana ordered an October 31, 2019 telephonic hearing regarding those filings with Mr. Purkey and his counsel. *Id.* ¶ 20. In anticipation of that hearing, Michelle Law, counsel for Mr. Purkey, traveled to USP Terre Haute from her office in Springfield, Missouri. *Id.* By car, this trip is over six hours one way. The prison refused to allow counsel to meet with Mr. Purkey in preparation for the telephone conference. *Id*.

Now, with just over three weeks until Mr. Purkey's execution, Mr. Purkey has been prohibited from meeting in-person with legal counsel since March 13, 2020. *Id.* ¶ 33; E. Vartkessian Supp. Decl. ¶ 3 This access to Mr. Purkey by both his legal counsel and medical experts continues to be impeded by the COVID-19 pandemic, the USP Terre Haute COVID-19 outbreak, and the BOP's complete lack of preparation to deal with visitations, let alone executions during this extreme medical emergency. BOP has yet to officially release *any* written safety protocols or procedures regarding visitations to USP Terre Haute during the pandemic. R. Woodman Decl. ¶¶ 13–38. In fact, communications with BOP Legal Counsel indicate that such protocols and procedures do not yet exist. This is troubling and, ultimately, unacceptable, particularly given there has been a confirmed death and ongoing infections from COVID-19 at USP Terre Haute. *Id.* ¶ 36.

COVID-19 is a global pandemic, that has sickened over two million people and resulted in over 119,000 deaths in the United States alone. J. Goldenson Decl. ¶ 8. Cases continue to rise in states across the country, including in the Midwest. *Id.* Prisons and other detention facilities pose heightened risks for exposure and transmission of the COVID-19. *Id.* ¶ 17. The lack of adequate ventilation, inability of all prisoners and staff to practice social distancing, inadequate

19

hand washing, and insufficient cleaning practices all contribute to the increased risk for the rapid spread of COVD-19 in prisons. *Id.* ¶¶ 18–31.

In recognition of the threat of COVID-19, the BOP has suspended all social and legal visits across the country.[5] All visitation at USP Terre Haute has been suspended since March 13, 2020. At the time of this filing, the BOP website still states that no visitors are allowed at USP Terre Haute and that all social and legal visits for all BOP facilities remain suspended. J. Goldenson Decl. ¶ 39. With scant testing, and no published data about the number of tests administered at USP Terre Haute, it is impossible to know the full scale of the infection. *Id.* ¶ 37.

Mr. Purkey's counsel immediately contacted BOP Legal Counsel to discuss USP Terre Haute's visitation policy after receiving notice of Mr. Purkey's new execution warrant. R. Woodman Decl. ¶ 37, Ex. 50. BOP Legal Counsel expressed willingness for legal visits to resume but could not provide any official protocols regarding visitation or safety precautions, despite the COVID-19 pandemic and outbreak at USP Terre Haute. *See id.* Ex. 51. Although BOP Legal Counsel stated that she would provide Mr. Purkey's counsel with a written policy the next day, June 17, 2020, Mr. Purkey's counsel has yet to receive any official documentation regarding legal or expert visits despite following up multiple times with BOP Legal Counsel. *Id.* ¶ 38, Ex. 52. This makes it impossible to plan for any type of visit, particularly since getting to the prison would require virtually every member of Mr. Purkey's defense team to travel hundreds of miles, some necessarily by plane, during a pandemic. *See id.* BOP Legal Counsel indicated only that the prison anticipated installing Plexiglass on Thursday, June 25, 2020 for possible use during visits. *Id.* ¶ 38. A single email referencing the possible installation of a

---

[5] *BOP Implementing Modified Operations*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 21, 2020).

piece of Plexiglass (with no supporting details) falls far short of the coordinated formalized plan necessary to protect Mr. Purkey, his medical experts, and counsel, as well as prison staff, prisoners, and members of the community. BOP has not explained how visitation is suddenly safe for the four inmates who have execution warrants and their visitors, but still too dangerous for the over 1200 other prisoners at USP Terre Haute and their visitors. In any case, the cursory and unplanned approach is entirely insufficient to protect Mr. Purkey, his medical experts, and counsel from exposure to COVID-19, particularly in the close quarters with limited ventilation and air flow within death row visitation rooms, while also providing adequate access to Mr. Purkey to make meaningful assessments. J. Goldenson Decl. ¶ 40.

All three of Mr. Purkey's expert witnesses have made clear how vital it is for Mr. Purkey's legal team to have in-person visits, testing, imaging, and examinations to obtain an accurate assessment of the progression of his dementia. *See* Ex. 1; Compl. Ex. 1, ECF No. 1-1; T. Hyde Decl. ¶¶ 8, 9, 11, 12, 15, 16, 17. By fast-tracking Mr. Purkey's execution, the Government ignores the unfortunate realities of the COVID-19 pandemic, creating an impossible choice for Mr. Purkey's experts and counsel: in order to help save Mr. Purkey's life, they must risk their own life and the lives of their family members or medically vulnerable persons to whom they provide care. Mr. Purkey must face the prospect of dying without his legal and spiritual advisors, and without familial support by his side—either because they will not be permitted to visit him, or because they must risk their lives to do so. J. Goldenson Decl. ¶¶ 40–49. Even the family members of the *victim* of Mr. Purkey's crime must make this difficult decision, as it is their right to attend the execution. *Id.* ¶¶ 44–49.

The Government's decision to schedule Mr. Purkey's execution with only one month's notice, after its months-long refusal to provide relevant materials and access to Mr. Purkey, and

21

in the midst of a global pandemic that creates new difficulties and dangers associated with in-person visits, further illustrates the necessity and appropriateness of injunctive relief.

## ARGUMENT

### I. THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION TO STAY THE PROCEEDINGS

Courts consider four factors on a motion for a preliminary injunction: 1) the likelihood of the plaintiff's success on the merits, 2) the threat of irreparable harm to the plaintiff if an injunction is not granted, 3) the balance of the equities, and 4) the interests of the public. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017). Likelihood of success and irreparable harm are "the most critical" factors in whether a preliminary injunction is warranted. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Courts in this Circuit traditionally analyze the four factors using a "sliding-scale" approach, whereby "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). That framework "allows a movant to remedy a lesser showing of likelihood of success on the merits with a strong showing as to the other three factors, provided that [there is] a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). Absent a contrary holding from the D.C. Circuit, courts in this District continue to apply the sliding-scale standard following the Supreme Court's decision in *Winter*. *See, e.g.*, *id.* at 560–61; *Nat'l Parks Conservation Ass'n v. Semonite*, No. 17-CV-01361-RCL, 2018 WL 3838809, at *1 (D.D.C. July 3, 2018); *Steele v. United States*, 287 F. Supp. 3d 1, 3 (D.D.C. 2017); *see also John Doe Co.*, 849 F.3d at 1131 (citing *Holiday Tours* when describing

22

the requirements of a preliminary injunction). Courts repeatedly have held that where a petitioner provides current evidence suggesting that he is not competent and "no court has ever made the appropriate inquiry," the balance of these factors warrant a stay of execution for a competency determination. *See, e.g., Miller v. Stewart*, 231 F.3d 1248, 1250, 1252 (9th Cir. 2000) (granting stay of execution to determine competency because petitioner presented current evidence of incompetency as well as evidence that his housing conditions are such that they "can cause psychological decompensation to the point that individuals may become incompetent."); *In re Moser*, 69 F.3d 690, 691 (3d Cir. 1995) (granting a stay of execution in order to determine competency where competency had been an issue earlier in the proceedings and where petitioner had previously been placed in psychiatric facilities).

Each of the preliminary injunction factors independently weighs in favor of an injunction in this matter.

### A. Mr. Purkey Demonstrates A High Likelihood of Success on His Eighth Amendment and Due Process Claims

Mr. Purkey is likely to succeed on his claims. To demonstrate that success on the merits is sufficiently likely, a plaintiff "need not establish an absolute certainty of success." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); *see also Holiday Tours*, 559 F.2d at 843. Instead, it is ordinarily sufficient that "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844; *see also Cigar Ass'n*, 317 F. Supp. 3d at 560–61; *Nat'l Parks Conservation Ass'n*, 2018 WL 3838809, at *1; *Steele*, 287 F. Supp. 3d at 3. But even under a more exacting standard, there is a strong likelihood that Mr. Purkey will succeed on the merits of each of his claims. Furthermore, a preliminary injunction is appropriate if the Court finds that any *one* of Mr.

Purkey's claims is sufficiently likely to succeed. *See, e.g.*, *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987) (affirming that, "in light of the district court's conclusion that the [plaintiff] will likely succeed on . . . two counts, it correctly declined to reach the merits of the [plaintiff's] other claims"); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 n.1 (9th Cir. 2014) (reversing denial of preliminary injunction where "there is a likelihood of success on the merits on one claim").

Mr. Purkey presents lay and expert observations of his obvious mental and cognitive decline and current state of mental incompetency, as well as a wealth of corroboration of his deteriorating mental health and cognitive impairments. *See generally* Compl., ECF No. 1. He demonstrates a high likelihood of success, and "[a] death sentence cannot begin to be carried out by the State while substantial legal issues remain outstanding." *Barefoot v. Estelle*, 463 U.S. 880, 888 (1983). It is only by enjoining Mr. Purkey's execution pending the hearing and determination of this motion that the Court can ensure the effective presentation and resolution of Mr. Purkey's *prima facie* competency claim. *Miller*, 231 F.3d at 1250; *In re Moser*, 69 F.3d at 692; *see also In re Hearn*, 376 F.3d 447 (5th Cir. 2004) (staying execution to allow investigation of mental retardation claim). Any other form of relief could result in the untenable situation where this Court finds a colorable competency issue to exist but cannot consider those arguments because the Government executed Mr. Purkey. Thus, this Court should enjoin and bar Mr. Purkey's execution pending a resolution on the merits of his *Ford* competency claim.

### 1. Mr. Purkey Is Likely to Prevail On His Due Process Claim

Mr. Purkey is likely to prevail on his claim that he is entitled to a hearing on his competence to be executed pursuant to his right to due process. Under the Due Process Clause of the Fifth Amendment, Mr. Purkey is entitled to notice and an opportunity to be heard on the

24

manner in which the Government will deprive him of his life and liberty. In a *Ford* inquiry, a prisoner who makes a sufficient threshold showing of incompetency is entitled to "the protection afforded by procedural due process," including a hearing at which to present evidence on the ultimate issue of competency. *See Panetti*, 551 U.S. at 948–49 ("Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being.") (quoting *Ford*, 477 U.S. at 411–12). A "fair hearing" is necessary under *Panetti* and *Ford* because there are facts that must be established at the time of, or shortly before, an execution date to determine if sanity is an issue. *Id.* at 948–49 ("fair hearing" necessary for fundamental fairness because "the fact or timing of [a prisoner's] execution [is] contingent upon establishment of a further fact") (quoting *Ford*, 477 U.S. at 411–12, 426).

Defendants have failed to provide Mr. Purkey with any adequate mechanism to gather, assess, and present information relevant to his current competency in violation of his federal due process rights. Indeed, Defendants have failed to establish *any* federal process at all to allow for the adequate review of Mr. Purkey's *Ford* competency claim. There are no federal procedures or regulations to facilitate access to necessary information by federal prisoners for investigating and litigating *Ford* claims. *Cf. Ex parte Jordan*, 758 S.W.2d 250, 252–53 (Tex. Crim. App. 1988) (en banc) (highest Texas criminal court noting that Texas had an "alarming lack of any Texas statute specifying the procedures to be followed in raising and determining a defendant's execution competency," in contrast to the vast majority of states, and inviting the legislature to adopt standards); *Commonwealth v. Banks*, 943 A.2d 230, 234 n.7 (Pa. 2007) (there "is not currently in place a specific procedure for the timely handling of *Ford v. Wainwright* claims").

25

In the context of state-conducted executions, courts have described the threshold showing of incompetency that a prisoner must make under *Ford* in various ways. *Panetti*, 551 U.S. at 949 (prisoner who makes a "substantial threshold showing" of incompetency is entitled to hearing on competency issue) (quoting *Ford*, 477 U.S. at 426, 424); *Charles v. Stephens*, 612 Fed. App'x 214, 221–22 (5th Cir. 2015) (whether described as a "colorable" or "substantial" showing, the burden "may require little, [but] at least requires some competent evidence" of prisoner's incompetency); *see also Ford*, 477 U.S. at 417 (citing *Pate v. Robinson*, 383 U. S. 375, 383 U.S. 387 (1966) and comparing competency to be executed to competency to stand trial, wherein a hearing on competency is required if "sufficient doubt" of competency exists). Regardless of how this standard is characterized, Mr. Purkey's extensive evidence of incompetency more than satisfies the threshold showing.

Mr. Purkey, who has not previously received an execution-related competency hearing, has submitted hundreds of pages of evidentiary support demonstrating his current incompetency as well as its historical progression and underpinnings, including: a report of a neuropsychologist concluding that Mr. Purkey has Alzheimer's; a report of a neuropsychiatrist concluding that Mr. Purkey—due to his irrational delusions and dementia—does not have a rational understanding of the basis for his execution; a neurologist report concluding that Mr. Purkey likely has some type of dementia based on his review of Mr. Purkey's history and current conditions, and reports of the investigators on his case who have witnessed his decline and deterioration. As cases granting a *Ford* hearing demonstrate, this evidence is more than enough to entitle Mr. Purkey to a fair competency hearing. *See Panetti*, 551 U.S. at 938, 950 (Panetti met the "threshold showing" when he filed a Renewed Motion To Determine Competency, supported by "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed

petitioner while on death row"); *Eldridge v. Thaler*, Civil Action No. H-05-1847, 2009 WL 3856672 (S.D. Tex. Nov. 17, 2009) (finding a substantial threshold showing of *Ford* insanity where the petitioner "submitted evidence from lay observers about his bizarre behavior and his delusional statements," including a belief his food is poisoned, evidence that his mental health has deteriorated in the last few years, and expert evidence corroborating those observations and opining on incompetency); *Wood v. Quarterman*, 572 F. Supp. 2d 814, 819 (W.D. Tex. 2008), *aff'd sub nom. Wood v. Stephens*, 619 F. App'x 304 (5th Cir. 2015) (petitioner was entitled to a *Ford* hearing based on his record of suicides, prior mental health problems, paranoia, and delusional statements to counsel).

Further, Mr. Purkey's federal *Ford* claim is properly brought before this Court. *See generally* Pl.'s Br. Pursuant to This Court's Order of Dec. 31, 2019, ECF No. 14; Pl.'s Reply to Defs.' Resp. to This Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17. Mr. Purkey's *Ford* claim does not challenge his underlying conviction or sentence and is therefore not "core" habeas and need not be brought exclusively through habeas. *See* Pl.'s Reply to Defs.' Resp. to This Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17 (providing multiple examples of parties seeking equitable relief for constitutional violations outside of habeas). The Government's relevant briefings continue to provide no authority for a contrary holding and in fact continues to ignore the core habeas analysis. Defs.' Resp. to Purkey's Br. Filed Pursuant to this Court's Order of Dec. 31, 2019, ECF No. 16; Defs.' Mot. to Dismiss or, in the Alternative to Transfer, ECF No. 18. As the Government itself acknowledges (through its convenient silence), competency is transitory and may be restored. Pl.'s Reply to Defs.' Resp. to This Court's Order of Dec. 31, 2019 at 3, ECF No. 17. If Mr. Purkey's *Ford* claim is successful, neither his conviction nor his sentence would be altered and, were the Government able to restore Mr. Purkey to a competent

27

state, his sentence would be executable. Mr. Purkey's *Ford* claim is thus not core habeas and is properly brought before this Court, independent of habeas, particularly because the named Defendants are the individuals that are singularly responsible for issuing Mr. Purkey's execution warrant, facilitating his actual execution, and issuing procedures to implement the execution.

Mr. Purkey is therefore likely to succeed on his due process claim entitling him to notice and a hearing on the competency issue, as well as the discovery that he has long sought and thus far been denied, including access to his most recent medical records. *See Panetti*, 551 U.S. at 952 (distinguishing between procedures required under *Ford* (namely, an impartial decision maker and an opportunity to offer evidence to counter government evidence of competency) and other rights falling under the Due Process Clause in some cases such as "the opportunity for discovery or for the cross-examination of witnesses"); *Ford*, 447 U.S. at 399 (due process on issue of competency to be executed was not satisfied where there was no meaningful opportunity to substantiate the claim before it was rejected, there was no opportunity to confront state's evidence, and there was no judicial factual determination of competency or incompetency to be executed).

Being "deprived of life" unequivocally implicates a constitutionally protected interest, U.S. Constitution amendment V, and the Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977). Thus, carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate due process under the Fifth and Eighth Amendments. Mr. Purkey's likelihood of prevailing on his due process claim merits the grant of a preliminary injunction in order to accord Mr. Purkey an opportunity to be heard.

### 2. Mr. Purkey Is Likely to Prevail On His Eighth Amendment Claim

Mr. Purkey is also likely to prevail on his Eighth Amendment claim that his execution would constitute cruel and unusual punishment. The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti,* 551 U.S. at 934; *Ford v. Wainwright,* 477 U.S. 399 (1985); *see also Madison*, 139 S. Ct. at 722. A condemned prisoner is incompetent when he cannot rationally understand his punishment or the reason for it. *Panetti,* 551 U.S. at 958–60. "The critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for [his] execution.' . . . Or similarly put, the issue is whether a 'prisoner's concept of reality' is 'so impair[ed]' that he cannot grasp the execution's 'meaning and purpose' or the 'link between [his] crime and its punishment.'" *Madison*, 139 S. Ct. at 718 (quoting *Panetti*, 551 U.S. at 958–60).

The Supreme Court has recognized that evidence of either delusional disorders or dementia can be a basis to find incompetency to be executed. As the Supreme Court recently explained in *Madison*, "a delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729 (citing *Panetti*, 551 U.S. at 958; *Ford*, 477 U.S. at 409). Similarly, the Court recognized that dementia "can cause such disorientation and cognitive decline as to prevent a person from sustaining a rational understanding of why the State wants to execute him." *Id.*

Here, Mr. Purkey presents a strong factual basis regarding his current mental incompetency from numerous sources, including: a report of a neuropsychiatrist concluding that Mr. Purkey—by virtue of his Alzheimer's Disease, cognitive impairments, and severe mental illness—"lack[s] a rational understanding of the basis for his execution"; a report of a

29

neuropsychologist diagnosing Mr. Purkey with Alzheimer's disease; a declaration by a neurologist concluding that there is "substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder"; and reports of the investigators on his case who have witnessed his decline and deterioration.

As in *Panetti*, Mr. Purkey "can recite the fact that his execution is for the murder of Jennifer Long, [but] he lacks rational understanding of that fact." Complaint, Ex. 1 at 11–12, ECF No. 1-1; *Panetti*, 551 U.S. at 938. "This," Dr. Agarkhar explains, "is an example of parroting, rather than having a rational understanding." Compl. Ex. 1 at 11–12, ECF No. 1-1. Much like Scott Panetti, Mr. Purkey misunderstands the real reason for his execution, instead believing it is a "conspiracy of retaliation . . . for his legal work." *Id*. This "fixed belief" is "part of his long-standing delusions" (*id.*), which have persisted over decades, and are evidenced by numerous prior evaluations and institutional records as well as contemporaneous observations and opinions rendered by experts and defense team members. *See, e.g.*, Compl. Exs. 1, 3, 7; E. Vartkessian Supp. Decl. & Ex. 1 to Supp. Decl. R. Woodman Decl. Contemporaneous institutional records and psychiatric evaluations documenting decades of delusional behavior by Mr. Purkey and the progression of his dementia support this conclusion. *See id*.; *see also* Compl. Exs. 12–15, ECF Nos. 1-1 to 1-18. Further, affidavits and declarations of those interacting with him on a regular basis demonstrate his decline. *See generally* E. Vartkessian Supp. Decl.; R. Woodman Decl.; Compl. Ex. 7., ECF No. 1-1.

Like the petitioners in *Panetti* and *Madison*, Mr. Purkey has already made a substantial threshold showing of his incompetency, entitling him to a *Ford* hearing. Upon an opportunity to be heard, the extensive factual record compiled thus far, together with witness testimony and

30

the additional discovery to which Mr. Purkey is entitled, will demonstrate that Mr. Purkey is

not competent to be executed. Mr. Purkey is therefore highly likely to prevail on this ultimate

issue of whether his execution would constitute cruel and unusual punishment under the Eighth

Amendment. Thus, although Mr. Purkey need only demonstrate a likelihood of success on one

of his claims, *see, e.g., Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987),

both of Mr. Purkey's claims satisfy the likelihood of success prong of the preliminary

injunction analysis.

### B. Mr. Purkey Will Suffer Irreparable Harm Without an Injunction

Unquestionably, Mr. Purkey will suffer irreparable harm if the Court denies the motion

for a preliminary injunction. To constitute irreparable harm, "the harm must be certain and great,

actual and not theoretical, and so imminent that there is a clear and present need for equitable

relief to prevent irreparable harm," and it "must be beyond remediation." *League of Women

Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citing *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (internal quotation marks and

brackets omitted). Here, absent a preliminary injunction, Mr. Purkey will die on July 15, 2020.

As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury."

*Wilson*, 791 F. Supp. at 314; *see also Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring)

(noting that the "irreparable harm [that] will result if stay is not granted . . . is *necessarily present*

in capital cases") (emphasis added). In *Battaglia v. Stephens*, where the petitioner presented

"some evidence of mental illness and delusions," the Fifth Circuit granted a stay of execution to

afford the petitioner the opportunity to develop his *Ford* claim with new counsel. 824 F.3d 470,

475 (5th Cir. 2016). Because the irreparable injury factor weighed so heavily in the petitioner's

favor, it was enough that there was a possibility that his claim had some merit. *Id*. at 475–76.

31

Like others facing imminent execution, Mr. Purkey has alleged a harm that, if realized, cannot be corrected. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. The threatened harm is "beyond remediation," *Newby*, 838 F.3d at 7–8, because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297. For Mr. Purkey, there is no later date. His claims are therefore "categorically irreparable." *Nken*, 556 U.S. at 435. Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring).

A preliminary injunction maintains the status quo, and is subject to future correction or even reversal, while the denial of a preliminary injunction is not susceptible to correction. The proper course is to maintain the status quo, so that life is sustained, because the decision to allow Mr. Purkey to die is irreversible. When life is at stake, and Mr. Purkey's surely is, due process places a heightened burden of proof on the Government where the "individual interests at stake . . . are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (termination of parental rights). As the Government intends to extinguish Mr. Purkey's life, irreparable harm will result absent a preliminary injunction.

## C. The Balance of The Equities and Public Interest Weigh in Favor of A Preliminary Injunction

The balance of the equities and public interest also favor a preliminary injunction. Where the government opposes a preliminary injunction, these two factors merge. *See Nken*, 556 U.S. at 434–35. This Court has an interest in granting a preliminary injunction in order "to protect the Court's jurisdiction over the case, for if the inmate was executed while the competency question

32

was pending, the case would become moot even if it later appeared that the inmate clearly was incompetent." *Smith ex rel. Smith v. Armontrout*, 626 F. Supp. 936, 939 n.1 (W.D. Mo. 1986). A cognizable *Ford* claim presents important constitutional questions courts must approach with "deliberate and thoughtful" consideration, for "a ripe *Ford* claim is due the same consideration as other issues raised in a first habeas petition." *See Amaya-Ruiz v. Stewart*, 136 F. Supp. 2d 1014, 1030–31 (D. Ariz. 2001) (granting stay of execution pending resolution of the *Ford* claim). Consequently, the question becomes, what equitable interest do Defendants possess in executing someone who is presumptively incompetent?

Although Defendants may claim the Government will be harmed if there is delay in its scheduled execution of Mr. Purkey, such a claim must necessarily be rejected, as the Government itself elected to delay Mr. Purkey's execution, as well as the execution of any other federal prisoner, for nearly two decades. Arbitrarily setting an execution date of July 15, 2020, after years of delay by the Government itself and at its sole discretion, does not create a true exigency here. This critical fact undermines any claims the Government may have on the grounds of prejudicial delay. Moreover, other courts have found "little potential for injury" as a result of a delayed execution date. *See, e.g.*, *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004). Any potential harm to the Government caused by a delayed execution is outweighed by the clear and obvious harm to Mr. Purkey and by the public's interest in a constitutional application of the execution protocol. And not delaying the execution undermines the rule of law as pronounced by *Ford* and *Panetti*—that we as a society do not execute the incompetent. Moreover, the complexity of the issue before the Court, as well as the unsettled nature of this area of the law, also countenance in favor of granting a stay. *See Ferguson v. Sec'y for Dept. of*

33

*Corr.,* 716 F.3d 1315, 1318 (11th Cir. 2013) (noting that after *Panetti*, "there is not yet a well-defined bottom line in this area of the law.").

Further, as noted above, the only delays in this matter have been caused by the Government. Since August 2019, despite repeated requests and efforts by Mr. Purkey's counsel, the Government has continuously refused to provide his medical, mental health, and administrative records, to furnish (or possibly even preserve) video evidence depicting Mr. Purkey's dementia, or to grant access to Mr. Purkey for brain imaging, all of which is integral to Mr. Purkey's claim. *See generally* R. Woodman Decl. Additionally, due to COVID-19, the United States BOP has precluded all visitors into USP Terre Haute beginning March 13, 2020, and to this date, has not released specific policies or precautions so that visits can be safely planned and conducted with enough notice before Mr. Purkey's execution date. *Id.* ¶¶ 33–38. Mr. Purkey's defense team is still in a holding pattern, notwithstanding a Government-manufactured fire-drill. Although Mr. Purkey has presented sufficient evidence to overcome the threshold showing to be granted a *Ford* hearing, Mr. Purkey's defense team does not have the information it needs to fairly and accurately prosecute Mr. Purkey's constitutional claims in this suit, despite repeated efforts to obtain relevant information.

By contrast, Mr. Purkey has acted diligently and expediently to protect his constitutional rights. This case falls into a category of cases where filing is not ripe until execution is imminent. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644–45 (1998) (a competency to be executed claim is not ripe until it is time to execute the sentence). Mr. Purkey's status has declined over the years, including in the months and weeks leading up to his initial execution date and has declined even more since. E. Vartkessian Supp. Decl. ¶¶ 5–21. Mr. Purkey's legal team and experts have noted his decline over time. *Id.*; R. Woodman Decl. ¶¶ 14–

23. It is due to this decline, and Mr. Purkey's current mental incompetency, and the imposition of the sentence, that the case is now properly before this Court.

The Government may have a "strong interest in enforcing its criminal judgments," but that interest is outweighed by the public's interest in a "humane and constitutional" application of the federal execution protocol. *Nooner v. Norris*, No. 5:06CV00110 SWW, 2006 WL 8445125, at *4 (E.D. Ark. June 26, 2006). Indeed, that interest will be served even if Mr. Purkey ultimately succeeds on the merits of his claims. He does not contest his conviction or the sentence of death. He contests only the unconstitutional way in which the Government proposes to execute him in his current condition of incompetency. In any event, "the fact that the government has not—until now—sought to" schedule Mr. Purkey's execution "undermines any urgency surrounding" its need to carry out Mr. Purkey's sentence. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018). A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the Government. *Chaplaincy*, 454 F.3d at 297.

And, the COVID-19 pandemic inescapably impacts what is a humane and constitutional execution. Based on Mr. Purkey's deteriorating condition, it is very likely that Mr. Purkey's competency has only continued to decline. But Mr. Purkey's counsel has been unable to assess this without access to in-person visits with her client. R. Woodman Decl. ¶¶ 33–38; E. Vartkessian Supp. Decl. ¶¶ 22–25. Further, the lack of access to one of the only forms of contact with the outside world has itself likely exacerbated his serious mental illness and deteriorating mental capacity. E. Vartkessian Supp. Decl. ¶ 25. Even if the BOP begins to permit visits, Mr. Purkey's legal counsel, expert witnesses, and others will need to risk their

lives to save Mr. Purkey's. It is not in the public interest to subject citizens to undue and unnecessary health hazards.[6]

Finally, it is clearly not in the public interest to execute an incompetent person. The public interest is not served by executing an individual presenting a *prima facie* case of incompetency before he has the opportunity to avail himself of the legitimate procedures to challenge his competence, as required by clearly existing United States Supreme Court authority. Accordingly, the public interest is only served by preliminarily enjoining Mr. Purkey's execution because it will allow for the equal application of the law in judicial processes.

## II.   EXPEDITED DISCOVERY IS REQUIRED TO SUPPORT AN EVIDENTIARY HEARING

As set forth above, the Government has imposed conditions on Mr. Purkey's pursuit of additional medical testing and has delayed in providing information requested pursuant to FOIA requests, all of which are relevant to the claim Mr. Purkey currently brings before this Court. *See generally* R. Woodman Decl. Specifically, Mr. Purkey seeks: (1) the BOP medical, mental health, and administrative (including disciplinary) records for Mr. Purkey from January 1, 2017 through the present; (2) video surveillance of Mr. Purkey's cell from July 25, 2019 through the

---

[6] Texas and Tennessee appellate state courts have stayed several executions in light of the COVID-19 Pandemic. *See* Order, *Tennessee v. Smith*, No 89-F-1773 (Tenn. Apr. 17, 2020) (resetting the June 4, 2020 execution for February 4, 2021 "due to the COVID-19 pandemic"); *In re Hummel*, No. WR-81,578-02, 2020 WL 1268970, at *1 (Tex. Crim. App. March 16, 2020) (sua sponte granting 60 stay of execution "in light of the current health crisis and the enormous resources needed to address that emergency"); *In re Beatty*, No. WR-59,939-04, 2020 WL 1329145, at *1 (Tex. Crim. App. March 19, 2020) (same); *In re Hernandez*, No. WR-81,577-02, 2020 WL 1645052, at *1 (Tex. Crim. App. April 1, 2020) (granting sixty day stay of execution in recognition that execution "should be stayed at the present time"); *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1, (Tex. Crim. App. April 27, 2020) (same). A Texas district court rescheduled Carlos Trevino's execution from June 3, 2020 until September 30, 2020. Order Withdrawing Execution Date, *Texas v. Carlos Trevino*, No. 1997-CR-1717D (Bexar Co. Dist. Ct. Apr. 15, 2020) (order granting unopposed motion to withdraw order setting execution date until September 30, 2020 "due to restrictions and concerns caused by the COVID-19/Coronavirus pandemic"), https://files.deathpenaltyinfo.org/documents/Trevino-Carlos-TX-Bexar-Cty-Order-Rescheduling-Execution-2020-04-15.pdf.

present; (3) BOP policies and procedures regarding the day and night watch protocols for death row in effect from July 25, 2019 to the present; and (4) access to Mr. Purkey for independent brain imaging as ordered by Dr. Bhushan Agharkar and Dr. Thomas Hyde, and requested by Dr. Jonathan DeRight in accordance with the standard of care. Ex. 1, Compl. Ex. 1 at 9, ECF No. 1-1; R. Woodman Decl. ¶ 12, Exs. 6–8.

Mr. Purkey is entitled to expedited discovery on these issues. Mr. Purkey's current competency is squarely at issue in the instant matter, and his ability to present a full picture of his current mental state is undermined by the lack of access to his most up to date medical records and doctor-ordered brain imaging, both of which are exclusively in the Government's possession and control, and which the Government continues to refuse to provide to Mr. Purkey. Likewise, the Government's failure to provide counsel with the requested policies and procedures and limited surveillance footage impedes Mr. Purkey's defense team from evaluating his current mental state in light of the execution watch protocol. *See* R. Woodman Decl. ¶¶ 6–7. This is further exacerbated by the COVID-19 pandemic and now encompasses the Government's utter lack of any safety procedures or protocol related to safe visitation of death row inmates during the pandemic.[7]

Mr. Purkey intends to file a separate motion before this Court seeking expedited discovery to ensure Mr. Purkey's access to a full and fair competency hearing and this Court's ability to make an informed decision on the merits. Following an accelerated discovery timeline

---

[7] Mr. Purkey previously filed a request for expedited discovery as part of his original motion for preliminary injunction, Pl.'s Mot. for a Prelim. Inj. Barring Execution of Wesley Purkey's Pending Final Disposition on the Merits, ECF No. 7.

to obtain the requested testing and documents and review these key materials, counsel may seek to supplement this motion with this additional evidence.[8]

<div align="center"><strong>CONCLUSION</strong></div>

The Court should preliminarily enjoin the Government from proceeding to execute Mr. Purkey pending (a) a fair hearing on the issue of Mr. Purkey's competency to be executed; (b) a determination of Mr. Purkey's competency to be executed; and (c) the completion of expedited discovery in a *Ford* hearing to which Mr. Purkey is entitled based on his substantial showing of a threshold of incompetency.

DATED: June 22, 2020

Respectfully Submitted,

*/s/Charles F.B. McAleer, Jr.*
Charles F.B. McAleer, Jr. (DC Bar #388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

*/s/Brian Fleming*
Brian Fleming (DC Bar #974889)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

---

[8] At a minimum, Mr. Purkey has demonstrated that he is entitled to expedited discovery in order to further develop his *Ford* claim and in support of this motion. Thus, to the extent the Court does not now enjoin Mr. Purkey's execution pending final resolution of his claims, the Court should enjoin the execution until the Court resolves this renewed motion for preliminary relief *after* Mr. Purkey has been given an opportunity to gather additional evidence through expedited discovery, including information Mr. Purkey previously sought from Defendants but as to which he has been denied access, and *after* Mr. Purkey has been given an opportunity to supplement this motion with such additional evidence. *See, e.g., Battaglia*, 824 F.3d at 475 (where the petitioner presented "some evidence of mental illness and delusions," stay of execution was granted to afford the petitioner the opportunity to develop his threshold claim of incompetency with new counsel, given that any delay was not due to any dilatory conduct on the prisoner's part, and "newly appointed counsel may locate and produce more" evidence of incompetency upon being given a meaningful opportunity to advance the merits of his *Ford* claim).

<div align="center">38</div>

/s/Rebecca E. Woodman
Rebecca E. Woodman (*pro hac vice*)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

/s/Michelle M. Law
Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

**Counsel for Plaintiff**

# Exhibit 1

# JONATHAN DERIGHT, PHD, ABPP

### BOARD CERTIFIED CLINICAL NEUROPSYCHOLOGIST

June 14, 2020

Rebecca E. Woodman, Esq.
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114


     In re: Mr. Wesley Purkey

Dear Ms. Woodman,

I am writing regarding to your client, Wesley Purkey, on whom I performed an initial neuropsychological evaluation in August 2019. My evaluation of your client is ongoing. On November 21, 2019, I issued a report of my evaluation of Mr. Purkey and found that there was evidence of Alzheimer's disease, as had been shown in previous evaluations, and that his condition had significantly worsened in recent years. I was able to reach conclusions about his diagnosis and the severity of his condition at that time because I was afforded the opportunity to perform an in-person evaluation of Mr. Purkey and review neuroimaging, information from collateral sources who had interacted with him frequently, and substantial records. Multiple sources of information in this manner is essential for a thorough diagnosis and staging of his condition and is the standard of practice in the field of neuropsychology.

It has been almost a year since I have seen Mr. Purkey, and I am requesting that I be able to perform another in-person evaluation of him and review additional neuroimaging. It is routine clinical practice to see individuals with progressive dementias for updated evaluations after a year in order to determine the extent of progression and to obtain a current assessment of his symptoms. In addition to being afforded another opportunity to interview and perform additional testing on Mr. Purkey in person, I am requesting additional up-to-date neuroimaging (brain MRI and EEG) and blood laboratory results in accordance with best practices in the field of neuropsychology. The information available to me from Mr. Purkey's records and declarations from those who met with him frequently were essential in my analysis of his progressing physical and mental faculties, and having this up-to-date information will again be important in assessing his current abilities and disease progression. I am in need of this information in order to properly assess him.

Please inform me if you would like me to express any of the above requests in more detail.


     Best regards,

     Jonathan DeRight, PhD, ABPP-CN

1464 Ingleside Ave
MCLEAN
VA 22101

**Woodbridge Psychological Associates, PC**
JDERIGHTPHD@GMAIL.COM
703-680-4200 X 112

4320 Prince William Pkwy # 109
WOODBRIDGE
VA 22192

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03570-TSC |
| | ) | |
| WILLIAM P. BARR, *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>Declaration of Dr. Joe Goldenson</u>

I, Dr. Joe Goldenson, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

**<u>Background</u>**

1.      I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director.  In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility, planned and coordinated the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2.      I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3.      For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4.      I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate

1

patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5.      My CV is attached as Exhibit A.

6.      I am not being compensated for my time reviewing materials and preparing this report.

7.       As a researcher of prisoner health care and infectious diseases, I have studied the scientific literature about COVID-19, including the literature regarding symptoms, testing, infection rates and transmission.  In addition, I have studied and am familiar with the public health guidance regarding prevention and containment of COVID-19, including U.S. Centers For Disease Control ("CDC")'s Guidance for Population in Jails and the CDC's Interim Infection Prevention and Control  Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.

8.       I have been asked by counsel for Wes Purkey, a death row prisoner detained at the United State States Prison at Terre Haute in Terre Haute, Indiana to describe the risks to visitors, prisoners, staff and the community posed by legal, religious, social and/or expert visits at Terre Haute during the COVID-19 pandemic, and in particular, the risks to individuals with medical vulnerabilities.  I have also been asked to describe the risk to those attending and participating in Mr. Purkey's scheduled execution on July 15, 2020.

## COVID-19

COVID-19 is a serious disease that has reached pandemic status.  As of June 19, 2020, there are at least 8,637,901 confirmed cases of COVID-19 worldwide, including 2,219,675 cases in the United States.[1] At least 459,399 people have died, including 119,097 in the United States.[2] As of June 19, 2020 there were 41,438 confirmed cases of COVID in Indiana and 2,491 reported deaths.[3] Vigo County, where Terre Haute is located, has had only 203 confirmed cases but 8 deaths. Because these numbers include only laboratory confirmed cases, they likely understate the actual number of cases and deaths.  Even as some jurisdictions relax social distancing restrictions, new hotspots of infection continue to emerge and cases continue to rise in states across the South, West and Midwest.[4]  Cases have

---

[1] Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/(last visited June 19, 2020).

[2] *Id.*

[3] *Id.*

[4] Julie Bosman, W.H.O. Warns of 'Dangerous Phase' of Pandemic as Outbreaks Widen, New York Times (June 19, 2020), https://www.nytimes.com/2020/06/19/us/coronavirus-new-dangerous-phase.html;  New York Times, *Coronavirus Live Updates: Cases Across U.S. Surge Toward May's High* (June 20, 2020).

increased 15% over the last two weeks and, as of June 20, are rising in 18 states across the South, West, and Midwest.  Twelve states hit single-day case records this week.[5]

9.      COVID-19 is a highly contagious respiratory illness. It is transmitted between persons in close proximity (within about six feet) by airborne droplets released by infected individuals when they cough or sneeze.[6] The droplets can survive in the air for up to three hours. It may also be possible for an individual to become infected by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for variable lengths of time, ranging from up to four hours on copper, to 24 hours on cardboard, to two to three days on plastic or stainless steel.

10.     Signs and symptoms of COVID-19 may appear two to 14 days after exposure and may include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell.[7] In severe cases, COVID-19 can require hospitalization and lead to respiratory failure or death. While more than 80% of the cases are mild, overall some 20% of cases will have severe disease requiring medical intervention and support.

11.     Patients who suffer from serious disease may progress to Acute Respiratory Distress Syndrome (ARDS), which is a type of respiratory failure.  Many patients suffering from ARDS will require mechanical ventilation.  ARDS has a 30 percent mortality rate overall, and a higher mortality rate in people with other medical conditions.

12.     Certain populations are particularly vulnerable to severe cases of COVID-19.  The case fatality rate and need for advanced medical intervention and support increase significantly with advancing age in people aged over 50 and for people of any age with certain underlying medical conditions (the "medically vulnerable").  The CDC has identified people with the following medical conditions as being particularly vulnerable to severe illness from COVID-19:

- Diabetes mellitus
- Lung disease including asthma or chronic obstructive pulmonary disease (chronic bronchitis or emphysema) or other chronic conditions associated with impaired lung function or that require home oxygen

---

[5] New York Times, *Coronavirus Live Updates,* June 21, 2020, https://www.nytimes.com/2020/06/21/world/coronavirus-updates.html?action=click&module=Top%20Stories&pgtype=Homepage

[6] Centers for Disease Control and Prevention, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings, https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Fcontrol-recommendations.html.

[7] Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

- Heart disease
- Blood disorders (e.g., sickle cell disease or on blood thinners)
- Chronic kidney disease
- Chronic liver disease
- Compromised immune system (immunosuppression) (including seeing a doctor for cancer and treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications, HIV or AIDS)
- Current or recent pregnancy in the last two weeks
- Endocrine disorders
- Metabolic disorders
- Neurological and neurologic and neurodevelopment conditions [including disorders of the brain, spinal cord, peripheral nerve, and muscle such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury ][8]
- Severe obesity[9]

13.     The CDC also deems people 65 or older to be particularly vulnerable to COVID.[10]

14.     A significant number of infected individuals do not exhibit symptoms, however, and asymptomatic individuals—either before the onset of symptoms or because no symptoms will ever manifest—can nevertheless transmit the disease to others. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[11] Similarly, infected individuals may experience only mild symptoms. These asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. Because of the high risk of transmission by asymptomatic individuals, CDC recommends everyone wear a mask when they leave their homes.

---

[8] Centers for Disease Control and Prevention, *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission* (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[9] Centers for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness* (Apr. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[10] Centers for Disease Control and Prevention, *What You Can Do if You are at Higher Risk of Severe Illness from COVID-19* (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19-What-You-Can-Do-High-Risk.pdf.

[11] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

15.     At this time there is no vaccine to prevent COVID-19 and there is no known cure or anti-viral treatment available.[12]

16.     Current preventive measures seek to slow the transmission of COVID-19 through social distancing (keeping persons separated by at least six feet), frequent handwashing, and respiratory hygiene (*e.g.*, covering mouth and nose when coughing or sneezing), and frequent cleansing of surfaces.[13] While these are important and necessary actions to reduce the risk of infection and the spread of the virus, they are not fully preventive.

**COVID-19 in Detention Facilities Generally**

17.     For multiple reasons, the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community, putting inmates and correctional staff at high risk of becoming ill with COVID-19.

18.     Close living quarters and often overcrowded conditions in jails, prisons, and detention centers facilitate the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing or coughing. In these congregate settings, large numbers of people are closely confined and forced to share bunkrooms, bathrooms, cafeterias, and other enclosed spaces. They are physically unable to practice social distancing, which the CDC has identified as a "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[14] Within these facilities, space and resource limitations—and the resulting inability of inmates and employees to practice social distancing[15]—make it extremely difficult to effectively quell the explosive growth of a highly contagious virus. The CDC has recognized that correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[16]

19.     Frequent and thorough hand washing is one of the key recommendations to reduce transmission but sufficient soap and/or hand sanitizer is often not available (for inmates and staff) to wash their hands frequently enough to prevent the risk of transmission in contravention of the CDC's *Interim Guidance.*[17]

---

[12] Centers for Disease Control and Prevention, *Prevent Getting Sick* (Apr. 8, 2020), cdc.gov/coronavirus/2019-ncov/prevent-getting-sick.

[13] Centers for Disease Control and Prevention, *How to Protect Yourself and Others* 1–2 (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.

[14] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 4 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf

[15] *See id.* at 2, 11.

[16] *Id.* at 2.

[17] *See id.*

5

20.     Housing units are commonly poorly ventilated, which facilitates the transmission of airborne illnesses, such as COVID-19. The CDC recommends generally after an infection in buildings that building operators open windows to allow fresh air to circulate.[18] This recommendation is not possible in prisons.

21.     Current CDC recommendations for reducing the transmission of COVID-19 in jails include screening of all newly arriving arrestees, quarantining all newly arriving arrestees for 14 days and performing daily symptom screening and temperature checks while they are in quarantine, isolating any detainee with any symptoms consistent with COVID-19 or with fever who is currently housed in the facility, and providing masks to all inmates who are "confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19."[19] In addition, the CDC generally recommends providing and wearing masks in congregate settings. Individuals should not be added to an existing quarantine cohort after the 14-day quarantine clock has started.

22.     These are also difficult, if not impossible, to implement in prisons due to space constraints, lack of sufficient respiratory isolation rooms, and lack of necessary equipment and other resources.

23.     Testing has been limited in many jails and prisons. Even when available, it can take days to obtain results. Moreover, someone who is tested shortly after being infected may test negative. Non-test based verbal screens—i.e., asking a person for a subjective report of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the Centers for Disease Control and Prevention, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[20] Similarly, infected individuals may experience only mild symptoms. These newly infected, asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. As a result, such inadequate screening presents a critical problem. The possibility of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission. Because of the problems with screening procedures, the risk of false negative tests, the unavailability of test kits and the delays in obtaining test results, one necessary means to prevent the introduction of COVID into the jails by someone who is arrested is to quarantine all arrestees for 14 days and monitor them daily for symptoms and fever before they are deemed safe to introduce into the general population of the jail.

---

[18] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility* 2 (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility-H.pdf.

[19] *See* Centers for Disease Control and Prevention, *Interim Guidance* at 10, 14, 15, 20.

[20] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

24.     In detention facilities, groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria or visiting room. Persons often from multiple different housing units, congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, telephones, or court appearances. These group movements, which may cluster large numbers of people together in small spaces, increase the risk of transmission between incarcerated persons and throughout the facility. It is common for detainees in a given housing unit to routinely be subjected to such group movements multiple times each day. Additionally, detention facilities often rely on detainees to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility.

25.     Correction officers and other detention facility staff routinely have direct physical contact with detainees, especially when handcuffing or removing handcuffs from detainees who are entering or exiting the facility. Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the facility and transmission to and from detainees in different parts of the facility.

26.     Correctional facilities largely lack the robust medical care infrastructure that would be necessary to deal with a COVID-19 outbreak. If a significant number of people become sick with COVID-19 the institution's health care facilities will be unable to respond appropriately to those people and those who need medical care for other reasons.  And, when an incarcerated patient's needs are too acute for a correctional facility to provide adequate treatment, the patient must be transported to and treated at a community hospital.  Once COVID-19 spreads throughout the correctional facility, the burden of caring for many of these sick individuals will shift to local community medical facilities.

27.     When an outbreak strikes a correctional facility, correction and medical staff will become ill. They will not show up to work.  These vacancies can result in facilities becoming dangerously understaffed, which compromises medical care.  Healthcare staff who provide treatment are unavailable.  Correctional staff also play a vital role in delivering medical services, by escorting prisoners, responding to and alerting medical of medical emergencies, and providing security to health care staff while they provide services.  Their absence also compromises treatment.

28.     If infected, inmates are at greater risk for harm from COVID-19 than those in the general community.  This is due to a number of factors including the fact that people in prisons have high rates of chronic illnesses, such as diabetes, heart disease, chronic lung disease, and immunosuppressive illnesses such as HIV disease that increase the risk from COVID-19, often have had poor or absent prior health care, and often have made unhealthy life-style choices, including alcohol and drug use.  For these reasons, it is well accepted within the medical community that prison inmates are physiologically 10 years older than their chronological age.

29.     Because of the conditions typically found in jails and prisons, carceral settings often have particularly serious incidence of communicable disease.  For example, during the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[21] Until recently the Cook County Jail in Chicago was believed to be the largest-known source of U.S. COVID virus infections.[22]  As of April 13, more than 500 people had been infected at the facility, and the numbers continue to climb.[23]  In one prison in Ohio,  78% of the approximately 2,500 prisoners tested positive.[24]  The State of Ohio tested its prisoners en masse for COVID-19 so this number includes large numbers of inmates who were asymptomatic and would otherwise not have been tested.  This underscores the risk of the spread of COVID-19 by asymptomatic individuals.  In addition, 109 staff had tested positive for COVID-19.[25]

30.     During an infectious disease outbreak, a containment strategy requires people who have known or suspected illness be isolated and that caregivers have access to personal protective equipment to protect themselves and to prevent the further transmission of the disease. During an outbreak, jails and prisons are under-resourced in being able to provide medically appropriate housing for persons with known or suspected infectious illness, and are often underequipped to provide sufficient personal protective equipment, increasing the risk of a widespread outbreak.

31.     In sum, current CDC recommendations for social distancing, frequent hand washing, frequent cleansing of surfaces, symptom screening, temperature checks and isolation to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in carceral settings.  As a result, the risk of COVID transmission is far greater than in non-custodial institutions.  Given the rapid spread of COVID-19, it is likely impossible to achieve and sustain these measures sufficiently to mitigate the risk of transmission for medically vulnerable individuals.

---

[21] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deathsare-few/.
[22] Timothy Williams and Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Cirus Spreads Behind Bars*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.
[23] Cheryl Corley, *The COVID-19 Struggle In Chicago's Cook County Jail*, NPR (Apr. 13, 2020) https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail.)
[24] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (last updated Apr. 20, 2020), https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf,
[25] Bill Chappell and Paige Pfleger, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus,* NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus

**CONDITIONS IN PRISONS POSE SIGNIFICANT RISK OF TRANSMISSION OF COVID-19 IN THE COMMUNITY OUTSIDE THE PRISONS**

32.      The conditions in prisons pose very significant risk of transmission of communicable diseases like COVID-19 not only to inmates, employees and volunteers in the prisons, but also to the community as a whole.  It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission, and that due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. While prisons are often thought of as closed environments, this is not the case. A large number of custody, medical, and other support staff and contractors who have direct contact with detainees enter and leave the facility throughout the day.  Prisons admit and release prisoners on a regular basis.  Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to the jail population.

33.      When there is an outbreak in a prison, staff can become infected and bring the virus home to their families and community.  For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home.

34.      It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on the detention facilities and its surrounding communities. At Rikers Island in New York, between the mornings of Wednesday, April 1 and Thursday, April 2, the number of COVID-19 positive incarcerated individuals and staff members grew by 47 and 57 people, respectively, upping the jail's total numbers of confirmed cases to 231 among the incarcerated population and 223 among staff.[26] The first known case of COVID-19 at Rikers was confirmed on Wednesday, March 18,[27] illustrating just how quickly this disease can and will overwhelm detention facilities. A rising number of individuals in prisons continue to test positive for COVID-19.[28]

---

[26] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, Slate (Apr. 2, 2020), https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html.
[27] *As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000*, N.Y. Times (updated Mar. 19, 2020), https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.
[28] The Marshall Project*, A State-by-State Look at Coronavirus in Prisons* (June 18, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20200612-2022&utm_source=The+Marshall+Project+Newsletter&utm_campaign=06b2d8b8bf-EMAIL_CAMPAIGN_2020_06_12_11_47&utm_medium=email&utm_term=0_5e02cdad9d-06b2d8b8bf-160852501 (describing recent "remarkable growth in coronavirus cases and noting that recent widespread testing results "suggest that coronavirus had been circulating in prisons in much greater numbers than know in the early weeks of the pandemic").

## CONDITIONS AT TERRE HAUTE USP AND RISKS FOR VISITATION

35.     The Bureau of Prisons (BOP) describes the Terre Haute Federal Correctional Complex (FCC) as comprised of two facilities, USP Terre Haute, a High Security Detention Facility with 1,306 male prisoners and FCI Terre Haute, a Medium Security Federal Correctional Institution (978) with an adjacent Minimum Security Satellite Camp (256 prisoners).[29] Death row prisoners are housed in USP Terre Haute, in the Maximum Security Facility.

36.     In April, Terre Haute FCC became the BOP's regional intake center, resulting in the transfer of inmates who were in the custody of the US Marshals from facilities around the region.[30]

37.     The first case of COVID-19 in Terre Haute was publicly reported on May 16, 2020.[31] Since then, at least one prisoner has died from the virus.[32] The BOP has not reported information about the number of tests it has conducted at the facility. News report describe that as of March, 2020 the facility had only 4 testing kits for the entire complex.[33]

38.     Counsel has provided a declaration of a mitigation specialist, Elizabeth Vartkessian, describing the process of admission and visitation for death row prisoners at Terre Haute. This process is similar to other prisons I have visited, and involves close and repeated contact between the visitor and custodial staff and the visitor and the death row prisoner.

39.     As of June 19, 2020, the BOP website announces that "all visiting at this facility has been suspended." According to the BOP website's modified operations, all in person social and legal visits are suspended across all BOP facilities "in order to mitigate the spread of COVID-19."

---

[29] https://www.bop.gov/locations/institutions/tha/.

[30] WHTI-TV 10, *Terre Haute's Federal Prison Set to Become Intake Center for the Region, Bringing in Over 100 Inmates*, (April 15, 2020), https://www.wthitv.com/content/news/Terre-Hautes-federal-prison-set-to-become-intake-center-for-the-region-bringing-in-over-100-inmates--569642741.html; WHTI-TV 10, *New Inmates Arrived at Terre Haute's Federal Penitentiary As Part of Plan to Make it Intake Center for the Region* (April 22, 2020), https://www.wthitv.com/content/news/New-inmates-arrived-at-Terre-Hautes-federal-penitentiary-as-part-of-plan-to-make-it-intake-center-for-the-region-569837071.html.

[31] Lisa Trigg, *Case of COVID-19 Infection Reported at Federal Prison in Terre Haute*, Tribute-Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/article_85a075ee-9940-11ea-87fe-fb3a2398734d.html

[32] *Terre Haute Prison Inmate With COVID-19 Dies; 3 More Have It*, U.S. News (May 26, 2020), https://www.usnews.com/news/best-states/indiana/articles/2020-05-26/3-terre-haute-federal-prison-inmates-positive-for-covid-19

[33] Heather Good, *Inmates Describe Life in Federal Prison in the Age of the Coronavirus* (June 11, 2020), https://www.wthitv.com/content/news/Inmates-describe-life-in-federal-prison-in-the-age-of-coronavirus-571194451.html.

10

40.     Counsel for Mr. Purkey, Rebecca Woodman, has provided me with information regarding possible visits by members of Mr. Purkey's defense team, expert witnesses, spiritual advisor visits, and family visits.  According to USP Terre Haute Counsel, the only precautions the prison can offer are to provide visitors a mask, type unknown, take the temperature of visitors, and to install Plexiglass in the visitation room.  These measures alone are not adequate.  As noted above, necessary precautions include ensuring the ability to social distance, frequent cleaning and disinfecting of objects and surfaces, requiring staff and inmates to wear masks if within six feet of others, and adequate ventilation.

41.     Counsel has further informed me that some of Mr. Purkey's team members and witnesses are Medically Vulnerable.

42.     Given the current health crisis related to the COVID-19 pandemic, and the fact that COVID-19 has already been identified in the prison, with at least one inmate death, it is my medical opinion that it is not safe for medically vulnerable individuals (as defined above) to visit a correctional facility.

43.     I have personally been requested to visit a number of correctional facilities to determine if appropriate safety precautions were being implemented and followed.  Given my age (70 years old) and the fact that I suffer from medical conditions that make me medically vulnerable, I have turned down these requests.

**SPECIAL RISKS POSED BY EXECUTION**

44.     The BOP execution regulations specify the attendance of a large number of witnesses for executions.  They delineate 24 witnesses, exclusive of the custodial staff, Warden, Marshall, and Department of Justice Attorneys. The execution protocol provided by counsel, although redacted in many areas, clearly anticipates involvement of a large number of BOP and Marshall personnel.

45.     Public reports of the execution facility show it as a single low building.[34]   One reporter described the room where media witnesses were directed to witness the execution as a  "small, unadorned room." [35]  Images from news reports show a small execution chamber with windows into what appear to be small observation areas.[36]

---

[34] Andrew Cohen, *Same Planet, Different Wolds*, CBS News.Com (June 10, 2001), https://www.cbsnews.com/news/same-planet-different-worlds/.
[35] Peter Slevin, Witnessing A Federal Execution (Sept. 4, 2019), https://www.newyorker.com/news/news-desk/witnessing-a-federal-execution
[36] Annie Johnston, WHI-TV1-, *Judge Halts Federal Executions Scheduled to Take Place in Terre Haute* (Nov. 21, 2019); Julia Delcourt, Timothy McVeigh's Last Day, Tulsa World (June 10, 2001), https://www.tulsaworld.com/archive/timothy-mcveighs-last-day/article_3ee65baf-50b9-5253-9a98-140faf0cc125.html.

46.     During the 2001 Timothy McVeigh execution, a reporter described a "media area, on the prison grounds, but away from the actual buildings" that "looks and feels like a fairground or circus," with a temporary village of media tents and media staff moving around on golf carts and foot.[37]

47.     In Mr. Purkey's case, I am informed that all of the defense attorneys, defense investigators, and his family members live out of town and will need to travel by plane or long car rides to the prison to attend the execution.

48.     While airlines have implemented many safety measures aimed at reducing the risk of COVID-19 infection, air travel (including transportation to and from the airport, going through security check points, using public bathrooms, and boarding the airplane) still poses a significant risk of COVID-19 infection.  Dr. Bob Wachter, the chairman of the University of California, San Francisco's Department of Medicine stated, "Flying is an accumulation of a bunch of things that in general imply higher risk.  It is staying in fairly close contact with a whole lot of people you don't know, it is doing that indoors, it is doing that for long periods of time."[38]

49.     Events, such as the execution described above, pose added risk of COVID-19 infection and spread of the virus.  They are referred to as "super-spreader events" and involve indoor gatherings with many people, like a religious service or birthday party.  On April 8, 2020, CDC reported on a cluster of 16 confirmed or probable cases of COVID-19, including three deaths, likely resulting from one introduction. CDC noted that family gatherings including a funeral and a birthday party likely facilitated transmission of SARS-CoV-2 in this cluster.  CDC concluded, "Together with evidence emerging from around the world these data shed light on transmission beyond household contacts, including the potential for super-spreading events."[39]

**Conclusion**

50.     For the reasons above, it is my professional opinion that any individual entering the prison for legal or other types of visits or to witness an execution is at increased risk of COVID-19 infection and that those who are medically vulnerable are at even greater risk if they were to become infected.

---

[37] Andrew Cohen, *Same Planet, Different Worlds*, CBS News.Com (June 10, 2001), https://www.cbsnews.com/news/same-planet-different-worlds/.

[38] Sarah Feldberg, *Is it safe to fly? Far-flung Bay Area families weigh coronavirus risk,* San Francisco Chronicle, June 20, 2020, https://www.sfchronicle.com/travel/article/Is-it-safe-to-fly-Far-flung-Bay-Area-families-15351374.php

[39] *Community Transmission of SARS-CoV-2 at Two Family Gatherings — Chicago, Illinois, February–March 2020*, Morbidity and Mortality Weekly Report (MMWR), April 17, 2020, 69(15);446–450, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e1.htm?s_cid=mm6915e1_w

12

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 21, 2020 in Alameda County, California.

Dr. Joe Goldenson

13

# Exhibit A

# CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 557-1086**
**jgoldenson@gmail.com**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

**Consulting**

| | |
|---|---|
| 3/20-Preset | Federal Court appointed Medical Monitor, *Chavez, et al., v. County of Santa Clara,* Case No. 15-cv-05277-RMI, Consent Decree, United States District Court, Northern District of California, Eureka Division, re: Medical care in Santa Clara County Jail |
| 6/16-8/19 | Consultant to Los Angeles Department of Health Services re: provision of health care services in the LA County Jail |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Newsome,* Class Action Lawsuit re: prisoner medical care in California State Prison System |
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, U.S.A. v. Cook County, et al., United States District Court for the Northern District of Illinois, No. 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al.,* re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen,* Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al,* Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template),* |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs* |

*Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility

| | |
|---|---|
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |
| 2/98 | Medical Expert, Department of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

## Work Related Committees

| | |
|---|---|
| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
| 10/11 to 5/19 | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-1/15 | Director's Cabinet San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |

| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |
| 1/93-7/93 | Medical Staff Bylaws Committee, San Francisco Department of Public Health |

## ACADEMIC APPOINTMENT

| 1980-2015 | Assistant Clinical Professor |
| | University of California, San Francisco |

## PROFESSIONAL AFFILIATIONS

Society of Correctional Physicians, Member of President's Council, Past-Treasurer and Secretary

American Correctional Health Services Association, Past-President of California Chapter

American Public Health Association, Jails and Prison's Subcommittee

Academy of Correctional Health Professionals

## PROFESSIONAL PRESENTATIONS

*Caring for the Inmate Health Population: A Public Health Imperative,* Correctional Health Care Leadership Institutes, July 2015

*Correctional Medicine and Community Health,* Society of Correctional Physicians Annual Meeting, October, 2014

*Identifying Pulmonary TB in Jails: A Roundtable Discussion*, National Commission on Correctional Health Care Annual Conference, October 31, 2006

*A Community Health Approach to Correctional Health Care,* Society of Correctional Physicians, October 29, 2006

*Prisoners the Unwanted and Underserved Population*, *Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities,* Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine,* American Public Health Association Annual Conference, 11/19/2003

*Hepatitis in Corrections,* CA/NV Chapter, American Correctional Health Services Association Annual Meeting, 1/17/02

*Correctional Medicine*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections,* CA/NV Chapter, American Correctional Health Services Association Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care,* California Tuberculosis Controllers Association Spring Conference, 5/12/98

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program. Correctional Health Care: Practice, Administration, and Law*. Kingston, NJ: Civic Research Institute. 2017.

*Structure and Administration of a Jail Medical Program – Part II.* Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I.* Correctional Health Care Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail.* Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use.* Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector*, Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3–S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting.* Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County* Jail, American Journal of Public Health, 98:2182–2184, 2008

*Public Health Behind Bars*, Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail*, American Journal of Public Health, 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition*, Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility,* Mark Lobato, MD and Joe Goldenson, MD, *Clinical Practice in Correctional Medicine, 2nd Edition,* Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up.* American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness* Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice.* Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up,* American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings,* Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis*, International Journal of STD & AIDS; 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998*, International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release*, American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail*, International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998

## AWARDS

Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

## LICENSURE AND CERTIFICATION

Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR, *et al.,*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:19-cv-03570-TSC |

## DECLARATION OF THOMAS M. HYDE, M.D., Ph.D.

Thomas M. Hyde, M.D., Ph.D., pursuant to 28 U.S.C. §1746(2), declares as follows:

1.     My official residency is in the state of Maryland, and I am over 18 years of age. I am competent to provide this declaration.

2.     Unless otherwise stated below, the facts contained herein are based on my personal knowledge and any opinions expressed herein are based on my professional experience and the factual information presently available to me.

3.     I have received an extensive array of medical records and expert reports. These records and reports, as provided by Mr. Purkey's counsel, are the type relied upon by experts in the field of Neurology for the formulation of an expert opinion. I have thoroughly reviewed these records, and I have prepared this expert opinion report. I reserve the right to modify, edit, and/or amend this report if new information becomes available.

4.     Mr. Purkey's counsel requested that I prepare this declaration with respect to the Plaintiff's motion for a preliminary injunction, as well as any requests by Plaintiff for testing, interviews and examinations of Mr. Purkey and/or for discovery.

5. A true and genuine copy of my curriculum vitae is attached to this declaration as Exhibit 1. As a licensed physician in the states of Maryland and California, in practice since 1988, and as a Board-Certified Neurologist, I am qualified to attest to the standards of care and the diagnosis and management of patients with neurological disorders.

6. I was trained in Neurology at Stanford University Hospital in California, and I have provided patient care in both inpatient and outpatient settings since 1988. In addition to my neurological training, I have received additional training in Psychiatry at the National Institutes of Health, where I worked in clinical and basic science research from 1988–2010.

At the National Institute of Mental Health, a subdivision of the National Institutes of Health ("NIH"), I was the director of an outpatient Neurology Clinic at St. Elizabeth's Hospital in Washington, DC, from 1988–1996. At this clinic, I specialized in the diagnosis and treatment of patients with coexisting psychiatric and neurologic illnesses. I also evaluated patients for inclusion in experimental treatment protocols. From 1996–2010, I was based at the Clinical Center of the NIH, a large multidisciplinary research hospital in Bethesda, Md. At this facility, I evaluated patients in both inpatient and outpatient protocols focused on a variety of neuropsychiatric disorders, including dementia. Most recently, at the Lieber Institute for Brain Development, I have been an integral participant in a variety of studies of Alzheimer's disease and related disorders.

In addition to my work at the NIH, I also maintained a private clinical practice in Chevy Chase, MD, from 1988–2010. This practice consisted of neuropsychiatric evaluations of inpatients at several facilities in the Washington, DC metropolitan area, including the Psychiatric Institute of Washington, DC; Dominion Hospital in Falls Church, VA; and the now-closed Chestnut Lodge Hospital in Rockville, MD. My practice also encompassed the outpatient management of individuals with a wide range of neurological disorders. Moreover, a significant proportion of

2

these patients suffered from dementia, including Alzheimer's disease, frontotemporal dementia, vascular dementia, and chronic traumatic encephalopathy, and the neuropsychiatric consequences of these disorders.

7.    I was retained by counsel for Wesley Ira Purkey (date of birth: January 6, 1952) on April 16, 2020, to provide a neurological assessment of Mr. Purkey. The scope of this assessment included a review of relevant medical and legal records, an interview and neurological examination of Mr. Purkey, the performance of diagnostic testing to characterize any neurological issues from his history and examination, and the provision of a report summarizing my findings as indicated by the results of my assessment.

8.    In addition to record review and interviews of relevant parties, a complete neurological assessment includes a face-to-face interview and physical neurological examination of Mr. Purkey, and follow-up with relevant diagnostic testing. In order to complete an evaluation, depending upon the findings correlating the clinical and historical record with the results of my interview and examination, relevant diagnostic tests would include an MRI scan of the brain, an electroencephalogram (EEG), a variety of blood tests, lumbar puncture and cerebrospinal fluid assays (spinal tap), and positron emission tomography (PET) scans. A PET scan uses radioactive tracers to image the brain. Two types of PET scans could be useful: $^{18}$F-FDG-PET/CT to assess the patterns of cerebral glucose metabolism and/or one of several agents to measure amyloid deposition in the brain [$^{18}$F-Florbetapir ($^{18}$F-AV-45; Amyvid), $^{18}$F-florbetaben Injection, (also known as AV1 or BAY04-9172), or $^{18}$F-flutemetamol (also known as GE067)]. One type of PET scan uses a radioactive tracer to measure glucose metabolism in regions of the brain ($^{18}$F-FDG-PET/CT) that are altered in a characteristic pattern in Alzheimer's disease and other forms of dementia. A second type measures the deposition of an abnormal protein in the brain called

3

amyloid-β, which accumulates in the brain of individuals suffering from Alzheimer's disease and is relatively specific to this disorder. Finally, repeat neuropsychological testing focused on memory function would be useful to measure the level of decline from previous testing batteries. A neurological history and physical examination and the diagnostic tests listed above are the standard of care for the evaluation of dementia.

9.      I have been unable to schedule a visit to see Mr. Purkey to date. This is due to the necessity of curtailing all but emergency travel during the ongoing active phase of the COVID-19 pandemic and the restriction of expert visits to sites of incarceration to protect inmates and staff against the introduction of the virus into a vulnerable population.

10.      I have reviewed a wide array of records including hospital records, medical records from inpatient and outpatient facilities, medical records from several different sites of incarceration, legal records, expert reports, birth and death records of Mr. Purkey's family, and declarations and affidavits from friends and family of Mr. Purkey. A true and genuine copy of an index of these materials is attached as Exhibit 2.

11.      To complete my assessment, I need up to date medical records from the prison medical services provider and health care providers employed by the Federal Bureau of Prisons ("BOP"). A complete review of all medical records is especially important when trying to establish the longitudinal course of illness with dementia, which, by definition, involves the progressive deterioration in memory and cognitive functions often with real life correlates in compromised level of function. In addition, observations by prison guards and administrative staff can provide useful information when arriving at a neurological diagnosis.

4

12.     In the absence of a complete set of BOP administrative and medical records and the opportunity to interview and examine Mr. Purkey, I cannot reach a definitive conclusion as to his neurological status or diagnosis, nor as to his level of capacity and competency.

13.     Records available to me nevertheless provide substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder.  Dementia is the decline and loss of cognitive functioning—learning, thinking, remembering, and reasoning—and behavioral abilities to the extent that it adversely impacts a person's activities of daily living.  Cognitive functions most profoundly affected include memory, language skills, visual perception, problem solving, self-management, and the ability to focus and pay attention.  Emotional dyscontrol and changes in personality often occur in conjunction with cognitive decline.  The signs and symptoms of dementia range in severity from the mildest stage, when it is just beginning to affect a person's functioning, to the most severe stage, when the person must depend completely on others for basic activities of living.  Although dementia becomes more common as people grow older (up to half of all people age 85 or older may have some form of dementia), it is **not** a normal part of aging.  There are many diseases that cause dementia, and they are classified by the types of brain changes (pathology) that takes place.  Alzheimer's disease is the most common cause of dementia in older adults.     Other    dementias    include Lewy    body    dementia    (related    to    Parkinson's disease), frontotemporal disorders, and vascular dementia.  It is common for people with dementia to have mixed dementia—a combination of two or more types of dementia.  For example, a significant number of people have both Alzheimer's disease and vascular dementia as established by diagnosis testing while living and verified at autopsy through examination of the brain.

5

14.     Dr. Robert H. Ouaou, Ph.D., a neuropsychologist and forensic psychologist, completed a report on April 24, 2017, after meeting with Mr. Purkey on October 11 and 12, 2016. Mr. Purkey received a comprehensive neuropsychological testing battery. Mr. Purkey put forth maximum effort on measures of malingering or feigned cognitive impairment. He had significant learning and memory deficits, motor weakness on the non-dominant side indicating possible right hemisphere deficits, as well as deficits on some measures of executive functioning. When Dr. Ouaou compared his testing results to testing performed by Dr. Leeson on January 5, 2003, Mr. Purkey showed significant declines on the Wechsler Memory Scale as well as impairments on other measures not administered in 2003. Mr. Purkey also had impairments on the Delis Kaplan Executive Functioning Systems that were also exhibited in 2003. Dr. Ouaou concluded that Mr. Purkey demonstrated objective indicators of acquired brain damage related to traumatic brain injuries and dementia. This pattern of cognitive deficits, coupled with his family medical history, led Dr. Ouaou to opine that Mr. Purkey was in the beginning stages of a cortical neurodegenerative disease such as dementia, the most likely cause being Alzheimer's disease.

Dr. Jonathan DeRight, Ph.D., a neuropsychologist, provided an evaluation report on November 21, 2019, after interviewing and examining Mr. Purkey on August 9, 2019. On examination, Mr. Purkey made paraphasic errors and had a tangential speech pattern. On a formal Mini-Mental State Examination, Mr. Purkey scored 24 out of 30, below age-related norms. He was impulsive (disinhibited) on some tests. Measures of test validity indicated that the results of neuropsychological testing were a valid reflection of Mr. Purkey's abilities at the time of testing, and not malingering. Notable changes from past assessments included significant worsening of the ability to learn and recall details of a story design, the ability to recognize words from a list that was read to him several times, the ability to recall historical, scientific, and geographic facts

6

that he knew previously, and the speed and dexterity of his right hand. He also performed poorly on some measures of executive functioning, facial memory, processing speed, clock drawing, and confrontation naming. He was impaired on the modified easier version of the Wisconsin Card Sorting Test, which he previously performed normally on the full version. Dr. DeRight opined that Mr. Purkey's test scores in areas of memory, language, and problem solving have considerably declined. These test results, combined with his clinical history and behavioral observations, were strongly indicative of Alzheimer's disease dementia with documented decline. Dr. DeRight diagnosed Mr. Purkey with Alzheimer's disease and concluded that Mr. Purkey met the criteria for dementia due to symptoms that: (1) interfered with his usual activities; (2) represented a decline from previous levels of functioning; (3) were not explained by delirium or a major psychiatric disorder; (4) comprised cognitive impairment based on interview and testing; and (5) involved deficits in learning, language, and behavior.

Dr. Bhushan S. Agharkar, M.D., a psychiatrist and forensic psychiatrist, provided a report on November 19, 2019, having interviewed Mr. Purkey on September 8, 2016, and again on November 8, 2019, an interval of over 3 years. Dr. Agharkar observed a significant deterioration in physical appearance and demeanor between visits. He also observed new right-sided facial weakness in 2019. Mr. Purkey stuttered more and had difficulty pronouncing words, even easy words. He also repeated himself and reiterated the same things over and over. Perseveration, rambling speech patterns, and tangential thoughts were present in 2019. Mr. Purkey presented to Dr. Agharkar the delusional persecutory belief that his execution was based upon Mr. Purkey's legal advocacy (on behalf of himself and others). Dr. Agharkar concluded that Mr. Purkey lacked a rational understanding for the basis for his execution. Dr. Agharkar also opined that Mr. Purkey's delusional thoughts and paranoia were compounded by the deterioration of his brain from

dementia, which prevent him from working with counsel or working for his own interests. Dr. Agharkar concluded that underlying brain damage and mental illness are long-standing problems and will continue to deteriorate as Mr. Purkey's dementia progresses.

John D. Fox, M.S.W., a mitigation specialist, provided a declaration on November 6, 2019. Mr. Fox served as a mitigation specialist for Mr. Purkey from September 2015 through May 2018. He met with Mr. Purkey about 25 times over four years, with visits lasting from two to six-and-a-half hours. Although Mr. Purkey appeared somewhat impaired from the outset, clear signs of cognitive impairment became pronounced with each subsequent visit. Mr. Purkey had deficits in both information retention and recall. He often interposed the names of ex-wives and longtime defense attorneys and forgot the names of longtime friends and mitigation witnesses. He forgot or misremembered his own biographical details. Mr. Purkey became fixated on minor details or false beliefs. He frequently retold stories. His memory abilities compromised his ability to cooperate with his defense team. He exhibited paranoia, leveling accusations at Mr. Fox and other members of his defense team. Stuttering became a more prominent issue as did word mispronunciation and word retrieval. His speech patterns were fragmented and tangential. His ability to comprehend and process information declined. There was evidence of some form of a urinary disorder because in March 2016, Mr. Purkey brought a bag to their visit in which to urinate due to his urinary urgency.

Dr. Elizabeth Vartkessian, Ph.D., a mitigation specialist, provided a declaration on November 15, 2019. Dr. Vartkessian served as a mitigation specialist for Mr. Purkey since October 2014. She first met with Mr. Purkey on February 3, 2015, and subsequently had visited him 24 times, with the longest visit lasting six hours. Mr. Purkey has had paranoid delusions that there is a grand conspiracy against him by the BOP in retaliation for filing lawsuits and grievances

8

on behalf of himself and other prisoners. Mr. Purkey displayed speech and language deficits from the beginning of their meetings, mispronouncing words, inventing words (neologisms), and making mistakes in both verbal and written communications. These speech and language deficits have progressively worsened. His speech patterns were tangential, and he was forgetful and easily distracted. Stuttering and slurred pronunciation of words worsened over the five years they had worked together. Mr. Purkey had problems with memory retention and recall, and there had been a progressive decline in memory. He often repeated stories. Mr. Purkey forgot the dates of his grandchildren's birthdays, which he had never done before. He has had difficulty remembering names. These memory deficits adversely affected Mr. Purkey's interactions with his attorneys. He often fixated on particular issues or observations that are not based on fact. Paranoia is also a problem that adversely affects his interactions with members of his legal team. Dr. Vartkessian also observed that Mr. Purkey has problems with urinary urgency.

Mr. Purkey has several risk factors for dementia. First is his age, as he currently is 68 years old, and advancing age especially over 65 is a significant risk factor for dementia. Second, Mr. Purkey suffered from multiple closed head injuries as both a teenager and an adult. There are records from multiple hospitals and correctional facilities substantiating this history. The cumulative effect of repeated closed head injury puts Mr. Purkey at risk for dementia in general and Alzheimer's disease in particular. Third, Mr. Purkey has a strong family history of cerebrovascular and coronary vascular disease. Death certificates demonstrate death by stroke, heart disease, and/or dementia in multiple relatives. Both the former and the latter put Mr. Purkey at risk for cerebrovascular disease and stroke. Finally, the report of Dr. Helen S. Mayburg, M.D. cites a structural MRI scan of the brain that showed increased signal intensity on T2-weighted images in the periventricular white matter bilaterally, in a radiology report from Dr. Solomon

Barntizky, M.D., from 2003. The impression from this report was microvascular ischemia or a demyelinating process. Microvascular disease is a type of disorder of the small blood vessels of the brain whereby they become blocked, leading to the death of the parts of the brain supplied by each of these vessels. As microvascular blockages accumulate in multiple blood vessels all over the brain, small often silent strokes occur repeatedly. When the amount of damage reaches the point where it causes cognitive deficits, progresses it produces a form of dementia known as vascular dementia due to the irreversible destruction of brain tissue. This results in a progressive loss of cognitive abilities often manifesting as memory deficits, speech and language problems, and behavior changes including paranoia and disinhibition.

I am offering the following opinion based upon my review of a wide array of records including hospital records, medical records from inpatient and outpatient facilities, medical records from several different sites of incarceration, legal records, expert reports, birth and death records of Mr. Purkey's family, and declarations and affidavits from friends and family of Mr. Purkey. Mr. Purkey has demonstrated a progressive decline in his cognitive abilities over the past four to five years, characterized by memory deficits, problems with speech and language, impairments in reasoning and judgment, paranoia, and delusional beliefs. His intellectual deficits, paranoia, and delusional beliefs, and the course of his progressive deterioration are consistent with the diagnosis of dementia. The most likely diagnosis is vascular dementia, but other reasonable considerations include Alzheimer's disease, frontotemporal dementia, chronic traumatic encephalopathy, and a mixed disorder containing elements of two or more of these illnesses.

Within a reasonable degree of medical certainty, it is my expert opinion that Mr. Purkey needs to undergo a complete neurological evaluation in order to ascertain his current cognitive status and diagnosis.

15.     Without having interviewed and examined Mr. Purkey and obtained the relevant diagnostic testing, I am unable to render a definitive opinion as to his current level of cognitive impairment and diagnosis. A definitive diagnosis must be deferred until additional information is available.

16.     If and when a meeting with Mr. Purkey face-to-face and the necessary and appropriate diagnostic testing described above can all be completed safely, fully and appropriately, I would be able to render a definitive opinion as to his level of cognitive impairment and neurological diagnosis.

17.     Due to the current COVID-19 pandemic, expert visits to jails, prisons, and other sites of incarceration have been either postponed or severely curtailed. I have not been able to conduct any in-person meetings since late February 2020. The lack of access to clients referred for neurological evaluation is the result of official policies enacted by correctional facilities to curtail the exposure of their inmates to COVID-19.

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED:  June 22, 2020

THOMAS M. HYDE, M.D., Ph.D.

11

# Exhibit 1

## Thomas Michael Hyde, M.D., Ph.D.

Chief Operating Officer, Lieber Institute for Brain Development, 855 North Wolfe
Street, Third Floor, Rangos Building, Baltimore, Maryland 21205
Telephone: 301-652-8777; FAX: 301-652-3959
Special Volunteer, Clinical Brain Disorders Branch, National Institute of Mental Health,
Intramural Research Program, National Institutes of Health, Building 10, Room 4N306, Bethesda, Maryland
20892.
Telephone: 301-652-8777; FAX: 301-652-3959

## PERSONAL INFORMATION:

| | |
|---|---|
| Date of Birth: | June 5, 1956 |
| Place of Birth: | Toronto, Ontario, Canada |
| Citizenship: | United States of America |
| Marital Status: | Single |
| Residence: | 2829 Greenvale Street, Chevy Chase, Maryland 20815 |
| Telephone: | (301) 652-8777 |

## EDUCATIONAL BACKGROUND:

| | |
|---|---|
| 1974-1978 | B.A., Department of Biology, College of Arts and Sciences, University of Pennsylvania, Philadelphia, Pennsylvania. |
| 1978-1984 | M.D., School of Medicine, University of Pennsylvania, Philadelphia, Pennsylvania. |
| 1978-1984 | Ph.D., Graduate Group in Anatomy, Faculty of Arts and Sciences, University of Pennsylvania, Philadelphia, Pennsylvania. |
| 1984-1985 | General Medical Internship, Department of Medicine, Presbyterian-University of Pennsylvania Medical Center, Philadelphia, Pennsylvania. |
| 1985-1987 | Neurology Residency, Department of Neurology, Stanford University Medical Center, Stanford, California. |
| 1987-1988 | Chief Resident in Neurology, Department of Neurology, Stanford University Medical Center, Stanford, California. |
| 1990 | Board Certification in General Neurology, American Academy of Neurology. |

## EMPLOYMENT AND APPOINTMENTS:

| | |
|---|---|
| 1988-1996 | Director, Neurology Consultation Services, Clinical Brain Disorders Branch, National Institute of Mental Health, St. Elizabeths Hospital, Washington, D.C. |
| 1988-1996 | Special Volunteer, Laboratory of Neuropathology, Clinical Brain Disorders Branch, National Institute of Mental Health, Washington, D.C. |
| 1988-2010 | Private Practice, Behavioral Neurology and Neuropsychiatry, Chevy Chase, Maryland. |
| 1996-2010 | Senior Staff Scientist, Neuropathology Section, Clinical Brain Disorders Branch, National Institute of Mental Health, IRP, NIH, Bethesda, Maryland. |
| 1990-present | Clinical Instructor, Department of Neurology, George Washington University Medical School, Washington, D.C. |
| 2010-2011 | Acting Chief Operating Officer, Lieber Institute for Brain Development, Baltimore, Maryland. |
| 2010-present | Chief Operating Officer, Lieber Institute for Brain Development, Baltimore, Maryland. |
| 2010-present | Special Volunteer, Neuropathology Section, Clinical Brain Disorders Branch, National Institute of Mental Health, IRP, NIH, Bethesda, Maryland. |
| 2012-present | Adjunct Professor, School of Life Sciences, Peking University, Beijing, China. |
| 2013-present | Associate Professor, Department of Psychiatry and Behavioral Sciences, Johns Hopkins School of Medicine, Baltimore, Maryland. |
| 2013-present | Associate Professor, Department of Neurology, Johns Hopkins School of Medicine, Baltimore, Maryland. |

## AWARDS AND HONORS:

| | |
|---|---|
| 1974 | Valedictorian<br>Magruder Senior High School<br>Rockville, Maryland |
| 1974-1978 | Dean's List<br>University of Pennsylvania<br>Philadelphia, Pennsylvania |
| 1976-1984 | University Scholar<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |

| | |
|---|---|
| 1977 | Phi Beta Kappa<br>University of Pennsylvania |
| 1978 | B.A. Summa cum Laude<br>University of Pennsylvania |
| 1978 | Grass Foundation Research Award<br>Graduate Group in Anatomy<br>University of Pennsylvania |
| 1979-1984 | Predoctoral Fellow<br>Medical Scientist Training Program<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1983 | Roy G. Williams Award for Excellence in Research<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1984 | Outstanding Clinician-Researcher in Senior Class<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1999 | National Institutes of Health Director's Award<br>National Institutes of Health<br>Bethesda, Maryland |
| 2008 | Elected to membership in the American College of<br>Neuropsychopharmacology |
| 2010 | Guest Lecturer, Cold Spring Harbor Laboratory<br>Banbury Seminars, Workshop on Schizophrenia and<br>Related Disorders, June 9 – June 15, 2010<br>"Postmortem Gene Expression in Neurodevelopment" |

## PROFESSIONAL ASSOCIATIONS:

Society for Neuroscience
American Medical Association
American Academy of Neurology
District of Columbia Medical Society
Society of Biological Psychiatry
American College of Neuropsychopharmacology

## RESEARCH FUNDING:

| | |
|---|---|
| 1989-1991 | National Alliance for Research on Schizophrenia and<br>Depression<br>Young Investigator Award |
| 1989-1991 | Tourette Syndrome Association<br>Independent Research Grant |

| | |
|---|---|
| 1996-present | Research funding through the Intramural Research Program of the National Institute of Mental Health |

## SELECTED INVITATIONAL LECTURES:

| | |
|---|---|
| February 11, 2013 | Symposium: "The Complexity of Genetic Risk for Schizophrenia", Department of Psychiatry, School of Medicine, University of Bari, Bari, Italy |
| March 18, 2013 | Invitational Lecture: "GABA Signaling Abnormalities in Schizophrenia", Departments of Psychiatry, Genetics, and Neuroscience, Oxford University School of Medicine, Oxford, England, United Kingdom |
| April 24, 2013 | Symposium: "Next-Generation Sequencing Approaches to Schizophrenia and its Neurodevelopmental Origins", 14th International Congress on Schizophrenia Research, Orlando, Florida. |
| April 25, 2013 | Symposium: "BrainCloud: an Integrative Approach to Genomic Brain Research", 14th International Congress on Schizophrenia Research, Orlando, Florida. |
| May 25, 2013 | Plenary Speaker, "GABA Signaling Abnormalities, Allelic Variation, Neurodevelopment, and Schizophrenia", 5th Macedonian Psychiatric Congress and International Meeting, Orhid, Macedonia. |

## ADDITIONAL ACTIVITIES:

| | |
|---|---|
| 1990-1993 | Volunteer, Whitman-Walker Clinic, AIDS Testing Section |
| 1992-present | Member, Program Committee, Winter Conference on Brain Research |
| 1992-1995 | Chairman, Radiation Drug Research Committee, Neuroscience Research Center, National Institute of Mental Health |
| 1993-1994 | Member, Montgomery County, Maryland AIDS Task Force |
| 1993-1995 | Member, Program Committee, Annual Meeting of the American Academy of Neurology |
| 1993-1994, 1998-2000 | Member, Program Committee, Annual Meeting of the Society of Biological Psychiatry |
| 1995-1997 | Member, Board, Epilepsy Foundation for the National |

|              | Capitol Area                                                                                         |
|--------------|------------------------------------------------------------------------------------------------------|
| 1998-present | Member, Advisory Board to Board of Directors, Greater Washington Chapter, Tourette Syndrome Association |

| | |
|---|---|
| 1999-2002 | Member, Board of Directors, Winter Conference on Brain Research |
| 2000-present | Member, Editorial Advisory Board, Journal of Chemical Neuroanatomy |
| 2004-present | Member, Editorial Advisory Board, Current Psychiatry Reviews |
| 2006-present | Member, Scientific Advisory Council, American Foundation for Suicide Prevention |
| 2007-present | Member, Editorial Advisory Board, The Open Psychiatry Journal |

## PUBLICATIONS:

### ORIGINAL RESEARCH PUBLICATIONS:

1. Hyde, T.M. and R.R. Miselis. Effects of area postrema/caudal medial nucleus of the solitary tract lesions on food intake and body weight. Americian Journal of Physiology. 244: 577-587, 1983.

2. Hyde, T.M. and R.R. Miselis. Effects of area postrema/caudal medial nucleus of the solitary tract lesions on water and sodium balance. American Journal of Physiology. 246: 173-182, 1984.

3. Miselis, R.R., T.M. Hyde, and R.E. Shapiro. The area postrema and adjacent solitary nucleus in water and energy balance. Federation Proceedings. 43: 2969-2971,1984.

4. Hyde, T.M., M. Gibbs, and S.J. Peroutka. Distribution of muscarinic cholinergic receptors in the dorsal vagal complex and other selected nuclei in the human medulla. Brain Research. 447: 287-292, 1988.

5. Hyde, T.M. and S.J. Peroutka. Distribution of cholecystokinin receptors in the dorsal vagal complex and other selected nuclei in the human medulla. Brain Research. 495: 198-202, 1989.

6. Hyde, T.M., J.R. Hotson, and J.E. Kleinman. Differential diagnosis of choreiform tardive dyskinesia. Journal of Neuropsychiatry and Clinical Neurosciences. 3: 255-268,1991.

7. Hyde, T.M., B.A. Aaronson, C. Randolph, K.C. Rickler, and D.R. Weinberger. The relationship of birthweight to the phenotypic expression of Tourette's Syndrome in monozygotic twins. Neurology. 42: 652-657, 1992.

8. Hyde, T.M., J.C. Ziegler, and D.R. Weinberger. Psychiatric disturbances in metachromatic leukodystrophy: insights into the neurobiology of psychosis. Archives of Neurology. 49: 401-406, 1992.

9. Egan, M.F., T.M. Hyde, G.W. Albers, A. Elkashef, R. Alexander, A. Reeves, A.O. Blume, and R.J. Wyatt. Treatment of tardive dyskinesia with vitamin E. American Journal of Psychiatry. 149: 773-777, 1992.

10. Hyde, T.M. and R.R. Miselis. The subnuclear organization of the human caudal nucleus of the solitary tract. Brain Research Bulletin, 29: 95-109, 1992.

11. Egan, M.F., T.M. Hyde, D.L. Tirschwell, J.E. Kleinman, and D.R. Weinberger. Laterality of appendicular tardive dyskinesia in chronic schizophrenia. Biological Psychiatry. 31: 1098-1109, 1992.

12. Hyde, T.M., L.-C. Wu, I.B. Krasnov, S.K. Sigworth, N.G. Daunton, and F. D'Amelio. Quantitative autoradiographic analysis of muscarinic cholinergic and $GABA_A$ (benzodiazepine) receptors in the forebrain of rats flown on COSMOS 2044. Brain Research. 593: 291-294, 1992.

13. Hyde, T.M., E.K. Fitzcharles, and D.R. Weinberger. Age-related prognostic factors in the severity of illness of Tourette's Syndrome in monozygotic twins. Journal of Neuropsychiatry and Clinical Neurosciences. 5: 178-182, 1993.

14. Randolph, C., T.M. Hyde, J.M. Gold, T.E. Goldberg, and D.R. Weinberger. Tourette's Syndrome in monozygotic twins: relationship of tic severity to neuropsychological function. Archives of Neurology. 50: 725-728, 1993.

15. Goldberg, T.E., T.M. Hyde, J.E. Kleinman, and D.R. Weinberger. The course of schizophrenia: neuropsychological evidence for a static encephalopathy. Schizophrenia Bulletin. 19: 797-804, 1993.

16. Gupta S., M.F. Egan, and T. M. Hyde. An unusual presentation of tardive dyskinesia with prominent involvement of the pectoral musculature. Biological Psychiatry. 33: 291-292, 1993.

17. Elkashef, A.M., M.F. Egan, J.A. Frank, T.M. Hyde, B.K. Lewis, and R.J. Wyatt. Basal ganglia iron content in tardive dyskinesia: an MRI study. Biological Psychiatry. 35: 16-21, 1994.

18. Abi-Dargham, A., M. Laruelle, J. Seibyl, Z. Rattner, R.M. Baldwin, S.S. Zoghbi, Y. Zea-Ponce, J.D. Bremner, T.M. Hyde, D.S. Charney, P.B. Hoffer, and R.B. Innis. SPECT measurement of benzodiazepine receptors in human brain with [$^{123}$I]Iomazenil: kinetic and equilibrium paradigms. Journal of Neurochemistry. 35: 228-238, 1994.

19. Ohuoha, D.C., M.B. Knable, S.S. Wolf, J.E. Kleinman, and T.M. Hyde. 5-HT$_3$ receptor distribution in the human nucleus of the solitary tract and other structures of the caudal medulla: a quantitative autoradiographic study. Brain Research. 637: 222-226, 1994.

20. Sambunaris, A. and T.M. Hyde. Stroke-related aphasias mistaken for psychotic speech: two case reports. Journal of Geriatric Psychiatry and Neurology. 7: 144-147, 1994.

21. Hyde, T.M., S. Nawroz, T.E. Goldberg, D. Strong, J.L. Ostrem, D.R. Weinberger, and J.E. Kleinman. Is there cognitive decline in schizophrenia? A cross-sectional study. British Journal of Psychiatry. 164: 494-500, 1994.

22. Wolf, S.S., T.M. Hyde, and D.R. Weinberger. Malformations of the septum pellucidum: two distinctive cases in association with schizophrenia. Journal of Psychiatry and Neuroscience. 19: 140-144, 1994.

23. Hyde, T.M., H.A. Emsellem, C. Randolph, K.C. Rickler, and D.R. Weinberger. EEG abnormalities in monozygotic twins with Tourette's Syndrome. British Journal of Psychiatry. 164: 811-817, 1994.

24. Cantor-Graae, E., T.F. McNeil, K.C. Rickler, K. Sjöström, R. Rawlings, E.S. Higgins, and T.M. Hyde. Are neurological abnormalities in well discordant monozygotic co-twins of schizophrenic subjects the result of perinatal trauma? American Journal of Psychiatry. 151: 1194-1199, 1994.

25. Wolf, S.S., T.M. Hyde, T.W. Moody, R.C. Saunders, D.R. Weinberger, and J.E. Kleinman. The autoradiographic characterization of $^{125}$I-neurotensin binding in human entorhinal cortex. Brain Research Bulletin. 35: 353-358, 1994.

26. Egan, M.F., Y. Hurd, T.M. Hyde, D.R. Weinberger, J.E. Kleinman, and R.J. Wyatt. Alterations in mRNA levels of D2 receptors and neuropeptides in striatonigral and striatopallidal neurons of rats with neuroleptic-induced dyskinesias. Synapse. 18: 178-189, 1994.

27. Knable, M.B., T.M. Hyde, M. Tosayali, R.J. Wyatt, J.E. Kleinman, D.R. Weinberger, and M.F. Egan. Quantitative autoradiography of striatal dopamine D1, D2, and reuptake sites in rats with vacuous chewing movements. Brain Research. 646: 217-222, 1994.

28. Knable, M.B., T.M. Hyde, M.M. Herman, J.M. Carter, L.B. Bigelow, and J.E. Kleinman. Quantitative autoradiography of dopamine-D1 receptors, D2 receptors and dopamine uptake sites in post-mortem striatal specimens from schizophrenic patients. Biological Psychiatry. 36: 827-835, 1994.

29. Hyde, T.M., M.F. Egan, R.J. Brown, D.R. Weinberger, and J.E. Kleinman. Diurnal variation in tardive dyskinesia. Psychiatry Research. 56: 53-57, 1995.

30. Hyde, T.M. and D.R. Weinberger. Tourette's Syndrome: a model neuropsychiatric disorder. Journal of the American Medical Association. 273: 498-501, 1995.

31. Egan, M.F., T.M. Hyde, J.E. Kleinman, and R.J. Wyatt. Neuroleptic-induced vacuous chewing movements in rodents: incidence and effects of long-term increases in haloperidol dose. Psychopharmacology. 117: 74-81, 1995.

32. Hyde, T.M., M.F. Egan, L.L. Wing, R.J. Wyatt, D.R. Weinberger, and J.E. Kleinman. Persistent catalepsy associated with severe dyskinesias in rats treated with chronic injections of haloperidol decanoate. Psychopharmacology. 118: 142-149, 1995.

33. Hyde, T.M., M.E. Stacey, R. Coppola, S.F. Handel, K.C. Rickler, and D.R. Weinberger. Structural abnormalities in Tourette's Syndrome: a quantitative MRI study in monozygotic twins. Neurology. 45: 1176-1182, 1995.

34. Knable, M.B., D.W. Jones, R. Coppola, T.M. Hyde, K.S. Lee, J. Gorey, and D.R. Weinberger. Lateralized differences in Iodine-123-IBZM uptake in the basal ganglia activity in asymmetric Parkinson's disease. J. Nuclear Medicine. 36: 1216-1225, 1995.

35. Egan, M.F., J.N. Ferguson, and T.M. Hyde. Effects of chronic naloxone administration on vacuous chewing movements and catalepsy in rats treated with long-term haloperidol decanoate. Brain Research Bulletin 38: 355-363, 1995.

36. Wolf, S.S., T.M. Hyde, R.C. Saunders, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Autoradiographic characterization of neurotensin receptors in the entorhinal cortex of schizophrenic patients and control subjects. J. Neural Transmission., 102: 55-65, 1995.

37. Murray, A.M., T.M. Hyde, M.B. Knable, M.M. Herman, L.B. Bigelow, J.M. Carter, D.R. Weinberger, and J.E. Kleinman. The distribution of putative D4 dopamine receptors in post-mortem striatum from patients with schizophrenia. J. Neuroscience. 15: 2186-2191, 1995.

38. Lynn, R.B., G.-Y. Cao, R.V. Considine, T.M. Hyde, and J.F. Caro. Autoradiographic localization of leptin binding in the choroid plexus of *ob/ob* and *db/db* mice. Biochemical and Biophysical Research Communications. 219: 884-889, 1996.

39. Lynn, R.B., T.M. Hyde, R.B. Cooperman, and R.R. Miselis. Distribution of bombesin-like immunoreactivity in the nucleus of the solitary tract and dorsal motor nucleus of the rat and human: colocalization with tyrosine hydroxylase. J. Comparative Neurology. 369: 552-570, 1996.

40. Considine, R.V., E.L. Considine, C.J. Williams, T.M. Hyde, and J.F. Caro. The hypothalamic leptin receptor is humans: identification of incidental sequence polymorphisms and absence of the db/db mouse and fa/fa rat mutations. Diabetes. 45:992-994, 1996.

41. Hyde, T.M., M.B. Knable, and A. M. Murray. The distribution of dopamine D1- D4 receptor subtypes in human dorsal vagal complex. Synapse. 24: 224-232, 1996.

42. Wolf, S.S., D.W. Jones, M.B. Knable, J. Gorey, K.S. Lee, T.M. Hyde, R. Coppola, and D.R. Weinberger. Phenotypic variation in Tourette Syndrome twins correlates with dopamine receptor imaging in caudate. Science. 273: 1225-1227, 1996.

43. Knable, M.B., T.M. Hyde, A.M. Murray, M.M. Herman, and J.E. Kleinman. A postmortem study of frontal cortical dopamine D1 receptors in schizophrenics, psychiatric controls, and normal controls. Biological Psychiatry. 40: 1191-1199, 1996.

44. Egan, M.F., J.N. Ferguson, and T.M. Hyde. Effects of rating parameters on assessment of neuroleptic-induced vacuous chewing movements. Pharmacology, Biochemistry, and Behavior. 53: 401-410, 1996.

45. Egan, M.F., Y. Hurd, J.N. Ferguson, S.E. Bachus, E.H. Hamid, and T.M. Hyde. Pharmacological and neurochemical differences between acute and tardive vacuous chewing movements induced by haloperidol. Psychopharmacology. 127: 337-345, 1996.

46. Bachus, S.E., T.M. Hyde, M.M. Herman, M.F. Egan, and J.E. Kleinman. Abnormal cholecystokinin mRNA levels in entorhinal cortex of schizophrenics. J. Psychiatric Research. 31: 233-256, 1997.

47. Hyde, T.M. and D.R. Weinberger. Seizures and schizophrenia. Schizophrenia Bulletin. 23: 611-622, 1997.

48. Hurd, Y.L., M.M. Herman, T.M. Hyde, L.B. Bigelow, D.R. Weinberger, and J.E. Kleinman. Prodynorphin mRNA expression is increased in the patch versus matrix compartment of the caudate nucleus in suicide subjects. Molecular Psychiatry. 2: 495-500, 1997.

49. Shimon, H., G. Agam, R.H. Belmaker, T.M. Hyde, and J.E. Kleinman. Reduced frontal cortex inositol levels in postmortem brain of suicide victims and patients with bipolar disorder. American J. Psychiatry. 154: 1148-1150, 1997.

50. Krimer, L.S., T.M. Hyde, M.M. Herman, and R.C. Saunders. The entorhinal cortex: an examination of cyto- and myelo-architectonic organization in humans. Cerebral Cortex. 7: 722-731, 1997.

51. Krimer, L.S., M.M. Herman, R.C. Saunders, J.C. Boyd, T.M. Hyde, J.M. Carter, J.E. Kleinman, and D.R. Weinberger. A qualitative and quantitative analysis of the entorhinal cortex in schizophrenia. Cerebral Cortex. 7: 732-739, 1997.

52. Noga, J.T., T.M. Hyde, M.M. Herman, C.F. Spurney, L.B. Bigelow, D.R. Weinberger, and J.E. Kleinman. Glutamate receptors in the post-mortem striatum of schizophrenia, suicide, and control brains. Synapse. 27: 168-176, 1997.

53. Moore, K.A., G.W. Kunsman, B.S. Levine, M.M. Herman, J. Cervenak, and T.M. Hyde. A comparison of ethanol concentrations in the occipital lobe and cerebellum. Forensic Science International. 86: 127-134, 1997.

54. Vawter, M.P., H.E. Cannon-Spoor, J.J. Hemperly, T.M. Hyde, D.M. VanderPutten, J.E. Kleinman, and W.J. Freed. Abnormal expression of cell recognition molecules in schizophrenia. Experimental Neurology 149: 424-432, 1998.

55. Baca, S.M., B.K. Lipska, M.F. Egan, S.E. Bachus, J.N. Ferguson, and T.M. Hyde. Effects of prefrontal cortical lesions on neuropeptide and dopamine receptor gene expression in the striatum-accumbens complex. Brain Research. 797: 55-64, 1998.

56. Mulberg, A.E., R.T. Weyler, S.M. Altschuler, and T.M. Hyde. Cystic fibrosis transmembrane conductance regulator expression in human hypothalamus. NeuroReport. 9: 141-144, 1998.

57. Heinz, A., M.B. Knable, S.S. Wolf, D.W. Jones, J.G. Gorey, T.M. Hyde, and D.R. Weinberger. Tourette's Syndrome: [I-123]beta-CIT SPECT correlates of vocal tic severity. Neurology. 51: 1069-1074, 1998.

58. Hamid, E.H., T.M. Hyde, S.M. Baca, and M.F. Egan. Failure to down regulate NMDA receptors in the striatum and nucleus accumbens associated with neuroleptic-induced dyskinesia. Brain Research. 796: 291-295, 1998.

59. Vawter, M.P., J.J. Hemperly, T.M. Hyde, S.E. Bachus, D.M. VanderPutten, A.L. Howard, H.E. Cannon-Spoor, M.T. McCoy, M.J. Webster, J.E. Kleinman, and W.J. Freed. VASE-containing N-CAM isoforms are increased in the hippocampus in bipolar disorder but not schizophrenia. Experimental Neurology. 154: 1-11, 1998.

60. McNamara, R.K., T.M. Hyde, J.E. Kleinman, and R.H. Lenox. Expression of myristoylated alanine-rich C kinase substrate (MARCKS) and MARCKS-related protein (MRP) in the prefrontal cortex and hippocampus of suicide victims. J. Clinical Psychiatry. Supplement 2: 21-6, 1999.

61. Vawter, M.P., A.L. Howard, T.M. Hyde, J.E. Kleinman, and W.J. Freed. Alterations of hippocampal secreted N-CAM in bipolar disorder and synaptophysin in schizophrenia. Molecular Psychiatry. 4: 467-475, 1999.

62. Spurney, C.F., S.M. Baca, A.M. Murray, G.E. Jaskiw, J.E. Kleinman, and T.M. Hyde. Differential effects of haloperidol and clozapine on ionotropic glutamate receptors in rats. Synapse. 34: 266-276, 1999.

63. Holt, D.J., M.M. Herman, T.M. Hyde, J.E. Kleinman, C.M. Sinton, D.C. German, L.B. Hersh, A.M. Graybiel, and C.B. Saper. Evidence for a deficit in cholinergic interneurons in the striatum in schizophrenia. Neuroscience. 94: 21-31, 1999.

64. Shannon Weickert, C., M.J. Webster, S.M. Colvin, M.M. Herman, T.M. Hyde, D.R. Weinberger, and J.E. Kleinman. Localization of epidermal growth factor receptors and putative neuroblasts in human subependymal zone. Journal of Comparative Neurology. 423: 359-372, 2000.

65.  Bower, C.M., T.M. Hyde, M. Zaka, E.H. Hamid, S.M. Baca, and M.F. Egan. Decreased mu-opioid receptor binding in the globus pallidus of rats treated with chronic haloperidol. Psychopharmacology.  150:  260-263, 2000.

66.  Meredith, GE, I.E.. De Souza, T.M. Hyde, G. Tipper, M.L. Wong, and M.F. Egan. Persistent alterations in dendrites, spines, and dynorphinergic synapses in the nucleus accumbens shell of rats with neuroleptic-induced dyskinesias.  Journal of Neuroscience. 20:  7798-7806, 2000.

67. Weickert, C.S., M.J. Webster, T.M. Hyde, M.M. Herman, S.E. Bachus, G. Bali, D.R. Weinberger, and J.E. Kleinman. Reduced expression of GAP-43 mRNA in dorsolateral prefrontal cortex of schizophrenics. Cerebral Cortex.  11:  136-147, 2001.

68. Webster, M.J., C.S. Weickert, M.M. Herman, T.M. Hyde, and J.E. Kleinman.  Synaptophysin and GAP-43 mRNA levels in the hippocampus of subjects with schizophrenia.  Schizophrenia Research.  49:  89-98, 2001.

69. Winterer, G., M.F. Egan, T. Radler, T. Hyde, R. Coppola, and D.R. Weinberger.  An association between reduced interhemispheric EEG coherence in the temporal lobe and genetic risk for schizophrenia.  Schizophrenia Research.  49:  129-143, 2001.

70.  Egan, M.F., T.E. Goldberg, T. Gscheidle, M. Weirich, R. Rawlings, T.M. Hyde, L.B. Bigelow, and D.R. Weinberger.  Relative risk for cognitive impairments in siblings of patients with schizophrenia.  Biological Psychiatry.  50: 98-107, 2001.

71.  Noga, J.T., T.M. Hyde, S.E. Bachus, M.M. Herman, and J.E. Kleinman.  AMPA receptor binding in the dorsolateral prefrontal cortex of schizophrenics and controls.  Schizophrenia Research. 48: 361-363, 2001.

72.  Crook, J.M., M. Akil, B.C.W. Law, T.M. Hyde, and J.E. Kleinman.  Comparative analysis of group II metabotropic glutamate receptor immunoreactivity in the dorsolateral prefrontal cortex of patients with schizophrenia and normal subjects.  Molecular Psychiatry. 7: 157-164, 2002.

73. Egan, M.F., T.M. Hyde, J.B. Bonomo, V.S. Mattay, L.B. Bigelow, T.E. Goldberg, and D.R. Weinberger. Relative risk of neurological signs in siblings of patients with schizophrenia. American Journal of Psychiatry.  158: 1827-1834, 2002.

74. Vawter, M.P., L. Thatcher, N. Usen, T.M. Hyde, J.E. Kleinman, and W.J. Freed.  Reduction of synpasin in the hippocampus of patients with bipolar disorder and schizophrenia. Molecular Psychiatry. 7: 571-578, 2002.

75. Mattay, V.A., A. Tessitore, J.H. Callicott, A. Bertolino, T.E. Goldberg, T.N. Chase, T.M. Hyde, and D.R. Weinberger. Dopaminergic modulation of cortical function in patients with Parkinson's disease.  Annals of Neurology 51: 156-164, 2002.

76.  Hamid, E.H., T. M. Hyde, S.E. Bachus, M.F. Egan, B. Kinkead, C.B. Nemeroff, and J.E. Kleinman. Neurotensin receptor abnormalities in the mesial temporal lobe in schizophrenia. Biological Psychiatry15: 795-800, 2002.

77. Tessitore, A.. R. Hariri, F. Fera, W.G. Smith, T. N. Chase , T. M. Hyde, D. R. Weinberger and V. S. Mattay. Dopamine modulates the response of the human amygdala: A study in Parkinson's disease. Journal of Neuroscience. 22: 9099-9103, 2002.

78. Vawter, M.P., J.M. Crook, T.M. Hyde, J.E. Kleinman, D.R. Weinberger, K.G. Becker, and W.J. Freed.  Microarray analysis of gene expression in the prefrontal cortex in schizophrenia. Schizophrenia Research. Schizophrenia Research. 58: 11, 2002.

79. Weickert, T.W., A. Terrazas, L.B. Bigelow, J.D. Malley, T. Hyde, M.F. Egan, D.R. Weinberger, and T.E. Goldberg. Habit and skill learning in schizophrenia: evidence of normal striatal processing with abnormal cortical input. Learning and Memory. 9:430-42, 2002.

80. Matsumoto, M., C.Shannon Weickert, M. Akil, T.M. Hyde, M.M. Herman, J.E. Kleinman, and D.R. Weinberger. Catechol-O-methyltransferase (COMT) mRNA expression in human and rat brain: evidence for a role in cortical neuronal function. Neuroscience. 116: 127-137, 2003.

81. Lerhmann, E., J. Oyler, M.P. Vawter, T.M. Hyde, B. Kolachana, J.E. Kleinman, M.A. Huestis, K.G. Becker, and W.J. Freed. Transcription profiling in the human prefrontal cortex: evidence for two activational states associated with cocaine abuse. Pharmacogenomics Journal. 3: 27-40, 2003.

82. Akil, M., B.S. Kolachana, D.A. Rothmond, T.M. Hyde, D.R. Weinberger, and J.E. Kleinman. Catechol-o-methyltransferase genotype and dopamine regulation in the human brain. Journal of Neuroscience. 15: 2008-2013, 2003.

83. Halim, N.D., C.S. Weickert, B.W. McClintock, T.M. Hyde, D.R. Weinberger, J.E. Kleinman, and B.K. Lipska. Presynaptic proteins in the prefrontal cortex of patients with schizophrenia and rats with abnormal prefrontal development. Molecular Psychiatry. 8: 797-810, 2003.

84. Matsumoto, M., C.Shannon Weickert, S. Beltaifa, B. Kolachana, J. Chen, T.M. Hyde, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Catechol-O-methyltransferase (COMT) mRNA expression in the dorsolateral prefrontal cortex of patients with schizophrenia. Neuropsychopharmacology. 28: 1521-1530, 2003.

85. Weickert, C.S., T.M. Hyde, B.K. Lipska, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Reduced brain-derived neurotrophic factor in prefrontal cortex of patients with schizophrenia. Molecular Psychiatry. 8: 592-610, 2003.

86. Vawter, M.P., C. Shannon-Weickert, E. Ferran, M. Matsumoto, K. Overman,, T.M. Hyde, D.R. Weinberger, W.E.Bunney,, and J.E. Kleinman. Gene expression of metabolic enzymes and a protease inhibitor in the prefrontal cortex are decreased in schizophrenia. Neurochemical Research. 29: 1245-1255, 2004.

87. Ghose, S., C. Shannon Weickert, S. M. Colvin, M.D, J. T. Coyle, M. M. Herman, T. M. Hyde, and J. E. Kleinman. Glutamate Carboxypeptidase II gene expression in the human frontal and temporal lobe in schizophrenia. Neuropsychopharmacology. 29: 117-125, 2004.

88. Hashimoto, R., R.E. Straub, C.S. Weickert, T.M. Hyde, J.E. Kleinman, and D.R. Weinberger. Expression analysis of neuregulin-1 in the dorsolateral prefrontal cortex in schizophrenia. Molecular Psychiatry. 9:299-307, 2004.

89. Shannon Weickert, C., R.E. Straub, M. Matsumoto, B.W. McClintock, T.M. Hyde, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Human dysbindin (DTNBP1) gene expression: anatomical distribution in normal brain and altered expression in schizophrenic prefrontal cortex. Archives of General Psychiatry. 61: 544-555, 2004.

90. Law, A.J., C. Shannon Weickert, T.M.Hyde, J.E. Kleinman, and P.J. Harrison. Neuregulin-1 (NRG-1) mRNA and protein in the adult human brain. Neuroscience. 127: 125-136, 2004.

91. Zhu, G., R.H. Lipsky, K. Xu, S. Ali, T. Hyde, J. Kleinman, L.A. Akhtar, D.C. Mash, and D. Goldman. Differential expression of human COMT alleles in brain and lymphoblasts detected by RT-coupled 5' nuclease assay. Psychopharmacology. 177: 178-184, 2004.

92. Egan, M.F., R.E. Straub, T.E. Goldberg, I. Yakub, J.H. Callicott, A.R. Hariri, V.S. Mattay, A. Bertolino, T.M. Hyde, C. Shannon-Weickert, M.Akil, J. Crook, R.K. Vakkalanka, R. Balkissoon, R.A. Gibbs, J.E. Kleinman, and D.R. Weinberger. Variation in GRM3 affects cognition, prefrontal glutamate, and risk for schizophrenia. Proceedings of the National Academy of Sciences. 101: 12604-12609, 2004.

93. Law, A.J., C. Shannon Weickert, T.M. Hyde, J. E. Kleinman, and P. J. Harrison. Reduced spinophilin but not MAP-2 expression in the hippocampal formation in schizophrenia and mood disorders: evidence for a pathology of dendritic spines. American Journal of Psychiatry. 161: 1848-1855, 2004.

94. Chen, J., B.K. Lipska, N. Halim, Q.D. Ma, M. Matsumoto, S. Melham, B.S. Kolachana, T.M. Hyde, M.M. Herman, J. Apud, M.F. Egan, J.E. Kleinman, D.R. Weinberger. Functional analysis of genetic variation in catechol-O-methyltransferase (COMT): effects on mRNA, protein, and enzyme activity in postmortem human brain. American Journal of Human Genetics. 75: 807-821, 2004.

95. Weickert, C.S. D.A. Kittell, R.C. Saunders, M.M. Herman, R.A. Horlick, J.E. Kleinman, and T.M. Hyde. Basic fibroblast growth factor and fibroblast growth factor receptor-1 in the human hippocampal formation. Neuroscience. 131: 219-233, 2005.

96. Deep-Soboslay, A., M.Akil, C.E. Martin, L.B. Bigelow, M.M. Herman, T.M. Hyde, and J.E. Kleinman. Reliability of psychiatric diagnosis in postmortem research. Biological Psychiatry. 57: 96-101, 2005.

97. Holt, D.J., S.E. Bachus, T. M. Hyde, M. Witttie, M.M. Herman, M. Vangeil, C.B. Saper, and J.E. Kleinman. Reduced density of cholinergic interneurons in the ventral striatum in schizophrenia: an *in situ* hybridization study. Biological Psychiatry. 58: 408-416, 2005.

98. Matsumoto, M., S. Beltaifa, C. S. Weickert, M.M. Herman, T.M. Hyde, R.C. Saunders, B.K.Lipska, D.R. Weinberger, and J.E. Kleinman. A conserved mRNA expression profile of SREB2 (GPR85) in the adult human, monkey, and rat forebrain. Brain Research: Molecular Brain Research. 138: 58-69, 2005.

99. Weickert, C.S., D.L. Ligons, T. Romanczyk, G. Ungaro, T.M. Hyde, M.M. Herman, D.R. Weinberger, J.E. Kleinman. Reductions in neurotrophin receptor mRNAs in the prefrontal cortex of patients with schizophrenia. Molecular Psychiatry. 10: 637-650, 2005.

100. Perlman WR, Matsumoto M, Beltaifa S, Hyde TM, Saunders RC, Webster MJ, Rubinow DR, Kleinman JE, Weickert CS. Expression of estrogen receptor alpha exon-deleted mRNA variants in the human and non-human primate frontal cortex. Neuroscience. 134: 81-95, 2005.

101. Lowe, R.H., A.J. Barnes, E. Lehrmann, W.J. Freed, J.E. Kleinman, T.M. Hyde, and M.A. Huestis. A validated positive chemical ionization GC/MS method for the identification and quantification of amphetamine, opiates, cocaine, and metabolites in human postmortem brain. Journal of Mass Spectrometry. 41: 175-184, 2006.

102. Lipska , B.K., T. Peters, T. M. Hyde, N. Halim, C. Horowitz, S. Mitkus, C.S. Weickert, M. Matsumoto, A. Sawa, R. Straub, R. Vakkalanka, M. M. Herman, D. R. Weinberger , and J. E. Kleinman. Expression of DISC1 binding partners Is reduced in schizophrenia and associated with DISC1 SNPs. Human Molecular Genetics. 15: 1245-1258, 2006.

103. Law, A.J., B.K. Lipska, C.S. Weickert, T.M. Hyde, R.E. Straub, R. Hashimoto, P.J. Harrison, J.E. Kleinman, and D.R. Weinberger. Neuregulin 1 transcripts are differentially expressed in schizophrenia and regulated by 5' SNPs associated with the disease. Proceedings of the National Academy of Sciences. 103: 6747-6752, 2006.

104. Lauriat, T.L., S. Dracheva, J. Kremerskothen, K. Duning, V. Haroutunian, J.D. Buxbaum, T.M. Hyde, J.E. Kleinman, L. Alison McInnes. Characterization of KIAA0513, a novel signaling molecule that interacts with modulators of neuroplasticity, apoptosis, and the cytoskeleton. Brain Research. 1121: 1-11, 2006.

105. Lipska, B.K., A. Deep-Soboslay, C.S. Weickert, T.M. Hyde, C.E. Martin, M.M. Herman, J.E. Kleinman. Critical factors in gene expression in postmortem human brain: focus on studies in schizophrenia. Biological Psychiatry. 60: 650-658, 2006.

106. Lipska, B.K., S. Mitkus, M. Caruso, T.M. Hyde, J. Chen, R. Vakkalanka, R.E. Straub, D.R. Weinberger, J.E. Kleinman. RGS4 mRNA expression in postmortem human cortex is associated with COMT Val158Met genotype and COMT enzyme activity. Human Molecular Genetics. 15: 2804-2812, 2006.

107. Lehrmann, E., Colantuoni, C., Deep-Soboslay, A., Becker, K.G., Lowe, R. Huestis, M.A. Hyde, T.M., Kleinman, J.E., Freed, W.J. Transcriptional changes common to human cocaine, cannabis and phencyclidine abuse. PLoS ONE, 1(1): e114.doi:10.1371/journal.pone.0000114, 2006.

108. Hyde, T.M., Goldberg, T.E., Egan, M.F., Lener, M., Weinberger, D.R. The relationship of frontal release signs and cognition in schizophrenics, their siblings, and normal controls. British Journal of Psychiatry. 191:120-125, 2007.

109. Mathew, S.V., Law, A.J., Lipska, B.K., Davila-Gracia, M.R., Zamora, E.D., Mitkus, S.N., Vakkalanka, R., Straub, R.E., Weinberger, D.R., Kleinman, J.E., Hyde, T.M. α7 nicotinic acetylcholine receptor mRNA expression and binding in postmortem human brain are associated with genetic variation in Neuregulin 1. Human Molecular Genetics. 16: 2921-2932, 2007.

110. Halim, N.D., Lipska, B.K., Hyde, T.M., Deep-Soboslay, A., Saylor, E.M., Herman, M.M., Thakar, J., Verma, A., Kleinman, J.E. Increased lactate levels and reduced pH in postmortem brains of schizophrenics: medication confounds. Journal of Neuroscience Methods. 169: 208-213, 2008.

111. Mitkus, S.N., Hyde, T.M., Vakkalanka, R., Kolachana, B., Weinberger, D.R., Kleinman, J.E., Lipska, B.K. Expression of oligodendrocyte-associated genes in dorsolateral prefrontal cortex of patients with schizophrenia. Schizophrenia Research. 98: 129-138, 2008.

112. Weickert, C.S., Rothmond, D.A., Hyde, T.M., Kleinman, J.E., Straub, R.E. Reduced DTNBP1 (dysbindin-1) mRNA in the hippocampal formation of schizophrenia patients. Schizophrenia Research. 98: 105-110, 2008.

113. Lehrmann, E., Afanador, Z.R., Deep-Soboslay, A., Gallegos, G., Darwin, W.D., Lowe, R.H., Barnes, A.J., Huestis, M.A., Cadet, J.L., Herman, M.M., Hyde, T.M., Kleinman, J.E., Freed, W.J. Postmortem diagnosis and toxicological validation of illicit substance abuse. Addiction Biology. 13: 105-117, 2008.

Case 2:20-cv-00365-JRS-DLP SCD Document 23-4 Filed 07/06/2020 Page 99 of 379 PageID #: 296

114. Deep-Soboslay, A., Iglesias, J., Hyde, T.M., Bigelow, L.B., Imamovic, V., Herman, M.M., Kleinman, J.E. Evaluation of tissue collection for postmortem studies of bipolar disorder. Bipolar Disorders. 10: 822-828, 2008.

115. Colantuoni, C., Hyde, T.M., Mitkus, S., Joseph, A., Sartorius, L., Aguirre· C., Creswell, J., Johnson, E., Deep-Sobolsay, A., Herman, M.M., Lipska, B.K., Weinberger, D.R., and Kleinman, J.E. Age-Related Changes in the Expression of Schizophrenia Susceptibility Genes in the Human Prefrontal Cortex. Brain Structure and Function. 213: 255-271, 2008.

116. Agarwal V., Kommaddi R., Valli K., Ryder D., Hyde T.M., Kleinman J.E., Strobel H., and Ravindranath V. Drug metabolism in human brain: high levels of cytochrome P4503A43 in brain and metabolism of anti-anxiety drug alprazolam to its active metabolite. PLoS ONE 3: e2337, 2008.

117. Hyde, T.M., Deep-Soboslay, A., Iglesias, B., Callicott, J.H., Gold, J.M., Meyer-Lindenburgh, A., Honea, R.A., Bigelow, L.B., Egan, M.F., Emsellem, E.M., and Weinberger, D.R. Enuresis as a premorbid developmental marker of schizophrenia. Brain. 131: 2489-2498, 2008.

118. Ghose, S., Crook, J.M., Bartus, C.L., Sherman, T.G., Herman, M.M., Hyde, T.M., Kleinman, J.E., and Akil, M. Metabotropic glutamate receptor 2 and 3 gene expression in the human prefrontal cortex and mesencephalon in schizophrenia. International Journal of Neuroscience. 118: 1609-1627, 2008.

119. Sartorius, L.J., Weinberger, D.R., Hyde, T.M., Harrison, P.J., Kleinman, J.E., and Lipska, B.K. Expression of a GRM3 splice variant is increased in the dorsolateral prefrontal cortex of individuals carrying a schizophrenia risk SNP. Neuropsychopharmacology. 33: 2626-2634, 2008.

120. Buerlein, R.C., Hyde, T.M., Lipska, B.K., Robinson Jr., W.E., Khosla, A., and Kleinman, J.E. A comparison of human brain dissection by drill versus saw on nucleic acid quality. Journal of Neuroscience Methods. 179: 68-70, 2009.

121. Huffaker, S.J., Chen, J., Sambataro, F., Nicodemus, K.K., Yang, F., Mattay, V., Lipska, B.K., Hyde, T.M., Song, J., Rujescu, D., Giegling, I., Chang, J. Egan, M.F., Goldberg, T.E., Kleinman, J.E., Lu, B., and Weinberger, D.R. A novel, primate specific brain isoform of KCNH2: role in cognition, hippocampal biology and association with schizophrenia. Nature Medicine 15: 509-518, 2009.

122. Nakata, K., Lipska, B.K., Hyde, T.M., Ye, T., Newburn, E.N., Morita, Y., Vakkalanka, R., Barenboim, M., Sei, Y., Weinberger, D.R., and Kleinman, J.E. DISC1 variants are upregulated in schizophrenia and associated with risk polymorphisms. Proceedings of the National Academy of Sciences. 106: 15873-15878, 2009.

123. Bristow, G.C., Lane, T.A., Walker, M., Chen, L., Sei, Y., Hyde, T.M., Kleinman, J.E., Harrison, P.J., and Eastwood, S.L. Expression of Kinase Interacting with Stathmin (KIS, UHMK1) in human brain and lymphoblasts: effects of schizophrenia and genotype. Brain Research 1301: 197-206, 2009.

124. Thakker-Varia, S., Jean, Y.Y., Parikh, P., Sizer, C.F., Ayer, J.J., Parikh, A., Hyde, T.M., Buyske, S., and Alder, J. The neurpeptide VGF is reduced in human bipolar postmortem brain and contributes to some of the behavioral and molecular effects of lithium. Journal of Neuroscience. 30: 9368-9380, 2010.

125. Eastwood, S.L., Walker, M., Hyde, T.M., Kleinman, J.E., and Harrison, P.J. The DISC1 Ser704Cys substitution affects centrosomal localisation of its binding partner PCM1 in glia in human brain. Human Molecular Genetics. 19: 2487-2496, 2010.

126. Deep-Soboslay, A., Hyde, T.M., Callicott, J.P., Lener, M.S., Verchinski, B.A., Apud, J.A., Weinberger, D.R., and Elvevag, B. Handedness, heritability, neurocognition and brain asymmetry in schizophrenia. Brain. 133: 3113-3122, 2010.

127. Lemaitre, H, Mattay, V.S., Sambataro, F., Verchinski, B., Straub, R.E., Callicott, J.H., Kittappa, R., Hyde, T.M., Lipska, B., Kleinman, J.E., McKay, R., and Weinberger, D.R. Parkinson's disease associated variation in FGF20 modulates hippocampal biology. Journal of Neuroscience. 30: 5992-5997, 2010.

128. Bigos, K.L., V.S. Mattay, J.H. Callicott, R.E. Straub, R. Vakkalanka, B. Kolachana, T.M. Hyde, B.K. Lipska, J.E. Kleinman, and D.R. Weinberger. Genetic variation in CACNA1C affects brain circuitries related to mental illness. Archives of General Psychiatry. 67: 939-945, 2010.

129. Kao, W.T., Y. Wang, J.E. Kleinman, B.K. Lipska, T.M. Hyde, D.R. Weinberger, and A.J. Law. Common genetic variation in Neuroregulin 3 (NRG3) influences risk for schizophrenia and impacts NRG3 expression in human brain. Proceedings of the National Academy of Sciences. 107: 15619-15624, 2010.

130. Wong, J., T.M. Hyde, H.L. Cassano, A. Deep-Soboslay, J.E. Kleinman, and C.S. Weickert. Promoter specific alterations of brain-derived neurotrophic factor mRNA in schizophrenia. Neuroscience. 169: 107101084, 2010.

131. Hellsten, K.S., S.T. Sinkkonen, T.M. Hyde, J.E. Kleinman, T. Sarkioja, A. Maksimow, M. Uusi-Oukari, and E.R. Korpi. Human locus coeruleus neurons express the GABA(A) receptor gamma2 subunit gene and produce benzodiazepine binding. Neuroscience Letters. 477: 77-81, 2010.

132. Conjero-Goldberg, C., T.M. Hyde, S. Chen, U. Dreses-Werringloer, M.M. Herman, J.E. Kleinman, P. Davies, and T.E. Goldberg. Molecular signatures in post-mortem brain tissue of younger individuals at high risk for Alzheimer's disease as based on APOE genotype. Molecular Psychiatry. 16: 836-847, 2010.

133. Zhang, F. Q. Chen, T. Ye, B.K. Lipska, R.E. Straub, R. Vakkalanka, R. Rujescu, D. St. Clair, T.M. Hyde, L. Bigelow, J.E. Kleinman, and D.R. Weinberger. Evidence of sex-modulated association of ZNF804A with schizophrenia. Biological Psychiatry. 69: 914-917, 2011.

134. Hyde, T.M., B.K. Lipska, T. Ali, S.V. Mathew, A.J. Law, O.E. Metitiri, R.E. Straub, T. Ye, C. Colantuoni, M.M. Herman, L.B. Bigelow, D.R. Weinberger, and J.E. Kleinman. Expression of GABA signaling molecules KCC2, NKCC1, and GAD1 in cortical development and schizophrenia. Journal of Neuroscience. 31: 11088-11095, 2011.

135. Kang, H.J., Y.I. Kawasawa, F. Cheng, Y. Zhu, X. Xu, M. Li, A.M.M. Sousa, M. Pletikos, K.A.

Meyer, G. Sedmak, T. Guennel, Y. Shin, M.B. Johnson, Z. Krsnik, S. Mayer, S. Fertuzinhos, S. Umlauf, A. Vortmeyer, D.R. Weinberger, S. Mane, T.M. Hyde, A. Huttner, M. Reimers, J.E. Kleinman, and N. Sestan. Spatiotemporal transcriptome of the human brain. <u>Nature</u>. 478: 483-489, 2011.

136. Colantuoni, C., B.K. Lipska· T. Ye·, T.M. Hyde R. Tao, J.T. Leek· E.A. Colantuoni, A.G. Elkahloun, M.M. Herman· D.R. Weinberger, and J.E. Kleinman. Temporal Dynamics and Genetic Control of Transcription in the Human Prefrontal Cortex. <u>Nature</u>. 478: 519-523, 2011.

137. Newburn, E.N., T.M. Hyde, T. Ye, Y. Morita, D.R. Weinberger, and B.K. Lipska. Interactions of human truncated DISC1 proteins: implications for schizophrenia. <u>Translational Psychiatry</u>. Epub, 2011.

138. Numata, S., T. Ye, T.M. Hyde, X. Guitart-Navarro, R. Tao, M. Wininger, C. Colantuoni, D.R. Weinberger, J.E. Kleinman, and B.K. Lipska. DNA methylation signatures in development and aging of the human prefrontal cortex. <u>American Journal of Human Genetics</u>. 90: 260-272, 2012.

139. Zeng, H. , Shen, E.H., Hohmann, J.G., Oh, S.W., Bernard, A., Royall, J.J., Glattfelder, K.J., Sunkin, S.M., Morris, J.A., Guillozet-Bongaart, A.L. Smith, K.A., Ebbert, A.J., Swanson, B., Kuan, L., Page, D.T., Overly, C.C., Lein, E.S., Hawrylycz, M.J., Hof, P.R., Hyde, T.M., Kleinman, J.E., and Jones, A.R. Large-scale cellular-resolution gene profiling in human neocortex reveals species-specific molecular signatures. <u>Cell</u>. 149: 483-496, 2012

140. Tao R., C. Li, E.N. Newburn, T. Ye, B.K. Lipska, M.M. Herman, D.R. Weinberger, J.E. Kleinman, and T.M. Hyde. Transcript-specific associations of SLC12A5 (KCC2) in human prefrontal cortex with development, schizophrenia, and affective disorders. <u>Journal of Neuroscience</u>. 32: 5216-5222, 2012.

141. Law, A.J., W. Yanhong , Y. Sei, P. O' Donnell , P. Piantadosi , F. Papaleo, R.E. Straub, W. Huang, C.J. Thomas, R.Vakkalanka, A. Besterman, B.K. Lipska, T.M. Hyde, P.J. Harrison, J.E. Kleinman and D.R. Weinberger. NRG1-ErbB4-p110δ signaling in schizophrenia and p110δ inhibition as a potential therapeutic strategy. <u>Proceedings of the National Academy of Sciences</u>. 109:12165-70, 2012.

142. Bliss, L.A., Sams, M.R., Deep-Soboslay, A., Ren-Patterson, R., Jaffe, A., Chenoweth, J.G., Jaishankar, A., Kleinman, J.E., and Hyde, T.M. Use of postmortem human dura mater and scalp for deriving human fibroblast cultures. <u>PloS One</u>. 7(9): e45282, 2012.

143. Jenko, K.J., Hirvonen, J., Henter, I.D., Anderson, K.B., Zoghbi, S.S., Hyde, T.M., Deep-Soboslay, A., Innis, R.B., and Kleinman, J.E. Binding of a tritiated inverse agonist to cannabinoid CB(1) receptors is increased in patients with schizophrenia. <u>Schizophrenia Research</u>. 141:185-8, 2012.

144. Ye, T., Lipska, B.K., Tao, R., Hyde, T.M., Wang, L., Li, C., Choi, K.H., Straub, R.E., Kleinman, J.E., and Weinberger, D.R. Analysis of copy number variations in brain DNA from patients with schizophrenia and other psychiatric disorders. <u>Biological Psychiatry</u>. 72: 651-4, 2012.

145. Kunii, Y., Hyde, T.M., Li, C., Kolachana, B., Dickinson, D., Weinberger, D.R., Kleinman, J.E., Lipska, B.K. Revisiting DARPP-32 in postmortem human brain: changes in schizophrenia and bipolar disorder and genetic associations with t-DARPP-32 expression. <u>Molecular Psychiatry</u>. Epublished: 10.1038/mp.2012.174, 2012.

146. Guillozet-Bongaarts, A.L., Hyde, T.M., Dalley, R.A., Hawrylycz, M.J., Henry, A., Hof, P.R., Hohmann, J., Jones, A.R., Kuan, C.L., Royall, J., Shen, E., Swanson, B., Zeng, H., Kleinman, J.E. Altered gene expression in the dorsolateral prefrontal cortex of individuals with schizophrenia. <u>Molecular Psychiatry</u>. Epublished. 10.1038/mp.2013.30, 2013.

**INVITED CHAPTERS, LETTERS AND REVIEWS:**

1. Hyde, T.M., R. Eng, and R.R. Miselis. Brainstem mechanisms in hypothalamic and dietary obesity. In: Neural Basis of Feeding and Reward., Edited by B.G. Hoebel and D. Novin., Haer Institute, 97-114, 1982.

2. Miselis, R.R., T.M. Hyde, and R.E. Shapiro. Disturbances in water balance controls following lesions to the area postrema and adjacent solitary nucleus. In: The Physiology of Thirst and Sodium Appetite., Edited by G. de Caro, A.N. Epstein, and M. Massi, Plenum Press, N.Y., pp. 279-285, 1986.

3. Miselis, R.R., R.E. Shapiro, and T.M. Hyde. The area postrema. In: Circumventricular Organs and Body Fluids., Edited by P.M. Gross, CRC Press, N.Y., Vol. II, Chap. 8, pp. 185-208, 1987.

4. Hyde, T.M. and D.R. Weinberger. The brain in schizophrenia. In: Seminars in Neurology. 10: 276-286, 1990.

5. Hyde, T.M., M.F. Casanova, J.E. Kleinman, and D.R. Weinberger. Neuroanatomical and neurochemical pathology in schizophrenia. In: Annual Review of Schizophrenia., Edited by A. Tasman and S.M. Goldfinger, APA Press, Washington, D.C., Vol. 10, Section 1, Chapter 1, pp. 7-23, 1991.

6. Khot, V., M.F. Egan, T.M. Hyde, and R.J. Wyatt. Neuroleptics and classic tardive dyskinesia. In: Drug-Induced Movement Disorders., Edited by A.E. Lang and W.J. Weiner, Futura Publishing, Mount Kisco, N.Y., pp. 121-166, 1992.

7. Kleinman, J.E. and T.M. Hyde. Structural foundations of mental illness and treatment: neuroanatomy. In: Current Psychiatric Therapy., Edited by D.L. Dunner, W.B. Saunders Co., Philadelphia, Pa., pp. 3-7, 1992.

8. Wolf, S. S., T.M. Hyde, and D.R. Weinberger. Neurobiology of schizophrenia. In: Current Opinion in Neurology and Neurosurgery. 6: 86-92, 1993.

9. Ohuoha, D.C., T.M. Hyde, and J.E. Kleinman. The role of serotonin in schizophrenia: an overview of the nomenclature, distribution, and alterations of serotonin receptors in the central nervous system. In: Psychopharmacology. (Supplement: Proceedings on Serotonin, Dopamine, and Their Interactions in Schizophrenia; Edited by R.S. Kahn and M. Davidson.) 112: S5-S15, 1993.

10. Hyde, T.M., J.C. Ziegler, and D.R. Weinberger. Response to letter re: psychopathology in metachromatic leukodystrophy. In: Archives of Neurology. 50: 131, 1993.

11. Egan, M.F., T.M. Hyde, A. Elkashef, and R.J. Wyatt. Response to letter re: treatment of tardive dyskinesia with vitamin E. In: American Journal of Psychiatry. 150: 992-993, 1993.

12. Clardy, J.A., T.M. Hyde, and J.E. Kleinman. Chapter 7. Postmortem neurochemical and neuropathological studies in schizophrenia. In: Schizophrenia: from mind to molecule. Edited by N.C. Andreasen. American Psychiatric Press, Washington, D.C., pp. 123-145, 1994.

13. Kleinman, J.E., T.M. Hyde, and M. M. Herman. Chapter 75. Methodological issues in the neuropathology of mental illness. In: Psychopharmacology: the Fourth Generation of Progress. Edited by F.E. Bloom and D.J. Kupfer. Raven Press: New York. pp. 859-864, 1995.

14. Coppola, R.C. and T.M. Hyde. Applied Electrophysiology. In: Comprehensive Textbook of Psychiatry.Edited by H. I. Kaplan and B.J. Sadock. Williams and Wilkins: Baltimore, pp. 72-79, 1995.

15. Daniel, D.G., K. Smith, T.M. Hyde, and M.F. Egan. Neuroleptic-induced tardive dyskinesia. In: American Journal of Psychiatry. 153: 734, 1996.

16. Katsetos, C.D., T.M. Hyde, and M.M. Herman. Neuropathology of the cerebellum in schizophrenia- an update: 1996 and future directions. In: Biological Psychiatry. 42: 213-224, 1997.

17. Bachus, S.E., T.M. Hyde, M. Akil, C.S. Weickert, M.P. Vawter, and J.E. Kleinman. Neuropathology of suicide: a review and an approach. In: Annals of the New York Academy of Sciences836: 201-219, 1997.

18. Kittell, D.A., T.M. Hyde, M.M. Herman, and J.E. Kleinman. The collection of tissue at autopsy: practical and ethical issues. In: Using CNS Autopsy Tissue in Psychiatric Research. Edited by B. Dean, T.M. Hyde, and J.E. Kleinman. Harwood: Melbourne, Australia. pp. 1-18, 1998.

19. Egan, M.F. and T.M. Hyde. The neurobiology of schizophrenia. In: Comprehensive Textbook of Psychiatry. Edited by H. I. Kaplan and B.J. Sadock. Williams and Wilkins: Baltimore. Volume I, pp. 1129-1146, 1999.

20. Hyde, T.M. and J.M. Crook. Cholinergic systems in schizophrenia: primary pathology or epiphenomena. In: J. Chemical Neuroanatomy. 22: 53-63, 2001.

21. Freed, W.J., Lehrman, E., Hyde, T.M., Kleinman, J.E., Vawter, M.P., and Becker, K. Gene expression profiling in drug abuse. In: 2001 ONDCP International Technology Symposium Proceedings: Counterdrug Research and Development.. 1: 119-131, 2001.

22. Freed, W.J., T.M. Hyde, J.E. Kleinman, K. Becker, and M.P. Vawter. Analysis of gene expression in schizophrenia using DNA microarrays. In: The Economics of Neuroscience. 4: 48 – 57, 2002.

23. Hyde, T.M. Tourette syndrome. In: The Encyclopedia of Cognitive Science. Edited by L. Nadel. Nature Publishing Group: London. 2002.

24. Hyde, T.M. Cognitive Impairment in Demyelinating Disease. In: The Neurobiology of Mental Illness. Edited by D.S. Charney and E.J. Nestler. Oxford University Press: San Francisco; pp. 873-880, 2003.

25. Hyde, T.M. and S.W. Lewis. The secondary schizophrenias. In: Schizophrenia. Edited by S.R. Hirsch and D.R. Weinberger. Blackwell Science: Oxford, England; pp. 187-202, 2003.

26. Lehrmann , E., T.M. Hyde , M.P. Vawter , K.G. Becker , J.E. Kleinman and W.J. Freed. The use of microarrays to characterize neuropsychiatric disorders: postmortem studies of substance abuse and schizophrenia. In: Current Molecular Medicine 3: 437-446, 2003.

27. Hyde, T.M., J.A. Apud, W.C. Fisher, and M.F. Egan. Tardive dyskinesia. In: Drug Induced Movement Disorders. Edited by S.A. Factor, A.E. Lang, and W. J. Weiner. Futura Publishing Co.: Armonk, N.Y.; Chapter 9, pp. 213-256.

28. Mathew, S.V., S.N. Mitkus, B.K., Lipska, T.M. Hyde, and J.E. Kleinman. Postmortem Studies: A Focus on Susceptibility Genes in Schizophrenia . in: The Handbook of Contemporary Neuropharmacology Edited by D.R. Sibley, I. Hanin, M. Kuhar, and P. Skolnick. John Wiley & Sons, New York. 2006.

29. Hyde, T.M. Cognitive Impairment in Demyelinating Disease. In: The Neurobiology of Mental Illness. Edited by D.S. Charney and E.J. Nestler. Oxford University Press: San Francisco; pp. 1001-1009, 2009.

30. Deep-Soboslay, A, F.M. Benes, V. Haroutunian, J.K. Ellis, J.E. Kleinman, and T.M. Hyde. Psychiatric Brain Banking: Three Perspectives on Current Trends and Future Directions. Biological Psychiatry. 69: 104-112, 2011.

31. Kleinman, J.E., A.J. Law, B.K. Lipska, T.M. Hyde, J.K. Ellis, P.J. Harrison, and D.R. Weinberger. Genetic neuropathology of schizophrenia: new approaches to an old question and new uses for postmortem human brains. Biological Psychiatry. 69: 140-145, 2011.

32. Hyde, T.M. and M.A. Ron. The Secondary Schizophrenias. In: Schizophrenia. Edited by D.R. Weinberger and Paul J. Harrison. Wiley-Blackwell: West Sussex, United Kingdom; pp. 165-184, 2011.

# Exhibit 2

## Index of Documents Provided to Dr. Hyde

| DOCUMENT TITLE | DATE PROVIDED |
|---|---|
| 2019-11-21, Dr. Jonathan DeRight report | 2020-04-23 |
| Dr. DeRight CV | 2020-04-23 |
| 2017-04-24, Dr. Robert Ouaou report | 2020-04-23 |
| 2018-10-26, Dr. Robert Ouaou update | 2020-04-23 |
| 2017-01-18, Dr. Bhushan Agharkar report | 2020-04-23 |
| Dr. Agharkar CV | 2020-04-23 |
| 11-15-2019 Declaration of Elizabeth Vartkessian | 2020-04-23 |
| Elizabeth Vartkessian CV | 2020-04-23 |
| 11-06-2019 Declaration of John Fox | 2020-04-23 |
| John Fox CV | 2020-04-23 |
| 2018-04-22 Dr. Sautter Psychological Evaluation | 2020-04-23 |
| 2018-04-26 Dr. Sautter Evaluation of Mental Health | 2020-04-23 |
| 1966-12-29 Wesley Purkey, St. Francis Hospital | 2020-04-23 |
| 1967-02-09 Wesley Purkey, St. Francis Hospital | 2020-04-23 |
| 1968-03-08 Wesley Purkey, St. Joseph Hospital Records | 2020-04-23 |
| 1968-04-29 Wesley Purkey, St. Joseph Hospital Notes | 2020-04-23 |
| 1968-11-17 Wesley Purkey, St. Francis Hospital Records | 2020-04-23 |
| 1971-05-24 Wesley Purkey KRDC Psychiatric Report | 2020-04-23 |
| 1972-12-29 Wesley Purkey, Larned State Hospital Report | 2020-04-23 |
| 1972-08-31 Wesley Purkey, St. Joseph Hospital Evaluation | 2020-04-23 |
| 1976-02-16 Wesley Purkey Wesley Medical Center, Admittance | 2020-04-23 |
| 1976-05-28 Wesley Purkey, St. Francis Hospital Records | 2020-04-23 |
| 1976-11-16 Wesley Purkey, KRDC Psychiatric Evaluation | 2020-04-23 |
| 1981-05-19 KSRDC Psychological Report | 2020-04-23 |
| 1993-01-11 Wesley Purkey, Prison Health Services Medical History and Physical | 2020-04-23 |
| 1998-05-02 Wesley Purkey, Via Christi Evaluation, WP906436-86 | 2020-04-23 |
| 1998-09-13 Wesley Purkey, KU Medical Records | 2020-04-23 |
| 1999-02-04 Wesley Purkey, Larned State Hospital Evaluation | 2020-04-23 |
| 2000-04-19 Dr. Peterson Diagnostic Interview Report | 2020-04-23 |
| 2002-08-13 Wesley Purkey, Forensic Evaluation WP928028-WP928037 | 2020-04-23 |
| 2002-11-11 Purkey Records, Trial Counsel Summary of Medical History | 2020-04-23 |
| 2003-01-05 Dr. Leeson Report | 2020-04-23 |
| 2003-06-06 Wesley Purkey, Report and Recommendation on Competency | 2020-04-23 |
| 2003-08-13 Dr. Peterson Report | 2020-04-23 |
| 2003-10-03 Scan 1, Wesley Purkey brain scan | 2020-04-23 |
| 2003-10-03 Scan 2, Wesley Purkey brain scan | 2020-04-23 |
| 2003-10-03 Scan 3, Wesley Purkey brain scan | 2020-04-23 |

| 2003-10-03 Scan 4, Wesley Purkey brain scan | 2020-04-23 |
|---|---|
| 2003-10-03 Scan 5, Wesley Purkey brain scan | 2020-04-23 |
| 2003-10-03 Scan 6, Wesley Purkey brain scan | 2020-04-23 |
| 2003-10-03 Scan 7, Wesley Purkey brain scan | 2020-04-23 |
| 2003-10-17 Preston PET and MRI scans analysis | 2020-04-23 |
| 2003-10-07 Dietz Report | 2020-04-23 |
| Jack Wesley Purkey death certificate (father) WP904947 | 2020-05-28 |
| Velma Purkey death certificate (mother) WP904948 | 2020-05-28 |
| Irene Mildred Purkey Death Certificate (paternal aunt) WP906711 | 2020-05-28 |
| Carrie Anna Burke death certificate (maternal great aunt) WP906722 | 2020-05-28 |
| Ira Franklin Purkey death certificate (paternal grandfather) WP906723 | 2020-05-28 |
| Samuel L Purkey death certificate (paternal great great uncle) WP906724 | 2020-05-28 |
| Roy Allen Purkey death certificate (paternal great great uncle) WP906725 | 2020-05-28 |
| Mary A Haberthier death certificate (maternal great great aunt) WP906726 | 2020-05-28 |
| Anthony J Haberthier death certificate (maternal great aunt) WP906727 | 2020-05-28 |
| Jessie A Williams (nee Purkey) death certificate (paternal great great aunt) WP906729 | 2020-05-28 |
| Nancy Ida Purkey death certificate (paternal great great grandmother) WP906730 | 2020-05-28 |
| Andrew Jackson Purkey death certificate (paternal great great grandfather) WP906731 | 2020-05-28 |
| William F. Moore death certificate (paternal great uncle) WP906732 | 2020-05-28 |
| Opal L Purkey death certificate (paternal grandmother) WP906733 | 2020-05-28 |
| Earl A Purkey death certificate (paternal great uncle) WP906734 | 2020-05-28 |
| Hester Scates (nee Moore) death certificate (paternal great aunt) WP906735 | 2020-05-28 |
| William A Haberthier death certificate (maternal great uncle) WP906736 | 2020-05-28 |
| Anthony P Haberthier death certificate (maternal great uncle) WP906737 | 2020-05-28 |

| | |
|---|---|
| Anna Louise Haberthier death certificate (maternal great aunt) WP906738 | 2020-05-28 |
| Sue Darling Death Certificate (maternal grandmother) WP912487 | 2020-05-28 |
| Larry Gene Hamilton Death Certificate (Wes's half-brother— same mother). WP926880 | 2020-05-28 |
| Death Certificate – Eloise Purkey (paternal aunt) WP925983-WP925984 | 2020-05-28 |
| Death Certificate – Irene Bartlett (paternal aunt) WP925985-WP925986 | 2020-05-28 |
| David Preston: Purkey PET & MRI WP_PC000018371-WP_PC000018382 | 2020-05-28 |
| 2018-04-22 Dr. Sautter Psychological Evaluation (resending) | 2020-05-28 |
| 2018-04-26 Dr. Sautter Evaluation of Mental Health (resending) | 2020-05-28 |
| Mark Cunningham Report WP_PC000011043-WP_PC000011109 | 2020-05-31 |
| Helen Mayberg Prosecution Assessment WP_PC000011192-WP_PC000011196 | 2020-05-31 |
| Daniel Martell Neuro Psych Assessment of Wes WP_PC000011626-WP_PC000011631 | 2020-05-31 |
| 2003-05-28 Assault at CCA Leavenworth WP_PC000017851-WP_PC000017894 | 2020-05-31 |
| Linda McCandless CCA Psychiatric Report Wes Purkey WP_PC000018333-WP_PC000018334 | 2020-05-31 |
| Partial transcript from 1980 hearing in 80CR1701 (Wes stabbed in the face and abdomen) | 2020-05-31 |
| Medical Records Provided by Wesley Purkey 02/3/2000 WP_PC000021996-WP_PC000022229 | 2020-05-31 |
| Wesley Purkey's Oregon State Penitentiary psych records WP906281-WP906299 | 2020-05-31 |
| Wesley Purkey Prison Records Kansas Department of Corrections (Part II) WP907378-WP907577 WP907445 (notes hit on head with pipe) | 2020-05-31 |
| Wesley Purkey Prison Records Kansas Department of Corrections (Part III) WP907578-WP907702 | 2020-05-31 |
| Wesley Purkey Prison Records Kansas Department of Corrections WP907703-WP907960 | 2020-05-31 |
| Wesley Purkey Prison Records Kansas Department of Corrections– copies of medical, mental health, classification, disciplinary etc. from 1970 to 2000 WP907961-WP910585 | 2020-05-31 |

| Jack Purkey Medical Records University of Kansas Medical Center WP912391-WP912486 | 2020-05-31 |
| --- | --- |
| Wesley Purkey I&I Prison Records Kansas Department of Corrections WP916561-WP916590 | 2020-05-31 |
| Wesley Purkey Central File – Federal Bureau of Prisons WP927877-WP930686 WP927957- WP927958 (Terre Haute psych assessment) WP928067 (notes closed head injury as a teenager) | 2020-05-31 |
| Declaration Debbie Prothero (paternal cousin) | 2020-05-31 |
| Declaration of Russ Prothero (paternal cousin through marriage) | 2020-05-31 |
| Declaration of Gary Milo Purkey (half-brother) | 2020-05-31 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:19-cv-03570-TSC |
| WILLIAM P. BARR, *et al.*, | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL DECLARATION OF ELIZABETH VARTKESSIAN, PH.D.

Elizabeth Vartkessian, Ph.D., pursuant to 28 U.S.C. §1746(2), declares as follows:

**Background and Qualifications**

1.      On November 15, 2019, I submitted a declaration detailing my observations of Mr. Wesley Purkey ("Wes") as it related to his progressive cognitive decline, attached herewith as Exhibit 1. This supplemental declaration provides updated information regarding my observations of Wes since November 15, 2019.  As set forth in my previous declaration, I possess the necessary qualifications to submit this declaration. A true and genuine copy of my current curriculum vitae is attached herewith as Exhibit 2.

2.      Since I provided a declaration, the United States has experienced the impacts of the world-wide pandemic related to COVID-19, a highly contractible viral disease with a high rate of death especially for those with preexisting medical conditions, including diabetes, asthma, compromised immune systems, or other age-related vulnerabilities. Correctional institutions have been hit especially hard due to the inability for social distancing to take place as well as the limited amount of sufficient ventilation within most institutions.

3. Due to the risks associated with contracting COVID-19, all visitation to United States Penitentiary Terre Haute, including legal visits, was suspended on March 13, 2020. Between November 15, 2019 and March 13, 2020, I visited with Wes in-person eight times. I was scheduled to visit with Wes every two to three weeks thereafter. Had legal visits not been canceled, I would have had the opportunity to personally observe Wes approximately six to eight additional times since March 13, 2020.

4. I have participated in six legal calls with Wes since the pandemic forced the suspension of in-person legal visits. This has been particularly challenging for Wes and the team. Part of the reason we visit with Wes so frequently is that he is far less likely to irrationally end an in-person visit than he would a phone call. Wes gets very agitated over the phone when he cannot see other people. If Wes asks a question and an answer is not immediately provided, he tends to become irate. When we are in-person, Wes can see that the visitor is thinking and not concocting a lie or being evasive, which are two common beliefs Wes has about his attorneys.

**In-Person Observations of Decline**

5. During these in-person visits, I was able to observe Wes's continuing decline. For instance, during an in-person visit on December 13, 2019, Wes forgot some items that he intended to bring to the visit with him, including his eye glasses, which an officer had to go back to his cell to collect for him. Toward the end of the visit, Wes discovered the materials and noted that he did not recall putting them in his folder in the first place. This was not something Wes did when I first met him in 2015 and has increased in frequency since 2019. He also struggled to locate words; that visit he could not recall a word that meant "people understanding each other

2

without speaking." He was not able to recall the word during the visit and became visibly agitated by his inability to find the word he wanted.

6. When I met with Wes on January 17, 2020, I was able to observe his unsteady gait, the involuntary movement of his muscles, his gaunt and ashy skin, and his lack of physical stamina, which resulted in a shorter visit then we would have had in previous years. Wes tired quickly during the visit, which I was able to observe by his posture, his facial expression, and his continuous sighing as he struggled to recall words.

7. During these in-person visits, Wes was unable to describe things he once could. For instance, Wes appeared at the visit wearing a long-sleeve thermal shirt, which he referred to as a tank top. Had I not been with Wes, I could not have determined the inaccuracy of that description.

8. Likewise, during the same visit, I was able to observe that Wes could not recall dates independently without the assistance of a list that he could reference. Visits were scheduled for the same day of the week to maintain consistency for Wes. For example, in February and March of 2020, visits with Wes were scheduled on Fridays. At each visit with Wes, a member of his legal team would remind him that the following week he would have another legal visit and let him know who would be coming. Despite these reminders, during my visit, Wes took out a piece of paper on which one of the Special Confinement Unit staff had written out his visits for the next two weeks. Wes noted that he would not have been able to remember his visit schedule without the paper.

9. These in-person visits also permitted me to observe Wes's declining ability to recall names of people with whom he had regular contact. He struggled to recall the names of officers who walked past us, even though he had written their names in grievances and orally

3

complained about their treatment of him in the past. He could not recall the names of some of the inmates with whom he communicated with on a regular basis. As Wes shared legal materials with me, I could see, based on the writing, that he had forgotten the names of cases which had been easy for him to recall previously. The notes were repetitive and indicated that he had to re-read these cases again and again; his ability to independently retain the information was significantly diminished.

10. Wes also showed me a form he needed to fill out. It was a request for the withdrawal of an inmate's personal funds (BP-199.045). The document was a scantron form with lines of bubbles that needed to be filled out. Wes could not fill out the bubbles in a straight line without using another piece of paper to act as a ruler. He described how the bubbles jumped around the page making it very hard for him to complete the form without the use of another piece of paper.

11. When I saw Wes on February 21, 2020, I observed his physical struggles with taking materials in and out of the mesh bag he brought to legal visits. Though I had seen Wes a few weeks before, he struck me as looking older, very tired, and smaller as if he had lost weight. His skin looked loose and his eyes became increasingly bloodshot as our visit continued. He yawned periodically even though he had slept well the night before. Wes's word recall was extremely poor. He could not recall the name of his grandson or the judge handling his habeas case and struggled to recall other names of people on his legal team throughout the visit. He combined names of people, such as his two attorneys: Michelle and Rebecca became Revel. Finally, Wes noted that he had visited with someone the week before for about 90 minutes. While I was waiting to be escorted out, I noticed that the log book stated the person had only

been with Wes for 30 minutes. I could not have verified this if I had not been with Wes in-person.

**Continuing Decline in Speech and Memory**

12. No one from Wes's legal team has been able to see him in person since his last legal visit took place on March 12, 2020. Our contact with Wes has been via phone or the occasional letter.

13. Almost every call is conducted by at least two members of our team to make it more likely for us to understand what Wes is saying. His speech impediments, especially his stuttering and slurring of words, have been very pronounced in the last few months. Likewise, Wes's inability to locate words or use the correct word, his memory problems, and general incoherence makes it necessary for multiple people to participate in legal calls.

14. Wes's letters have changed significantly since 2015. He used to write longer letters by hand, but the letters I receive now are usually more like notes on larger post-its. His handwriting does not stay within the lines. He writes anywhere on the page, which has also increased over time.

15. In June, I received a two-page letter from Wes in which he wrote the letter "M" and then the letter "J," crossed them both out, and then wrote "Is it May still or June?" at the top of the second page, even though he had already written the correct date on the first page of the letter.

16. Wes has struggled with word recall, stuttering, and using the wrong words in sentences in each call I have had with him over the last three months. For instance, on our May 20, 2020 call, Wes attempted to describe an epiphany and instead called it an elliptical. He also called coronavirus, coronus.

5

17. During that same call, Wes discussed a letter he received as if he did not understand how the sender got his name and contact information. We had to remind Wes that he was the one who initiated the correspondence, which we knew because the letter stated so.

18. Wes's deteriorating memory and delusions are also evidenced by his inability to recall his own medical history. Wes cannot recall that he was diagnosed with Hepatitis C in the late 1980s. A recent medical exam showed that his Hepatitis C has returned. Wes was convinced that he was recently diagnosed with HIV instead of Hepatitis C. Wes does not believe that he was ever diagnosed with Hepatitis C, and he believes that if he is in fact positive for Hepatitis C, he contracted it through the food provided to him through the Bureau of Prisons.

19. Wes's frustration level has also increased as his inability to recall dates, events, and people worsens. During a legal call on June 3, 2020, Wes had questions about the timing of filings that had taken place in December 2019. When provided with the information, which differed from his memory, he would not accept that he was wrong. He yelled and screamed that the information was wrong, and he was right. This type of response has occurred with greater frequency over the last several months.

20. There have been many instances on the phone where Wes starts to ask a question only to forget what he wanted to say. He makes requests for materials that have already been sent to him, but which he has misplaced in his cell. During these calls, Wes has described standing in his cell and forgetting what he was about to do. He has also described feeling like he is on the verge of blacking out, which used to occur only on a monthly basis, but now is happening several times a week.

21. As Wes's memory continues to deteriorate, his frustration increases. Wes recently requested a legal call, which was arranged. He began the call angrily demanding to know why a

6

legal call had been scheduled. When I informed him that he had asked for the call, he was so irate that he left the call.

**Insufficiency of Telephonic Interactions**

22.    Though it is possible to ascertain that Wes's memory and word finding capacity appears to be declining, a significant amount of additional, necessary information is missed when he cannot be visited in-person by members of his legal team. We cannot observe his physical appearance, gait, and functioning. More specifically, there have been occasions when we have observed one side of Wes's face drooping, Wes's need for an incontinence bag, and his increasing unsteadiness as he walks or stands. We miss critical information about the context of his comments, like the example described above where he mistakenly referred to a long sleeve thermal shirt as a tank top.

23.    Critically, being in-person also allows the legal team to ensure that the conversation is taking place out of earshot of anyone else. "Mental health experts recognize that '[m]ost patients do not speak freely unless they have privacy and are sure that their conversations cannot be overheard.'"[1] There have been numerous incidents where defense team calls have been recorded and provided to prosecutors even though the communications were assured to be protected by legal privilege,[2] and prisoners understandably fear their communications are not private.

---

[1] Sean D. O'Brien, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 HOFSTRA L. REV. 693, 746 (2008) (quoting BENJAMIN JAMES SADOCK & VIRGINIA ALCOTT SADOCK, KAPLAN & SADOCK'S SYNOPSIS OF PSYCHIATRY 136 n. 8 (9th ed. 2003)).

[2] Katie Bernard & Steve Vockrodt, *Federal Judge Holds Kansas City, Kansas, U.S. Attorney's Office in Contempt of Court,* THE KANSAS CITY STAR (Aug. 15, 2019, 11:56 AM), https://www.kansascity.com/news/state/kansas/article233985767.html.

24.     Privacy and confidentiality are particularly critical for Wes given his longstanding and well-documented mental health history of paranoia and distrust.

25.     Moreover, given that Wes has struggled to communicate with counsel as he continues to view them as working against him, the inability to meet face-to-face with members of his team exacerbates his mental condition.

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED:  _JUNE 22, 2020_                     _____
                                            ELIZABETH VARTKESSIAN, PH.D.

8

# Exhibit 1

## DECLARATION OF ELIZABETH VARTKESSIAN, PH.D.

I, Elizabeth Vartkessian, declare and state the following:

### QUALIFICATIONS

1. I have worked as a mitigation specialist for capital defense teams since 2004 in both trial and post-conviction cases. In the last 15 years, I have conducted mitigation investigations in nearly 40 death penalty cases. I have worked on federal capital cases originating in the 2nd, 3rd, 4th, 5th, 6th, 8th, and 9th circuits and state capital cases originating in Alabama, Arkansas, Georgia, Florida, Texas, Louisiana, Oklahoma, Pennsylvania, and South Dakota. I have provided a copy of my *curriculum vitae*, which outlines the trainings I have attended or taught, publications authored, and other relevant work as it relates to conducting mitigation investigation in capital cases.

2. I am the founding Executive Director of Advancing Real Change, Inc. (hereinafter, ARC) a national not-for-profit organization conducting mitigation investigation in criminal cases across the country. In addition to direct casework, we provide training and consultation to defense teams regarding best practices in mitigation investigation, development and courtroom presentation and litigation.

3. Throughout my career, by virtue of my training and experience, I have developed a knowledge and understanding of mental illnesses and impairments, cognitive disorders, PTSD, and related symptomology. As detailed in my CV, since 2005 I have attended over 50 training seminars related to identifying signs and symptoms of mental illness and trauma, working with clients with mental illness specifically, understanding and working with clients with delusions, paranoia, intellectual disability, and other impairments.

### BACKGROUND OF INVOLVEMENT

4. My office was retained by the Federal Defender in the Western District of Missouri to conduct the mitigation investigation for Mr. Purkey's post-federal habeas proceedings in October 2014. I was the lead mitigation specialist from that time until December 2015, when I took a medical leave due to an automobile accident. In order to ensure that work on Wes's case

1

$EV$ (Initial)

Ex_5-000039

continued, John Fox, another ARC mitigation specialist, assumed the lead mitigation role. I returned to full-time employment, John remained in that position with me in a supporting role. I resumed the lead mitigation specialist role in May of 2018 after John left the firm.

5. I met Wes for the first time on February 3, 2015. Since then, I have visited in person with Wes 24 times, with my longest visit lasting up to six hours. Wes corresponded with me in writing during this time as well. I have been asked by Wes's current counsel Rebecca Woodman and Michelle Law to provide details of my observations of his mental and physical health from the start of my involvement in his case to the present day, a period of approximately five years.

6. Wes has resisted discussions about his mental health with his defense team. When talking about the need to provide the court with full information about his functioning, Wes responds that he takes responsibility for his actions – not recognizing that those two things are not mutually exclusive. This resistance towards even discussing his functioning has only increased in the last two years, since receiving a diagnosis of dementia. Wes has flatly stated that he does not want to be found incompetent, though my observations lead me to believe that he is.

## MENTAL HEALTH OBSERVATIONS

### Delusions and Paranoia

7. Early in my involvement, Wes began exhibiting delusional thinking. The first delusions he shared with me were about his belief that he was being poisoned. Wes believed that, between January and October 1998, drugs were being sprayed into his room from the ceiling and that someone was poisoning his food and cigarettes. Like many delusions, there was a kernel of truth. Wes's ex-wife Jeannette had in fact added rat poison to his intravenous drugs. However, Wes was certain that it was a broader conspiracy, and that his other ex-wife (Claire) and several friends were involved in poisoning him over a long period of time as well. For example, on March 9, 2015 he told me that the people who poisoned him were camouflaged and trying to hide, and that he was living out in the country so that there was no one to observe what was happening to him. He believed that the FBI, DEA, and Kansas Bureau of Investigation (KBI) were a part of the conspiracy to kill him. At various points he also mentioned that

2

*EV* (Initial)

Ex_5-000040

Jeannette's three sons, who were all children at the time, were also involved in poisoning him. Wes mentioned that he couldn't remember how or why he decided to call the KBI, but he called several times.

8. Likewise, Wes has expressed throughout the last five years a consistent belief that there exists a grand conspiracy against him. The main components of this conspiracy are that he is being singled out by the Bureau of Prisons (BOP) in retaliation for filing lawsuits and grievances on behalf of himself and other prisoners addressing the conditions of death row. Wes falsely believes that his filings have had a monumental impact in preventing correctional officers from depriving prisoners of their constitutional rights, and therefore the prison staff have developed a "retaliatory animus" against him. Some evidence of this retaliation, according to Wes, is that the prison has restricted his visitation, email, and his access to a microwave and has written him up for contraband. Wes perceives that this retaliation is something that he experiences because the BOP wants to keep him quiet and stop him from revealing numerous instances of BOP staff violating BOP policies.

9. One example can be seen in an affidavit Wes wrote in connection to a grievance on 11/07/2018: "SCU Unit Manager Thomas and Case Worker Sutton have reiterated and clarified that because of my *sedulous and assiduous filing of administrative remedies, and as well as for assisting other inmates in filing of such in turn and aiding other inmates in preparing and filing litigation naming* Thomas as a named defendant in such litigation that any and all visitors that I request visitation with will be denied, and they have maintained this tactic policy on different occasions denying requested visitors without reason given". In reality, Wes had a number of visitors during that period of time.

10. These 2018 views are consistent with his historical record. An August 10, 2000 declaration reflects the same delusional beliefs about prison officials conspiring against him. In a grievance filed against the Kansas Department of Corrections, Wes complained that officers had issued a disciplinary write up against him because they wanted to destroy grievances he had filed about the unsanitary conditions, denial of basic necessities, and extreme heat. Wes wrote that the unit team management was aware of "the continuing harassment and refuses to take any initiative to stop it" and that the unit team was clearly "doing everything they can to impede and thwart me from seeking redress of these issues through the grievance process." The unit

3

_EV_ (Initial)

Ex_5-000041

team's response pointed out that Wes did not offer any evidence to support his allegation that he was being targeted or singled out for harassment: "you have never mentioned the allegation that grievances were being destroyed to unit team staff, despite the fact that you have contact with them on a daily basis. You also offer absolutely no evidence supporting your allegation that UT staff are aware of AND covering up staff misconduct. Every allegation made regarding staff conduct is investigated and appropriate action taken. No further action deemed necessary for this complaint."

11. Wes often provides me with his grievances so I can make copies of the forms and send them out for him. Wes does this because he believes the BOP staff are destroying his grievances and that if he does not provide the materials to me the grievances will not get filed. I have noticed that the grievances are rigidly and narrowly focused on Wes's views that the prison is covering up its misdeeds, retaliating against Wes for his efforts to expose the truth, and engaging in a campaign of retaliation against Wes to stop him from assisting inmates with lawsuits.

12. Wes has repeatedly said that "picking up his Bic" is the only way for changes to happen within the prison. He views himself as the only one able to effect change for the other inmates. Likewise, he has stated that the other inmates are not strong enough to handle the retaliation he experiences in order to safeguard the protections inmates are supposed to be afforded.

13. Since Wes received an execution date I have seen him four times (July 31, August 16, September 10, and October 9). Each time he has noted that he is facing an execution date because of his use of the grievance process and because of his efforts to file lawsuits about the conditions of confinement. The first time Wes mentioned this, I was struck by the fact that just a few weeks before Wes had filed a petition requesting that he be executed. He did not attribute his petition as even remotely connected to him receiving a date. Nor did he express a desire to actually be executed. There is a clear disconnect between the reality of his execution and his own perceptions around it.

### Speech Deficits and Inability to Communicate Effectively

14. From the first time I met with Wes in February 2015, I noticed that he often mispronounced words and that these mistakes were not consistent. For example, while Wes sometimes says or writes, "per batim" instead of

4

_D\__ (Initial)

Ex_5-000042

"verbatim," "egrevious" instead of "egregious," and "toleracy" instead of "tolerance," he occasionally pronounces the words correctly. Sometimes when Wes uses a word that does not exist, such as "prociforus," it is impossible to determine even with context what word he meant to say instead. Wes makes these mistakes both orally and in writing, and they have become increasingly frequent with the passage of time. As recently as October 31, 2019 I received a letter from Wes in which he misspelled the name of George Kouros, an attorney with whom Wes is in frequent contact. He spelled George's last name as Kourose. In July of 2019, Wes sent me a letter in which he even spelled my last name incorrectly, spelling it "Vartessian" instead of "Vartkessian," which he has never done before.

15. Wes frequently uses words and phrases incorrectly. Sometimes he conflates two existing words that sound alike. For example, he has said "abolish" instead of "admonish," "refugee" instead of "refuge," "exist" instead of "existence," "affording" instead of "forwarding," and "under" instead of "unless." Other times he mixes up words that do not sound similar at all. For instance, described himself as "stamped Catholic" instead of "raised Catholic." Wes's difficulties finding the right words and putting them together in a coherent sentence often prevent him from having constructive communication with me and other members of his defense team.

16. Wes's speech is often tangential, jumping from topic to topic without any transition. It is common for him to begin an anecdote and divert to several other topics before reaching a conclusion to his original story. Sometimes Wes tells half a story and then moves on to a new topic without ever returning to the first, leaving the story unfinished. Wes is easily distractible and it does not seem possible for him to think and speak linearly. Beginning in 2017, I started to suspect that Wes's tangential manner of speaking was related to his poor memory. Sometimes it seemed like he would forget what we were talking about in mid-sentence, and then try to guess what the conversation was about at various points.

17. In having conversations with Wes, I often felt as if he had a repertoire of prepackaged phrases that he would use repetitively, like "lucrative endeavor," "a blind man in sunglasses could see that," and "crazy as a fox." Wes uses these phrases with such frequency that the context is often hard to place.

18. On May 13, 2015, Wes and I discussed his stuttering. He told me he used to

5

____ (Initial)

Ex_5-000043

stutter so badly that it was hard for people to understand what he was trying to say. As child, whenever Wes stuttered, his father would throw him up against the wall and punch him. He said his mother did not have any patience for him either, and described a Thanksgiving dinner in which he struggled to say "pass the gravy." His mother reacted by throwing vodka in his face and screaming at him, "If you can't talk correctly then shut the fuck up." Since his childhood, Wes learned various speech therapy techniques from professionals at the Institute of Logopedics and within the Oregon State Prison system that greatly reduced his stuttering. Given that Wes has a long history of stuttering and has learned techniques to minimize this deficit, I have taken particular note of the times he is unable to control his stutter.

19. During my earliest meetings with Wes in 2015, he started to stutter only when fatigue set in around four or five hours into a visit. Since then, however, Wes's stuttering has started progressively sooner into each of our meetings. The same speech exercises that were previously effective no longer work. During several visits in 2017, Wes began to slur his words. This occurred within the first hour and a half of our conversation. Now, Wes begins stuttering and slurring his words within five minutes of our visits.

20. Wes no longer has the stamina to handle conversations lasting as long as when I first joined his case. In the early days, I would often visit Wes two days in a row, and speak with him for five to six hours straight each day. In 2017, Wes began to look especially tired when he arrived for my visit the second day. Now, I avoid scheduling visits back to back, and I have greatly shortened the length of my visits.

### Memory Problems

21. Wes has struggled with both memory retention and recall, a problem that continues to progressively worsen with the passage of time. Wes acknowledges that he doesn't have a good memory. He has said that he "get[s] a glimpse of a memory, like looking through a little window or through little gaps in time, but [he] can't remember much about [his] life. [He couldn't] remember good times at all, just the bad."

22. During my first visit with Wes on February 3, 2015, he shared the story of when another prisoner stabbed him in the neck while he was serving time

6 _____ (Initial)

Ex_5-000044

in Oregon in 1988. Wes could not recall the name of the person who stabbed him, even though Wes was placed in segregation immediately after being treated at a hospital for refusing to disclose his attacker's name. During that same visit, Wes told me he knew he was divorced because he remembered being served with papers, but he couldn't recall when or how it happened. It is important to note that Wes has been married and divorced two times.

23. After just three visits with Wes, I noticed that he began recycling a number of stories that he forgot he had already shared. Each time he retold a story, he told it using the same exact words and phrases as his first recitation. Sometimes Wes would even retell the same stories within the span of one visit. For example, during a visit with Wes in May 2015, he described a phone call in which he told his daughter Angie that I was younger than her. During the visit, he relayed the story twice, each time acting as if it was the first time I was hearing this information.

24. The stock narratives that Wes tells include three to four stories about the lawsuits he had engaged in against the Kansas Department of Corrections for its use of box car cells. Wes tells the same story about how he was represented by Sly James, the former Mayor of Kansas City in one of the suits. Wes tells this story, completely unprompted, as if he is reading from a script. In actuality, Wes was not represented by Sly James, but another attorney for the same office.

25. The more I met with Wes, the more apparent his memory failures became. During several visits, Wes struggled to recall significant details about his relationships with friends and family. For example, Wes forgot how he met and developed a relationship with his ex-wife Claire Gaida. He also could not remember much about his relationship with Peggy Noe, a lifelong friend with whom he was especially close. First Wes described meeting Peggy in sixth grade. Later in the same conversation, Wes said he met her in second grade, as if he did not remember just telling me they met in middle school.

26. During my visit on March 12, 2019, Wes forgot the dates of his grandchildren's birthdays, which he had never done before. He also started the conversation by telling me about his grandson's new girlfriend from El Paso. A few minutes later, he told me she was from Tucson, forgetting he had just said it was El Paso.

7

_EV_ (Initial)

Ex_5-000045

27. In a letter on May 13, 2019, Wes asked me to send him information on his mother's "birthday and death, and where she was buried at, as well as birth's or the babies lost." Over the years Wes had spoken with me about her birthday and visiting his mother's grave. I know Wes was aware of when his mother died because he sought permission from the prison to visit her in the hospital just before her death. The fact that Wes asked me for these details was especially noteworthy because he used to know all of the information he was requesting.

28. During my visit on May 12, 2015, Wes could not recall several details about the car accident that left a permanent and noticeable bump on his head, including which hospital he received treatment from, how long he was in the hospital, or the fact that he lost consciousness.

29. During my visit the following day, Wes told me that his grandmother died when he was a teenager and left something for him in her will, but not for his brother Gary. He said this made sense since Wes was her grandson and Gary was not, which was not true. It took Wes several minutes to realize that his brother was also his grandmother's grandson. Even then, Wes did not remember why he was included in his grandmother's will when his brother was not.

30. In the time that I have known Wes, he has struggled to recall names. For example, he could not recall the names of Aline Pryor (his attorney for a previous criminal charge), Detective Howard (who investigated the crime for which he was convicted, and testified at Wes's trial), and Stormy (his mother's Siamese cat whom he frequently played with growing up). He also confused the title of "Hamilton" the musical by calling it "Jefferson". At one point, Wes repeatedly told me to watch the movie "Sully," which he later started referring to as "Scully." More recently, however, I have been increasingly surprised by the names Wes has had trouble remembering or could not recall at all. For example, he has both forgotten his aunt Marguerite's name and called her by his mother's name. He has repeatedly forgotten the name of his current counsel, Rebecca Woodman, and sometimes called her Teresa, the name of a previous attorney. He has also repeatedly forgotten the name of his current counsel Michelle Law. In fact, in a declaration Wes wrote in January of 2019 he referred to Michelle as Mr. Law. In January of this year, Wes told me that last time he talked to his niece, whom he adores, he had to say "*tell your daughter* I said

8

_____ (Initial)

Ex_5-000046

congratulations" instead of "tell Britney" because he could not remember Britney's name.

31. Based on my conversations with Wes, he does not have an accurate recollection of his 2003 capital trial. For example, Wes could not remember when his trial occurred or whether his trial attorney questioned jurors individually or as a group. He also struggled to remember who testified at his trial, and could not remember the name of Dominick Geniuk, the penalty phase witness who testified about Wes's work mentoring young prisoners. Additionally, on at least four separate occasions (March 9, 2015; February 17, 2017; May 17, 2017; January 17, 2019), Wes affirmatively stated that his jury spent 13-14 hours deliberating his guilt. In reality, his jury deliberated for just two and a half hours.

32. When Wes holds a wrong belief or memory, I am often unable to change that belief – even with evidence. Often, my efforts to correct Wes are met by him with anger and frustration. In the above example about the duration of deliberations, I provided Wes with the transcripts of the trial to show that his memory was incorrect. On that particular occasion, Wes retreated temporarily from his position. But the next time he discussed his jury, he again maintained that jury deliberations were 13-14 hours. This fixed false memory is directly connected to his inability to understand the facts from the crime and trial. For example, according to Wes, the "inordinate amount of time" the jury deliberated is evidence that the jurors were wrestling with finding him guilty because of the information Wes provided them in his testimony at trial.

33. Wes's inaccurate recollection of his trial has created problems for his current defense team. Wes continuously threatened to fire his attorneys, Rebecca and Michelle, if they did not litigate that his trial lawyer Fred Duchardt told him to lie on the stand when he testified at his trial. Accusing an officer of the court of suborning perjury is a serious allegation and Wes's attorneys did not have the evidence to lodge such a claim. Wes became fixated on how the visitation logs would prove that his trial attorneys did not prepare him to testify. After obtaining the logs we could see that counsel had actually visited with Wes the day before his testimony. Rather than accepting that evidence, Wes immediately determined that trial counsel had lied on the timesheet and that the logs were not true.

34. Wes has on a number of occasions said that he believes his current

9

_____ (Initial)

Ex_5-000047

attorney, Rebecca Woodman, is secretly cooperating with his trial counsel. When Rebecca did not file the litigation described above, for example, Wes intimated that it was because Rebecca was friends with Ms. O'Sullivan and had no incentive to tell the truth. Wes continues to believe that Rebecca is collaborating against him on this point. Wes has also continuously conflated Laura O'Sullivan, trial counsel in his capital case, with Aline Pryor, counsel in the Mary Ruth Bales case, and at times uses their names interchangeably.

35. Wes's thinking becomes extremely fixed when he perceives that someone does not believe what he is saying. He is not able to understand that differences can be due to interpretation. There is no ability to agree to disagree with Wes. If one does not come around to his view Wes interprets it as that person acting against him.

36. Wes told me he struggles on a daily basis to remember whether or not he took his hypertension medication. He has noted that he cannot often remember what he was doing in his cell, meaning that he will find himself standing in his cell as if he was about to look for something and cannot recall what he had intended to do. This problem appears to have gotten worse in the last 12 to 18 months, and he has raised the issue with me much more frequently.

37. In speaking with Wes, it is often difficult to ascertain whether my difficulties in understanding him are due to his memory failures or his problems conveying information. For example, during a visit on February 4, 2015, Wes said that Terre Haute offered "a diabetic diet via facsimile only." During another visit on March 10, 2015, he told me his granddaughter Haley did not want to visit him because "she didn't want to do math."

38. During a visit in 2018, Wes could not recall the term PTSD, even though we had previously discussed PTSD in depth. Just a year before, Wes told me that he never believed PTSD was real. He then started talking about how he blew his head off while his bed wasn't made and there were bottles everywhere. He then repeated the question "Why couldn't he come up?" I could not make sense of what Wes was saying.

39. Recently, Wes forgot to prepare for and bring materials with him to our legal visit. As usual, I had sent Wes a letter letting him know what day I

10

$\text{\textcircled{V}}$ (Initial)

Ex_5-000048

would be visiting. When I showed up for the visit, Wes was surprised because, though he knew I planned to see him that day, he had forgotten what day of the week it was.

40. In Wes's correspondence he will often ask for copies of the same document multiple times. When I provide the documents he will forget having asked for the materials and/or sometime later say that I never provided the materials to him and become very upset. By May of 2016, I started sending letters back to Wes that detailed when he asked for the materials and what I was sending back so he would have a document verifying the completion of the task.

41. Wes regularly expresses the belief that Rebecca and Michelle have promised to perform a task, when, in actuality, they did not. For instance, recently, Wes was incensed that Michelle did not pay Wes back for copies he made of medical records. This came up in the last visit I had with Wes in October 2019. Wes repeatedly called Michelle a son-of-a-bitch and a liar. After I left the prison, I spoke with Michelle who confirmed that she had not told Wes that she would reimburse him for the cost of the copies.

42. The October 2019 visit with Wes lasted less than 20 minutes. When I arrived, Wes was told that I was getting him items from the vending machine. I could hear him say, "there is just one of them". When I walked in Wes said that Michelle and Rebecca were supposed to be there. I had told Wes that I was coming alone. I explained that they were working on a reply brief in his case. He was furious that they were not with me. I offered to write down all he wanted to go over and share it with them. Wes declined, noting that doing so would just give the appearance that they were working on his case, another paranoid and conspiratorial belief. I reminded him that they were coming to see him with a draft the next week and told him the date. Wes stated that the date they were coming was the day before the reply was due, which was incorrect. I corrected Wes and he became irate and terminated the visit.

43. Losing the ability to recall basic information such as the name of his aunt or his niece's daughter has been especially chilling for Wes. He watched several family members die of dementia and is aware of the painful end that comes with the disease. Wes has mentioned several times that he would prefer death to having to experience dementia to the end. Wes's ability to communicate and write has been a source of purpose for him. As

11

$\cancel{\text{EV}}$ (Initial)

Ex_5-000049

such, he has tried very hard to minimize the lapses in his memory though at this stage he cannot mask the decline as effectively as he once could.

44. Wes's memories are often inaccurate reflections of exchanges that have taken place. As a recent example, Wes told me about a conversation he had with attorney George Kouros, who has previously assisted Wes in several civil lawsuits. Wes described George as "passionately [telling him] 'just fuck you Purkey.'" When relaying the conversation to me, Wes told me during the exchange he wanted to tell George "now you are starting to sound like Liz." I have never spoken to Wes that way and believe that George did not speak to Wes that way either. I had spoken with George about this exchange previously and he had described the exchange much differently.

### Additional Signs of Cognitive and Physical Impairment

45. The first time I met Wes in February 2015, I was accompanied by Jeremy Isard, another mitigation specialist from my office. When Jeremy wrote his name on a piece of paper and handed it to Wes, Wes asked him to clarify the spelling because he mistook the "A" in "Isard" for an "L." Jeremy's handwriting was perfectly legible, and I did not see how Wes could confuse the two letters from what Jeremy had written. Afterwards, Wes rewrote Jeremy's name, spelling his first name "Jemery."

46. Ever since my first meeting with Wes in February 2015, he has been paranoid that prison officials were targeting him to prevent his work filing grievances and lawsuits on behalf of fellow prisoners. During our first meeting, Wes complained that the prison's visitation policy restricting visits to those who had a previous relationship with the prisoner was selectively applied to him. He was convinced the prison rejected his request for a visit from his Scottish pen pal because he was "being singled out since [he was] the least favorite camper of the administration." Wes's paranoia has only become more deeply engrained in his thinking since I first met him.

47. On December 7, 2017, Wes told me the prison staff fired him from his job at the law library because they knew about and did not approve of the lawsuits he brought against the Wyandotte County Jail over a decade ago. He was convinced the prison staff lied when they told him the reason for his termination from the law library was because of his typing errors.

12       _____ (Initial)

Ex_5-000050

According to Wes, this explanation was a cover up for the truth—they wanted him to stop "pushing his pen in the wrong direction" and filing lawsuits to improve prison conditions. Wes told me that despite the prison staff's intimidation, he was not going to stop because his lawsuits are helping inmates, and specifically referred me to *Purkey v. Green I* and *Purkey v. Green II*. In reality, Wes's claims in *Green I* were dismissed for failure to raise a claim and *Green II* was dismissed on summary judgment. One such claim included the allegation that jail employees put Wes in segregation and incited other inmates to harm him in retaliation for his attempts to file grievances and lawsuits against jail employees.

48. During my first visit with Wes he told me that ever since he was hit by an 18-wheeler on the highway in 1968 he suffers from frequent headaches in the form of sharp pains in the front of his head. He also gets dizzy whenever he rolls over or leans back. His dizziness is especially bad when he lays down on his back.

49. During the same visit, Wes described the lines as "jumping" when he reads. Since that time, Wes's ability to read in my presence has also declined. When I first started visiting with Wes he would read documents to me before handing the papers over for my review. Within the last two years Wes started handing documents to me without reading them aloud first. After he passes the materials he will often ask me to read it to him. His handwriting, which was once legible, is now almost impossible for me to read, I have to take time and decipher the words. Wes himself has trouble reading his own handwriting and it takes time in visits for him to try and figure out what he has written. Likewise, Wes often gives me handwritten documents to read during our visits and I have noticed that in his writings there are often pages of documents that simply list words. When asked about the words on the page Wes will shake his head as if to indicate he doesn't know why he wrote them.

50. Wes has told me that he talks to pictures in his cell. He has mentioned in passing that he catches himself speaking aloud in his cell to no one.

51. In May 2015, I noticed Wes starting to have trouble controlling his body. During some visits, the muscles in his chest seemed to be constantly and involuntarily flexing. Beginning in 2017, I started opening Wes's drinks and snack wrappers for him because his hands were shaking too much to do

13

*(Initial)*

it himself. Wes also seemed to be getting clumsier, as I noticed him periodically misjudge the location of the table and hit his leg against it—a problem he did not have before. Over the course of my last few visits, Wes has visibly aged. His chest, which had always been very muscular, looked saggy. He looked gaunt and appears to have lost a considerable amount of weight in a short period of time. This rapid decline in his physical appearance has been extremely pronounced since Wes was moved to the execution range. During my last three visits between August and October 2019 Wes has repeatedly stated that he is tired, which is unusual for him to say. During my last visit with Wes on October 9, 2019 he appeared unable to hold his composure and swayed as he stood. He banged the table between us accidently. I thought that at one point he might fall over because his balance appeared to be off.

52. During my visit with Wes on September 10, 2019 I became aware that he was urinating in a bag when he told me that he needed to empty his "pee bag." I had never known Wes to do this before. I learned that he had fashioned something he could use to relieve himself while we were in a legal visit. This struck me as especially troubling given the fact that there was a correctional officer outside our visiting room who could take him to the bathroom. Wes has never had to wait longer than five minutes to be escorted from the visiting room to the bathroom when he has asked in the past. It is my belief that Wes is experiencing incontinence and cannot wait to be taken to the bathroom.

53. On February 16, 2017, the emergency alarm went off within thirty minutes of the start of my visit with Wes. While the sirens stopped after about ten minutes, the flashing lights never ceased. Wes could not get past this. Though I tried to continue our conversation, the flashing lights were distracting Wes beyond his ability to control his frustration. He abruptly stopped talking to go ask the staff to cover the light and shout that he would file a grievance.

54. Less intense disruptions have also caused Wes to lose focus. In the last two years especially I have observed Wes become distracted to the point where he has stood up from our visits mid conversation to see what was happening outside of the room. The sounds were often those of doors opening and closing, officers walking past, or keys jingling – all common sounds for the inside of a prison.

14                                    _EV_ (Initial)

Ex_5-000052

55. Wes used to prolifically create artwork, especially yarn work. I have noticed that this has decreased remarkably over the last two years. Wes barely crafts any blankets, handbags, hats, or toys compared to how active he was in 2015-2017.

### Inability to Work with his Defense Team

56. Wes frequently vacillates in his instructions to the legal team. At times when Wes has been clear about material he does not want the team to litigate, we could not have a rational discussion about it because his frustration and concreteness would get in the way. Other times, he would tell us that we were allowed to include certain information.

57. Wes's anger escalates often and quickly, sometimes in ways that I can anticipate and other times without any obvious trigger. On July 31, 2018, Wes explained that when he gets angry, he is not able to think. He described his episodes of anger as if he was having an out-of-body experience standing by, watching himself unravel and act in ways he did not understand.

58. Wes's memory failures have created tension between him and the defense team, particularly when he misremembers what we have communicated to him. Wes becomes very frustrated when events do not occur as he expected they would, so these constant misunderstandings create huge issues for Wes's ability to cooperate effectively with his team. Moreover, when Wes cannot convince members of his team of his point of view, he sees that as evidence that they are actively working against him. The instances in which he has attempted to fire Rebecca and Michelle are often connected to Wes's inability to convince them to see what he is saying as accurate, or to rationally understand their perspective.

59. Wes demonstrates extremely fixed thinking and this has been the cause of much of his frustration. For instance, Wes became especially agitated on May 16, 2017. I started the visit by sharing records we had collected as a part of the investigation into his case related to his aunt's husband, John, whom Wes had never met. Wes wanted to keep the documents related to John's personal history. I reminded Wes that we had reached an agreement about him getting such materials and that I wouldn't be leaving the papers with him that day. Wes's entire body language changed within seconds from being open to looking extremely tense. All his muscles seemed to be

15

_____ (Initial)

Ex_5-000053

flexed and his face looked both angry and confused. He became irrational stating that the records about John that he had just seen for the first time that day meant more to him than life itself. I asked if the records meant more to him than his own life and he said they did. I explained that I was not trying to keep the records from him, but that I could not leave the records that day. This frustrated him further. He stood up, his face turning red, and snapped that he didn't care if the prison found the records. After I tried further explaining my rationale, he cussed me out, threw his materials into a bag, told me he did not want to see me again, and called for the guard to escort him out of the visitation room. The visit was over within 30 minutes.

60. Wes repeatedly threatened to have his attorneys, Rebecca Woodman and Michelle Law removed from his case. Wes has maintained throughout the last four years that he never gave permission for Rebecca and Michelle to work on his case, which is not accurate. Wes repeatedly brings this up when he is frustrated. Likewise, Wes will say that he is more knowledgeable on death penalty litigation because this is Michelle and Rebecca's first death penalty case and although they are smart women, he has done extensive research on the topic. Wes's belief that his is the first capital case that Rebecca and Michelle have worked on is false. I have corrected Wes about this several times over the years and yet it continues to be something he states as a matter of fact at various points.

61. Wes is paranoid about attorneys. Though it would be rational for Wes to have a healthy skepticism of some lawyers given his experiences with his capital trial counsel, who filed a 117-page affidavit post-conviction essentially justifying every single potential issue that could have been brought up to allege ineffectiveness, Wes's views are not rational. For example, Wes continues to hold on to the false belief that Rebecca and Michelle do not want to file certain claims related to conditions of confinement because they actually want him to die. When they do not do as he says, Wes internalizes that decision as evidence of their desire to cause him harm and, more specifically, for him to be executed. In this way, he sees them as part of the conspiracy against him and his efforts to litigate against the prison.

62. Likewise, when Wes does not understand the law Rebecca and Michelle have tried to explain to him, he accuses them of lying to him. On May 12, 2015, for example, Wes accused Rebecca of lying and deceiving him about

16

_EV_ (Initial)

Ex_5-000054

the filing deadlines for his petition and blamed Michelle for being a passive accomplice. In reality, Wes just did not understand Rebecca's explanations of the statute regarding filing deadlines. As a result, Wes drafted a motion to fire both Rebecca and Michelle, though he did not file it. In September 2019, Wes told me that he removed both Rebecca and Michelle from his visit list because of their "repeated and protracted lies for a five year period." He accused them have having a hidden agenda. Wes more recently filed a motion requesting to go *pro se* again for similar reasons. Wes has a long history of filing and withdrawing pro se motions, so much so that the clerks of the courts Wes routinely files in have acknowledged this behavior as a sign of mental illness.

63. Wes believes that those on death row, as well as himself, are being represented by attorneys who do not have the interests of their clients in mind. He has made efforts to get other inmates to file grievances and suits. Attorneys for other inmates have contacted our team to ask us to try and persuade Wes to stop trying to litigate on behalf of their clients. Wes truly believes that he is capable of adequately representing himself and others in complex litigation even though he has failed to successfully litigate far less complicated cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 15th day of November, 2019.

Elizabeth Vartkessian, Ph.D.

17                                                                 _____ (Initial)

Ex_5-000055

# Exhibit 2

# CURRICULUM VITAE

**Elizabeth S. Vartkessian, Ph.D.**
309 N. Charles St., 3rd floor
Baltimore, MD 21201
Phone: (281) 217-0946   esv@advancechange.org

## EDUCATION

2012        Ph.D. in Law (DPhil)
            University of Oxford, St. Hilda's College—Oxford, England

2004        M.S. in Comparative Social Policy (M.Sc.)
            University of Oxford, St. Antony's College—Oxford, England

2003        B.A., Political Science; B.A., Philosophy; Minor, Africana Studies, *Magna Cum Laude*
            George Washington University, Washington D.C.

## PROFESSIONAL EXPERIENCE

2014-Present   *Founding Executive Director*, Advancing Real Change, Inc. (ARC, Inc.),
               Baltimore, Maryland.
               ARC, Inc. promotes justice by ensuring that the life histories of people charged with crimes are at the forefront of their cases. ARC, Inc. engages in casework, provides training and consulting services to legal teams regarding the best practices of life history investigations.

               In addition to working as a mitigation specialist further tasks as the Executive Director include:

- Managing daily office operations of 11 full-time staff.
- Providing direct supervision to all mitigation and records collection specialists.
- Reporting to the Governing Board of Directors.
- Overseeing office finances.
- Leading fundraising efforts.
- Engaging in coalition building and community outreach.
- Providing training and consultation services to defender organizations and private bar attorneys.
- Maintaining a discrete caseload as a mitigation specialist in complex cases.
- Licensed as a Private Detective in Maryland, number 101-24647.

2010-2014      *Mitigation Specialist*, private consulting services for capital and cases involving juvenile life sentences.

- Built a successful private mitigation practice.
- Engaged in networking including identifying clients and marketing.

1

# CURRICULUM VITAE

- Ran daily operations, including budgeting, invoicing, accounting, and collection of payments.
- Obtained a private investigator license in New York.
- Trained as a Defense Victim Outreach Liaison.

2004-2010    *Mitigation Specialist*, The Gulf Region Advocacy Center, Houston, Texas. Life history investigator for death penalty cases at trial and post-conviction stages. Regular tasks included:

- Providing expert testimony regarding the standard of care for the development and presentation of mitigating evidence in death penalty cases.
- Interviewing the client for the purpose of preparing a social history.
- Identifying, locating, and interviewing family, friends, and other witnesses for the purpose of preparing a social history.
- Collecting and evaluating birth, medical, education, social welfare, employment, incarceration, military, and other records of clients and family members for the construction of a social history.
- Investigating and researching issues related to medical history; prenatal, pediatric and adult health; exposure to harmful substances *in utero* and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religion, gender and sexual orientation; ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.
- Working with the client's family, community, and clergy in the development of other favorable evidence for the client.
- Analyzing information gathered in investigation to determine potential expert witness consultations.
- Writing memoranda analyzing the factual information obtained from witnesses and historical documents in light of the principles discerned from the professional literature.

## INVITED GUEST LECTURES, PRESENTATIONS, AND TRAINING SESSIONS

2020    Thurgood Marshall, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker by video. Houston, Texas. June 9.

2020    Advancing Real Change, Inc.: *Mitigation Webinar Series*. "Mitigation Investigation During COVID-19". Baltimore, Maryland. April 7.

2020    American Civil Liberties Union, Scharlette Holdman Mentorship Training. Plenary speaker session topic "ABA Guidelines" and "Advanced Interviewing Skills". New Orleans, Louisiana. March 12-13.

2

**CURRICULUM VITAE**

2020      Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 4.

2019      Advancing Real Change, Inc.: *Mitigation Training Series*. Curriculum coordinator and plenary session speaker topic "Mitigation's Power and Purpose". Houston, Texas. December 6-8.

2019      Federal Death Penalty Strategy Session, Closing Comments: Thoughts on Pleas and Deauthorization. San Diego, California. November 14-16.

2019      *Bring Your Own Case* training, Curriculum coordinator and faculty member. Supported by National Association of Criminal Defense Lawyers and a grant from the Bureau of Justice. Tallahassee, Florida. November 8-10.

2019      Arkansas Association of Criminal Defense Lawyers: *Death Penalty Conference*. Plenary session speaker, "Ethics of Mitigation Investigation". Rogers, Arkansas. October 25-26.

2019      Louisiana State Public Defender, Faculty member and plenary session speaker for capital and *Miller/Montgomery* tracks, topics "Mitigation's Power and Purpose", "Assets-Based Mitigation Evidence", "Identifying Trauma". Kenner, Louisiana. October 23-25.

2019      University of Texas, Capital Punishment Clinic: Tools for Organizing Casework. Austin, Texas. September 18.

2019      Authorized Case Consultation and Training. Federal Resource Counsel, "Capital Jury Selection". St. Louis University School of Law. June 6-8.

2019      Advancing Real Change, Inc.: *Baltimore Training Series*. Curriculum coordinator and plenary session speaker, "Mitigation 101" and "Mitigation's Power and Purpose". May 16-18.

2019      Bellarmine University, Topic: "Capital Mitigation" (by video). April 10.

2019      Amicus U.S. Death Penalty Training, "Mitigation 101", "Working with Clients", "Investigating and Litigating Mental Health and Trauma", and "Getting in the Door and Conducting Witness Interviews". London, England. March 23-24.

2018      The Virginia Bar Association, 26th Annual Capital Defense Workshop, plenary session speaker, "School to Prison Pipeline as Mitigation". Richmond, Virginia. November 16.

3

**CURRICULUM VITAE**

| | |
|---|---|
| 2018 | 26th Annual Federal Death Penalty Strategy Session, plenary speaker "Preparing for Authorization". Tampa, Florida. November 7-9. |
| 2018 | Amicus U.S. Death Penalty Training, "Mitigation 101", "Common Claims and How to Prepare Evidence", Unearthing Records that Will Change the Face of a Case", "Working with Clients", "Identifying Signs and Symptoms of Mental Health and Trauma", and "Getting in the Door and Conducting Witness Interviews". London, England. November 3-4. |
| 2018 | Louisiana State Public Defender, Faculty member and plenary session speaker, "Working with Experts", "Capital Jury Project: Findings and Application", and "Developing Themes and Theories in Juvenile Cases". Kenner, Louisiana. October 24-26. |
| 2018 | University of Texas, Capital Punishment Clinic: Tools for Organizing Casework. Austin, Texas. September 19. |
| 2018 | Office of the Public Defender in the Ninth Circuit, Sentencing Strategies Seminar, plenary session speaker, "Preparing for Your Penalty Phase and Sentencing". Orlando, Florida. August 6-7. |
| 2018 | Miami Public Defender, in-house training. Case management and document processing. Miami, Florida. May 7-9. |
| 2018 | University of Texas, Capital Punishment Clinic: Mitigation Advocacy. Panelist discussing empirical assessments of successful mitigation in capital and non-capital cases. Austin, Texas. April 7-8. |
| 2018 | Advancing Real Change, Inc.: *Baltimore Mitigation Training*. Curriculum coordinator and plenary session speaker, "Mitigation: The Heart of Criminal Defense," and "Forward-looking Mitigation and Re-entry". Baltimore, Maryland. March 16-18. |
| 2018 | American Civil Liberties Union, *Bring Your Own Case Training*. Faculty member and plenary session speaker, "What Must Be Done in Every Case: Mitigation Investigation". Perdido Beach, Alabama. February 28-March 2. |
| 2018 | Alabama Criminal Defense Lawyers Association: *Capital Training*. Plenary Speaker, "Basics of Case Organization and Tools of the Mitigation Trade", and "Compelling Narratives: Mitigation Themes and Theories" Birmingham, Alabama. January 18-20. |
| 2017 | Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. November 29-December 2. |

4

**CURRICULUM VITAE**

2017    Amicus U.S. Death Penalty Training, "Mitigation 101", "Common Claims and How to Prepare Evidence", Unearthing Records that Will Change the Face of a Case", and "Getting in the Door and Conducting Witness Interviews". London, England. November 4-5.

2017    Louisiana State Public Defender, Faculty member and plenary session speaker, "Ethical Obligations of the Mitigation Investigation", "Mitigation in *Miller* cases", and "Capital Juror Research". Kenner, Louisiana. October 18-20.

2017    Virginia Correctional Association: *Stop Blocking the Exit*. Panelist, "Struggles and Success of the Journey Home". Williamsburg, Virginia. October 12.

2017    Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. October 11.

2017    Federal Criminal Defense Seminar, Administrative Offices of the U.S. Courts. "Mitigation Investigation and Mental Health Evidence". Philadelphia, Pennsylvania. August 24.

2017    The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member and plenary session speaker, "Records Collection". Houston, Texas. August 7-9.

2017    Habeas Assistance and Training Counsel Project: *Fourteenth Annual National Seminar on the Development and Integration of Mitigation Evidence*. "Basics of Case Organization and Tools of the Mitigation Trade". Baltimore, Maryland. April 7.

2017    Florida Defender Organization: Topic: "Compelling Narratives: Mitigation Themes and Theories" (by videoconference). March 24.

2017    Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 23.

2017    Yale School of Management: *Yale Philanthropy Conference*. Invited panelist, "A Public Voice: Rethinking How Advocacy Supports Mission". New Haven, Connecticut. February 24.

2017    Advancing Real Change, Inc.: *Baltimore Mitigation Training*. Curriculum coordinator and plenary session speaker, "Best Practices of Mitigation Investigation," and "Forward-looking Mitigation". Baltimore, Maryland. February 10-11.

**CURRICULUM VITAE**

2017        Yale School of Law: *Educational Opportunity and Juvenile Justice Clinic*. Topic: records collection and interviewing basics for mitigation development. Guest speaker. New Haven, Connecticut (by videoconference). January 31.

2016        Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. December 15-17.

2016        Michigan State Appellate Defender: *Juvenile Life Mitigation Training*. Curriculum coordinator and plenary session speaker, "Best Practices of Mitigation Investigation". Detroit, Michigan. December 8-9.

2016        Louisiana State Public Defender: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Walk a Mile in My Shoes: A Day in the Life of Your Client". Baton Rouge, Louisiana. October 19-21.

2016        University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. April 25.

2015        Maryland Office of the Public Defender, *Summer Law Clerk Training*. Plenary session speaker, "Mitigation: The Heart of Criminal Defense". Baltimore, Maryland. May 27.

2015        Habeas Assistance and Training Counsel Project: *Twelfth National Seminar on the Development and Integration of Mitigation Evidence*. "Basics of Case Organization and Tools of the Mitigation Trade". Baltimore, Maryland. April 12.

2015        Arizona Capital Representation Project: *Bring Your Own Case Training*. Faculty member Phoenix, Arizona. April 1-3.

2015        University of Maryland, School of Law: *Social Work and Law*. Topic: social work assessments and sentencing determinations. Guest speaker. Baltimore, Maryland. March 30.

2015        Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 19.

2015        Administrative Offices of the U.S. Courts: *Fourth Annual Capital Mitigation Skills Workshop*. Faculty member and plenary session speaker, "Basics of Case Organization and Tools of the Mitigation Trade", Kansas City, Missouri. January 15-18.

**CURRICULUM VITAE**

| | |
|---|---|
| 2014 | Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. November 20-22. |
| 2014 | Arkansas Association of Criminal Defense Lawyers: *Death Penalty Conference*. Plenary session speaker, "Records Collection" and "What Matters to Capital Jurors". Rogers, Arkansas. October 31-November 1. |
| 2014 | Oregon Capital Resource Center: Plenary session speaker, "Capital Jurors and Mitigation Evidence". Gleneden Beach, Oregon. October 10-11. |
| 2014 | Florida Death Penalty Training Program: *Life Over Death*. Plenary session speaker, "What Matters to Capital Jurors". Orlando, Florida. September 5. |
| 2014 | The Gulf Region Advocacy Center: *Bring Your Own Case Training*. Plenary session speaker, "Capital Jurors and Mitigation Evidence"; "Developing the Social History"; "Effective Team Work". Faculty member. St. Louis, Missouri. August 15-17. |
| 2014 | Atlantic Center for Capital Representation: *Mitigation Skills Training*. Planner and faculty member. Philadelphia, Pennsylvania. August 8-9. |
| 2014 | University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. June 10. |
| 2014 | Maryland Office of the Public Defender, Summer Law Clerk Training. Plenary session speaker, "Mitigation: The Heart of Criminal Defense". Baltimore, Maryland. May 28. |
| 2014 | Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. February 27. |
| 2013 | The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member. Houston, Texas. November 20-22. |
| 2013 | Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member. Lafayette Hill, Pennsylvania. September 25-28. |
| 2013 | University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. May 28. |
| 2013 | Oregon Capital Resource Center: Plenary session speaker, "Capital Jurors and Mental Health Mitigation Evidence". Portland, Oregon. April 19-21. |

7

# CURRICULUM VITAE

2013    University at Albany, School of Criminal Justice: *Qualitative Research Methods*: Topic: intensive interviewing techniques and conducting field research. Guest speaker. Albany, New York. January 22.

2012    University at Albany, School of Criminal Justice: *Law and Psychology*: Topic: the role of mitigation evidence in juror decision-making in capital cases. Guest speaker. Albany, New York. October 31.

2012    Idaho Federal Defenders Annual Training Seminar: Plenary session speaker, "Capital Jurors and Mitigation Evidence". Boise, Idaho. September 13.

2012    Habeas Assistance and Training Counsel Project: Ninth National Seminar on the Development and Integration of Mitigation Evidence. Plenary session speaker, "Capital Jurors and Mitigation Evidence". Atlanta, Georgia. April 28.

2008    Reprieve U.K. *Death Penalty Investigators Training*. Faculty member. London, England. March 29-30.

2007    Reprieve U.K. *Death Penalty Investigators Training*. Faculty member. London, England. April 21.

2007    National Consortium for Capital Defense Training funded by the Bureau of Justice Assistance: *Capital Defense Mitigation Issues*. Faculty member. Plano, Texas. March 23-24.

2007    The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member. Houston, Texas. January 19-21.

2006    Texas Criminal Defense Lawyers Association: *Mitigation Training*. Faculty member. Dallas, Texas. April 20-21.

2005    Capital Unit of the Oklahoma City Public Defenders Office: *Conducting Mitigation Investigation*. Faculty member. Oklahoma City, Oklahoma. September 20-23.

## PROFESSIONAL TRAININGS AND CONFERENCES ATTENDED

2019    NAACP Legal Defense Fund, Inc. 40th Annual Capital Punishment Training Conference. Tarrytown, New York. July 11-14.

2019    Authorized Case Consultation Training, Federal Resource Conference. Atlanta, Georgia, January 22-24.

2015    Post-2255 Litigation and Advocacy, Federal Capital Habeas Project Training Conference. Philadelphia, Pennsylvania, July 21-22.

8

# CURRICULUM VITAE

2015    NAACP Legal Defense Fund, Inc. 36th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 9-12.

2014    Defense Initiated Victim Outreach Training, sponsored by the Administrative Offices of the U.S. Courts. Santa Clara, California. September 15-19. (by application).

2014    NAACP Legal Defense Fund, Inc. 35th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 17-20.

2014    Eleventh National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases sponsored by the Administrative Offices of the U.S. Courts. Philadelphia, Pennsylvania. March 27-30.

2013    Eighteenth Annual National Federal Habeas Corpus Seminar sponsored by the Administrative Offices of the U.S. Courts. Cleveland, Ohio. August 15-18.

2013    NAACP Legal Defense Fund, Inc. 34th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 11-14.

2013    Tenth National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases sponsored by the Administrative Offices of the U.S. Courts. Baltimore, Maryland. April 4-7.

2011    Law and Society Annual Meeting, San Francisco, California. June 2-5.

2011    Vermont Law School Symposium, New Perspectives on Capital Punishment, South Royalton, Vermont. February 11.

2009    NAACP Legal Defense Fund, Inc. 30th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 9-12.

2008    Law and Society Annual Meeting, Montreal, Quebec. May 29-June 1.

2006    Mitigation Seminar sponsored by the Habeas Assistance and Training Counsel: The Development and Integration of Mitigation Evidence in Capital Cases. Washington D.C. April 27-30.

2006    Third National Forensics Seminar sponsored by The Habeas Assistance and Training Counsel. San Antonio, Texas. January 26-29.

2006    National Consortium for Capital Defense Training funded by the Bureau of Justice Assistance. Plano, Texas. January 11-14.

9

**CURRICULUM VITAE**

2005        National Association of Criminal Defense Lawyers Death Penalty Seminar. Oklahoma City, Oklahoma. September 30-October 2.

2005        A Fighting Chance: Themes and Theories of Mitigation Investigation. New Orleans, Louisiana. June 1-3.

2005        Records collection, Juror and Witness Interviews and Legal Aspects of Investigative Work. Houston, Texas. April 12-14.

2005        National Legal Aid and Defender Association: Life in the Balance. New Orleans, Louisiana. March 18-22.

2005        Capital and Mental Health Seminar. Houston, Texas. February 23-25.

## ACADEMIC POSITIONS

2013-present   *Research Fellow*, School of Criminal Justice, University at Albany

2012-2013    *Adjunct Professor*, School of Criminal Justice, University at Albany
Introduction to Criminal Justice Processes

2010-2011    *Discussion Leader*, School of Criminal Justice, University at Albany
Introduction to Criminal Justice Processes
Introduction to Criminology

## PUBLICATIONS

2019        Vartkessian, Elizabeth S., "Including Assets-Based Mitigation in Sentencing" ***Criminal Justice Policy Review***. Published on-line (August 9) ahead of print, https://journals.sagepub.com/doi/10.1177/0887403419866887.

2018        Sean O'Brien, Elizabeth S. Vartkessian, and Marla Sandys "Psychological Defenses and Mitigation" in ***Forensic Science Reform: The Psychology and Sociology of Wrongful Convictions***. Wendy J. Koen and Michael Bowers (Eds). Elesevier.

2018        Riner, Robin and Elizabeth S. Vartkessian. "Showing Humanity: How Defense Attorneys Use Mitigation Narratives to Advocate for Clients" in ***Language & Social Justice: Case Studies on Communication & the Creation of Just Societies***.

2018        Vartkessian, Elizabeth S. (July 12). "All Serious Crimes Deserve Podcast-Style Scrutiny" Published by ***The Baltimore Sun***, Retrieved from: http://www.baltimoresun.com/news/opinion/oped/bs-ed-op-0713-curtis-flowers-20180711-story.html.

10

**CURRICULUM VITAE**

2017        Vartkessian, Elizabeth S. (April 27). "The Tragic Life and Cruel Execution of Ledell Lee" Published on-line by *The Marshall Project* and *Vice News*, Retrieved from: https://www.vice.com/en_us/article/the-tragic-life-and-cruel-execution-of-ledell-lee.

2017        Sandys, Marla, Elizabeth S. Vartkessian, Heather Pruss, and Sarah Walsh, "Setting the Stage and Listening to What Jurors Have to Tell Us About Mitigation" in Edward Monahan and Jim Clark (Eds.) *Mitigation in Capital Cases: Understanding and Communicating the Life Story*. **American Bar Association**.

2017        Vartkessian, Elizabeth S., Jonathan Sorenson, and Christopher E. Kelly. "Tinkering with the Machinery of Death: Juror Decision-Making in Texas Death Penalty Trials During Two Statutory Eras" *Justice Quarterly*. 34(1): 1-24.

2014        Bowers, William, Christopher E. Kelly, Ross Kleinstuber, Elizabeth S. Vartkessian, and Marla Sandys. "The Life or Death Sentencing Decision: It's at Odds with Constitutional Standards, Is it Beyond Human Ability?" in James R. Acker, Robert M. Bohm, and Charles S. Lanier (Eds.) *America's Experiment with Capital Punishment*. Carolina Academic Press.

2012        Vartkessian, Elizabeth S. "What One Hand Giveth, the Other Taketh Away: How Future Dangerousness Corrupts Guilt Verdicts and Produces Premature Punishment Decisions in Capital Cases." *Pace Law Review*. 32: 447-543.

2011        Vartkessian, Elizabeth S. and Jared P. Tyler. "Legal and Social Exoneration: The Consequences of Michael Toney's Wrongful Conviction." *Albany Law Review*. 75: 1467-1498.

2011        Vartkessian, Elizabeth S. "Dangerously Biased: How the Texas Capital Sentencing Statute Encourages Jurors to be Unreceptive to Mitigation Evidence." *Quinnipiac Law Review*. 29: 237-288.

## WORKS IN PROGRESS

Vartkessian, Elizabeth S., Christine Land, and Alice Gould, "How Evidence of Mental Illness Becomes Aggravating: An Analysis of Texas Capital Cases" (Manuscript)

## RESEARCH EXPERIENCE

2017-present   *Co-investigator with Scott Sundby*
Capital Jury Project, Arizona data collection

2010-2013     *Visiting Researcher*, School of Criminal Justice, University at Albany, State University of New York
Capital Jury Project

11

# CURRICULUM VITAE

2008-2010    *Primary Investigator*, Research Foundation of the State University of New York, Hindelang Criminal Justice Research Center
Capital Jury Project, Texas data collection

## SCHOLARSHIPS, GRANTS, AND AWARDS

2018    Resolution by the City Council of Baltimore recognizing ARC, Inc.'s work

2017    United States Human Rights Network, Human Rights Builders Award (for ARC, Inc.'s work to bring empathy to the criminal legal system)

2015    J.M. Kaplan Social Innovation Prize Awardee (private foundation grant to support the work of ARC, Inc.)

2014    Research Affinity Group (private foundation grant)

2010    Research Affinity Group (private foundation grant)

2009    Criminology Department, Oxford University (partial tuition)

2009-2008    St. Hilda's Graduate Student Scholarship (partial tuition)

2008    Alpha Delta Pi Foundation (academic, philanthropic, and social society grant)

2008    Law and Society Graduate Students Workshop Grant

1999-2003    George Washington University's Presidential Scholarship

## ACADEMIC PAPERS PRESENTED

2018    Vartkessian, Elizabeth S. and Kaylesh Ramu, Paper entitled "*Improving Outcomes in Juvenile Life Without Parole Resentencings: A Preliminary Analysis of National Transcripts*" Legal Services for the Indigent: The Impact of Policy Changes, The American Society of Criminology, Atlanta, Georgia.

2017    Vartkessian, Elizabeth S., Paper entitled "*Mitigation's Role in Criminal Defense*" Legal Services for the Indigent: Social Work, Mitigation, and Holistic Defense, The American Society of Criminology, Philadelphia, Pennsylvania.

2017    Vartkessian, Elizabeth S., Paper entitled "*Capital Juror's Response to Mental Health Evidence: Context Matters Most*" International Academy of Law and Mental Health, Prague, Czech Republic.

12

**CURRICULUM VITAE**

2013          Vartkessian, Elizabeth S. and Christopher E. Kelly, Paper entitled *"Capital Improvements? Juror Decision-Making in Texas Death Penalty Trials Before and After Penry v. Lynaugh"* Law and Society Association, Boston, Massachusetts.

2011          Acker, Jim, William J. Bowers, Andrew L.B. Davies, Elizabeth S. Vartkessian, and Kay Lang, Paper entitled *"Families and Friends of Homicide Victims: Violent Bereavement and Adaptation"* The American Society of Criminology, Washington D.C.

2011          Vartkessian, Elizabeth S., Paper entitled *"What One Hand Giveth, the Other Taketh Away: How Future Dangerousness Corrupts Guilt Verdicts and Produces Premature Punishment Decisions in Capital Cases"* School of Criminal Justice, University at Albany.

2011          Bowers, William J., Wanda Foglia, Elizabeth S. Vartkessian, Marla Sandys, and Christopher E. Kelly, Paper entitled *"The Receptivity of Courts to Empirical Evidence of How Jurors Decide Death Penalty Cases: The Capital Jury Project (CJP) as a Case Study"* Michigan State Law School Symposium, East Lansing, Michigan.

2010          Vartkessian, Elizabeth S., Paper entitled *"Fatal distraction: Does the Texas capital sentencing statute discourage the consideration of mitigating evidence?"* Law and Society Annual Meeting, Chicago, Illinois.

2009          Vartkessian, Elizabeth S., Paper entitled *"Persuasive Mitigation Evidence in Texas Capital Cases"* Law and Society Annual Meeting, Denver, Colorado.

2008          Vartkessian, Elizabeth S., Paper entitled "*Making the Case for Life: Patterns of Successful Mitigation Evidence Presented to Capital Juries in Texas"* St. Hilda's College, Oxford University.

## BOARD MEMBERSHIPS

2008-Present   Governing Board of the Gulf Region Advocacy Center
              A non-profit law office committed to providing quality defense services to indigent defendants facing capital charges primarily in Texas and throughout the south.

## REVIEWER

Justice Quarterly
Punishment and Society

13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:19-cv-03570-TSC |
| WILLIAM P. BARR, *et al.*, | ) | |
| Defendants. | ) | |

## DECLARATION OF REBECCA E. WOODMAN, ATTORNEY AT LAW

Rebecca E. Woodman, pursuant to 28 U.S.C. §1746(2), declares as follows:

1. I am an attorney representing plaintiff Wesley I. Purkey ("Mr. Purkey" or "Plaintiff") in the above-captioned action ("Civil Action"). The Complaint in the Civil Action ("Complaint" or "Compl.") presents the claim that Mr. Purkey is presently incompetent to be executed, and therefore carrying out his execution while he is incompetent would be unconstitutional under the Eighth Amendment and the Fifth Amendment's Due Process Clause. *See Ford v. Wainwright*, 477 U.S. 399 (1985); *Panetti v. Quarterman*, 551 U.S. 930 (2007); *Madison v. Alabama*, 139 S.Ct. 718 (2019). I am admitted to the Court *pro hac vice*.

2. I am over eighteen (18) years old and competent to attest and declare to the matters set forth herein. Unless otherwise stated, I have personal knowledge regarding the facts set forth herein.

3. I have represented Mr. Purkey since 2013, when I was originally appointed under the Criminal Justice Act and 18 U.S.C. § 3599 by the U. S. Court of Appeals for the Eighth Circuit at the *certiorari* stage of Mr. Purkey's 28 U.S.C. § 2255 proceedings. I have been involved in all

1

aspects of investigation and litigation in Mr. Purkey's case with respect to the investigation and preparation of a petition pursuant to 28 U.S.C. § 2241, *Purkey v. United States, et al.*, No. 2:19-cv-00414 (S.D. Ind.), *appeal pending* No. 19-3318 (7th Cir.), the *Ford* complaint filed in *Purkey v. Barr et al.*, No. 1:19-cv-03570, and clemency proceedings. I, along with my co-counsel Michelle M. Law, were counsel of record for Mr. Purkey when a notice was issued on July 25, 2019 by Attorney General William Barr, scheduling an execution date for Mr. Purkey on December 13, 2019.

4.      Mr. Purkey is also one of the consolidated Plaintiffs in the suit challenging the lethal injection execution protocol. On November 20, 2019, this Court preliminarily enjoined Mr. Purkey's execution (and the scheduled execution of three other federal prisoners) in the related case of *Roane v. Barr*, No. 19-mc-145, ECF No. 50 (D.D.C. Nov. 20, 2019). The Government sought to stay the November 20, 2019 preliminary injunction in both the D.C. Circuit and the United States Supreme Court.

5.      While the Government sought to stay the injunctive order, Mr. Purkey filed a Protective Motion for a Preliminary Injunction in the *Ford* suit on December 4, 2019. The Government's request to stay the preliminary injunction were denied, and after Mr. Purkey's scheduled execution date passed, Mr. Purkey moved to withdraw his Protective Motion in the *Ford* suit. This Court granted that motion but ordered briefing on jurisdictional questions. The parties completed that briefing in January 2020. On February 24, 2020, the Government filed a Motion to Dismiss Mr. Purkey's *Ford* complaint, and Mr. Purkey filed his opposition on March 16, 2020. The Government filed its reply on March 30, 2020.

6.      On June 15, 2020, Attorney General Barr sent a notice of new execution date for Mr. Purkey, set for July 15, 2020.

2

7. Throughout the course of my representation of Mr. Purkey, my defense team and I have observed the effects of his longstanding mental health problems, which include past diagnoses of severe mental illness, including schizophrenia and complex Post-Traumatic Stress Disorder; multiple traumatic brain injuries; and progressive dementia including Alzheimer's Disease and a likely diagnosis of vascular dementia. As described in detail below, the ability of our defense team to observe Mr. Purkey's current functioning has been curtailed since March 13, 2020, when all legal visits were canceled because of COVID-19.

**Record Requests From the 2019 Warrant Period**

8. Though Mr. Purkey's mental health has deteriorated over the course of my representation, in the immediate aftermath of the July 25, 2019 warrant notice, the defense team observed a rapid and substantial decline in Mr. Purkey's mental health. USP Terre Haute had implemented a "death watch protocol" for prisoners under execution warrant, who were moved to A Range, an isolated unit of cells within the Secure Confinement Unit (SCU), following the execution notices issued on July 25, 2019. Concerned about Mr. Purkey's competency to be executed and his ability to work with counsel, and given his scheduled execution date, we began taking steps immediately to obtain additional information relating to Mr. Purkey's then current mental health functioning.

9. We requested Mr. Purkey's medical, mental health, and disciplinary records, and surveillance videos as well as information about BOP policies through the FOIA process, directly through counsel for the Federal Bureau of Prisons ("BOP"), and through the litigation in this case, beginning on August 28, 2019. To date, Defendants have failed to produce a single record we have requested.

3

10. We first submitted requests related to the BOP protocols on August 28, 2019. We understood from Mr. Purkey that, as part of the newly implemented death watch protocol, a bright flashlight was being shone in his eyes by BOP guards every 10 to 15 minutes, 24 hours per day, resulting in extreme sleep deprivation. Given the DOJ's and BOP's failure to provide us with a protocol detailing the execution watch procedures, we were unable to verify whether this was an execution watch policy. On August 21, 2019, my co-counsel, Michelle Law, sent an email to BOP Legal Counsel at USP Terre Haute Katherine Siereveld, informing her that the flashlight checks were interfering with Mr. Purkey's sleep and affecting counsel's ability to communicate with him. Ex. 1.[1] Having received no response, on August 28, 2019, Ms. Law again emailed BOP Counsel Siereveld requesting to bring a sleep mask with her on a visit the following day. Ex. 2. In an email on August 29, 2019, BOP Counsel Siereveld informed Ms. Law that Mr. Purkey would not be allowed a sleep mask and that "[h]e can cover his eyes with a blanket if that helps." *Id.* That same day, Ms. Law emailed BOP Counsel Siereveld again requesting a copy of the written BOP policy concerning the night watch checks to which BOP Counsel Siereveld replied that she would have to do further research, but that "specific directives such as that are usually found in Post Orders which are Law Enforcement Sensitive and cannot be released." Ex. 3.

11. On September 17, 2019, Ms. Law sent an email to BOP Counsel Siereveld requesting disclosure and preservation of range surveillance video in the SCU range where Mr. Purkey was currently housed. Ex. 4. Ms. Law also requested that copies of the surveillance video be provided on a weekly basis and offered to provide blank storage media for that purpose. *Id.* BOP Counsel Siereveld replied on September 19, 2019 that there was no mechanism to provide

---

[1] Unless otherwise stated herein, the exhibits attached hereto are true and genuine copies thereof.

4

ongoing footage and suggested that it was best requested via another process such as a FOIA request. BOP Counsel Siereveld stated further that the preservation alone was "quite voluminous, but can be accomplished if necessary." *Id.* Ms. Law followed up on September 24, 2019 with a request to preserve all night watch range surveillance video since Mr. Purkey was moved to the new range or, in the alternative, the earliest video available for night watch hours and every night since and to come, and that a FOIA request was forthcoming. Ex. 5. That same date, BOP Counsel Siereveld responded that she had forwarded the request to the appropriate office to determine the time period for which the videos could be preserved. *Id.*

12. Ms. Law and I waited two weeks for the BOP to communicate the dates they would preserve. When it became evident that further communication was not forthcoming, on October 9, 2019, I prepared three separate expedited FOIA requests for the following: (1) a request for night watch and day watch surveillance video for limited date ranges (in an effort to accommodate BOP Counsel Siereveld's ability to facilitate preservation of the video in accordance with her previous email correspondence with counsel); (2) a comprehensive request for all records of BOP policies and procedures pertaining to the day and night watch protocol implemented following issuance of the execution notices on July 25, 2019 and all video surveillance on the watch range dating from July 25, 2019 to the present; and (3) a request for Mr. Purkey's BOP medical and mental health records dating from January 1, 2017 to the present. Ex. 6; Ex. 7; Ex. 8. I delivered these FOIA requests to the relevant department of the BOP via email and U.S. Mail on October 9, 2019. The same day I sent an email to BOP Counsel Siereveld, notifying her in particular of the FOIA requests for the watch protocol surveillance videos, and stressing that it was imperative we obtain at least the surveillance videos pursuant to our limited request, given Mr. Purkey's impending execution date. Ex. 9.

5

13.     On October 10, 2019, I received an email and letter (attached to the email) from the North Central Regional Office of the Federal BOP, acknowledging receipt of the FOIA requests and granting expedited processing, but stating that processing the requests may take up to six months. Ex. 10. The following day, October 11, 2019, I informed BOP Counsel Siereveld via email that our expedited request for the limited surveillance video had been granted, but that a potential six-month time frame for processing the request was untenable in light of Mr. Purkey's execution date. Ex. 11. I asked BOP Counsel Siereveld to provide a time frame within the next few weeks in which the videos could be made available, given the importance of the surveillance video to our representation of Mr. Purkey and the fact that she had indicated she could facilitate preservation of the video. *Id.* BOP Counsel Siereveld responded to me on October 16 that she had no authority to circumvent the FOIA process, but that she would follow up "with our FOIA folks" and see if there was a more expedited time frame. Ex. 12. I heard nothing further from the BOP about the matter. I followed up with BOP Counsel Siereveld again on November 11, 2019 about our FOIA requests, requesting that the BOP provide the requested materials within ten days in light of Mr. Purkey's fast-approaching execution date, and BOP Counsel Siereveld responded with a similar answer on November 13, 2019, stating that "everyone involved is cognizant that time is of the essence[,]" and that she would "forward [our] concerns along to the folks directly involved in the FOIA process." Ex. 13. Despite BOP Counsel Siereveld's acknowledgement that "time is of the essence," to date none of the requested documents or videos have been produced.

**Attorney and Expert Access to Mr. Purkey During the 2019 Warrant Period**

14.     On September 26, 2019, Dr. Bhushan Agharkar, a psychiatrist who had previously evaluated Mr. Purkey in 2016, wrote a medical order for brain image testing to be

conducted on Mr. Purkey. Ex. 14; Ex. 15. Dr. Agharkar recommended testing based upon Mr. Purkey's history of cognitive deficits and need to rule out an intracranial process. Ex. 14; Ex. 15. Dr. Agharkar had reviewed Mr. Purkey's diagnosis of progressive dementia such as Alzheimer's by Dr. Robert Oauou in 2016, as well as Dr. Oauou's 2018 updated report of further progression of the disease following Mr. Purkey's defense team's reports of Mr. Purkey's deteriorating mental health symptoms. Ex. 14; Ex. 15.

15. In our efforts to accomplish the brain image testing as soon as possible, my co-counsel Michelle Law corresponded with BOP Counsel Siereveld by email and telephone beginning September 26, 2019 to discuss the need for this testing. Ex. 16. BOP Counsel Siereveld, without citing any policy or other authority, imposed three conditions for the testing: (1) it had to be done on-site with BOP contractors; (2) a court had to enter an order for the testing; and (3) Mr. Purkey's defense counsel had to pay for the testing. On October 4, 2019, Ms. Law sent an email to BOP Counsel Siereveld confirming their telephone conversations regarding the testing, and requesting information concerning the costs and procedures associated with the testing. Ex. 17. In addition, Ms. Law informed BOP Counsel Siereveld that counsel needed the information regarding costs and procedures first, and then would move for a court order authorizing the testing. *Id.* On October 9, 2019, Ms. Law forwarded Dr. Agharkar's order to BOP Counsel Siereveld, along with his prescribed testing parameters. *Id.* On October 16, 2019, BOP Counsel Siereveld sent an email outlining some of the estimated costs of the testing, and Ms. Law responded on October 21, 2019 that she would begin the process of procuring funding for the tests through her office. *Id.* On October 25, 2019, Ms. Law and I filed an *ex parte* motion for brain imaging in Case No. 2:19-cv-00414 (S.D. Ind.). The motion explained that the testing

7

was an "integral part" of the evidence we wanted to gather in anticipation of filing a motion challenging Mr. Purkey's competency to be executed. Ex. 18.

16. While we were seeking access for the imaging, Mr. Purkey continued to deteriorate. He filed various *pro se* motions that were against his own interest, one to withdraw a pending petition and another to proceed *pro se*, as well as another mandamus petition. *See generally* Ex. 19; Ex. 20. On October 17, 2019, I was notified by the Clerk of the District Court for the Southern District of Indiana that Mr. Purkey had filed a mandamus petition in the Court of Appeals for the Seventh Circuit. Ex. 21.

17. On October 21, 2019, Judge Hanlon issued an order directing counsel to respond to the allegations in Mr. Purkey's Mandamus and file a status report by October 25, 2019, which could be filed *ex parte*. Ex. 22. In response, we profferred a declaration from Dr. Craig Haney, a psychologist and recognized expert on the psychological effects of solitary or isolated confinement on mental health, who met with Mr. Purkey and opined that Mr. Purkey's attempt to withdraw his appeals should be viewed with judicial caution and concern, because his decision making was likely affected by the increased severity of his isolated conditions of confinement in combination with his organic mental health condition from which he suffers that results in deteriorating cognition and dementia. Ex. 23; Ex. 24.

18. Ultimately, the court rejected Mr. Purkey's attempts to fire us and proceed *pro se*. At the same time it denied Mr. Purkey's 2241 petition, the court also denied the motion for brain imaging. The court ruled that it was not appropriately granted before Mr. Purkey had filed a *Ford* claim. *Purkey v. United States, et al.*, No. 2:19-cv-00414, ECF No. 76 (S.D. Ind. Nov. 20, 2019).

19. Throughout this process, and even under warrant when communication with counsel is vitally important, we have had difficulty obtaining access to Mr. Purkey. From the

8

time that the execution notice was issued and Mr. Purkey was moved to the A Range, my defense team and I sought to increase our communication with Mr. Purkey in order to address his needs and to monitor his mental health status, which has sometimes warranted emergency communication. It was been extremely difficult at times to arrange for legal calls or visits with Mr. Purkey with officials at USP Terre Haute during the fall of 2019. More than once our team was told by SCU case managers that a visit or phone call could not be scheduled because the visitation rooms were full or the telephone time slots taken on the requested dates. It appeared to us that the unavailability was due, in part, to the fact that five individuals, including Mr. Purkey, were scheduled for execution in December 2019 and January 2020, and that the SCU was unprepared to handle the increased need for access to and by counsel.

20. The BOP attempted to deny Mr. Purkey's access to counsel during a teleconference with the court and prohibited counsel from meeting with Mr. Purkey to prepare beforehand. To prepare for a quickly scheduled October 31, 2019 hearing on Mr. Purkey's *pro se* motions to withdraw, Ms. Law made an emergency trip to USP Terre Haute to be present with Mr. Purkey at the scheduled telephonic conference and consult with him beforehand. When Ms. Law arrived at USP Terre Haute, she was informed by prison officials that she would not be allowed to visit Mr. Purkey or be present with him during the telephonic conference. Ms. Law met in person with BOP Counsel Siereveld in an effort to resolve the situation, but this conversation did not result in access to Mr. Purkey. Ms. Law, who had traveled to Terre Haute from Kansas City, Missouri late the previous night, was forced to leave the prison and return to Kansas City without ever being given any opportunity to meet with Mr. Purkey. Shortly thereafter, the hearing was rescheduled. *See* Ex. 25; Ex. 26.

9

21.     Around this time, I learned that Mr. Purkey had filed yet another *pro se* pleading against counsel's wishes and against his best interests. On October 30, 2019, I received an email from a court official for the Southern District of Indiana that Mr. Purkey had filed a *pro se* civil action with the district court on October 28, 2019. Ex. 27. The filing alleged that Mr. Purkey was selected for execution in retaliation for his grievances about BOP conditions of confinement and his successful legal work on behalf of himself and other prisoners. Though the filing alleged that BOP guards had personally confirmed this, it did not include affidavits or documentation in support. The filing was consistent with Mr. Purkey's long standing delusions about retaliation by guards because of his legal advocacy. We provided the filing to the forensic psychiatrist, Dr. Bhushan Agarkar, who had previously evaluated Mr. Purkey.

22.     On November 8, 2019, Dr. Agharkar conducted an evaluation of Mr. Purkey for his competency to be executed and competency to work with counsel. Counsel provided Dr. Agharkar with the scant updated medical records obtained since his previous 2016 evaluation of Mr. Purkey, but noted that the BOP had failed to disclose critical medical and mental health files, and that FOIA requests were still pending. The team also provided Dr. Agharkar with various expert reports, including neuropsychological testing conducted in 2003, a 2016 report (updated in 2018) from Dr. Oauou's diagnosing Mr. Purkey with progressive dementia, and a 2018 report from Dr. Sautter diagnosing Mr. Purkey with complex PTSD. The team also provided Dr. Agharkar with other relevant documents from Mr. Purkey himself, including a compendium of grievances and *pro se* lawsuits Mr. Purkey had filed over the years, and *pro se* motions to fire his attorneys and to withdraw litigation. Finally, the team provided Dr. Agharkar declarations from the team's current mitigation specialist, Dr. Elizabeth Vartkessian, and former mitigation specialist, John Fox, detailing their observations of Mr. Purkey's delusional and paranoid

10

behavior, as well as his increasing memory loss over the last five years. Dr. Agharkar concluded in a written report dated November 19, 2019, that Mr. Purkey lacked a rational understanding of the basis for his execution based upon Dr. Agharkar's contemporaneous evaluation, his observations of Mr. Purkey's behavior and mental status, and his review of the records. *See* Compl. Ex. 1 at 11–13. Dr. Aghargkar observed that Mr. Purkey has a fixed and false belief that the government wants to execute him in retaliation for his legal advocacy. *Id.* at 3, 10–13. Dr. Agharkar found that Mr. Purkey's lack of rationality is a result of his delusional thoughts and paranoia, compounded with the deterioration of his brain due to Alzheimer's disease and his long-time complex-PTSD. *Id.* at 12. Dr. Agharkar also concluded that Mr. Purkey's brain damage, dementia, and delusions prevent him from effectively communicating or working with counsel or working for his own interests. *Id.*

23.     Dr. Jonathan DeRight, a neuropsychologist, submitted a written report on November 21, 2019, concluding that Mr. Purkey's previously diagnosed dementia is consistent with Alzheimer's disease, and documenting a marked deterioration in his functioning. *See* Compl. Ex. 3. Dr. DeRight evaluated Mr. Purkey in August 2019 after the defense team began to observe Mr. Purkey's rapid mental deterioration. *See id.*

24.     In the instant litigation, we continued to seek access to the imaging, medical and custody records, and relevant BOP policies, raising these issues in both our complaint for relief and in the Protective Motion for Preliminary Injunction. Compl. ¶¶ 14, 17, 19, 25 n.1; Pl's Mem. in Supp. of Mot. for A Prelim Inj. 8-11, 22-23, ECF No. 7-1.

11

**Post-Warrant, Winter and Spring, 2020**

25.     Even after Mr. Purkey's original warrant expired, we continued to press our requests for information and expert access. We did not receive any of the information, videos or documents we requested, and indeed, our access to Mr. Purkey became even more limited.

26.     On February 3, 2020, I renewed the FOIA requests for the death watch protocols, A-Range surveillance video, and Mr. Purkey's medical and mental health records, having received no response to our previous requests. The renewed FOIA requests were updated to encompass records from July 25, 2019 to the present and were emailed to the relevant department of BOP on February 3, 2020. Ex. 28; Ex. 29; Ex. 30.  That same day, I received email responses from the relevant department of BOP acknowledging receipt of the requests. At first, the BOP/FOIA representative, S. Lilly on behalf of Eugene Blaine, Supervising Attorney, responded via email that I would need to submit a new Certificate of Identity in order to authorize the requests because the current authorization was more than three months old. Ex. 31. Then the BOP/FOIA representative, S. Lilly, responded in a separate email that my requests were duplicative of the requests I had sent previously on October 10, 2019. Ex. 32; Ex. 33. After that, I sent a response email clarifying that I was renewing my previous requests as well as updating the time period for the requests to extend to the present.  Ex. 34; Ex. 35. I was then informed in another email from the same representative that my information would be forwarded to the processor. *Id.* I heard nothing further regarding my requests, and to date, none of the requested records have been provided.

27.     We again raised the issue of the Defendants' failures to provide the video surveillance, protocols, and medical and mental health records (even pursuant to FOIA) as well as access to diagnostic again in Mr. Purkey's Opposition to the Defendant's Motion to Dismiss,

12

filed on March 16, 2020. ECF 20, at 1, 7–9. We specifically raised our concern that Defendants might attempt to issue another warrant with as little as twenty days' notice, which would provide insufficient timing for us to receive all of the necessary information to prepare for a *Ford* competency hearing. *Id.* at 10. Defendants filed their Reply on March 30, 2020 and erroneously asserted that Mr. Purkey had not renewed the FOIA request. ECF 21, at 4, n. 1.

28.     On April 14, 2020, my co-counsel in the *Ford* case, Brian Fleming, sent a letter via electronic mail to opposing counsel in response to several statements set forth in Defendants' Reply to Mr. Purkey's Opposition to Defendants' Motion to Dismiss that counsel believed did not fairly and accurately represent various aspects of this case. Ex. 36. A portion of that letter was in response to Defendants' assertion in their Reply that our requests for relevant information, documents, and testing regarding Mr. Purkey's condition and circumstances, including the requests for the A-range video surveillance footage, the BOP records, and brain imaging, were made only for "dilatory purposes," as well as Defendants' assertion that the BOP did not receive "any additional requests for information since Purkey's October 2019 FOIA request." ECF 21, at 4 n.1. Mr. Fleming pointed out my additional follow-up to the October 9, 2019 FOIA requests on October 11, 2019, and November 11, 2019, and my additional FOIA requests for Mr. Purkey's BOP records on February 3, 2020. *See* Ex. 36. Given that my requests had been refused or obstructed by the relevant officials to whom the requests were made, and the fact that my requests "remain unresolved to this day[,]" Mr. Fleming suggested in his letter that "the simple solution would be for Defendants to ensure that the relevant government officials immediately and fully provide the requested information and documentation, as well as access for testing." *See id.* Mr. Fleming also requested that "if the government is intending to seek a new execution warrant for Mr. Purkey on an expedited basis," that "the government disclose,

13

without delay, its intended course of action regarding the issuance of new execution warrants so we can make an informed decision about the need to seek immediate judicial intervention to ensure Mr. Purkey's competency claim is fully and fairly heard on the merits." *Id.*

29.    On April 22, 2020, my co-counsel Mr. Fleming received an email from Assistant United States Attorney Brian P. Casey, counsel of record for the Government in the instant case, acknowledging receipt of the April 14, 2020 letter (Exhibit 36) and stating that they had inquired with BOP regarding the renewed and updated FOIA requests submitted to and acknowledged by the BOP on February 3, 2020, but that "the BOP has been unable to find any record of it." Ex. 37. Mr. Casey also represented that they would "let us know as soon as we learn of a new execution date, which will be when the Attorney General makes a decision." *Id.*

30.    On May 20, 2020, Mr. Fleming responded to AUSA Casey's April 22, 2020 email, again reiterating the history of FOIA requests from October 9, 2019 and February 3, 2020, and reiterating that Mr. Purkey has yet to receive any of the requested information. Ex. 37. Still, to date, Mr. Purkey's counsel has not been provided any of the requested information or granted access to testing.

31.    On June 15, 2020, AUSA Casey emailed my co-counsel Mr. Fleming that Mr. Purkey's execution warrant would be issued shortly, only a few minutes before alerting the Court. Ex. 38. In this same email, AUSA Casey again reiterated that the execution warrant was scheduled at the "Attorney General's direction." *Id.*

32.    Most recently, on June 15, 2020, before receiving notice of Mr. Purkey's new warrant, I emailed BOP Counsel Siereveld regarding my outstanding request for Mr. Purkey's BOP records, attaching copies of all of my previous requests and emphasizing the importance of the records to the ability of our expert, Dr. Jonathan DeRight, to accurately assess and evaluate

14

Mr. Purkey's current mental state and the extent of his deterioration, especially given Dr. DeRight last saw Mr. Purkey in August 2019. Ex. 39. To date, I have received no response from BOP Counsel Siereveld or any other BOP personnel in response to my outstanding requests.

33.     In-person visits by Mr. Purkey's defense team as well our mental health experts are essential to the ability to conduct in-person evaluations of Mr. Purkey to monitor and assess Mr. Purkey's current level of incompetency and the extent of his cognitive deterioration. However, since March 13, 2020, neither members of our defense team nor any of our defense experts have been able to conduct in-person visits with Mr. Purkey at USP Terre Haute due to the ongoing effects of the COVID-19 pandemic.

34.     On March 13, 2020, Ms. Law received an email from SCU Unit Manager Royer at USP Terre Haute stating that all legal visits were immediately suspended for 30 days, after which the suspension would be reevaluated. Ex. 40. The same day, she received an email from her office, the Federal Public Defender for the Western District of Missouri, that the BOP was suspending visits bureau-wide. Ex. 41. On March 16, 2020, Ms. Law received an email from BOP Counsel Siereveld, who advised that no-contact visits would be allowed pursuant to screening procedures, including "self-reporting of symptoms and temperature checks based on current CDC guidance," but that any approved visit would be no-contact, and that "visit by phone conference" should be considered. Ex. 42. That same day, Ms. Law received an email from USP Terre Haute SCU Correctional Counselor Andrew Sutton that a previously-requested visit with Mr. Purkey by defense expert Dr. Bhushan Agharkar, M.D. "was not scheduled and is now not considered under the circumstances." Ex. 43.

35.     Contrary to Ms. Siereveld's March 16, 2020 email, no-contact attorney visits were also canceled. On March 30, 2020, Ms. Law received an email from Counselor Sutton informing

her that previously-scheduled visits with Mr. Purkey on April 13, April 22, and May 1 were cancelled, and that, due to the COVID-19 outbreak, all legal and social visits would be suspended through May 3, 2020, after which the suspension would be reevaluated. Ex. 44. On April 1, 2020, the BOP instituted a total lockdown of all BOP facilities. Ex. 45. On April 8, 2020, I received an email from Ms. Law informing me that our defense team member, mitigation specialist Kathleen Cleary, who was also employed by the Federal Public Defender for the Western District of Missouri, would be prohibited by the FDO from visiting Mr. Purkey at USP Terre Haute until it could be determined that a visit would be safe for everyone. Ex. 46. On April 15, 2020, Ms. Law received an email from Counselor Sutton that our previously scheduled visits with Mr. Purkey on May 8 and May 15 were cancelled, and that all visits were suspended through May 18, 2020, after which the suspension would be reevaluated. Ex. 47. Then, on May 14, 2020, Ms. Law received an email from Counselor Sutton advising that our previously-scheduled visits with Mr. Purkey on May 20, May 29, and June 17 were cancelled, that "there will not be a resumption of visitation on May 18, 2020[,]" that "all visits scheduled for the rest of May and continuing through June are hereby postponed until further notice[,]" and that "there is no date set that visiting will begin to resume." Ex. 48.

36.     To date, the BOP reports that one inmate has died and 5 inmates have tested positive for COVID-19 at USP Terre Haute. *See* https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases,12%2C785%20in%20community%2Dbased%20facilities.&text=Currently%2C%203%2C868%20inmates%20and%20452.attributed%20to%20COVID%2D19%20disease (last visited June 19, 2020). The homepage of USP Terre Haute's website states prominently that, "All visiting at this facility has been suspended until further notice." Ex. 49 (last visited June 22, 2020).

16

37.     On June 16, 2020, the day after I learned that Mr. Purkey's execution was scheduled for July 15, 2020, I sent an email to BOP Counsel Siereveld requesting information on arrangements being made at USP Terre Haute to facilitate access to our client for legal, social, and spiritual visitation given the ongoing COVID-19 crisis and requesting copies of any written policies in this regard. Ex. 50. BOP Counsel Siereveld responded that "[w]e do not have anything written yet but I am working on it." Ex. 51. The public facing website for USP Terre Haute continued to announce on June 16, 2020 that all visitation was suspended at the institution. *See* Ex. 49. This makes it impossible to safely plan any type of visit, particularly since getting to the prison would require virtually every member of Mr. Purkey's defense team to travel hundreds of miles.

38.     Later in the day on June 16, 2020, I received an email from BOP Counsel Siereveld stating, "We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19" and that she would have something in writing for me by the next day. Ex. 52. The following day, I received nothing. On both June 19 and June 20, 2020, I again emailed BOP Counsel Siereveld requesting a copy of the written policy or plan. Ex. 53; Ex. 54. Despite BOP Counsel Siereveld's repeated promises to provide a written policy or plan that would set forth in detail the precise safety protocol to protect counsel, our experts, spiritual advisors, family members, and any other person for whom access to Mr. Purkey will be crucial in the next few weeks leading up to and including the execution, to date I have received no such writing.

39.     The evidence that would be presented at a hearing in support of our petition is as follows:

- Report of Dr. Bhushan S. Agharkar dated 11-19-2019

17

- Report of Dr. Jonathan DeRight dated 11-21- 2019

- Declaration of Elizabeth Vartkessian, Ph.D. dated 11-15-2019

- Declaration of John D. Fox dated 11-6-2019

- Court orders and responses (*ex parte*) in Case No. 2:19-cv-00414, Dkt. 54, 55, 55-1, 55-2, 57, 59, 61, 62, 63, 64, 65

- *Ex Parte* Motion for Brain Imaging filed October 25, 2019 in Case No. 2:19-cv-00414, Dkt. 56

- FOIA requests for written BOP execution watch protocol and surveillance videos dated 10-9-2019

- FOIA request for Mr. Purkey's BOP medical and mental health records dated 10-9-2019

- FOIA requests for written BOP execution watch protocol and surveillance videos dated 2-3-2020

- FOIA request for Mr. Purkey's BOP medical and mental health records dated 2-3-2020

- Email correspondence with BOP FOIA official S. Lilly for Eugene Baine, Supervising Attorney, dated 2-3-2020

- Email correspondence with BOP Counsel Siereveld dated 8-21-2019, 8-29-2019, 9-17-2019, 9-19-2019, 9-24-2019, 10-9-2019, 10-11-2019, 10-16-2019, 10-21-2019, 11-11-2019, 11-13-2019, 3-16-2020, 6-16-2020, 6-18-2020, 6-19-2020, 6-20-2020

- Email correspondence with USP Terre Haute staff dated March 13, 2020, March 16, 2020, March 30, 2020, April 15, 2020, May 14, 2020

- Email correspondence from Michelle Law to Rebecca Woodman dated April 8, 2020 (email from ML to REW re visit with Wes by Kathleen Cleary not permitted by WDMO FDO)

- BOP lockdown notice dated April 1, 2020

- BOP COVID-19 statistics for USP Terre Haute (showing 1 death and 5 positives)

- Federal Bureau of Prisons Website, USP Terre Haute homepage (showing visits suspended until further notice)

18

40. The evidence that counsel for Mr. Purkey have diligently attempted to but thus far have been unable to obtain and would require expedited discovery to present at a hearing in support of our petition is as follows:

- Brain image testing per medical order of Dr. Agharkar dated 9-26-2019

- BOP medical and mental health records per FOIA request dated 10-9-2019 and response dated 10-10-2019

- BOP execution watch protocol and surveillance video per FOIA requests dated 10-9-2019 and response dated 10-10-2019

- BOP medical and mental health records per FOIA request and responses dated 2-3-2020

- BOP execution watch protocol and surveillance video per FOIA requests and responses dated 2-3-2020

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED: 6-22-2020

REBECCA E. WOODMAN
ATTORNEY AT LAW
COUNSEL FOR MR. PURKEY

19

# Exhibit 1

| | |
|---|---|
| **Subject:** | FW: Night Checks on Range -- Wesley Purkey |
| **Date:** | Monday, September 9, 2019 at 12:25:08 PM Central Daylight Time |
| **From:** | Michelle Law |
| **To:** | rewlaw_outlook.com |
| **Attachments:** | image001.png |



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

---

**From:** Michelle Law
**Sent:** Wednesday, August 21, 2019 9:27 AM
**To:** 'Katherine Siereveld' <ksiereveld@bop.gov>
**Cc:** rewlaw_outlook.com <rewlaw@outlook.com>; 'Elizabeth Vartkessian' <esv@advancechange.org>
**Subject:** Night Checks on Range -- Wesley Purkey

Katherine:

I am writing about an ongoing issue on the range where the five with execution dates are being housed.  As you know, I represent Wesley Purkey, and he is complaining about the cell checks that occur about every 10 - 15 minutes during the night.  Apparently, a guard is using a large flashlight to illuminate Mr. Purkey's cell, and the super bright light is waking Mr. Purkey every time there is a cell check.  This has led to extreme sleep deprivation and the resulting agitation is affect our ability to communicate with Mr. Purkey.  I would prefer not to litigate this issue, but if we can't find a solution soon, we plan to file a lawsuit.  It seems to me that significantly curtailing the use of a bright flashlight at night is a reasonable request.  Or, if that is not an option, I could bring Mr. Purkey a sleep mask to shield his eyes from the bright light.

Any assistance that you can offer on this issue would be appreciated.  If you cannot resolve this issue, please let me know to who I should talk to about this situation.

Thank you

Michelle



## Michelle M. Law

**Assistant Federal Public Defender**
**Western District of Missouri**
**Springfield, MO 65806**

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 2

**Monday, September 9, 2019 at 12:28:00 PM Central Daylight Time**

| | |
|---|---|
| **Subject:** | FW: Wesley Purkey - Sleep Mask Question Follow-up |
| **Date:** | Monday, September 9, 2019 at 12:24:12 PM Central Daylight Time |
| **From:** | Michelle Law |
| **To:** | rewlaw_outlook.com |
| **Attachments:** | ATT00001.png, image001.png |



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Thursday, August 29, 2019 5:41 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Re: Wesley Purkey - Sleep Mask Question Follow-up

Hi,
I'm sorry. I did get an answer, but forgot to convey it to you. He cannot have a sleep mask and they are not sold on commissary. He can cover his eyes with his blanket if that helps. As long as the officers see living inmate it won't be a problem.
Thanks!

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 8/28/2019 8:22 PM >>>

Hi Katherine    Did you get word back about the sleep mask for Wesley Purkey?  I am visiting him tomorrow (Thursday) and I have a mask with me to give to him.  The mask is in its original packaging if someone wants to look at it before deciding, I'll be in the reception area around 8:45 a.m.



## Michelle M. Law

**Assistant Federal Public Defender**
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 3

| | |
|---|---|
| **Subject:** | Re: Policy Regarding Night Checks |
| **Date:** | Thursday, August 29, 2019 at 2:26:53 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Michelle Law |
| **CC:** | rewlaw_outlook.com |
| **Attachments:** | Portable Network Graphics image |

Hi Michelle,
I will have to do some further research to see if we have anything that is releasable, but specific directives such as that are usually found in Post Orders which are Law Enforcement Sensitive and cannot be released.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Michelle Law <Michelle_Law@fd.org> 8/29/2019 3:18 PM >>>

Katherine:

Would you mind forwarding a copy of the BOP written policy regarding the night checks?

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 4

| From: | Katherine Siereveld |
| To: | Michelle Law |
| Cc: | Elizabeth Vartkessian; rewlaw_outlook.com |
| Subject: | Re: Range Surveillance Video |
| Date: | Thursday, September 19, 2019 11:00:41 AM |

Hi Michelle,

I apologize for the delay in response, we have not had computers or electricity the last few days.

We do not have a mechanism with which to provide you ongoing footage.  Additionally, the preservation alone is quite voluminous, but can be accomplished if necessary.  Are there specific time frames or days even that you are looking for?  At that point we could preserve what you need and then evaluate our ability to provide it through a properly filed FOIA request, discovery request, or subpoena.

I hope that helps.  Please don't hesitate to call and discuss.

Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 9/17/2019 4:54 PM >>>
Katherine:

I am writing to request the preservation of the range surveillance video for the SCU range where Mr. Purkey is currently housed.  I am also requesting that copies of the surveillance video be provided to me on a weekly basis.  If you require blank storage media in order to provide weekly copies, please let me know, and my office will provide blank storage media.

Thanks -

Michelle

Get Outlook for iOS

# Exhibit 5

| From: | Katherine Siereveld |
|---|---|
| To: | Michelle Law |
| Subject: | RE: Range Surveillance Video |
| Date: | Tuesday, September 24, 2019 10:25:18 AM |
| Attachments: | ATT00001.png |

Hi Michelle:
I forwarded this on to the appropriate office to see how far back they can go preserving the evening watch.
Thanks,
Katherine

>>> Michelle Law <Michelle_Law@fd.org> 9/24/2019 9:19 AM >>>
Katherine:

We would like the range video for the night watch hours since Wes was moved to the new range.  If the video has not been maintained that far back, we would like the earliest range surveillance video available for night watch hours, every night since and every night to come.  We will be making a FOIA request in the very near future.  As I wrote before, if you need storage media, please let me know and I'll have my CSA provide a storage device.

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>

**Sent:** Thursday, September 19, 2019 11:01 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Cc:** Elizabeth Vartkessian <esv@advancechange.org>; rewlaw_outlook.com <rewlaw@outlook.com>
**Subject:** Re: Range Surveillance Video

Hi Michelle,

I apologize for the delay in response, we have not had computers or electricity the last few days.

We do not have a mechanism with which to provide you ongoing footage. Additionally, the preservation alone is quite voluminous, but can be accomplished if necessary. Are there specific time frames or days even that you are looking for? At that point we could preserve what you need and then evaluate our ability to provide it through a properly filed FOIA request, discovery request, or subpoena.

I hope that helps. Please don't hesitate to call and discuss.

Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Michelle Law <Michelle_Law@fd.org> 9/17/2019 4:54 PM >>>
Katherine:

I am writing to request the preservation of the range surveillance video for the SCU range where Mr. Purkey is currently housed. I am also requesting that copies of the surveillance video be provided to me on a weekly basis. If you require blank storage media in order to provide weekly copies, please let me know, and my office will provide blank storage media.

Thanks -

Michelle

Get Outlook for iOS

# Exhibit 6

**Rebecca E. Woodman, Attorney at Law, L.C.**
**1263 W. 72nd Ter.**
**Kansas City, Missouri 64114**
(785) 979-3672
*rewlaw@outlook.com*

October 9, 2019

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**
**Wesley Ira Purkey**
**DOB: 01/06/1952**
**SSN: 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**
**FPN: 14679-045**
**Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remain in the death watch range to the present day.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All night watch range surveillance videotape of the death watch range dating from the earliest two weeks available from July 25, 2019, and separately, dating from September 18-28, 2019.

2. All day watch range surveillance videotape of the death watch range on August 13, 2019 and September 18-19, 2019.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as Mr. Purkey has a pending execution date of December 13, 2019**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

Rebecca E. Woodman, Esq.
1263 W. 72nd Terrace
Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

Rebecca E. Woodman

*Enclosures: (2)*

# Exhibit 7

# Rebecca E. Woodman, Attorney at Law, L.C.
## 1263 W. 72nd Ter.
## Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

October 9, 2019

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**
       **Wesley Ira Purkey**
       **DOB: 01/06/1952**
       **SSN: 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**
       **FPN: 14679-045**
       **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remain in the death watch range to the present day.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda, electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All records of BOP policies and procedures pertaining to the day and night watch protocol implemented on the range housing the five prisoners at USP-Terre Haute

including Wesley Ira Purkey who received execution notices issued by the Department of Justice on July 25, 2019.

2. All watch range surveillance videotape (both day and night) dating from July 25, 2019-Present (date upon receipt).

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as Mr. Purkey has a pending execution date of December 13, 2019**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Terrace
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

Rebecca E. Woodman

*Enclosures: (2)*

# Exhibit 8

## Rebecca E. Woodman, Attorney at Law, L.C.
### 1263 W. 72nd Ter.
### Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

October 9, 2019

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**
      **Wesley Ira Purkey**
      **DOB: 01/06/1952**
      **SSN: 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**
      **FPN: 14679-045**
      **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana and has been previously incarcerated at the U.S. Penitentiary in Leavenworth, Kansa. We are in need of all custodial records regarding Mr. Purkey dated **January 01, 2017-Present (date upon receipt).**

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda, electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey. This request includes specifically, but is not limited to, the following records:

1. All records contained in Mr. Purkey's "Medical File;"

2. All records contained in Mr. Purkey's "Mental Health File;"

3. All records contained in any file maintained by a BOP psychologist, social worker, counselor, or any other individual providing any type of services related to emotional and/or mental health care and/or treatment;

4. All records relating to Mr. Purkey's disciplinary history, any gang affiliations or activities, including without limitation all incident reports issued to Mr. Purkey, even such incident reports that may have been canceled or rescinded;

5. All records related to Mr. Purkey's grievances at the BOP;

6. All records relating to Mr. Purkey's inmate classification;

7. All medical records and notes relating to any health care requested by or provided to Mr. Purkey, and including but not limited to all medical care, dental care, mental health care, and substance abuse treatment;

8. All documentation of suicide attempts by Mr. Purkey, or injuries of Mr. Purkey, inflicted upon himself, intentionally or otherwise;

9. All records relating to any internal memoranda or correspondence within the BOP relating to Mr. Purkey;

10. All records relating to any reviews of Mr. Purkey's housing placements and transfers within institutions as well as between institutions within BOP; and

11. All records relating to any administrative remedies sought by Mr. Purkey.

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as Mr. Purkey has a pending execution date of December 13, 2019**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Terrace
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

Rebecca E. Woodman

*Enclosures: (2)*

# Exhibit 9

| **From:** | Rebecca Woodman |
|---|---|
| **To:** | Katherine Siereveld |
| **Cc:** | Michelle Law |
| **Subject:** | Purkey FOIA requests |
| **Date:** | Wednesday, October 9, 2019 9:47:07 AM |
| **Attachments:** | Purkey FOIA request death watch protocols 10-9-2019.pdf |
| | Purkey limited FOIA request 10-9-2019.pdf |
| | Purkey updated certificate of identity 9-25-2019.pdf |
| | Purkey updated release 9-25-2019.pdf |

Dear Katherine: I am attaching two FOIA requests that I sent via email and USPS today to the Federal Bureau of Prisons. One is a limited request for the surveillance videos of the death watch range that my co-counsel, Michelle Law, specifically requested be preserved in previous email correspondence with you. That specific request is reiterated in the attached FOIA letter. It is imperative that we obtain at least these video surveillance tapes as soon as possible, given Mr. Purkey's impending execution date of December 13, 2019, so anything you can do to ensure that we obtain these videotapes as soon as possible would be appreciated. The other FOIA request is a more detailed request for all records pertaining to BOP protocols for the death watch range, as well as all video surveillance of the range. Anything you can do to expedite this request would be most appreciated as well. Please let me know if you have any questions, and Michelle and I are available to discuss these requests further with you should you wish.

Thank you.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 10



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS 66101*

October 10, 2019

Rebecca Woodman
1263 W. 72nd Terrace
Kansas City, MO  64114

Re:  Freedom of Information Act Request No. 2020-00234
     Wesley Purkey

Dear Sir/Madame:

This acknowledges our receipt of your Freedom of Information Act (FOIA) request. Regulations that may be pertinent to your request may be found at Title 28 C.F.R.   A copy of the first page of your request is attached to help you more easily keep track of your request.

We have examined your request and have determined that the documents responsive to your request must be searched for and collected from a field office.  As a result, the amount of time necessary to respond to your request will increase. Once responsive documents have been collected from the field, we will process your request in the order that it was received.

The Department of Justice requires all requests for records be processed on a first-in, first-out basis. The four exceptions to this requirement are: "(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; (ii) An urgency to inform the public about an actual or alleged Federal Government activity, if made by a person who is primarily engaged in disseminating information; (iii) The loss of substantial due process rights; or (iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e).

Your request meets the requirement to be processed on an expedited basis and will be expedited to the best of our ability. This request will be placed on the processing track

ahead of other requests and processed as soon as practicable. Processing this request may take up to six months.

If you have questions regarding the status of your request or anything discussed in this letter, you may contact the North Central Regional Office or the BOP FOIA Public Liaison, Mr. C. Darnell Stroble at (202) 616-7750 or BOP FOIA Section, 320 First Street, NW, Room 936, Washington, D.C. 20534. You can also check the status of your request on line at http://www.bop.gov/PublicInfo/execute/foia.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information, Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

E. Fenstermaker
for

Richard M. Winter
Regional Counsel

# Exhibit 11

**Michelle Law**

| | |
|---|---|
| **From:** | Rebecca Woodman <rewlaw@outlook.com> |
| **Sent:** | Friday, October 11, 2019 7:45 AM |
| **To:** | Katherine Siereveld |
| **Cc:** | Michelle Law |
| **Subject:** | Re: Purkey FOIA requests |
| **Attachments:** | Ack and Expedite Grant Ltr.pdf |

Hi Katherine: Attached is a reply to our limited FOIA request for the A range death watch video surveillance, granting our request for expedited response. Nevertheless, the response indicates it may take as much as six months to process the request. As you know, this time frame is untenable in light of Mr. Purkey's execution date. You have already agreed to preserve the requested video, and it is vitally important that we obtain at least these limited video surveillance tapes now. Please advise on the time frame in which those videos can be made available to us in the next few weeks. We greatly appreciate your timely assistance in this matter.

Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Wednesday, October 9, 2019 at 9:46 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Purkey FOIA requests

Dear Katherine: I am attaching two FOIA requests that I sent via email and USPS today to the Federal Bureau of Prisons. One is a limited request for the surveillance videos of the death watch range that my co-counsel, Michelle Law, specifically requested be preserved in previous email correspondence with you. That specific request is reiterated in the attached FOIA letter. It is imperative that we obtain at least these video surveillance tapes as soon as possible, given Mr. Purkey's impending execution date of December 13, 2019, so anything you can do to ensure that we obtain these videotapes as soon as possible would be appreciated. The other FOIA request is a more detailed request for all records pertaining to BOP protocols for the death watch range, as well as all video surveillance of the range. Anything you can do to expedite this request would be most appreciated as well. Please let me know if you have any questions, and Michelle and I are available to discuss these requests further with you should you wish.

Thank you.

Sincerely,
Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 12

**Subject:** Re: Purkey FOIA requests

**Date:** Wednesday, October 16, 2019 at 9:54:20 AM Central Daylight Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

**CC:** Michelle Law

Hi Rebecca,
I understand your time constraints, but I do not have the authority to circumvent the FOIA process. I will follow up with our FOIA folks and see if there is a more expedited time frame.
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 10/11/2019 8:45 AM >>>
>
Hi Katherine: Attached is a reply to our limited FOIA request for the A range death watch video surveillance, granting our request for expedited response. Nevertheless, the response indicates it may take as much as six months to process the request. As you know, this time frame is untenable in light of Mr. Purkey's execution date. You have already agreed to preserve the requested video, and it is vitally important that we obtain at least these limited video surveillance tapes now. Please advise on the time frame in which those videos can be made available to us in the next few weeks. We greatly appreciate your timely assistance in this matter.

Thank you.

Best,
Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com


**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Wednesday, October 9, 2019 at 9:46 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Purkey FOIA requests

Dear Katherine: I am attaching two FOIA requests that I sent via email and USPS today to the Federal Bureau of Prisons. One is a limited request for the surveillance videos of the death watch range that my co-counsel, Michelle Law, specifically requested be preserved in previous email correspondence with you. That specific request is reiterated in the attached FOIA letter. It is imperative that we obtain at least these video surveillance tapes as soon as possible, given Mr. Purkey's impending execution date of December 13, 2019, so anything you can do to ensure that we obtain these videotapes as soon as possible would be appreciated. The other FOIA request is a more detailed request for all records pertaining to BOP protocols for the death watch range, as well as all video surveillance of the range. Anything you can do to expedite this request would be most appreciated as well. Please let me know if you have any questions, and Michelle and I are available to discuss these requests further with you should you wish.

Thank you.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 13

Saturday, November 30, 2019 at 3:19:33 PM Central Standard Time

**Subject:** Re: Request for documents/video

**Date:** Wednesday, November 13, 2019 at 12:28:43 PM Central Standard Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

**CC:** Michelle Law

Hi Rebecca,
I do not have the authority to circumvent the FOIA process, but please be assured that everyone involved is cognizant that time is of the essence.  I will forward your concerns along to the folks directly involved in the FOIA process.
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 11/11/2019 12:28 PM >>>
>
Dear Katherine: We have previously submitted three FOIA requests for documents and video that contain information vital to our urgent warrant litigation for Mr. Purkey. The requests are for the video surveillance tapes of A range since the "death watch" protocol began on July 25, 2019, and written documents pertaining to the same, a more limited request for video surveillance tapes on specified dates (which you had previously indicated to us would be easier to assemble in a short amount of time), and a request for Mr. Purkey's current BOP records. I am also attaching the FOIA reply granting our request to expedite, but stating it may take six months for us to receive the documents. As you know, we do not have this kind of time, since Mr. Purkey's execution date is scheduled for December 13, 2019. It is imperative that we receive at least the limited video surveillance tapes we requested, as well as Mr. Purkey's BOP records in order to prepare impending warrant litigation for Mr. Purkey. I am respectfully requesting that you forward the requested documents to us in the next 10 days so that we have the necessary documentation for our litigation on behalf of Mr. Purkey. We greatly appreciate your timely assistance in this matter. Please let me know if you have any questions in the meantime. Thank you.

Best,
Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 14



September 26, 2019

Re: Wesley Purkey
DOB: 1/6/52
Dx: R41.844 - Frontal lobe and executive
function deficit

To Whom It May Concern:

I would like to order a head MRI w/ and w/o contrast, PET scan (brain), and a DTI scan (brain) for Mr. Purkey. The indication is that he has a history of cognitive deficits and need to rule out an intracranial process. For his head MRI, this study should be done with a field strength of at least 1.5 tesla. Scanning should include a T1−weighted 3−dimensional 1x1x1mm (no skips) acquisition sequence (such as MPRAGE or a 3D spoiled−gradient procedure) to allow segmentation of gray matter (GM) and white matter (WM) for volumetric analysis. If feasible, scanning should also include a dual−echo sequence (proton density and T2−weighted) with slice thickness of no more than 5mm and in−plane resolution of no worse than 1x1mm, no skip, and covering at least the entire supratentorial volume. This could be needed for robust segmentation of brain parenchyma from cerebrospinal fluid (CSF). If possible, the raw data needs to be saved in a standard (e.g., DICOM) format and downloadable for post-processing by specialized software. I would like to order a diffusion tensor imaging (DTI) study to evaluate for fiber tract abnormalities. It should be done with a minimum of 25 directions; 64 directions is preferred. Please see the attached scanning protocol for further details and information. Please send the images to Rebecca Woodman <rewlaw@outlook.com> when ready.

Sincerely,

Bhushan S. Agharkar, M.D., D.F.A.P.A.
Distinguished Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology, with Added Qualifications in Forensic Psychiatry
NPI: 1619180304

# Exhibit 15

Case 2:20-cv-00365-JPS-DL-TSC Document 6-23 Filed 07/06/2020 Page 262 of 379 PageID #4089451
Case 2:19-cv-00414-JP-4-DLP Document 56-2 (Ex Parte) ATTACHMENT 12 Page 1 of 1
Page ID #: 9451



**Ruben C. Gur, PhD**
Professor, Departments of Psychiatry, Radiology & Neurology
Director, Brain Behavior Laboratory and the Center for Neuroimaging in Psychiatry

**MRI.** A magnetic resonance imaging (MRI) study should be done with a field strength of at least 1.5 tesla. Scanning should include a T1-weighted 3-dimensional **1x1x1mm** (no skips) acquisition sequence (such as MPRAGE or a 3D spoiled-gradient procedure) to allow segmentation of gray matter (GM) and white matter (WM) for volumetric analysis. If feasible, scanning should also include a dual-echo sequence (proton density and T2-weighted) with slice thickness of no more than 5mm and in-plane resolution of no worse than 1x1mm, no skip, and covering at least the entire supratenorial volume. This could be needed for robust segmentation of brain parenchyma from cerebrospinal fluid (CSF). The raw data needs to be saved in a standard (e.g., DICOM) format and downloadable for postprocessing by specialized software. If a diffusion tensor imaging (DTI) study is performed, it should be done with a minimum of 25 directions; 64 directions is preferred. Of course, the scans can be supplemented by any other clinically indicated scans as deemed necessary by the referring neuropsychiatrist or neurologist or by the performing neuroradiologist. Furthermore, the scans should receive clinical readings, although these are not necessarily expected to detect diffuse volume reduction of the kind we can document with quantitative volumetric analysis.

**PET.** A resting baseline positron emission tomography (PET) study using ligands such as 18F-fluoro-d-2-deoxyglucose (FDG) for measuring local cerebral metabolic rates for glucose (CMRgI). Ideally, the PET studies should be quantitative, with good estimation of the input function using arterial (or "arterialized") blood samples. This is necessary to have quantitative assessment of CMRgI in physiological units (milliliter per 100 grams of tissue per minute). Such quantitative data will allow for a better estimate of the nature of the pathology and possibly determine its origin. Perhaps more importantly from the clinical perspective, such data will allow for a better prognosis of whether an ongoing pathological process may be kindling. However, it is acknowledged that not all PET centers are capable of this procedure, and that non-quantitative measures (such as region-to-whole brain ratios of raw counts) are likely sufficient to document abnormalities. As with the structural studies, the scans should be supplemented by any other clinically indicated scans as deemed necessary by the referring neuropsychiatrist or neurologist or by the performing nuclear medicine physician. Furthermore, the scans should receive clinical readings, although again these are not necessarily expected to detect diffuse abnormalities of the kind we are proposing to document with quantitative analysis. Also, as with MRI, the raw data should be saved in a standard (e.g. DICOM) format and downloadable for post-processing.

*Updated 16-May-2012*

# Exhibit 16

| From: | Michelle Law |
| --- | --- |
| To: | "Katherine Siereveld" |
| Cc: | rewlaw_outlook.com |
| Subject: | Medical Questions regarding Wesley Purkey |
| Date: | Thursday, September 26, 2019 10:02:00 AM |
| Attachments: | image001.png |

Katherine:

Mr. Purkey requires neurology imaging of his brain in order to determine his current neurological functioning in light of a progressive dementia diagnosis and recommendations therefrom. This testing must be performed in a hospital setting. Mr. Purkey must be transported to a hospital facility for testing, and we are looking at hospitals near Terre Haute as a testing location. Given the pending execution date, we hope to have arrangements made soon. Will a doctor's order for the procedure, along with an appointment date be sufficient for Mr. Purkey's transport? How much lead time will the prison need in order to make arrangements for Mr. Purkey's transport to a hospital facility?

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

# Exhibit 17

**Michelle Law**

| | |
|---|---|
| **From:** | Michelle Law |
| **Sent:** | Monday, October 21, 2019 7:59 AM |
| **To:** | 'Katherine Siereveld' |
| **Cc:** | rewlaw_outlook.com |
| **Subject:** | RE: Medical Imaging Tests for Wesley Purkey |

Thanks, Katherine – I'll start the process of procuring funding. I am certain that we will want a true DTI image so let me know what the outside vendors report about costs.



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Wednesday, October 16, 2019 9:59 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Cc:** rewlaw_outlook.com <rewlaw@outlook.com>
**Subject:** RE: Medical Imaging Tests for Wesley Purkey

**Please see below for the estimates I have received so far for the outside testing.**

PET Scan of the brain – CPTs 78608 and 70450 is about $2500
MRI of the brain with and without contrast – CPT 70553 is about $800.

MRI DT can most likely be done with the regular MRI but it may have to go out of network depending on availability of the testing/reading. Two other hospitals both say they can do it. I am checking to see if the onsite vendor can do it as well. I would add another $250 to the regular MRI to cover that cost just to be on the safe side.

1

**The response from the onsite vendor is in red below.  Please let me know how you want us to proceed...**

The answer is yes and no.
We can provide Diffusion-weighted Imaging which is a part of diffusion tensor imaging .

From what I was told is that DTI is used a lot in Brain accident injury application. DWI provides the raw data for the DTI.

Bottom line we can do DWI. Let me suggest this. Let's do a DWI and submit it to the Radiologist and see if he can interpret a DTI from the data.

>>> Michelle Law <Michelle_Law@fd.org> 10/9/2019 11:26 AM >>>
Katherine:
I've attached our doctor's order for the imaging – this is all the information I have regarding the details of the tests.  It is my understanding that all imaging is of the head and no other part of the body.
Once you learn more about who will be performing the tests, would you please forward that information to me along with more information regarding the machines that will be used to perform the tests (manufacturer, model number, etc.).  If you will not be able to obtain this information, would you forward the name of a contact person so we can obtain all relevant information regarding the performance of the tests and the qualifications of those administering the tests?  Also, we will need to know how to go about paying for the tests – like a vendor number, etc.
Thanks-
Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Tuesday, October 8, 2019 1:28 PM

**To:** Michelle Law <Michelle_Law@fd.org>
**Subject:** RE: Medical Imaging Tests for Wesley Purkey

Hi Michelle,
They need a little more information...

The providers for the DT MRI need more specific orders to have a good understanding of what they are looking for.  They gave the example of stroke vs. MS.

Also, do you want the MRI with or without contrast?

One more, is the PET scan of the whole body?  What are the parameters for that?

Thanks!
Katherine


>>> Michelle Law <Michelle_Law@fd.org> 10/4/2019 2:26 PM >>>
It stands for diffusion tensor imaging and it is a study to evaluate brain fiber tract abnormalities.



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Friday, October 4, 2019 1:20 PM
**To:** Michelle Law <Michelle_Law@fd.org>
**Cc:** rewlaw_outlook.com <rewlaw@outlook.com>
**Subject:** Re: Medical Imaging Tests for Wesley Purkey

Really quick dumb question…what is DTI??  I have not been asked for that one before.

>>> Michelle Law <Michelle_Law@fd.org> 10/4/2019 2:18 PM >>>
Katherine:

We have a medical order for the following imaging tests for Mr. Purkey:  1)  An MRI of Mr. Purkey's head; 2) a PET scan of his brain; and 3) a DTI scan of his brain.  Pursuant to our earlier conversation, if you will let me know the medical costs associated with these examinations, and some detail regarding how they will be carried out, we will then move forward with plans to get a court order and to arrange for payment of medical expenses.  I am happy to assist in any way that I can – if you need more info from me, please let me know.

Thanks-

Michelle



## Michelle M. Law

**Assistant Federal Public Defender**
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 18

Case 2:20-cv-01365-JRS-DLP Document 23-6 Filed 07/06/2020 Page 219 of 379 PageID #: 416

Case 2:20-cv-01805-JPS-DSC Document 6-23 (Ex Parte) Filed 07/07/2020 Page 220 of 329 PageID
Case 2:19-cv-00414-JPH-DLP Document 56 (Ex Parte) Filed 10/25/19 Page 1 of 4
PageID #: 9446

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Case No.: 2:19-cv-414 |
| **WARDEN OF USP TERRE HAUTE**, | ) | |
| **UNITED STATES OF AMERICA** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR DECEMBER 13, 2019 |
| Respondents. | ) | |

---

## SEALED *EX PARTE* MOTION FOR BRAIN IMAGING

---

Petitioner Wesley Ira Purkey, through counsel undersigned, respectfully requests an Order from this Court for Mr. Purkey to undergo certain brain imaging tests, which have been determined by his defense experts to be medically necessary for a determination of Mr. Purkey's present brain functioning, specifically frontal lobe and executive functioning deficits. In support, counsel states as follows:

1. The results of the recommended brain image testing, which is an integral part of the evaluation of Mr. Purkey's mental state and deterioration observed by counsel, will also bear on the question of whether Mr. Purkey is competent to be executed, an issue that is ripe in his case for the reasons set forth in the *ex parte*

1

response to the Court's order. *See* Sealed *Ex Parte* Status Report filed October 25, 2019.

2. The medical order for brain imaging testing setting forth the need for such testing and the parameters of such testing by Mr. Purkey's medical expert are submitted herewith as Attachments 1 and 2.

3. Recognizing the various institutional issues associated with carrying out brain imaging testing, such as security and transportation issues, Counsel contacted Katherine Siereveld, Attorney Advisor, USP-Terre Haute regarding the logistics of carrying out the medical imaging. Ms. Siereveld advised counsel that the brain imaging testing can be carried out if: 1) the Court enters an order for the testing; 2) the testing is completed by a BOP medical vendor; and 3) Counsel assumes responsibility to pay the medical costs associated with each imaging test. Ms. Siereveld indicated that as long as these requirements are met, the BOP will provide transportation and security. Counsel provided Ms. Siereveld with a copy of Attachments 1 and 2, and she in turn indicated that she would collect more information in light of the Petitioner's expert's order for medical imaging testing. Ms. Siereveld has since informed Counsel that the MRI testing, and possibly the DTI testing, can be accomplished when a mobile MRI truck is scheduled to be at the prison. Ms. Siereveld also provided Counsel with the medical costs associated with the MRI and PET scan. Ms. Siereveld indicated off-site testing may be

2

Case 2:20-cv-01065-JPS-DO-FSCD Document 6-23 Filed 07/06/2020 Page 223 of 379 PageID
Case 2:19-cv-06414-SFF-DEP Document 56 (Ex Parte) Filed 10/25/13 Page 3 of 4
PageID #:99448
#D4199448

required for the DTI and PET scan, but that two local hospitals can do the testing.

Counsel would therefore request that the Court's order include appropriate

transportation orders and directives to BOP to ensure Mr. Purkey's transportation

to any off-site facility for any part of testing should it be necessary.

4. Counsel informs the Court that the cost of the testing will be borne by

counsel Michelle Law's office, the Federal Public Defender for the Western

District of Missouri.

WHEREFORE, for the foregoing reasons, Petitioner requests that the Court

enter an order directing that the testing occur and ensuring any necessary

transportation for Mr. Purkey to effectuate such testing.

Respectfully submitted,

/s/Rebecca E. Woodman
Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

/s/Michelle M. Law
Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

*Counsel for Petitioner*


Dated: October 25, 2019

# Exhibit 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00414-JPH-DLP |
| | ) | |
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER

On September 6, 2019, the Court received a two-page document prepared by Petitioner Wesley Purkey styled, "Motion to Withdraw Petition for Habeas Corpus." The Court does not accept this document for filing because Mr. Purkey is represented by counsel. *See United States v. Patterson*, 576 F.3d 431, 436–37 (7th Cir. 2009) (stating in the criminal context that there is no right to "hybrid" representation and that such arrangements are disfavored).

The document was inadvertently docketed at docket 21 and has since been restricted. The parties should disregard the document. The document will be forwarded to Mr. Purkey's counsel who, consistent with counsel's professional obligations, shall review the document and decide what action, if any, should be taken regarding the issues raised therein.

The clerk is **directed** to send a copy of docket 21 by United States Mail to Mr. Purkey's counsel.

**SO ORDERED.**

Date: 9/11/2019

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
901 Saint Louis Street, Suite 801
Springfield, MO 65806

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
1263 W. 72nd Ter.
Kansas City, MO 64114

# Exhibit 20

Case 2:20-cv-01865-JPS-FSC    Document 6-23    Filed 07/06/2020    Page 229 of 379 PageID #: 5906

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

WESLEY IRA PURKEY,  )
 )
Petitioner,  )
 )
v.  )    No. 2:19-cv-00414-JPH-DLP
 )
UNITED STATES OF AMERICA, et al.  )
 )
Respondents.  )

**ORDER**

On September 13, 2019, the Court received a one-page document prepared by Petitioner Wesley Purkey styled, "Motion to Rescind Petitioner's Pro Se Motion to Withdraw Petition(s)." The Court does not accept this document for filing because Mr. Purkey is represented by counsel. *See United States v. Patterson*, 576 F.3d 431, 436–37 (7th Cir. 2009) (stating in the criminal context that there is no right to "hybrid" representation and that such arrangements are disfavored).

The document will be forwarded to Mr. Purkey's counsel who, consistent with counsel's professional obligations, shall review the document and decide what action, if any, should be taken regarding the issues raised therein. The clerk is **directed** to send a copy of the above referenced document by United States Mail to Mr. Purkey's counsel.

**SO ORDERED.**

Date: 9/16/2019

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
1263 W. 72nd Ter.
Kansas City, MO 64114

# Exhibit 21

**Monday, December 2, 2019 at 10:39:12 AM Central Standard Time**

| | |
|---|---|
| **Subject:** | Fwd: 2-19-cv-414 Purkey's mandadum short record |
| **Date:** | Thursday, October 17, 2019 at 5:06:11 PM Central Daylight Time |
| **From:** | Laura Briggs |
| **To:** | rewlaw_outlook.com |
| **Attachments:** | purkey short record for mandamus action.pdf |

The document itself is attached to this message, for reference.

(Or maybe you already have it).

I'll get to sorting this all out tonight, but likely won't have an update until tomorrow.

Laura A. Briggs, Clerk of Court
U.S. District Court, Southern District of Indiana
(317) 229-3705

---

**From:** Rebekah Farrington <Rebekah_Farrington@insd.uscourts.gov>
**Sent:** Thursday, October 17, 2019 5:22:32 PM
**To:** Laura Briggs <Laura_Briggs@insd.uscourts.gov>; Roger Sharpe <Roger_Sharpe@insd.uscourts.gov>
**Subject:** 2-19-cv-414 Purkey's mandadum short record

Rebekah Farrington
Divisional Operations Manager/
CRD to Magistrate Judge McKee
U.S. District Courthouse
921 Ohio Street
Terre Haute, Indiana 47807
(812) 231 1841

# Exhibit 22

Case 2:20-cv-00665-JPS-DLP   Document 6-23   Filed 07/06/2020   Page 234 of 379   PageID #: 9379

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| WESLEY IRA PURKEY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   No. 2:19-cv-00414-JPH-DLP |
| | ) |
| UNITED STATES OF AMERICA, et al. | ) |
| | ) |
| Respondents. | ) |

**Order Directing Response to Petitioner's Pro Se Filing and Writ of Mandamus**

On September 6, 2019, the Court received a two-page document prepared by Petitioner Wesley Purkey styled, "Motion to Withdraw Petition for Habeas Corpus." Mr. Purkey indicated, among other things, that he did not consent to actions taken by his counsel. In response, the Court issued an Order stating that the document would not be accepted for filing because Mr. Purkey is represented by counsel. *See* Dkt. 22. The Court forwarded the document to Mr. Purkey's counsel and ordered counsel, "consistent with counsel's professional obligations, [to] review the document and decide what action, if any, should be taken regarding the issues raised therein." *Id.* Mr. Purkey's counsel did not file anything with the Court in response to Mr. Purkey's allegations or the Court's order.

On October 17, 2019, the Court received notification that Mr. Purkey filed a writ of mandamus with the United States Court of Appeals for the Seventh Circuit. *See* Dkt. 53. In this filing, Mr. Purkey reiterates the allegations previously made against his counsel and his desire to represent himself. *See Purkey v. Hanlon*, No. 19-3047 (7th Cir. Oct. 17, 2019), Dkt. 1.

Mr. Purkey's counsel shall file a status report by **October 25, 2019** responding to the allegations in Mr. Purkey's "Motion to Withdraw Petition for Habeas Corpus" and his writ of

Case 2:20-cv-10855-JPH-DLF Document 6-23 Filed 07/06/2020 Page 235 of 379 PageID
Case 2:19-cv-00414-JPH-DLP Document 54 Filed 10/21/19 Page 25 of 29 PageID #: 9380
#: 431

mandamus filed with the Seventh Circuit. The status report may be filed ex parte if deemed necessary by counsel to preserve client confidences and attorney-client privileged communications.

**SO ORDERED.**

Date: 10/21/2019

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

# Exhibit 23

## Opinion of Dr. Craig Haney as to the Filing from Wesley Purkey

**Introduction**

1.      I was contacted by counsel for Wesley Purkey, who is incarcerated at U.S.P. Terre Haute under warrant of execution. Mr. Purkey, who suffers from pre-existing complex post-traumatic stress disorder, major depression and progressive dementia, has been on "execution watch" at Terre Haute since July 25, 2019. This means that he is in a special isolation cell, apart from other prisoners. Upon implementation of the execution watch, Mr. Purkey was moved to a so-called "shotgun cell" that is a cell much smaller than the cell he occupied prior to the execution watch, and which has two doors that separate him from the range hallway.  It is my understanding that as a part of the execution watch, prisoners are monitored through "cell checks" that occur around-the-clock, every 15 minutes. They are conducted even at night, when correctional officers use flashlights that they shine into prisoners' cells every 15 minutes.  Mr. Purkey has reported to his attorneys that these cell checks awaken him, or keep him awake throughout the night. It is also my understanding that Mr. Purkey's attorneys requested permission to provide Mr. Purkey a sleep mask to shield his eyes from the bright flashlights that awaken him every 15 minutes during the night but that prison authorities have denied the request.  Mr. Purkey has recently reported to his attorneys that during one cell check, a particular guard shone a flashlight on Mr. Purkey for an extended period of time while he was at the toilet urinating. I understand from counsel that they have requested video surveillance of these checks from the prison, but have not yet received the videos.

2.      In addition, Mr. Purkey has limited access to family and loved ones.  I understand that his daughter and only child, Angie Genail, must travel from Leavenworth, Kansas, to Terre Haute, Indiana, a round-trip distance of 442 miles,

in order to visit her father. She does not have the financial means to make frequent trips. However, during her last visit on October 20, 2019, she was arbitrarily denied permission to visit her father based on the pair of jeans she was wearing, even though she had been allowed to visit her father wearing the same jeans the previous two days. Her two minor children were sent up alone to visit their grandfather, and Ms. Genail, Mr. Purkey's daughter, was forced to leave the premises instead of being allowed to wait for them in the reception area near the front desk.

3. Recently, in a filing docketed on October 17, 2019, Mr. Purkey has asked the Seventh Circuit Court of Appeals to waive an appeal that his attorneys filed on his behalf. I have also been made aware that Mr. Purkey attempted to file, and then withdrew, a motion to waive his appeal in the district court prior to filing his motion in the Seventh Circuit. I was asked by his counsel to offer an opinion on whether his current conditions of confinement could have an impact on his mental health and whether they could be a factor in the October 17 filing. As discussed further below, the increased severity of Mr. Purkey's changed conditions of confinement, especially the increased level of isolation to which he now exposed and the sleep deprivation that he is now experiencing, are likely to have significantly impacted his mental health and affected state of mind and decision-making. They likely were a significant factor that contributes to and accounts for the letter he wrote effectively asking to be allowed to commit suicide.

**Expert Qualifications**

4. I am Distinguished Professor of Psychology, and UC Presidential Chair, 2015-2018, at the University of California at Santa Cruz. I have been teaching graduate and undergraduate courses in social psychology, research methodology, psychology and law, forensic psychology, and institutional analysis

Case 2:20-cv-00665-JPS-DTSC Document 6-23 (Ex-Parte) Filed 07/06/2020 Page 238 of 279 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-1 (Ex-Parte) Filed 10/29/19 Page 3 of 18 PageID #:59390
Page ID #:4350

at the University of California for nearly 40 years. I previously served as the Chair of the Department of Psychology, Chair of the Department of Sociology, Director of the Program in Legal Studies, and Head of the Graduate Program in Social Psychology. I received a Ph.D. in psychology from Stanford University and a J.D. degree from the Stanford Law School. I have been the recipient of a number of scholarship, fellowship, and other academic awards and have published approximately one hundred scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on conditions of confinement and the psychological effects of incarceration. My book on the psychological consequences of imprisonment, Reforming Punishment: Psychological Limits to the Pains of Imprisonment,[1] was published by the American Psychological Association in 2006. (My curriculum vitae is attached to this Report as "Appendix A.")

5. For more than 40 years, I have been studying the psychological effects of living and working in institutional environments. In the course of that work, I have conducted what is perhaps the only laboratory experiment ever done on the acute psychological effects of prison-like environments.[2] This research, which has come to be known as the "Stanford Prison Experiment," is regarded as a classic

---

[1] Craig Haney, Reforming Punishment: Psychological Limits to the Pains of Imprisonment. Washington, DC: APA Books (2006).

[2] This study was originally published as Haney, C., Banks, C., and Zimbardo, P., Interpersonal Dynamics in a Simulated Prison, 1 *International Journal of Criminology and Penology* 69 (1973), and has been reprinted in numerous books in psychology and law and translated into several languages. For example: Steffensmeier, D., and Terry R. (Eds.) *Examining Deviance Experimentally*. New York: Alfred Publishing, 1975; Golden, P. (Ed.) *The Research Experience*. Itasca, Ill.: Peacock, 1976; Leger, R. (Ed.) *The Sociology of Corrections*. New York: John Wiley, 1977; *A kiserleti tarsadalom-lelektan foarma*. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, N., and Savitz, L. *Justice and Corrections*. New York: John Wiley, 1978; *Research Methods in Education and Social Sciences*. The Open University, 1979; Goldstein, J. (Ed.), *Modern Sociology*. British Columbia: Open Learning Institute, 1980; Ross, R. (Ed.) *Prison Guard/Correctional Officer: The Use and Abuse of Human Resources of Prison*. Toronto: Butterworth's 1981; Monahan, J., and Walker, L. (Eds.), *Social Science in Law: Cases, Materials, and Problems*. Foundation Press, 1985; Siuta, Jerzy (Ed.), *The Context of Human Behavior*. Jagiellonian University Press, 2001; and Ferguson, Susan (Ed.), *Mapping the Social Landscape: Readings in Sociology*. St. Enumclaw, WA: Mayfield Publishing, 2001; Pethes, Nicolas (Ed.), *Menschenversuche (Experiments with Humans)*. Frankfurt, Germany: Suhrkamp Verlag, 2006.

Case 2:20-case-00365-JB-DTSC Document 6-23 (Ex Parte) Filed 07/06/2020 Page 239 of 279 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-1 (Ex Parte) Filed 10/25/19 Page 4 of 18
PageID #:9391

social psychological study of the effects of institutional environments.[3] In the nearly 50 years since that study was completed, I have continued to study and publish scholarly articles on the psychology of imprisonment. My research on this topic has included conducting numerous interviews with correctional officials, officers, and prisoners to assess the nature and consequences of living and working in correctional settings. In addition, I have statistically analyzed aggregate correctional data to examine the effects of overcrowding, punitive segregation, and other conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.

6.    In addition, I have toured and inspected and analyzed conditions of confinement at numerous state prisons (including in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, New York, Nebraska, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Washington, and Wyoming), maximum security federal prisons (at McNeil Island, Washington; Marion, Illinois; Lewisburg, Pennsylvania; and the United States Penitentiary and Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, Ireland, Norway, the Netherlands, and Russia. In 1989, I received a UC-Mexus grant to conduct a comparative study of prisons and prison policy in the United States and Mexico. As a result of that research grant, I toured a number of Mexican prisons, interviewed correctional officials and, in conjunction with United States Department of State officials, interviewed many United States citizens who were incarcerated in Mexico.

---

[3] The American Psychological Association sponsored a "retrospective" commemorating the 25th anniversary of this study at its Annual Convention a decade ago, and a 40th anniversary commemorative event two years ago at the Annual Convention in Washington, DC. *See also* Haney, C., and Zimbardo, P., The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment, 53 *American Psychologist* 709- 727 (1998); and Haney, C., and Zimbardo, P., The Stanford Prison Experiment, in Brian Cutler (Ed.), *The Encyclopedia of Psychology and the Law* (pp. 756-757). Volume II. Thousand Oaks, CA: Sage Publications (2008).

Case 2:20-case-10385-JBS-DHS CD-Document-6-23-(Ex-Parte) Filed 07/06/2020 Page 240 of 279 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-1 (Ex-Parte) Filed 10/25/19 Page 5 of 18
PageID #:79392
#:4379

7.      I have lectured and given invited addresses throughout the country on the psychological effects of living and working in institutional settings (especially maximum security prisons) at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association. I have also served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, the California Judicial Council, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the NAACP Legal Defense Fund, and the United States Department of Justice.

8.      In addition to the research I have conducted into the psychological effects of confinement and patterns of adjustment in institutional settings, I also have extensive experience evaluating the life histories and psychological reactions of individual clients in the criminal justice system. Beginning as a Law and Psychology Fellow at the Stanford Law School in the mid-1970s, I participated for several years in an intensive clinically-oriented course co-taught by law professor Anthony Amsterdam and psychiatrist Donald Lunde that sensitized me to the special problems and vulnerabilities of psychiatrically impaired criminal defendants and prisoners with special needs. Since that time, I have been extensively involved in teaching and conducting research on a variety of forensic issues that have placed me in continuing contact with diverse prisoner populations, many of whose members suffer from adverse effects of institutionalization, as well as preexisting psychiatric disorders and developmental disabilities.[4]

9.      I have often focused in this work on the effects of conditions of confinement on so-called "special needs" prisoners (primarily the mentally ill and

---

[4] For example, *see* Haney, C., and Specter, D., Legal Considerations in the Treatment of "Special Needs" Offenders, in Ashford, J., Sales, B., and Reid, W., (Eds.), *Treating Adult and Juvenile Offenders with Special Needs* (pp. 51-79). Washington, D.C.: American Psychological Association (2000).

developmentally disabled). For example, under the auspices of the United States Department of Justice, I evaluated conditions of confinement and the quality of care provided at Atascadero State Hospital, a forensic facility designed to house mentally-ill and developmentally-disabled offenders for the State of California. As noted above, I testified as an expert witness concerning conditions of confinement and their effects on prisoners at the California Men's Colony, which was a treatment-oriented facility in which many mentally-ill prisoners were housed at the time I evaluated it. In addition, I evaluated the effects of conditions of confinement on prisoners at the California Medical Facility at Vacaville (including prisoners housed in the Department of Mental Health units),[5] and also testified about the prevalence of seriously mentally-ill prisoners in the California Department of Corrections, as well as the special psychological problems that living in isolated housing units created for them.[6]

10.   I have also evaluated the psychological effects of conditions of confinement at juvenile justice facilities, on the condemned or "death row" units in several states (including Arkansas, California, New Mexico, and Texas), and in various special treatment facilities for sex offenders (in Florida and Washington).

**Extreme Penal Isolation and Its Effects on Mental Health**

11.   It is my expert opinion that being housed in solitary or isolated confinement—especially over a long period of time—can and often does produce a number of negative psychological effects. It places prisoners at grave risk of psychological harm. I believe that these effects are now well understood and described in the scientific literature. There are numerous empirical studies that report "robust" findings—that is, the findings have been obtained in studies that were conducted by researchers and clinicians from diverse backgrounds and

---

[5] *Gates v. Deukmejian*, Civ-S-87-1636 LKK-JFM (E.D. Cal. 1990).
[6] *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).

perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm to which they are exposed.

12.     In addition, the empirical conclusions are theoretically sound. That is, there are straightforward scientific explanations for the fact that long-term isolation—the absence of meaningful social contact and interaction with others— and the other severe deprivations that typically occur under conditions of isolated or solitary confinement have harmful psychological consequences. Social exclusion and isolation from others is known to produce adverse psychological effects in contexts other than prison; it makes perfect theoretical sense that this experience produces similar negative outcomes in correctional settings, where the isolation is so rigidly enforced, the social opprobrium that attaches to isolated prisoners can be extreme, and the other associated deprivations are so severe.

13.     It should be noted that "long-term" or "prolonged" exposure to prison isolation is generally used in the literature to refer to durations of solitary confinement that are much briefer than the amounts of time that Mr. Purkey has been subjected to it. For example, the American Psychiatric Association (APA) defined "prolonged segregation" as segregation lasting for *four weeks* or longer (which the APA also said "should be avoided" for the seriously mentally ill).[7] Thus, Mr. Purkey has been subjected to durations of isolated confinement that far exceed—by substantial orders of magnitude—the amounts typically reported in the literature, studied by researchers, and considered psychiatrically problematic.

---

[7] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 PrisonerSegregation.pdf

14.    "Solitary confinement' and isolated confinement" are terms of art in correctional practice and scholarship. For perhaps obvious reasons, total and absolute solitary confinement—literally *complete* isolation from any form of human contact—does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as:

15.    [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[8]

16.    Mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[9] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[10]

---

[8] Haney, *The Social Psycohology of Isolation, supra* note 8, at footnote 1.

[9] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see, for example: Haney, *Mental Health Issues in Long- Term Solitary and "Supermax" Confinement*, and Haney & Lynch, *Regulating Prisons of the Future, supra* note 8; and Smith, *The Effects of Solitary Confinement on Prison Inmates, supra* note 18.

[10] Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement*, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison*, Canadian Psychiatric Association Journal, 12, 337- 341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, *Effect of Solitary Confinement on Prisoners*, American Journal of Psychiatry, 119, 771-773 (1963).

17. A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[11] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[12] 24 Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[13]

18. More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self- mutilation, and suicidal ideation and behavior.[14]

---

[11] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Aldine Publishing Co.: Chicago (1975).

[12] *Id.* at 54.

[13] *Ibid.*

[14] In addition to the numerous studies cited in the articles referenced *supra* at notes 11 and 15, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, *L'Isolement Carceral*, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social

19.     In addition, a number of correlational studies have been done examining the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing or SHU, where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[15] These

---

rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey), Psychologie -Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung* (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems*, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[15] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004*, Psychiatric Services, 59, 676-682 (2008), at p. 678.

authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[16] Similarly, a team of researchers in New York recently reported that "[i]nmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm after we controlled for the length of jail stay, SMI [whether the inmate was seriously mentally ill], age, and race/ethnicity."[17] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[18]

20.     Not every isolated prisoner will suffer all of the previously described adverse psychological reactions to their severe conditions of confinement. But the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that it creates. The potentially devastating effects of these conditions are

---

[16] Ibid. See also: Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later*. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, *Vulnerability and Prison Suicide*, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, *Prison Suicide and Prisoner Coping*, Crime and Justice, 26, 283-359 (1999).

[17] Fatos Kaba, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, American Journal of Public Health, *104*, 442-447 (2014), at p. 445.

[18] For example, see: Howard Bidna, *Effects of Increased Security on Prison Violence*, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress in Prison*, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*, Criminal Justice and Behavior, 13, 286- 296 (1986); Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, *A Prison Environment: Its Effect on Health Care Utilization*, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, *Managing Violent Individuals in Correctional Settings*, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

reflected in the characteristically high numbers of suicide deaths, incidents of self-harm and self-mutilation that occur in many of these units.

21. In recognition of the adverse mental health effects of segregated, solitary, or isolated confinement, the American Bar Association's *Standards for Criminal Justice on the Treatment of Prisoners* mandate that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[19] Moreover, the ABA requires that the mental health of *all* prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations).[20] In addition, at intervals "not to exceed [30 days], correctional authorities should meet and document an evaluation of each prisoner's progress" in an evaluation that explicitly "should also consider the nature of the prisoner's mental health," and at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing."[21]

**Exacerbating Effects of Isolation on Mental Illness**

---

[19] American Bar Association, *ABA Criminal Justice Standards on the Treatment of Prisoners, Standard 23-2.6(a)* (2010), *available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentp risoners.html [hereinafter "*ABA Standards*"].
[20] *ABA Standards*, 23-2.8(b).
[21] *ABA Standards*, 23-2.9.

Case 2:20-cv-00885-JPS-DTS Document 623 (Ex Parte) Filed 10/26/15 Page 13 of 16
Case 2:19-cv-00414-JFH-DLF Document 55-3 (Ex Parte) Filed 10/26/15 Page 13 of 16
PageID #:59400

22. Although prison isolation places all prisoners at significant risk of serious harm, its adverse psychological effects vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences) but also a function of the characteristics of the prisoners subjected to it. A rare and unusually resilient prisoner might be able to withstand even harsh forms of solitary confinement with few or minor adverse effects, especially if the experience does not last for an extended period of time. Conversely, some prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement, and deteriorate even after brief exposure. Mentally ill prisoners are particularly at risk in these isolated environments and have been precluded from such environments by legal and human rights mandates precisely because of this. There are several reasons why this is so.

23. For one, as I have noted, solitary confinement or isolated confinement subjects prisoners to significantly more stress and psychological pain than other forms of imprisonment. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill prisoners are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of prison isolation.

24. Some of the deterioration and decompensation that mentally ill prisoners suffer in isolated confinement results from the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan once summarized the clinical significance of meaningful social contact by observing that "[w]e can't be

Case 2:20-cv-10365-JFW-DFM Document 6-23-6 Filed 07/22/20 Page 249 of 379 Page D
Case 2:15-cv-00414-JFW-DFM Document 55-1 (Ex Parte) Filed 10/26/15 Page 14 of 16
PageID #:9401
PageID #:4469401

alone in things and be very clear on what happened to us, and we…can't be alone and be very clear even on what is happening in us very long - excepting that it gets simpler and simpler, and more primitive and more primitive, and less socially acceptable."[22] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

25.  Thus, the experience of isolation is inherently psychologically destabilizing. It undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[23]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, seemingly so bizarre and impossible for them to make sense of that some prisoners create their own reality - they live in a world of fantasy, instead of the intolerable one that surrounds them.

26.  Finally, many of the direct negative psychological effects of isolation mimic or parallel specific symptoms of mental illness. Even though the direct effects of isolation, experienced in reaction to adverse conditions of confinement, are generally less chronic that those that are produced by a diagnosable mental

---

[22] Harry Stack Sullivan, The Illusion of Personal Individuality, *Psychiatry*, 12 317 - 332 (1971), at p. 326.
[23] Compare also, Margaret K. Cooke and Jeffrey H. Goldstein, Social Isolation and Violent Behavior, *Forensic Reports*, 2, 287 - 296 (1989), at p. 288.

Case 2:20-cv-10365-JPS-DLFSC Document 6-23-6 Filed 10/22/20 Page 251 of 239 PageID
Case 2:15-cv-00414-JPF-DLF SC Document 55-1 (Ex Parte) Filed 10/29/15 Page 15 of 10
PageID #479402
#4479402

illness, they can add to and compound a mentally ill prisoner's outward manifestation of symptoms as well as the internal experience of their disorder.

27. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depression. Thus, for already clinically depressed prisoners, these acute situational effects are likely to exacerbate their pre-existing chronic condition and lead to a worsening of their depressed state. Similarly, the mood swings that some prisoners report experiencing in isolation would be expected to amplify the pre-existing emotional instability that prisoners diagnosed with conditions such as bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the high levels of frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the potentially stabilizing influence of social feedback that might ground their sense of reality in a stable and meaningful social world.

28. As I noted in passing above, widespread recognition of the heightened vulnerability to mentally ill prisoners to the adverse psychological effects of isolated confinement has let numerous corrections officials, professional mental health groups, and human rights organizations to prohibit their placement in such units or, if it is absolutely necessary (and only as a last resort) to confine them there, to very strictly limit the duration of such confinement and to provide prisoners with significant amounts of out-of-cell time and augmented access to care. For example, the American Psychiatric Association ("APA") has issued a Position Statement on Segregation of Prisoners with Mental Illness stating:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in

segregation, out-of-cell structured therapeutic activities (i.e. mental health/psychiatric treatment) in appropriate programming space for an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.[24]

The APA's position on this issue reflects the accepted fact that mentally ill prisoners are especially vulnerable to isolation- and stress-related regression, and decompensation that worsen their psychiatric conditions and intensify their mental health related symptoms and maladies (including depression, psychosis, self-harm).

29.     This widely accepted fact about mentally ill prisoners' heightened vulnerability to isolated confinement is acknowledged in the standard operating procedures that typically govern their admission and retention in such units. Specifically, mental health staff in most prison systems with which I am familiar are charged with the responsibility of screening prisoners in advance of their possible placement in isolation, identifying those who are mentally ill and, typically, taking steps to exclude them from such confinement. Moreover, mental health staff are required to regularly and meaningfully monitor isolated prisoners with the same intended purpose - to identify any prisoners who may be manifesting the signs and symptoms of emerging mental illness and to remove them from these harmful environments.

30.     Courts that have been presented with evidence on this issue have reached the same conclusions about the vulnerability of the mentally ill to several forms of prison isolation. One such court, in an opinion issued in a case in which I

---

[24] AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--newsroom/position statements.

Case 2:20-cv-10365-JFW-DFM Document 6-23 Filed 06/22/20 Page 252 of 379 Page ID
Case 2:15-cv-00414-JFW-DFM Document 55-1 (Ex Parte) Filed 10/29/15 Page 17 of 18
PageID #:9404
Page ID #:4499404

testified as an expert witness, noted that the psychological risks of isolated confinement were "particularly" and unacceptably high for any prisoner suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[25] The judge elaborated, noting that the group of prisoners to be excluded from isolation should include:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[26]

31. In summary, the accumulated weight of the scientific evidence that I have cited and summarized above demonstrates the painful nature of isolated confinement and the serious risk of significant psychological harm at which it places prisoners. When persons are deprived of normal social contact for extended periods of time they experience mental pain and suffering, are more susceptible to severe stress-related maladies and disorders, and are subject to deterioration and dysfunction along a number of mental, emotional, and physical dimensions. These people are thus placed at risk of even more serious harm, including the loss of their sanity and even their lives. The broad range of adverse effects that derive from social deprivation underscores the fundamental importance of meaningful social contact and interaction and, in essence, establishes

---

[25] *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995)
[26] *Id.*

Case 2:20-cv-01365-JPH-DLP Document 6-23-6 Filed 07/15/20 Page 253 of 379 PageID
Case 2:19-cv-00414-JPH-DLP Document 55-1 (Ex Parte) Filed 10/28/19 Page 18 of 19
PageID #: 9405

these things as identifiable human needs. Over the long-term, meaningful social contact and interaction may be as essential to a person's psychological well-being. This appears to be true for prisoners in general, but especially true for mentally ill prisoners who are particularly vulnerable to the pains of isolated confinement and susceptible to its harmful effects.

### Opinion regarding the October 17 pro se filing

32. In my professional opinion, Mr. Purkey's pro se attempt to withdraw his appeals should be viewed with judicial caution and concern. His decision-making was undoubtedly affected by the increased severity in his isolated conditions of confinement in combination with the organic mental health condition from which he suffers, one that results in deteriorating cognition and dementia. A competent psychological evaluation is clearly necessary in order to determine the exact cause of Mr. Purkey's request and to evaluate his competence to make it. The very likely possibility that his pro se filing was the result of a chronic mental condition, the psychological trauma of extreme isolation, and the exacerbating effect of sleep deprivation raises grave concerns about the voluntariness of the filing and serious doubts about Mr. Purkey's capacity and competence to make such a request.

33. It is my understanding that Mr. Purkey's attorneys are seeking the orders necessary to collect medical information in order to make informed decisions regarding his competency issues. Given the information we have about the conditions of confinement in combination with counsel's observations about their client's deteriorating mental health, in my expert opinion, counsel should be given the opportunity to evaluate this information before any court were to acquiesce to Mr. Purkey's wishes and allow him to withdraw his appeals. This evaluation should also include an evaluation of the prison conditions, including an in person tour of the execution watch cell and access to video footage of sleep monitoring.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: October 25, 2019

_Dr. Craig Haney_
Dr. Craig Haney

# Exhibit 24

Case 2:20-cv-00865-JPS-DLPSC Document 6-23 6 Filed 07/6/2/20 Page 155 of 220 PageID
Case 2:19-cv-00414-JPH-DLPC Document 53-2 (Ex Parte) Filed 10/25/19 Page 1 of 40
Page ID#45 9406
#D4529406

APPENDIX A

## CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

Co-Director,
UC Consortium on Criminal Justice Healthcare

Co-Director,
AMEND at UCSF: US-Norway Correctional Change/Exchange Program

| | |
|---|---|
| home address: | 317 Ocean View Ave. |
| | Santa Cruz, California 95062 |
| phone: | (831) 459-2153 |
| fax: | (831) 425-3664 |
| email: | psylaw@ucsc.edu |

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

1

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

2018      Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections").

2016      Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council.

     Psychology Department "Most Inspiring Lecturer"

2015      University of California Presidential Chair (2015-2018 Term)

     Martin F. Chemers Award for Outstanding Research in Social Science

     Excellence in Teaching Award (Academic Senate Committee on Teaching).

     President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen).

     Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council.

     Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof]

2014      Distinguished Faculty Research Lecturer, University of California, Santa Cruz.

2013      Distinguished Plenary Speaker, American Psychological Association Annual Convention.

2

Case 2:20-cv-00865-JPS-DLPSC Document 6-23-6 Filed 07/16/2/20 Page 157 of 379 PageID
Case 2:19-cv-00414-JPH-DLPC Document 53-2 (Ex Parte) Filed 10/25/19 Page 3 of 40
Page ID #: 9408
#:4549

| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
|---|---|
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for Death by Design). |
| | Nominated for National Book Award (by American Psychological Association Books, for Reforming Punishment: Psychological Limits to the Pains of Imprisonment). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |
| 2002 | Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz. |
| | United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project. |

3

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000      Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999      American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997      National Science Foundation Grant to Study Capital Jury Decision-making.

1996      Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995      Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994      Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992      Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991      Alumni Association Teaching Award ("Favorite Professor")

1990      Prison Law Office Award for Contributions to Prison Litigation

1989      UC Mexus Award for Comparative Research on Mexican Prisons

4

Case 2:20-cv-00365-JPS-DLPSC Document 6-23-6 Filed 07/16/20 Page 159 of 379 PageID
Case 2:19-cv-00414-JPH-DLPSC Document 53-2 (Ex Parte) Filed 10/25/19 Page 5 of 40
Page ID #: 9410
#:4569

| | |
|---|---|
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree <u>Magna cum laude</u> with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-2016 | Director, Legal Studies Program |
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |

1984-1986     Chair, Committee on Privilege and Tenure


WRITINGS AND OTHER CREATIVE ACTIVITIES <u>IN PROGRESS</u>


Books:

<u>Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace</u> (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.


PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

<u>Books</u>


2020     <u>Criminality in Context: The Psychological Foundations of Criminal Justice Reform</u>. APA Books, in press.

2014     <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006     <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>, Washington, DC: American Psychological Association Books.

2005     <u>Death by Design: Capital Punishment as a Social Psychological System</u>. New York: Oxford University Press.


<u>Monographs and Technical Reports</u>


1989     <u>Employment Testing and Employment Discrimination</u> (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.


6

Case 2:20-cv-00865-JPS-70-PSC Document 6-23-6 Filed 07/6/2/20 Page 161 of 379 PageID
Case 2:19-cv-00414-JP-H-DLP-C Document 53-2 (Ex Parte) Filed 10/25/19 Page 7 of 40
Page ID #: 9412
#D 4589

Articles in Professional Journals and Book Chapters

2019       "Afterword," in Robert Johnson, <u>Condemned to Die: Life Under Sentence of Death</u> (pp. 136-141). Second Edition. New York: Routledge.

"Changing correctional culture: Exploring the role of U.S.-Norway exchange in placing health and well-being at the center of U.S. prison reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), <u>American Journal of Public Health</u>, in press.

"Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), <u>Solitary Confinement: Effects, Practices, and Pathways to Reform</u>. New York: Oxford University Press, in press.

2018       "Restricting the Use of Solitary Confinement," <u>Annual Review of Criminology</u>, <u>1</u>, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), <u>Law & Policy</u>, in press.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. <u>Journal of General Internal Medicine</u>, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), <u>The Criminalization of Mental Illness</u> (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

2017       "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

Case 2:20-cv-00865-JPH-DLC Document 63-2 (Ex Parte) Filed 10/16/20 Page 8 of 40
Case 2:19-cv-00414-JPH-DLC Document 53-2 (Ex Parte) Filed 10/16/19 Page 8 of 40
Page ID #: 9413
#: 4599

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), <u>Torture and Its Definition in International Law: An Interdisciplinary Approach</u> (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, <u>International Journal of Prisoner Health</u>, <u>13</u>, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), <u>International Journal of Prisoner Health</u>, <u>13</u>, 41-48.

2016    "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), <u>The Prison Journal</u>, <u>96</u>, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book <u>Moral Disengagement: How People Do Harm and Live With Themselves</u>, by A. Bandura], <u>PsycCRITIQUES</u>, 61(8).

2015    "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), <u>Law & Social Inquiry</u>, <u>40</u>, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014      "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013      "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books (in press).

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012      "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011      "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

Case 2:23-cv-01365-JPS-TB-PSC Document 6-23-6 Filed 07/16/20 Page 265 of 379 PageID
Case 2:15-cv-06414-JPH-DLF Document 55-2 (Ex Parte) Filed 10/28/19 Page 10 of 40
PageID #:9415

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), <u>Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors</u> (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), <u>Michigan State Law Review</u>, 2011, 573-608.

2010     "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009     "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-814.

2008        "Counting Casualties in the War on Prisoners," <u>University of San Francisco Law Review</u>, <u>43</u>, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," <u>Hofstra Law Review</u>, <u>36</u>, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," <u>Criminal Justice and Behavior</u>, <u>35</u>, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), <u>Dictionary of Prisons</u> (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006        "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 265-293. [Reprinted in: N. Berlatsky, <u>Opposing Viewpoints: America's Prisons</u>. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," <u>Golden Gate Law Review</u>, <u>37</u>, 131-173.

Case 2:23-cv-01365-JPH-DLP Document 6-23 (Ex Parte) Filed 07/15/20 Page 267 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/28/19 Page 12 of 40
PageID #: 9417

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), <u>Analyses of Social Issues and Public Policy (ASAP)</u>, <u>4</u>, 1-22.

"Abu Ghraib and the American Prison System," <u>The Commonwealth</u>, <u>98 (#16)</u>, 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

12

Case 2:23-cv-01365-JPS-DLR Document 6-23-6 Filed 07/6/2/20 Page 267 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/29/15 Page 13 of 40
Page #D #: 9418

2003      "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review.

2002      "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), Taking Psychology and Law into the Twenty-First Century (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The Daubert Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., The Handbook of Psychological Injury (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001      "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), Treating Adult and Juvenile Offenders with Special Needs (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), Undoing Time (pp. 245-256). Boston, MA: Northeastern University Press.

2000      "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), Law and Human Behavior, 24, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999     "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998     "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American</u> <u>Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The</u> <u>American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997     "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

14

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988    "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

16

1986        "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984        "Editor's Introduction. Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification: Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions: Judicial Reform and the Use of Social Science." In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>. New York: John Wiley, pp. 43-54.

1983        "The Future of Crime and Personality Research: A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.: Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful: An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>. Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982        "Psychological Theory and Criminal Justice Policy: Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

Case 2:23-cv-01365-JFH-DLF Document 6-23-6 Filed 07/16/20 Page 273 of 239 PageID
Case 2:15-cv-00414-JFH-DLF Document 55-2 (Ex Parte) Filed 10/26/15 Page 18 of 40
Page ID #:9423
#:4699

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981    "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980    "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Loh, Wallace (Ed.), <u>Social Research and the Judicial Process.</u> New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), <u>The People's Law Review</u>. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), <u>Readings on the Social Animal</u>. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), <u>Challenges and Alternatives to the Criminal Justice System.</u> Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), <u>Social Psychology and Modern Life</u>. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), <u>Law and Society Review</u>, <u>13</u>, pp. 633-650.

[Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), <u>Criminal Law and Its Processes</u>. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), <u>The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology</u>, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), <u>Law, Justice, and the Individual in Society: Psychological and Legal Issues</u> (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), <u>The Research Experience</u>, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  <u>Psychology</u> <u>Today</u>, 26ff.

"Implementing Research Results in Criminal Justice Settings," <u>Proceedings</u>, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), <u>Theory and Research in Abnormal Psychology</u>.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), <u>Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving</u>.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) <u>Contemporary Issues in Social Psychology</u>.  Third Edition.  Monterey:  Brooks/Cole, 1977. Calhoun, James  <u>Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships</u>. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, <u>Revisita de Psicologia Social</u>, 1, 95-105 (1986).]

1973    "Social Roles, Role-Playing, and Education" (with P. Zimbardo), <u>The Behavioral and Social Science Teacher</u>, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) <u>Psychology For Our Times</u>. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E.

and Hunt, R. (Eds.) <u>Current Perspectives in Social Psychology</u>. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), <u>The New York Times Magazine</u>, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), <u>International Journal of Criminology and Penology</u>, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) <u>Examining Deviance Experimentally</u>. New York: Alfred Publishing, 1975; Golden, P. (Ed.) <u>The Research Experience</u>. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) <u>The Sociology of Corrections.</u> New York:  John Wiley, 1977; <u>A kiserleti tarsadalom-lelektan foarma</u>. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. <u>Justice and Corrections</u>. New York: John Wiley, 1978; <u>Research Methods in Education and Social Sciences.</u> The Open University, 1979; Goldstein, J. (Ed.), <u>Modern Sociology</u>. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), <u>Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison.</u> Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), <u>Social Science in Law: Cases, Materials, and Problems</u>. Foundation Press, 1985: Siuta, Jerzy (Ed.), <u>The Context of Human Behavior</u>. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), <u>Mapping the Social Landscape: Readings in Sociology</u>. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  <u>Naval Research Reviews</u>, <u>1</u>-<u>17</u>.  [Reprinted in Aronson, E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]

## MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

Case 2:23-cv-01365-JPS-TB-PSC Document 6-23-6 Filed 07/16/20 Page 127 of 239 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/28/15 Page 22 of 40
Page ID #39427

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014    "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

22

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013    "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

23

Case 2:23-cv-01365-JPS-TB-PSC Document 5-23-6 Filed 07/16/20 Page 279 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/29/15 Page 24 of 40
Page ID #:59429
#D-4 #59429

2012 "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011 "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010 "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

Case 2:23-cv-10365-JFW-DLH Document 55-2 (Ex Parte) Filed 10/16/23 Page 279 of 379 Page ID
Case 2:15-cv-00414-JFW-DLH Document 55-2 (Ex Parte) Filed 10/25/15 Page 25 of 40
Page ID #:69430
#:4769430

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007    "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

Case 2:23-cv-10365-JFW-DLP Document 6-23-6 Filed 07/16/20 Page 131 of 239 Page ID
Case 2:15-cv-00454-JFW-DLP Document 55-2 (Ex Parte) Filed 10/23/15 Page 26 of 40
Page ID #479431

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006       "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005       "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004      "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

27

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

28

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000    "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

Case 2:23-cv-00365-JPS-PSC  Document 6-23 (Ex Parte)  Filed 07/02/20  Page 135 of 239  Page ID
Case 2:15-cv-00414-JPH-DLP  Document 55-2 (Ex Parte)  Filed 10/29/15  Page 30 of 40
Page ID #: 9435
#: 19435

"Crime and Punishment: Where Do We Go From Here?" Division 41
Invited Symposium, "Beyond the Boundaries: Where Should
Psychology and Law Be Taking Us?" American Psychological
Association Annual Convention, Washington, DC, August.

1999        "Psychology and the State of U.S. Prisons at the Millennium,"
            American Psychological Association Annual Convention, Boston,
            MA, August.

            "Spreading Prison Pain: On the Worldwide Movement Towards
            Incarcerative Social Control," Joint American Psychology-Law
            Society/European Association of Psychology and Law Conference,
            Dublin, Ireland, July.

1998        "Prison Conditions and Prisoner Mental Health," Beyond the Prison
            Industrial Complex Conference, University of California, Berkeley,
            September.

            "The State of US Prisons: A Conversation," International Congress
            of Applied Psychology, San Francisco, CA, August.

            "Deathwork: Capital Punishment as a Social Psychological System,"
            Invited SPPSI Address, American Psychological Association Annual
            Convention, San Francisco, CA, August.

            "The Use and Misuse of Psychology in Justice Studies: Psychology
            and Legal Change: What Happened to Justice?," (panelist),
            American Psychological Association Annual Convention, San
            Francisco, CA, August.

            "Twenty Five Years of American Corrections: Past and Future,"
            American Psychology and Law Society, Redondo Beach, CA, March.

1997        "Deconstructing the Death Penalty," School of Justice Studies,
            Arizona State University, Tempe, AZ, October.

            "Mitigation and the Study of Lives," Invited Address to Division 41
            (Psychology and Law), American Psychological Association Annual
            Convention, Chicago, August.

1996        "The Stanford Prison Experiment and 25 Years of American Prison
            Policy," American Psychological Association Annual Convention,
            Toronto, August.

30

1995      "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994      "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992      "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991      "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990      "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989      "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

"Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

"The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

31

Case 2:23-cv-01365-JPS-TB-PSC Document 6-23-6 Filed 07/16/20 Page 137 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/28/15 Page 32 of 40
Page ID #:9437

| 1987 | "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August. |
|---|---|
| | "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July. |
| 1986 | Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August. |
| | "Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August. |
| 1985 | "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November. |
| | "The State of the Prisons: What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August. |
| 1983 | "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September. |
| 1982 | "Psychology in the Court: Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July. |
| 1982 | "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March. |
| 1982 | "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April. |

Case 2:23-cv-10365-JES-TB-PSC Document 6-23-6 Filed 07/15/20 Page 133 of 229 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/29/15 Page 33 of 40
PageID #: 9438
#: 849438

1980   "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

     "On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

     "Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975   "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2016-present  Editorial Consultant, Translational Issues in Psychological Science.

2015-present  Editorial Consultant, Criminal Justice Review.

2014-present  Editorial Board Member, Law and Social Inquiry.

2013-present  Editorial Consultant, Criminal Justice and Behavior.

2012-present  Editorial Consultant, Law and Society Review.

2011-present  Editorial Consultant, Social Psychological and Personality Science.

2008-present  Editorial Consultant, New England Journal of Medicine.

2007-present  Editorial Board Member, Correctional Mental Health Reporter.

2007-present  Editorial Consultant, Journal of Offender Rehabilitation.

2004-present  Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

| | |
|---|---|
| 2000-2003 | Reviewer, Society for the Study of Social Issues Grants-in-Aid Program. |
| 2000-present | Editorial Board Member, ASAP (on-line journal of the Society for the Study of Social Issues) |
| 1997-present | Editorial Board Member (until 2004), Consultant, Psychology, Public Policy, and Law |
| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989 | Editorial Consultant, Journal of Personality and Social Psychology |
| 1988- | Editorial Consultant, American Psychologist |
| 1985 | Editorial Consultant, American Bar Foundation Research Journal |
| 1985-2006 | Law and Human Behavior, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, Law and Social Inquiry |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, Law and Society Review |
| 1979-1985 | Editorial Consultant, Law and Human Behavior |
| 1997-present | Editorial Consultant, Legal and Criminological Psychology |
| 1993-present | Psychology, Public Policy, and Law, Editorial Consultant |

GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

34

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the

35

Case 2:23-cv-01365-JPS-DLP Document 6-23-6 Filed 07/16/20 Page 291 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/25/19 Page 36 of 40
Page ID #: 9441
#D487

Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy

Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

<u>PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION</u>

37

Case 2:23-cv-01365-JPS-TJS Document 6-23-6 Filed 07/16/20 Page 193 of 239 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/29/15 Page 38 of 40
PageID #: 9443

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)]. Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown (Marin Country Superior Court; September, 1982, Justice Burke). Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing). Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)]. Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983). Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)]. Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984). Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985). Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985). Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)]. Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Case 2:23-cv-01365-JPS-TB-PS Document 6-23 Filed 07/15/20 Page 293 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/29/19 Page 85 of 40
Page ID #: 9444

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Case 2:23-cv-01365-JPS-TB-PSC Document 6-23-6 Filed 07/16/20 Page 294 of 379 PageID
Case 2:15-cv-00414-JPH-DLP Document 55-2 (Ex Parte) Filed 10/25/19 Page 40 of 40
PageID #:9445

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities.

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# Exhibit 25

Case 2:20-cv-01965-JPS-DLPSC Document 6-23-6 Filed 07/16/20 Page 295 of 379 PageID #: 492

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00414-JPH-DLP |
| | ) | |
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Respondents. | ) | |

**Ex Parte Order Granting Motion to Reconsider**

For the reasons stated in the motion, Petitioner Wesley Purkey's motion to reconsider the

Court's denial of his motion to continue the telephonic conference, dkt. [63], is **granted**. The

Court will reschedule the telephonic conference by separate order.

**SO ORDERED.**

Date: 10/31/2019

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

# Exhibit 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

WESLEY IRA PURKEY,                    )
                                      )
                Petitioner,           )
                                      )
        v.                            )      No. 2:19-cv-00414-JPH-DLP
                                      )
UNITED STATES OF AMERICA,             )
WARDEN USP Terre Haute,               )
                                      )
                Respondents.          )

**EX PARTE ORDER SCHEDULING TELEPHONIC STATUS CONFERENCE**

The above cause is set for a telephonic status conference on

**November 6, 2019 at 11:00 a.m.**  If counsel is present with Mr. Purkey,

counsel need not separately call into the conference.  Otherwise, counsel for

Mr. Purkey shall attend the conference by calling the designated telephone

number, to be provided by the Court via email.  Mr. Purkey shall attend the

conference by telephone.

**SO ORDERED.**

Date: 10/31/2019

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

# Exhibit 27

**Monday, December 2, 2019 at 10:40:05 AM Central Standard Time**

| | |
|---|---|
| **Subject:** | new civil action filed by Mr. Purkey 2-19-cv-517 |
| **Date:** | Wednesday, October 30, 2019 at 9:55:45 AM Central Daylight Time |
| **From:** | Rebekah Farrington |
| **To:** | rewlaw_outlook.com, Michelle Law |
| **CC:** | Laura Briggs |
| **Attachments:** | 2-19-cv-517 purky new civil rights action.pdf |

Rebecca and Michelle:

Wanted to make you aware of a recent filing.

Rebekah Farrington
Divisional Operations Manager/
CRD to Magistrate Judge McKee
U.S. District Courthouse
921 Ohio Street
Terre Haute, Indiana 47807
(812) 231 1841

# Exhibit 28

<div align="center">

**Rebecca E. Woodman, Attorney at Law, L.C.**
**1263 W. 72nd Ter.**
**Kansas City, Missouri 64114**
(785) 979-3672
*rewlaw@outlook.com*

</div>

<div align="center">

February 3, 2020

</div>

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**

> **Wesley Ira Purkey**
> **DOB: 01/06/1952**
> **SSN: 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**
> **FPN: 14679-045**
> **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to A-Range, a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remained there until on or about December 10, 2019, after a stay of execution. On October 9, 2019, I submitted a FOIA request by letter requesting pertinent records and surveillance videotape (detailed below) from July 25 to the date of receipt of the request. Although this request was expedited, I have yet to receive the requested records. That previous request is included with this request. In addition to that previous request, I am updating the request for the records detailed below from **October 9, 2019 to the present (date upon receipt)**.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda,

electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All records of BOP policies and procedures pertaining to the day and night watch protocol implemented on the A-Range housing the five prisoners at USP-Terre Haute including Wesley Ira Purkey who received execution notices issued by the Department of Justice on July 25, 2019.

2. All watch range surveillance videotape (both day and night) dating from October 9, 2019-Present (date upon receipt).

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as the Department of Justice has indicated that it will issue new warrants of execution as soon as the law allows**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

Rebecca E. Woodman, Esq.
1263 W. 72nd Ter.
Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

/s/Rebecca E. Woodman

*Enclosures: (3)*

# Exhibit 29

# Rebecca E. Woodman, Attorney at Law, L.C.
## 1263 W. 72nd Ter.
## Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

February 3, 2020

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**

>      **Wesley Ira Purkey**
>      **DOB: 01/06/1952**
>      **SSN: 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**
>      **FPN: 14679-045**
>      **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to A-Range, a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remained there until on or about December 10, 2019, after a stay of execution. On October 9, 2019, I submitted a FOIA request by letter requesting pertinent records and surveillance videotape (detailed below) from July 25 to the date of receipt of the request. Although this request was expedited, I have yet to receive the requested records. That previous request is included with this request. In addition to that previous request, I am updating the request for the records detailed below from **October 9, 2019 to the present (date upon receipt)**.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda,

electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All records of BOP policies and procedures pertaining to the day and night watch protocol implemented on the A-Range housing the five prisoners at USP-Terre Haute including Wesley Ira Purkey who received execution notices issued by the Department of Justice on July 25, 2019.

2. All watch range surveillance videotape (both day and night) dating from October 9, 2019-Present (date upon receipt).

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as the Department of Justice has indicated that it will issue new warrants of execution as soon as the law allows**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Ter.
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

/s/Rebecca E. Woodman

*Enclosures: (3)*

# Exhibit 30

# Rebecca E. Woodman, Attorney at Law, L.C.
## 1263 W. 72nd Ter.
## Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

February 3, 2020

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**

> **Wesley Ira Purkey**
> **DOB: 01/06/1952**
> **SSN: 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**
> **FPN: 14679-045**
> **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana and has been previously incarcerated at the U.S. Penitentiary in Leavenworth, Kansas. We are in need of all custodial records regarding Mr. Purkey dated **October 9, 2019-Present (date upon receipt).** We are requesting expedited processing. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. On October 9, 2019, I submitted a FOIA request by letter requesting all custodial records regarding Mr. Purkey from January 01, 2017 to the date of receipt of the request. Although this request was expedited, I have yet to receive the requested records. That previous request is included with this request.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda, electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey. This request includes specifically, but is not limited to, the following records:

1. All records contained in Mr. Purkey's "Medical File;"

2. All records contained in Mr. Purkey's "Mental Health File;"

3. All records contained in any file maintained by a BOP psychologist, social worker, counselor, or any other individual providing any type of services related to emotional and/or mental health care and/or treatment;

4. All records relating to Mr. Purkey's disciplinary history, any gang affiliations or activities, including without limitation all incident reports issued to Mr. Purkey, even such incident reports that may have been canceled or rescinded;

5. All records related to Mr. Purkey's grievances at the BOP;

6. All records relating to Mr. Purkey's inmate classification;

7. All medical records and notes relating to any health care requested by or provided to Mr. Purkey, and including but not limited to all medical care, dental care, mental health care, and substance abuse treatment;

8. All documentation of suicide attempts by Mr. Purkey, or injuries of Mr. Purkey, inflicted upon himself, intentionally or otherwise;

9. All records relating to any internal memoranda or correspondence within the BOP relating to Mr. Purkey;

10. All records relating to any reviews of Mr. Purkey's housing placements and transfers within institutions as well as between institutions within BOP; and

11. All records relating to any administrative remedies sought by Mr. Purkey.

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I

have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as the Department of Justice has indicated that it will issue new warrants of execution as soon as the law allows**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Ter.
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

/s/ Rebecca E. Woodman

*Enclosures: (3)*

# Exhibit 31

| | |
|---|---|
| **Subject:** | Re: Updated FOIA request 1 |
| **Date:** | Monday, February 3, 2020 at 12:56:49 PM Central Standard Time |
| **From:** | OGC Electronic Freedom of Information |
| **To:** | Rebecca Woodman |
| **Attachments:** | _DOJ-361.pdf |

Good afternoon,

We determined the information you request is maintained in a Privacy Act protected system of records and requires written authorization from the subject of the record before it can be released. The written authorization must meet the requirements of 28 C.F.R. §16.41(d).  Please resubmit your request, and provide the information identified below. Until such time as this information is received, your request is not considered perfected and has not been logged in or assigned a request number.

**Your authorization was incomplete because the date on the authorization was more than three months old.**

For your convenience, we attached a form DOJ-361, Certification of Identity. Completing this form should provide the information we need to proceed. A current or former inmate should include on the form his/her Federal Bureau of Prisons register number.

You must resubmit your request when returning the Certification of Identity or proper authorization as we do not keep copies. You can find additional information on the Federal Bureau of Prisons FOIA/PA process at www.bop.gov.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee  free to contact the unders gned, th s office, or the Federa  Bureau of Pr sons  (BOP) FOIA Pub  c L a son, Mr. C. Darne  Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc efo a@bop.gov.

Add t ona y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona  Arch ves and Records Adm n strat on to nqu re about the FOIA med at on serv ces they offer. The contact nformat on for OGIS s as fo ows: Office of Government Informat on, Serv ces, Nat ona  Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph  Road, Co ege Park, Mary and 20740-6001; e-ma  at og s@nara.gov; te ephone at 202-741-5770; to  free at 1-877-684-6448; or facs m e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea  by wr t ng to the D rector, Office of Informat on Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea  through OIP s FOIAon ne porta  by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea  must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea  by ma , both the  etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**Page 2 of 2**

Case 2:20-cv-10365-JRS-DLPSC Document 6-23-6 Filed 07/16/2/20 Page 316 of 379 PageID #: 513

# Exhibit 32

| | |
|---|---|
| **Subject:** | Re: Updated FOIA request 1 |
| **Date:** | Monday, February 3, 2020 at 1:25:44 PM Central Standard Time |
| **From:** | OGC Electronic Freedom of Information |
| **To:** | Rebecca Woodman |
| **Attachments:** | 2020-00234 Ack and Expedite Grant Ltr2.pdf |

Good afternoon,

Please disregard my previous message about the outdated Certification of Identity. Upon further review it looks like this is a duplicate request of 2020-00234. As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019. A copy of the letter is attached.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have questions about this response please feel free to contact the undersigned, this office, or the Federal Bureau of Prisons (BOP) FOIA Public Liaison, Mr. C. Darnell Stroble at 202-616-7750, 320 First Street NW, Suite 936, Washington DC 20534, or ogc_efoia@bop.gov.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information, Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20001, or you may submit an appeal through OIP's FOIAonline portal by creating an account at: https://www.foiaonline.gov/foiaonline/action/public/home. Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 33

Case 2:20-cv-01365-JPS-DL-PSC   Document 6-23-6   Filed 07/16/20   Page 318 of 379   PageID #: 515

Wednesday, June 17, 2020 at 15:51:56 Central Daylight Time

**Subject:** Re: Updated FOIA request 2

**Date:** Monday, February 3, 2020 at 1:31:36 PM Central Standard Time

**From:** OGC Electronic Freedom of Information

**To:** Rebecca Woodman

Good afternoon,

Upon review it looks like this is a duplicate request of 2020-00234. As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019. A copy of the letter was attached in the previous email.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee free to contact the unders gned, th s office, or the Federa Bureau of Pr sons (BOP) FOIA Pub c L a son, Mr. C. Darne Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc efo a@bop.gov.

Add t ona y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona Arch ves and Records Adm n strat on to nqu re about the FOIA med at on serv ces they offer. The contact nformat on for OGIS s as fo ows: Office of Government Informat on, Serv ces, Nat ona Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph Road, Co ege Park, Mary and 20740-6001; e-ma at og s@nara.gov; te ephone at 202-741-5770; to free at 1-877-684-6448; or facs m e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea by wr t ng to the D rector, Office of Informat on Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea through OIP s FOIAon ne porta by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea by ma , both the etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 34

**Subject:** Re: Updated FOIA request 1

**Date:** Monday, February 3, 2020 at 1:43:00 PM Central Standard Time

**From:** OGC Electronic Freedom of Information

**To:** Rebecca Woodman

I will forward this message to the processor. If a new Certification of Identity is needed they will let you know.

Sincerely, S. Lilly
FOIA/PA Section

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 2:34 PM >>>
>
Good afternoon: These are updated requests for the time period from the previous grant of October 10, 2019 to the present. If you need a new Certification of Identity we can re-submit the requests once we have that document.

Thank you,

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** OGC Electronic Freedom of Information <ogc_efoia@bop.gov>
**Date:** Monday, February 3, 2020 at 1:25 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Updated FOIA request 1

Good afternoon,

Please disregard my previous message about the outdated Certification of Identity. Upon further review it looks like this is a duplicate request of 2020-00234. As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019. A copy of the letter is attached.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee  free to contact the unders gned, th s office, or the Federa  Bureau of Pr sons (BOP) FOIA Pub  c L a son, Mr. C. Darne  Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc  efo a@bop.gov.

Add t ona  y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona  Arch ves and Records Adm n strat on to  nqu re about the FOIA med at on serv ces they offer. The contact  nformat on for OGIS  s as fo  ows: Office of Government Informat on, Serv ces, Nat ona  Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph  Road, Co  ege Park, Mary and 20740-6001; e-ma  at og s@nara.gov; te ephone at 202-741-5770; to   free at 1-877-684-6448; or facs m  e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea by wr t ng to the D rector, Office of Informat on Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea through OIP s FOIAon ne porta by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea by ma , both the etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 35

**Subject:** Re: Updated FOIA request 2

**Date:** Monday, February 3, 2020 at 1:43:05 PM Central Standard Time

**From:** OGC Electronic Freedom of Information

**To:** Rebecca Woodman

I will forward this message to the processor.  If a new Certification of Identity is needed they will let you know.

Sincerely, S. Lilly
FOIA/PA Section

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 2:35 PM >>>
>
Good afternoon: These are updated requests for the time period from the previous grant of October 10, 2019 to the present. If you need a new Certification of Identity we can re-submit the requests once we have that document.

Thank you,

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** OGC Electronic Freedom of Information <ogc_efoia@bop.gov>
**Date:** Monday, February 3, 2020 at 1:31 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Updated FOIA request 2

Good afternoon,

Upon review it looks like this is a duplicate request of 2020-00234.  As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019.  A copy of the letter was attached in the previous email.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have questions about this response please feel free to contact the undersigned, this office, or the Federal Bureau of Prisons (BOP) FOIA Public Liaison, Mr. C. Darnell Stroble at 202-616-7750, 320 First Street NW, Suite 936, Washington DC 20534, or ogc_efoia@bop.gov.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information, Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information

Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea through OIP s FOIAon ne porta by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea by ma , both the etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 36

# Miller & Chevalier

**Brian J. Fleming**
Member
(202) 626-5871
bfleming@milchev.com

April 14, 2020

**VIA ELECTRONIC MAIL**

Brian P. Casey
Assistant United States Attorney
Western District of Missouri
400 E. Ninth Street, Room 5510
Kansas City, MO 64106
Brian.Casey@usdoj.gov

> Re: Defendants' Reply to Mr. Purkey's Opposition to Defendants'
> Motion to Dismiss in *Purkey v. Barr, et al.*, C.A. No. 19-03570
> (TSC) (D.D.C.) (ECF No. 21)

Dear Brian:

We were disappointed with several statements in Defendants' Reply to Mr. Purkey's Opposition to Defendants' Motion to Dismiss which we believe did not fairly and accurately represent various aspects of this case. We write to request that Defendants refrain from making similar assertions in the future and, as to certain misrepresentations, that Defendants promptly submit a correction to the Court.

As a general matter, we have raised Mr. Purkey's constitutional *Ford* claim in a responsible and consistent fashion, zealously sought information and documents necessary to prove the claim (most, if not all, of which are in the exclusive possession, custody or control of your clients) and pursued adjudication of Mr. Purkey's claim in an expeditious and orderly fashion. In short, we raised a colorable (and we believe meritorious) *Ford* competency claim many months ago and have actively sought reasoned consideration of the merits of that claim. To the extent that Defendants' Reply brief suggests otherwise, and we believe it does, it is incorrect and misleading.

For example, Defendants allege that Mr. Purkey has been inconsistent in his position regarding his competency. *See* Defs.' Reply 9, ECF No. 21 ("Purkey began this litigation by asserting that his condition cannot improve. . . . More recently, in response to Defendants' position that his claims sound only in habeas, Purkey has emphasized what he believes to be the changeable nature of competency. . . . This Court should take note of this late change in position . . . ."). Mr. Purkey has argued since the start that he is not currently competent to be executed, but he has never contended that competency is unrestorable. Defendants' erroneous assertion again misleadingly conflates the distinction between longstanding/irreversible mental illness and

**Miller & Chevalier Chartered** . 900 16th Street NW . Washington, DC 20006
**T** 202.626.5800 . millerchevalier.com

Brian P. Casey
April 14, 2020
Page 2

competency (and uses this conflation to imply that Mr. Purkey's arguments are dishonest). It is *competency* that potentially can be restored, and the focus of any competency determination under the law is *not whether an individual suffers from mental illness* but whether that "mental illness prevents him from 'rational[ly] understanding' why the State seeks to impose that punishment." *Madison v. Alabama*, 139 S. Ct. 718, 722 (2019) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007)).

Defendants also assert in their Reply that the many requests for relevant information, documents and testing regarding Mr. Purkey's condition and circumstances, including requests for video surveillance footage, medical and administrative records, and brain imaging, were somehow untimely or delayed and/or were made only for dilatory purposes. *See* Defs.' Reply 4 n.1, ECF No. 21. Defendants further assert that the Bureau of Prisons did not receive "any additional requests for information since Purkey's October 2019 FOIA request." *Id.* These assertions are demonstrably false. As previously shown, Mr. Purkey repeatedly renewed his requests for certain records and footage. *See, e.g.*, Compl. ¶¶ 14, 19, ECF No. 1; Mem. in Supp. of Mot. for Prelim. Inj. 3, 8–11, 20–21, 22–23 (requesting expedited discovery), ECF No. 7-1; Pl.'s Opp. to Mot. to Dismiss or to Transfer 4–5, 7–10, ECF No. 20 (describing requests by plaintiffs counsel on September 17, 2019 and October 9, 2019, and then follow up on October 11, 2019 and November 11, 2019). Indeed, when requests for Mr. Purkey's own personal information and documents went unfulfilled, he had to resort to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, a process designed to provide access to government records, not one's own personal information and records. *See* Compl. ¶ 19, ECF No. 1 (describing submission of FOIA request to the Bureau of Prisons in October 2019); Mem. in Supp. of Mot. for Prelim. Inj. 8–11, ECF No. 7-1.[1] Contrary to Defendants' assertions that October was the last date Mr. Purkey requested records, counsel Rebecca Woodman submitted yet another request for Mr. Purkey's records on February 3, 2020. *See* Letter from R. Woodman to Bureau of Prisons (February 3, 2020). Up to this point, Mr. Purkey's requests have been refused or obstructed by the relevant officials to whom the requests were made, with the result that these requests remain unresolved to this day. At no time, however, has Mr. Purkey or anyone representing him withdrawn, abandoned, rescinded or in any way deferred those requests. If timeliness and delay are matters of concern to Defendants, the simple solution would be for Defendants to ensure that the relevant government officials immediately and fully provide the requested information and documentation, as well as access for testing.

Defendants' argument that we abandoned those requests by allegedly ignoring Defendants' supposed offer of an expedited discovery schedule (*see* Defs.' Reply 4 n.1, ECF No. 21) is similarly wrong and squarely belied by the relevant chronology of events. In our discussions with you following the filing and service of the lawsuit and our Motion for Preliminary Injunction, we, not you, initiated the concept of an agreed, expedited briefing and

---

[1] On October 10, 2019, the Bureau of Prisons promised to "expedite" the processing of Mr. Purkey's FOIA request (*see* Compl. Ex. 16, ECF No. 1-20), but subsequently failed to do so. As a result, on February 3, 2020, Mr. Purkey submitted an updated and renewed FOIA request which the Bureau of Prisons has also failed to process in a complete and timely manner. *See* Letter from R. Woodman to Bureau of Prisons (February 3, 2020).

Brian P. Casey
April 14, 2020
Page 3

discovery schedule. Your December 16, 2020 email to us following a meet and confer call demonstrates that undeniable fact. As you know well, however, circumstances thereafter changed. On December 31, 2019, the Court granted our request to withdraw the Motion for Preliminary Injunction, but ordered further briefing on jurisdictional issues, which did not close until January 28, 2020. While those jurisdictional issues were (and still are) pending before the Court, Defendants filed their Motion to Dismiss on February 24, 2020, contending, in part, that Plaintiff has no right to any discovery, let alone expedited discovery. Then, on the very day Plaintiff's response to the Motion to Dismiss was due, the Court entered Court Operations Standing Order No. 20-9, in which the Court limited its operations to those necessary "to support essential functions" (Para. 1) and deferred all other courthouse-related matters in civil proceedings (Para. 4). Not once during that sequence of events did we ever indicate that we did not want to receive the previously requested information, documents and testing, all of which are potentially relevant to the claims and issues in this case. To the contrary, we have raised the issue of discovery consistently and repeatedly. For Defendants to argue that we abandoned or failed to pursue Mr. Purkey's entitlement to discovery and failed to respond to *Defendants'* alleged proposal for expedited discovery is irresponsible and patently incorrect. It is incumbent on Defendants to file an *errata* with the Court correcting the misrepresentations in footnote 1 of the Defendants' Reply Brief, failing which Plaintiff will bring them to the Court's attention through appropriate means.[2]

Finally, given the recent developments in the D.C. Circuit, the need for you to produce the requisite discovery has become even more acute, especially if the government is intending to seek a new execution warrant for Mr. Purkey on an expedited basis. In these circumstances, it is fair for us to request that the government disclose, without delay, its intended course of action regarding the issuance of new execution warrants so we can make an informed decision about the need to seek immediate judicial intervention to ensure Mr. Purkey's competency claim is fully and fairly heard on the merits.

Sincerely,

Brian J. Fleming
*Counsel for Plaintiff*

cc:     John Hurst (John.Hurst@usdoj.gov)
        Kate Mahoney (Kate.Mahoney@usdoj.gov)
        David Wagner (David.Wagner@usdoj.gov)

---

[2] Defendants also contend that Mr. Purkey is "audacious" for seeking the due process required by *Ford* because he has never "attempted to show why a habeas petition would be a constitutionally inadequate process," all while continuing to ignore that Mr. Purkey's constitutional *Ford* claims are not core habeas. Defs.' Reply 6, ECF No. 21.

**Miller & Chevalier Chartered** . 900 16th Street NW . Washington, DC 20006
**T** 202.626.5800 . millerchevalier.com

# Exhibit 37

**From:** Fleming, Brian
**Sent:** Wednesday, May 20, 2020 4:58 PM
**To:** 'Casey, Brian (USAMOW)' <Brian.Casey@usdoj.gov>
**Cc:** Hurst, John (USAMOW) <John.Hurst@usdoj.gov>; Mahoney, Kate (USAMOW) <Kate.Mahoney@usdoj.gov>; Wagner, David (USAMOW) <David.Wagner@usdoj.gov>; McAleer, Chas <cmcaleer@milchev.com>
**Subject:** RE: PURKEY v. BARR - Case 1:19-cv-03570-TSC (D.D.C.)

Brian,

We are in receipt of your April 22, 2020 email responding to our April 14, 2020 letter. We are disappointed that you chose not to respond substantively to many of the concerns we raised in detail in our letter.

With respect to the issue of outstanding FOIA requests, we do note, as indicated in our letter, that Ms. Woodman submitted three initial FOIA requests on October 9, 2019—one for medical records and two for BOP death watch protocols and video surveillance of the death watch range, which were confirmed received and promised expedited processing by BOP's Regional Counsel on October 10, 2019. Thereafter, Ms. Woodman had several communications with responsible attorneys and officials at BOP who acknowledged receipt and committed to expediting the requests in light of the then pending execution date in December 2019.

Ms. Woodman also submitted updated FOIA requests on February 3, 2020 and received confirmation of receipt that same day by a BOP supervisory attorney, who acknowledged that the request updated rather than duplicated the October 9, 2019 requests and indicated that the updated requests would be forwarded to the agency's FOIA processor. As explained in our April 14 letter, Mr. Purkey has been seeking this information through FOIA and other means since before October of last year. To date, BOP has produced nothing in response to either the October or the February FOIA requests. This is unacceptable, particularly given the gravity of this matter. The record of our requests on behalf of Mr. Purkey for the complete and expedited production of all requested information is clear and indisputable.

Best regards,

Brian

**BRIAN J. FLEMING**
Member | Miller & Chevalier Chartered
bfleming@milchev.com | 202.626.5871

1

**From:** Casey, Brian (USAMOW) <Brian.Casey@usdoj.gov>
**Sent:** Wednesday, April 22, 2020 11:15 AM
**To:** Fleming, Brian <bfleming@milchev.com>
**Cc:** Hurst, John (USAMOW) <John.Hurst@usdoj.gov>; Mahoney, Kate (USAMOW) <Kate.Mahoney@usdoj.gov>; Wagner, David (USAMOW) <David.Wagner@usdoj.gov>; McAleer, Chas <CMcAleer@milchev.com>
**Subject:** RE: PURKEY v. BARR - Case 1:19-cv-03570-TSC (D.D.C.)

**EXTERNAL**

Brian,

We have received your letter of April 14.  Responding to your accusations point-by-point does not seem productive, so suffice it to say that we have reviewed your letter carefully and disagree with your assertions and conclusions.  To the extent you intend to file a motion with the court regarding the issues raised in your letter, please let us know specifically what motion you intend to file and please provide a proposed order so that we can have a full opportunity to decide whether to consent.  We do not view your current reference only to "appropriate relief" as sufficiently specific to satisfy the meet and confer requirement for nondispositive motions under Local Civil Rule 7.

Likewise, if you believe the filings in the case so far have provided an incomplete picture of your attempts to obtain information or documents, we would be willing to discuss the possibility of providing the court with a joint timeline of your various requests.  Your letter mostly references matters already discussed in papers before the court, but if you believe that a single, agreed timeline would be helpful, please let us know.

In response to your point that Ms. Woodman submitted an "updated and renewed FOIA request" dated February 3, 2020, we have specifically inquired about this request, and the BOP has been unable to find any record of it.

Finally, in response to your request that we provide information about the issuance of new execution warrants, we will let you know as soon as we learn of a new execution date, which will be when the Attorney General makes a decision.

Sincerely,
Brian P. Casey
Assistant United States Attorney
Western District of Missouri
400 E. Ninth Street, Room 5510
Kansas City, MO 64106
Phone:  816-426-4138
Fax:  816-426-3126

**From:** Fleming, Brian <bfleming@milchev.com>
**Sent:** Tuesday, April 14, 2020 4:52 PM
**To:** Casey, Brian (USAMOW) <BCasey@usa.doj.gov>
**Cc:** Hurst, John (USAMOW) <JHurst@usa.doj.gov>; Mahoney, Kate (USAMOW) <KMahoney@usa.doj.gov>; Wagner, David (USAMOW) <DWagner@usa.doj.gov>; McAleer, Chas <CMcAleer@milchev.com>
**Subject:** PURKEY v. BARR - Case 1:19-cv-03570-TSC (D.D.C.)

Brian,

I hope you are well.  Please see the attached correspondence relating to the above-referenced matter.

Best regards,

Brian

**BRIAN J. FLEMING**

Member | Miller & Chevalier Chartered

900 16th Street NW | Washington, DC 20006

bfleming@milchev.com | 202.626.5871 | millerchevalier.com

* * *

This electronic message contains information which may be legally confidential and/or privileged. The information
is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are
not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is
prohibited and may be unlawful. If you have received this electronic transmission in error, please reply
immediately to the sender that you have received the message in error, and delete it. Thank you.

# Exhibit 38

**From:** Casey, Brian (USAMOW) <Brian.Casey@usdoj.gov>
**Date:** June 15, 2020 at 6:43:43 PM EDT
**Subject:** Purkey v. Barr, Case No. 1:19-cv-03570-TSC (D.D.C.)
**To:** McAleer, Chas <CMcAleer@milchev.com>,Fleming, Brian <bfleming@milchev.com>
**Cc:** Hurst, John (USAMOW) <John.Hurst@usdoj.gov>,Wagner, David (USAMOW) <David.Wagner@usdoj.gov>,Mahoney, Kate (USAMOW) <Kate.Mahoney@usdoj.gov>

**EXTERNAL**

Dear Chas and Brian,

I am writing to let you know that today the Director of the Bureau of Prisons, at the Attorney General's direction, scheduled Purkey's execution for July 15, 2020.  We will shortly be filing a notice alerting the Court to this development.

Regards,
Brian P. Casey
Assistant United States Attorney
Western District of Missouri
400 E. Ninth Street, Room 5510
Kansas City, MO 64106
Phone:  816-426-4138
Fax:  816-426-3126

# Exhibit 39

**Subject:** Re: Purkey- expert visitation

**Date:** Monday, June 15, 2020 at 10:54:15 AM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**Attachments:** Purkey FOIA re death watch video 2.3.2020.pdf, Purkey FOIA re medical records 2.3.2020.pdf, Purkey FOIA re death watch protocols and video 2.3.2020.pdf, Purkey FOIA request death watch protocols 10-9-2019.pdf, Purkey FOIA request medical records 10-9-2019.pdf, Purkey limited FOIA request 10-9-2019.pdf

Katherine: I am writing separately to request Mr. Purkey's BOP records. These requests are not new, as we have requested these records several times previously, most recently this past February, but they have not yet been honored. I am attaching copies of all of our previous requests. These records, including Mr. Purkey's mental health, medical, and disciplinary records, are necessary in order for Dr. DeRight to review in his evaluation and assessment of Mr. Purkey, and without them, such assessment will be necessarily incomplete. We are requesting that these records, updated to the present date, be provided to Mr. Purkey's counsel forthwith in order for Dr. DeRight to utilize those records in his evaluation and assessment of Mr. Purkey.

As always, please contact me if you have any questions or wish to discuss these matters.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Monday, June 15, 2020 at 8:38 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Subject:** Purkey- expert visitation

Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 40

| | |
|---|---|
| **From:** | THP/SCU~ |
| **To:** | Michelle Law |
| **Subject:** | Legal Visit w/ Purkey on 03-20-20 and 03-27-20 |
| **Date:** | Friday, March 13, 2020 1:56:53 PM |

Ms. Law,

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to postpone all legal visits. Specifically, legal visits will be suspended for 30 days, at which time the suspension will be reevaluated. Case-by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel. If you would like to visit your client in the Special Confinement Unit (SCU) you are strongly encouraged to contact a member of the SCU Unit Team via past practice as soon as possible. All requests will be reviewed in the order received and as timely as possible. If approved, all legal representatives will be screened prior to being admitted inside the facility.

Thank you in advance for your understanding in this matter.

T. Royer
SCU Unit Manager

# Exhibit 41

**From:** Nicole McFarland <nmcfarland@bop.gov>
**Sent:** Friday, March 13, 2020 2:30 PM
**To:** Adam Johnson <a10johnson@bop.gov>; kirshner@clayro.com; David Patton <David_Patton@fd.org>; Deirdre Vondornum <Deirdre_Vondornum@fd.org>; Jennifer Brown <Jennifer_Brown@fd.org>; Peggy Cross-Goldenberg <Peggy_Cross-Goldenberg@fd.org>; nick.lewin@kklllp.com; paul.krieger@kklllp.com; a.robin@londonrobin.com; tracy_miller@nysd.uscourts.gov; dawn_doino@nysp.uscourts.gov; rriopelle@sercarzandriopelle.com; bc@sternheimlaw.com; Jeffrey Oestericher <Jeffrey.Oestericher@usdoj.gov>; dbanders@wlrk.com
**Cc:** Holly Pratesi <hpratesi@bop.gov>; Lee Plourde <lplourde@bop.gov>; lindsaylewis@gmail.com; snecheles@hnrlawoffices.com; richrosenberg@msn.com; edward_friedland@nysd.uscourts.gov; justin.danilewitz@saul.com
**Subject:** MCC and MDC legal visiting

Effective immediately legal visits will be suspended for 30 days, at which time the suspension will be re-evaluated. Case -by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel.

This applies to MDC Brooklyn and MCC NY and across the BOP.

I am attaching a copy of the message going to inmates at both institutions.

# Exhibit 42

| Subject: | Re: COVID-19 Legal Visit Scheduling and Screening Policy |
|---|---|
| Date: | Monday, March 16, 2020 at 2:54:35 PM Central Daylight Time |
| From: | Katherine Siereveld |
| To: | Michelle Law |
| CC: | Elizabeth Vartkessian, THP/SCU~@bop.gov, Kathleen Cleary, rewlaw_outlook.com |
| Attachments: | ATT00001.png |

Hi Michelle,

As of now, the screening includes self-reporting of symptoms and temperature checks based on current CDC guidance. When you know the date you would like to visit, we ask that you minimize the number of people you wish to attend, and let us know as soon as possible. Any approved legal visit will be non-contact. If any of the individuals are symptomatic based on the guidelines available to the BOP at the time of the visit, they will not be allowed into the institution. Additionally, please consider whether or not you can conduct the visit by phone conference. We would be happy to allow additional time if necessary. Current BOP information is available here: https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Hope that helps.
Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 3/16/2020 3:22 PM >>>

Katherine:

We received notice that our in-person legal visits with Mr. Purkey have been suspended for 30 days due to the COVID-19 virus pandemic. The notice indicated that during this time, legal visits may be approved at the local level, but visitors will be "screened" before visiting. In anticipation that it may be necessary to visit Mr. Purkey in person in the coming weeks, I am writing to request a copy of the COVID-19 visitation and screening policy so we can arrange to comply with the policy before visiting. We do not want to be in a position where an in-person visit with Mr. Purkey is urgently needed, but an unanticipated aspect of the COVID-19 policy prevents us from visiting.

Thank you –

Michelle



**Michelle M. Law**

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**Page 2 of 2**

# Exhibit 43

| | |
|---|---|
| **Subject:** | Re: Dr. Agharkar visit with Wes Purkey |
| **Date:** | Monday, March 16, 2020 at 8:54:12 AM Central Daylight Time |
| **From:** | Andrew Sutton |
| **To:** | Katherine Siereveld, Michelle Law |
| **CC:** | Elizabeth Vartkessian, Kathleen Cleary, rewlaw_outlook.com |
| **Attachments:** | ATT00001.png |

This was never scheduled and is now not considered under the circumstances.

>>> Andrew Sutton 3/3/2020 6:57 AM >>>
Awaiting response...

A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information. If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."


>>> Andrew Sutton 2/27/2020 12:26 PM >>>
Do you have a court order for an evaluation?

A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information. If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."


>>> Michelle Law <Michelle_Law@fd.org> 2/27/2020 8:13 AM >>>
Katherine and Counselor Sutton:

Is March 31, 2020 available for Dr. Agharkar to visit Mr. Purkey? He would like to visit with Mr. Purkey from 11:30 a.m. – 2:30 p.m., and would require the same items as before -- his brief case, written materials, and pens/pencils. I will double check with him about a laptop, but I do not think he brought a laptop the last time he visited Wes. Please let me know soon as Dr. Agharkar is holding open March 31, and would otherwise schedule patient visits on that day.

Please let me know if you have questions for me.

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

# Exhibit 44

**From:** Andrew Sutton <asutton@bop.gov>
**Sent:** Monday, March 30, 2020 11:18 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Purkey visits 4-13, 4-22, and 5-1

Good Afternoon,

Due to the ongoing concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have been advised to continue to postpone all legal and social visits. Specifically, all visits will be suspended through May 3, 2020, at which time the suspension will be reevaluated. Case-by-case review, upon receiving request, with reasoning why telephone conference is not adequate, and a verified court ordered deadlines, may be considered. If you must request a visit your client in the Special Confinement Unit (SCU), you are strongly encouraged to contact a member of the SCU Unit Team via email as soon as possible. All requests will be reviewed and verified, in the order received, as timely as possible. If approved, all legal representatives will be screened prior to being admitted inside the facility. All approved visits would be non-contact.  We strongly encourage you to utilize telephone and written correspondence during this difficult time.

Thank you in advance for your understanding in this matter.


A. Sutton


**Page 1 of 2**

Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information.  If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."

# Exhibit 45



**U.S. Department of Justice**
**Federal Bureau of Prisons**

**FOR IMMEDIATE RELEASE**                          Contact: Office of Public Affairs
March 31, 2020                                                    202-514-6551

## Bureau of Prisons COVID-19 Action Plan: Phase Five

WASHINGTON – Today, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 5 of its COVID-19 Action Plan, effective tomorrow, April 1, 2020.  In response to a growing number of quarantine and isolation cases in our facilities, the BOP will take the following actions immediately to further mitigate the exposure and spread of COVID-19.

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus.  This modification to our action plan is based on health concerns, not disruptive inmate behavior.
- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
- In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.
- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.
- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

Starting in January 2020, the BOP implemented its Pandemic Influenza contingency plan, modified as an Action Plan for COVID-19.   The BOP continues to revise and update its action plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC) and the Office of Personnel Management (OPM).

Background on Phases 1 – 4:

Phase 4:  On March 26, 2020, the BOP implemented revised preventative measures for all institutions.  The agency updated its quarantine

and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check.  This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival.  Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

These are the latest measures that follow the first three phases of the Bureau's action plan, which may be found here: www.bop.gov/resources/news/pdfs/20200324 bop press release covid 19 update.pdf

The Bureau will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/

### ###

# Exhibit 46

| | |
|---|---|
| **Subject:** | In-person visit follow-up |
| **Date:** | Wednesday, April 8, 2020 at 10:46:16 AM Central Daylight Time |
| **From:** | Michelle Law |
| **To:** | rewlaw_outlook.com |
| **Attachments:** | image001.png |

Checked with Laine and Larry about Kathleen visiting Wes – the answer was a resounding no, as I thought it would be. I think we should tell Wes that we are re-evaluating as we go, and we will schedule a visit as soon as the experts tell us it is safe for everyone.



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

# Exhibit 47

| From: | Andrew Sutton |
|-------|---------------|
| To: | Michelle Law |
| Subject: | Purkey Visits Canceled May 8th and 15th |
| Date: | Wednesday, April 15, 2020 5:39:32 AM |

Ms. Law,

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to further postpone all visits. Specifically, visits will be suspended until at least May 18th, 2020, at which time the suspension will be reevaluated.

Thank you in advance for your understanding in this matter.


A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information.  If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."

# Exhibit 48

| From: | Andrew Sutton |
|---|---|
| To: | Michelle Law |
| Subject: | Purkey Legal Visits 5/20, 5/29, 6/17 |
| Date: | Thursday, May 14, 2020 9:53:00 AM |

Good Morning,

Due to ongoing concerns pertaining to the Wuhan Virus outbreak, FCC Terre Haute staff have just been advised to further postpone all visits.  Specifically, the Special Confinement Unit Team has just advised that there will not be a resumption of visitation on May 18th, 2020. There is no date set that visiting will begin to resume. Therefore, all visits scheduled for the rest of May and continuing through June are hereby postponed until further notice.

Thank you in advance for your understanding in this matter.

A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

Reference below:

4/15/2020 6:39 AM >>>

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to further postpone all visits. Specifically, visits will be suspended until at least May 18th, 2020, at which time the suspension will be reevaluated.

Thank you in advance for your understanding in this matter.

~ 3/13/2020 3:33 PM >>>

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to postpone all legal visits. Specifically, legal visits will be suspended for 30 days, at which time the suspension will be reevaluated. Case-by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel. If you would like to visit your client in the Special Confinement Unit (SCU) you are strongly encouraged to contact a member of the SCU Unit Team via past practice as soon as possible. All requests will be reviewed in the order received and as timely as possible. If approved, all legal representatives will be screened prior to being admitted inside the facility.

Thank you in advance for your understanding in this matter.

# Exhibit 49

# Exhibit 50

Case 2:20-cv-01365-JPS-TOL-PSC Document 6-23-6 Filed 07/16/2020 Page 363 of 379 PageID #: 560

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Tuesday, June 16, 2020 at 12:58:02 PM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld, Michelle Law

Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey. I will be available tomorrow to discuss legal and social visits going forward. Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 51

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Tuesday, June 16, 2020 at 12:59:45 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Michelle Law, Rebecca Woodman

Hi Rebecca,
We do not have anything written yet but I am working on it.  Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

From: Katherine Siereveld <ksiereveld@bop.gov>
Date: Monday, June 15, 2020 at 4:48 PM
To: Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
Subject: Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey.  I will be available tomorrow to discuss legal and social visits going forward.  Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 52

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Tuesday, June 16, 2020 at 2:43:32 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Michelle Law, Rebecca Woodman

**CC:** Andrew Sutton

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19.  I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish. The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID.  Please note that vending will not be available.  Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>
Yes, you can call me at the number below.

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it.  Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey.  I will be available tomorrow to discuss legal and social visits going forward.  Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 53

Case 2:20-cv-10365-JRS-DLPSC Document 6-23-6 Filed 07/16/2/20 Page 371 of 379 PageID #: 567

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Friday, June 19, 2020 at 10:04:23 AM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**CC:** Michelle Law, McAleer, Chas, Fleming, Brian, Casey, Brian (USAMOW)

Dear Katherine:

I wanted to follow up on our telephone conversation and emails of Tuesday, June 16, 2020. Specifically, you indicated both in your emails and on the phone that written policies to ensure full access to our client, Wes Purkey, who is scheduled to be executed on July 15, 2020, for legal, social, and spiritual visitation while also protecting the safety of our team members, Mr. Purkey, and staff from COVID-19, were being developed and would be issued forthwith. In our telephone conversation on Tuesday, you stated that I would have those written policies within the next hour or two. In an email later in the day on Tuesday, you stated that I would have the written policies the following day. However, I have yet to receive any written policy.

The safety measures that you mentioned in our telephone conversation on Tuesday – temperature checks, questions about symptoms, a mask (either one's own or provided by the facility), and a preference for non-contact visits – are the same measures that were instituted at USP Terre Haute back in March 2020 when the impact of the COVID-19 pandemic was beginning to be felt in the United States. These measures were also instituted just before we were first notified on March 13, 2020 that all of our visits were cancelled until further notice and the prison went into full lockdown, and thus are obviously insufficient to ensure our safety and protection from COVID-19. The homepage of USP Terre Haute's website still prominently displays a banner stating that "All visiting at this facility has been suspended until further notice." BOP reports there has been one death from COVID-19 and five positive tests at USP Terre Haute, but I am aware of no regular testing regime of either prisoners or staff at the facility, and the known COVID-19 transmission rates in closed spaces like a prison is extreme.

Under the circumstances, we are concerned about the ability of USP Terre Haute to accommodate full access to our client while protecting the safety of ourselves, Mr. Purkey, and staff during the time up to and including the execution itself. In-person access to Mr. Purkey by ourselves and our experts is an essential part of our ability to effectively represent him, and is critical as he is facing an execution date in less than one month. We have been unable to conduct any in-person visitation with Mr. Purkey since March. At the same time, we have team members who are high risk because they are medically vulnerable to COVID-19 or who care for persons who are vulnerable to the virus.

Please provide by close of business today the written policies of measures to protect our safety and the safety of Mr. Purkey, while ensuring full in-person access to our client for legal, social, and spiritual visitation in the next now less than four weeks, up to and including the execution itself, as we need to schedule expert and legal visits immediately.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 2:43 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Andrew Sutton <asutton@bop.gov>
**Subject:** Re: Execution notice for Wesley Purkey

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19.  I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish.  The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID.  Please note that vending will not be available.  Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>
Yes, you can call me at the number below.

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it.  Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey.  I will be available tomorrow to discuss legal and social visits going forward.  Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 54

**Saturday, June 20, 2020 at 12:00:37 Central Daylight Time**

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Saturday, June 20, 2020 at 11:55:22 AM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**CC:** Michelle Law, McAleer, Chas, Fleming, Brian, Casey, Brian (USAMOW)

Dear Katherine:

Thank you for your email regarding the issue of access to and visits with Mr. Purkey. We have several initial reactions.

First and foremost, we believe the decision to schedule Mr. Purkey's execution in the middle of a global pandemic, at a time when many states are experiencing severe outbreaks of the COVID-19 virus and prisons in particular are veritable breeding grounds for the COVID-19 virus, is really outrageous and unreasonable. The decision seems designed to deny Mr. Purkey the basic rights to which he is entitled under the circumstances. The fact that the decision to do so was made notwithstanding the pendency of litigation over Mr. Purkey's constitutional rights is particularly disturbing.

Second, the relatively short notice given for his execution, i.e., 30 days, is patently unreasonable given all of the visitations, examinations and tests that would need to be completed for purposes of the pending litigation and/or in advance of an execution even were there no pandemic. The logistical and scheduling complications caused by the coronavirus pandemic make the decision to proceed with the execution on this accelerated timeline unconscionable.

Third, making the decision to execute Mr. Purkey and providing such short notice before the Bureau of Prisons had developed a comprehensive, written plan, policy or procedure to ensure timely and safe visits during the pandemic and thus protect inmates, staff and visitors alike is utterly reckless. Semantics aside, you repeatedly promised this week to provide us a "writing" that would set forth in detail the precise safety protocol to protect counsel, our experts, spiritual advisors, family members, and any other person for whom access to Mr. Purkey will be crucial in the next few weeks leading up to and including the execution. You still have not done so. Sequential comments in emails (such as your reference today to the possible installation of a sheet or sheets of plexiglass in one room of the prison 10 days into the 30-day execution notice period) does not come close to meeting the Bureau's legal, ethical and moral obligations to provide for the safety of inmates, staff and visitors, assuming any safety procedures would be sufficient to do so during this pandemic. Moreover, your email comments do not even begin to address all logistical and physical aspects implicated by a visitation to an inmate. Indeed the absence of such a plan, policy or procedure also would seem to render impossible attendance at the execution of all required persons**.**

Fourth, your repeated encouragement this week that we can and should schedule visits seems more like a disingenuous suggestion that visitations are possible, safe and feasible at this time, particularly since your own website adamantly states that "All visiting at this facility has been suspended until further notice." The last time you made us such assurances, your staff informed us otherwise, cancelling and/or refusing to schedule visits. Are all inmates capable of receiving visitations at this time, or is the decision to allow visits to Mr. Purkey simply a special "accommodation" to him individually to facilitate your desire to execute him on July 15?

Fifth, your statements regarding the availability of visits to Mr. Purkey is further meaningless given the Bureau's continued failure and refusal to provide us the records and information we have been requesting for months (through FOIA and otherwise) – records that would need to be received and reviewed in advance of

**Page 1 of 5**

visits with and examinations of Mr. Purkey if those visits and examinations are to be meaningful and sufficient in any respect. By continuing to withhold the requested information from us, you are deliberately ensuring that any visits with and examinations of Mr. Purkey will be impaired and inadequate.

Given the foregoing, your statements regarding the availability of visits with Mr. Purkey are simply not genuine, in good faith, reasonable, practicable, feasible or safe. But even were it otherwise, we cannot begin to make evaluations about whether counsel and experts can safely visit Mr. Purkey without substantial additional information wholly apart from the safety plan, policy or protocol. For example, we would immediately need information about the scope of the outbreak at the Terre Haute facility, including information about all testing conducted at Terre Haute within the last 30 days, including the number of individuals who requested tests, the numbers tested, and the results of those tests. In addition, we need information about where the visitations will occur, the size of the plexiglass, the ventilation in that room, and any other protections the prison plans to offer. These are just two examples of much more information we would need to make informed decisions about whether counsel and experts can safely visit Mr. Purkey, such as the availability of personal protective equipment (beyond a mask) to staff, Mr. Purkey, and visitors from our team; safety precautions taken within the pathways of travel to legal visits with Mr. Purkey generally and on the day of execution; sanitation and cleaning protocols between visits and between visitors; steps taken to ensure adequate ventilation within the prison; and much more.

Given the urgency of this matter and Mr. Purkey's upcoming execution, we request that you respond to this email (including with the information requested above) before Monday, June 22, 2020, at noon.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Friday, June 19, 2020 at 10:04 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>, "McAleer, Chas" <CMcAleer@milchev.com>, "Fleming, Brian" <bfleming@milchev.com>, "Casey, Brian (USAMOW)" <Brian.Casey@usdoj.gov>
**Subject:** Re: Execution notice for Wesley Purkey

Dear Katherine:

I wanted to follow up on our telephone conversation and emails of Tuesday, June 16, 2020. Specifically, you indicated both in your emails and on the phone that written policies to ensure full access to our client, Wes Purkey, who is scheduled to be executed on July 15, 2020, for legal, social, and spiritual visitation while also protecting the safety of our team members, Mr. Purkey, and staff from COVID-19, were being developed and would be issued forthwith. In our telephone conversation on Tuesday, you stated that I would have those written policies within the next hour or two. In an email later in the day on Tuesday, you stated that I would have the written policies the following day. However, I have yet to receive any written policy.

The safety measures that you mentioned in our telephone conversation on Tuesday – temperature checks,

**Page 2 of 5**

questions about symptoms, a mask (either one's own or provided by the facility), and a preference for non-contact visits – are the same measures that were instituted at USP Terre Haute back in March 2020 when the impact of the COVID-19 pandemic was beginning to be felt in the United States. These measures were also instituted just before we were first notified on March 13, 2020 that all of our visits were cancelled until further notice and the prison went into full lockdown, and thus are obviously insufficient to ensure our safety and protection from COVID-19. The homepage of USP Terre Haute's website still prominently displays a banner stating that "All visiting at this facility has been suspended until further notice." BOP reports there has been one death from COVID-19 and five positive tests at USP Terre Haute, but I am aware of no regular testing regime of either prisoners or staff at the facility, and the known COVID-19 transmission rates in closed spaces like a prison is extreme.

Under the circumstances, we are concerned about the ability of USP Terre Haute to accommodate full access to our client while protecting the safety of ourselves, Mr. Purkey, and staff during the time up to and including the execution itself. In-person access to Mr. Purkey by ourselves and our experts is an essential part of our ability to effectively represent him, and is critical as he is facing an execution date in less than one month. We have been unable to conduct any in-person visitation with Mr. Purkey since March. At the same time, we have team members who are high risk because they are medically vulnerable to COVID-19 or who care for persons who are vulnerable to the virus.

Please provide by close of business today the written policies of measures to protect our safety and the safety of Mr. Purkey, while ensuring full in-person access to our client for legal, social, and spiritual visitation in the next now less than four weeks, up to and including the execution itself, as we need to schedule expert and legal visits immediately.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 2:43 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Andrew Sutton <asutton@bop.gov>
**Subject:** Re: Execution notice for Wesley Purkey

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19. I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish. The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID. Please note that vending will not be available. Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>
Yes, you can call me at the number below.

Rebecca E. Woodman

**Page 3 of 5**

Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it. Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey. I will be available tomorrow to discuss legal and social visits going forward. Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476