# Exhibit H

Reply in Support of Plaintiff's Motion for Expedited Discovery & Supporting Documents, Purkey DC Ford Matter (D.D.C. July 2, 2020), ECF Nos. 30, 30-1, 30-2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03570-TSC |
| | ) | |
| WILLIAM P. BARR, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPLY IN SUPPORT OF PLAINTIFF'S
## MOTION FOR EXPEDITED DISCOVERY

Plaintiff Wesley Ira Purkey ("Plaintiff" or "Mr. Purkey") has demonstrated both that he is entitled to procedural due process protections to adjudicate his competency to be executed, including a fair hearing and access to highly relevant evidence, and that he is entitled to discovery in this matter on an expedited basis. *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Ford v. Wainwright*, 477 U.S. 399, 426 (1986); *Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015). Defendants have known for over ten months the specific and relevant information Mr. Purkey seeks, including current medical records, but, rather than producing that information, Defendants have engaged in a protracted game of "Simon Says," demanding Mr. Purkey jump through a variety of procedural hoops but never intending to actually produce the information. Defendants' arguments in response to Plaintiff's Motion for Expedited Discovery, filed on June 23, 2020 (ECF No. 24) (the "Motion for Expedited Discovery"), are just another example of their continuing obstruction of Mr. Purkey's attempts to obtain relevant information in further support of his claims in this case.

In their Opposition to Plaintiffs' Motion for Expedited Discovery, filed on June 29, 2020 (ECF No. 27) (the "Opposition"), Defendants mischaracterize Plaintiff's numerous prior attempts to obtain relevant records, ignore the substantial showing Mr. Purkey has already made regarding his incompetency, and make baseless claims regarding burden and cost of production, even while purporting to rely on the very material relevant to Mr. Purkey's *Ford* claim that he has been repeatedly requesting and has been denied to him. None of Defendants' arguments overcome or refute Mr. Purkey's entitlement to the expedited discovery requested.

## ARGUMENT

### I.     DEFENDANTS MISCHARACTERIZE MR. PURKEY'S NUMEROUS PRIOR ATTEMPTS TO OBTAIN RELEVANT DISCOVERY

Defendants attack Mr. Purkey's Motion for Expedited Discovery by criticizing his prior attempts to obtain the requested information. Their argument is essentially that, although Mr. Purkey has admittedly sought this information before, he did not ask for it the right way, with ever shifting goalposts. Even if there was any merit to such an argument, the reality paints a very different picture. Mr. Purkey repeatedly and diligently requested the information through multiple avenues and was met with roadblocks, misinformation, and misdirection every step of the way.

*First*, Defendants' recitation of the history of Mr. Purkey's attempts to obtain the information he now seeks through expedited discovery is disingenuous at best. Mr. Purkey submitted requests for his medical and psychological records, as well as other relevant records, directly to the Federal Bureau of Prisons' ("BOP") counsel and, pursuant to BOP counsel's suggestion, through the Freedom of Information Act ("FOIA"). *See generally* R. Woodman Decl. in Supp. of Pl.'s Renewed Mot. for a Prelim. Inj. Barring Execution of Wesley Purkey Pending Final Disposition on the Merits, filed on June 22, 2020 ("R. Woodman Decl."), ECF No. 23-6.

2

Methods by which Mr. Purkey conveyed his requests were undertaken per the guidance of BOP counsel, and Mr. Purkey's counsel diligently pursued outstanding requests. *Id.* ¶¶ 8–13, 25–32. Submitted with this memorandum is a summary table containing a non-exhaustive list of Mr. Purkey's attempts to obtain relevant materials, the responses received, and the results of these attempts—or lack thereof—with cites to the materials submitted in support of the Motion for Expedited Discovery and Plaintiff's Renewed Motion for Preliminary Injunction Barring Execution of Wesley Purkey Pending Final Disposition on the Merits, filed on June 22, 2020 (ECF No. 23) (the "Renewed Motion for Preliminary Injunction"). Appendix A (Chronology of Pl.'s Reqs. to BOP and Defense Counsel For Information, Records, Testing, and Imaging Relating to Claims and Issues In the Case (Aug. 29, 2019 to Present)). To date, *none* of the records requested in the Motion for Expedited Discovery have been produced to Mr. Purkey's counsel.

*Second*, Defendants' criticism of the steps Mr. Purkey took under FOIA is nonsensical. Mr. Purkey pursued production through FOIA upon discussion with BOP counsel and after first submitting certain requests directly to the BOP. R. Woodman Decl. ¶¶ 10–12, Exs. 1–9, ECF No. 23-6. BOP counsel has long been aware of and in possession of Mr. Purkey's FOIA requests. *Id.* ¶¶ 12–13, 26–27, 32, Exs. 10–13, 28–35, 39, ECF No. 23-6. When Mr. Purkey's execution was just two months away, counsel for Mr. Purkey was told the FOIA requests would be processed on an "expedited" basis that would take up to six months. *Id.* ¶ 13, Ex. 10. When Mr. Purkey's counsel sought BOP counsel's assistance due to the unacceptable time frame for "expedited" processing, BOP counsel claimed it could not "circumvent" the FOIA process. *Id.* ¶ 13, Ex. 12. At no point did the BOP assert any objections to the pending requests or issue any formal, substantive response regarding the requests. *Id.* ¶¶ 12–13, 26. After the BOP failed to meet its

3

legal obligation to provide Mr. Purkey with his own records, the BOP now argues that Mr. Purkey could have obtained access to the requested material by filing a FOIA lawsuit. The Government may not unlawfully ignore records requests for months, only for Defendants to argue against expedited discovery in this action because, if Mr. Purkey truly wanted the documents, he would have filed another, separate lawsuit to compel production. This argument further illustrates Defendants' dilatory tactics and violation of Mr. Purkey's due process rights.

*Third*, the concept that Mr. Purkey should have but failed to seek litigation discovery at an earlier date is belied by the facts and Defendants' own arguments. As Defendants are aware, Mr. Purkey sought a court order for relevant medical testing prior to initiating this action, but that order was denied because he did not then have a pending *Ford* claim. Order Denying Pet. for a Writ of Habeas Corpus, *Purkey v. United States*, No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019), ECF No. 76 (Ex Parte); *see* R Woodman Decl. ¶ 18, ECF No. 23-6. He also sought expedited discovery in connection with his prior preliminary injunction motion in this matter, which was withdrawn only because Mr. Purkey's then scheduled execution was enjoined through a separate action and there was no pending execution warrant. In the months afterward, the parties submitted jurisdictional and dismissal briefing in this matter. Defendants took the positions that a *Ford* claim was not ripe because Mr. Purkey no longer had a scheduled execution date and sought to dismiss the case on that basis. Opp'n 2–3, ECF No. 27. They further asserted that Mr. Purkey was not entitled to discovery on his claim. Reply in Supp. of Defs.' Mot. to Dismiss Or, in the Alternative, to Transfer 9, filed on Mar. 30, 2020, ECF No. 21. When a new execution warrant was issued, Mr. Purkey promptly filed his Motion for Expedited Discovery. Even now that Mr. Purkey has a scheduled execution date that is mere days away, Defendants complain that it is too early to engage in discovery because they have a pending motion to

dismiss. Opp'n 9, ECF No. 27. It is illogical to argue that Mr. Purkey is not entitled to expedited discovery now because he should have sought discovery even earlier, when Defendants would have opposed any such request and have continuously blocked reasonable attempts to obtain relevant records. Moreover, throughout this time, there were multiple outstanding FOIA requests to the BOP allegedly being processed on an expedited basis. R. Woodman Decl. ¶¶ 13, 26, ECF No. 23-6. Mr. Purkey was not required to assume that the BOP's statement that the requests were being processed expeditiously was untrue. The current motion is timely.

*Fourth*, the unspecified "other channels" that Defendants claim Mr. Purkey should have pursued to obtain the requested information, Opposition 3 (ECF No. 27), merely underscore that Defendants' strategy is to continue to move the goalpost so as to avoid production until Mr. Purkey quite literally runs out of time. On September 19, 2019, BOP counsel suggested that Mr. Purkey file a FOIA request, subpoena, or discovery request to obtain certain records, including video footage. R. Woodman Decl. ¶ 11, Ex. 4, ECF No. 23-6. But, as discussed above, any discovery motion submitted prior to Mr. Purkey's rescheduled execution date would have been opposed on the basis that it was not ripe. While Mr. Purkey did seek the materials through FOIA, he never received them.

Then, on June 26, 2020, after Mr. Purkey's Preliminary Injunction Motion and Motion for Expedited Discovery were filed, BOP counsel emailed Mr. Purkey's counsel and claimed to have *no knowledge of pending document requests*, despite being repeatedly apprised of the pending FOIA requests. R. Woodman Suppl. Declaration in Supp. of Pl.'s Mot. for Expedited Discovery ("R. Woodman Suppl. Decl.") ¶¶ 3, 9, Exs. 1 and 4; Decl. R. Woodman Decl. ¶¶ 12–13, 26–27, 32, Exs. 10–13, 28–35, 39, ECF No. 23-6. Further, for the first time, BOP counsel informed Mr. Purkey's counsel that the "quickest way" to obtain the requested medical records

5

would be to ask Mr. Purkey to ask the prison staff to make a copy of his records to give to Mr. Purkey to then send to counsel. R. Woodman Suppl. Decl. ¶ 9, Ex. 4. Setting aside the logistical challenges of asking a prisoner suffering from dementia to request, obtain, and then find a way to deliver the records from prison to counsel during a pandemic, and setting aside the fact that there is no reason these records should not be provided directly from prison staff to counsel, this instruction was contrary to BOP counsel's prior correspondence and appeared designed to further frustrate Mr. Purkey's efforts.

*Fifth*, in support of their opposition to the medical testing and imaging requested by Mr. Purkey's medical experts, Defendants submit a declaration containing a hearsay professional medical opinion on behalf of an anonymous doctor who allegedly formed his or her opinion on the basis of a review of records that are being wrongly withheld from Mr. Purkey. T. Watson Decl. in Supp. of Defs.' Opp'n to Pl.'s Mot. for Expedited Discovery, filed on June 29, 2020, ECF No. 27-2. T.J. Watson, the Complex Warden at the Terre Haute facility, does not purport to possess any medical expertise. Yet his declaration states that an unnamed "treating physician" of Mr. Purkey "has reviewed Purkey's records and does not believe the tests [] are medically necessary or clinically indicated." *Id.* ¶ 5.[1] Ironically, this hearsay medical opinion relies on medical records Defendants refuse to produce. The submission of the declaration is accordingly a tacit admission that those withheld records are relevant to the issues pending before this Court, including in assessing the credibility, accuracy, basis, and weight of any proffered medical opinions. The hearsay medical opinion is also contradicted by the record. Mr. Purkey has offered declarations from three physicians explaining in detail why and how the records and medical

---

[1] Because this hearsay declaration has no evidentiary value and was improperly submitted by an individual with no ability to swear to the validity of the medical opinion purportedly provided therein, Mr. Purkey is separately moving to strike the declaration. *See* Plaintiff's Motion to Strike Declaration of T.J. Watson, ECF No. 27-2, filed July 2, 2020.

testing and imaging requested are relevant and necessary to the issues pending in this case. The conclusory hearsay statement in a layperson's declaration, based on unspecified records not before this Court, is irrelevant to determining whether expedited medical testing is appropriate, as is the fact that Mr. Purkey was previously denied an order for medical testing by the Southern District of Indiana when the request was not brought with a *Ford* claim, as it is here. Order Denying Pet. for a Writ of Habeas Corpus, *Purkey v. United States*, No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019), ECF No. 76 (Ex Parte); *see* R. Woodman Decl. ¶ 18, ECF No. 23-6.

Defendants' portrayal of the procedural and factual posture of this case is contradicted by the evidence and fails to refute Mr. Purkey's entitlement to the expedited discovery he seeks.

## II.  DEFENDANTS' ADDITIONAL ARGUMENTS AGAINST EXPEDITED DISCOVERY ARE MERITLESS

The additional arguments Defendants advance against Mr. Purkey's Motion for Expedited Discovery are equally unpersuasive, and Mr. Purkey's Motion for Expedited Discovery should be granted.

### A.  Mr. Purkey Has Already Met the *Ford* Threshold Showing of Incompetency, but Even if He Has Not, He Is Entitled to Expedited Discovery

Mr. Purkey has made a substantial threshold showing of incompetency entitling him to due process under *Ford* and *Panetti*, and even if he has not yet met that showing, this is not a basis for Defendants to obstruct expedited discovery of documents that have long been sought. Mr. Purkey has already submitted copious evidence demonstrating his entitlement to due process on his incompetency claim, including an evidentiary hearing to determine his competency to be executed. As described in more detail in the papers submitted in support of the Renewed Motion for Preliminary Injunction, ECF No. 23, Mr. Purkey has more than met the threshold showing of incompetency required under *Ford* through the submission of multiple declarations from

7

physicians and legal counsel and numerous documents, including medical records, detailing his history of progressive dementia, schizophrenia, complex-Post Traumatic Stress Disorder (PTSD), and severe mental illness.

Further, even if Mr. Purkey has not yet made a substantial threshold showing under *Ford*, that would not be a basis to deny this motion. Mr. Purkey has demonstrated, at minimum, some evidence of incompetency. Defendants are actively obstructing his ability to present further evidence prior to his execution. It would be inherently unjust for Defendants to be permitted to block Mr. Purkey's access to highly relevant evidence that is in their sole possession, custody, and control all while arguing that Mr. Purkey has not presented sufficient evidence to meet the *Ford* threshold showing. Defendants do not even deny the relevancy of Mr. Purkey's medical and psychological records to his incompetency claim. Opp'n 7, ECF No. 27 ("Purkey's request for medical and psychological records may bear on th[e] question" of his *Ford* claim). Indeed, in their Opposition papers, Defendants rely on the very medical records they refuse to provide to Mr. Purkey. T. Watson Decl. ¶ 5, ECF No. 27-2. In light of Defendants' actions, requiring Mr. Purkey to first make a threshold incompetency showing under *Ford* in order to obtain the requested expedited discovery—a requirement that would be over and above the showing necessary under the "good cause" test for granting expedited discovery—would place an improper burden on Plaintiff. *Attkisson*, 113 F. Supp. 3d at 162.

**B.     Mr. Purkey Is Entitled to Expedited Discovery under the "Good Cause" Test**

Mr. Purkey satisfies each factor of the "good cause" test frequently used in this District, and relied on by Defendants, for determining whether expedited discovery is appropriate. *Attkisson*, 113 F. Supp. 3d at 162 (under the "reasonableness" or "good cause" standard, courts consider "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants

to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.").

*First*, as Defendants acknowledge, Mr. Purkey has a pending preliminary injunction motion (ECF No. 23). The fact that a preliminary injunction motion and motion for expedited discovery were previously filed and withdrawn in this matter because Mr. Purkey's then-scheduled execution date was enjoined through another action is irrelevant to the issue now before the Court. Defendants acknowledge that, following the injunction of that execution date, they took the position "that this Court's injunction in another case mooted [Mr. Purkey's] *Ford* claim." Opp'n 6, ECF No. 27. In the interim, Mr. Purkey was promised, but never received, expedited processing of his FOIA requests. Upon the issuance of a new execution warrant on June 15, 2020, Mr. Purkey promptly filed his Motion for Expedited Discovery and Renewed Motion for Preliminary Injunction. Defendants articulate no reason why "the Court should not give great weight to the first factor" of the "good cause" test. Opp'n 7, ECF No. 27.

*Second*, Mr. Purkey's expedited discovery requests are narrowly tailored and appropriate in scope. The medical and psychological records Mr. Purkey seeks cover a discrete period of time (Jan. 1, 2017 through the present), not his entire medical history. And Defendants concede the records' relevancy to his *Ford* claim. *Id.*; *see also* T. Watson Decl. ¶ 5, ECF No. 27-2. The video footage sought by Mr. Purkey is also temporally and spatially limited (July 25, 2019 through the present). Although Defendants argue that such video footage would take months to review and imply that it may not even be available, Opposition 8 (ECF No. 27), they have had many months to collect and review it, and BOP counsel previously indicated that it would work to separate and preserve such video at least for certain periods from July 25, 2019 through

9

September 2019, the dates relevant to then outstanding requests for footage.[2] R Woodman Decl. ¶ 11, Exs. 4–5, ECF No. 23-6. Defendants' purported concern that production of the footage would result in disclosure of "law enforcement sensitive information" is similarly unsupported and unfounded, given Mr. Purkey is only requesting the footage of his cell. Opp'n 9, ECF No. 27.

The medical testing and imaging requested by Mr. Purkey's medical experts is similarly limited and is specifically identified in Plaintiff's requests. Defendants cite no authority for their argument that such testing is irrelevant to Mr. Purkey's competency to be executed.[3] Mr. Purkey's counsel have been diligently working to secure appointments for the testing and have confirmed that, once the BOP complies with basic requirements to maximize safety and protection from COVID-19, the tests could be performed in the near-term over the course of just a few days at a hospital not far from USP Terre Haute, contrary to Defendants' argument that such testing "will serve only to require lengthy delays for off-site procedures." R. Woodman Suppl. Decl. ¶¶ 10–11, Exs. 5–6; Opp'n 7, ECF No. 27. Defendants' "delay" argument is especially disingenuous given Mr. Purkey has been on death row for over 16 years, he has sought these tests for nearly a year, and any delay is the fault of Defendants, as it was not until after the filing of Mr. Purkey's recent motions that the BOP expressed an alleged willingness to assist in setting up such testing despite their purported rule that off-site testing requires a court order. R. Woodman Suppl. Decl. ¶ 6, Exs. 2–3.

---

[2] To the extent Defendants are now claiming that the requested video footage is unavailable, that is directly contrary to BOP counsel's prior statements regarding preservation, and, further, would be inconsistent with appropriate practices for preserving records clearly relevant to and sought in pending litigation.

[3] As discussed above, Warden Watson is in no way an authority on the issue of the necessity of medical testing, and his hearsay declaration is not evidence. T. Watson Decl. ¶ 5, ECF No. 27-2.

Mr. Purkey's requests for information relating to the COVID-19 pandemic, including information regarding the outbreak at USP Terre Haute—a facility specifically identified by the BOP as housing COVID-19 positive prisoners—and the facility's safety protocol and procedures, are also directly relevant to the claims and defenses in this action because they are a prerequisite to obtaining other discovery to which Purkey is entitled, such as access to medical testing. They are also directly relevant to the Renewed Motion for Preliminary Injunction itself. An inability to identify and produce written safety protocol and procedures in place during a pandemic or more specific information regarding testing for COVID-19 at USP Terre Haute is simply further proof that an injunction is needed so that Mr. Purkey's counsel and physicians can be assured of safe access to him to obtain additional evidence for his incompetency claim—and to provide counsel to him in advance of his scheduled execution.[4] *See* R. Woodman Suppl. Decl. ¶¶ 5–8, Exs. 2–4.

Defendants imply that the pursuit of expedited discovery relating to the merits of the claims, as opposed to discovery tailored to reveal information related to the Renewed Motion for Preliminary Injunction, is by nature not appropriately limited. Opp'n 7, ECF No. 27. But the expedited discovery that Mr. Purkey requests is both narrowly-tailored and relevant to the merits of his claims and his Renewed Motion for Preliminary Injunction. The evidence sought speaks to

---

[4] As of July 2, 2020, the BOP reported a total of eight positive cases and one COVID-19-related death among USP Terre Haute prisoners. Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited June 29, 2020). But, fewer than 19 percent of the prisoner population at USP Terre Haute has been tested for the virus. *See id.* (reporting COVID-19 tests administered to 240 of the 1,300 prisoners detained at the facility). The BOP has not published or disclosed any established criteria for determining whether a given prisoner at USP Terre Haute should be administered a test. Nor has BOP disclosed any information about testing of USP Terre Haute staff, whether any quarantine measures are in place for prisoners and staff who exhibit COVID-19 symptoms, or whether any precautionary measures are in place for isolating those with known exposure to COVID-19-positive individuals. All of this information is critical to understanding the full impact of COVID-19's spread within the facility's walls.

his competency to be executed and to the requested injunction of his scheduled execution, which is necessary to afford Mr. Purkey due process to prove his *Ford* claim and is itself based on Mr. Purkey's likelihood of success on the merits.[5] In the cases cited by Defendants, the expedited discovery requested was held to be overly broad because the requests sought information that had no clear nexus to the urgent purpose and need articulated by the movants. *See Attkisson*, 113 F. Supp. 3d at 163–64 (where plaintiff sought expedited discovery to identify Doe defendants, requests that were "not limited to the particular individuals plaintiffs intend[ed] to sue" and instead sought identification of "a broad range of individuals" with knowledge of relevant information were overbroad); *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97–98 (D.D.C. 2014) (in suit regarding alleged breaches of non-disparagement provision in a settlement agreement, motion for expedited discovery was not narrowly tailored to its stated purpose of supporting plaintiff's pending preliminary injunction motion, where plaintiff sought extensive discovery on issues such as damages, which in turn contradicted plaintiff's "irreparable harm" argument in the preliminary injunction motion). Here, Mr. Purkey's limited requests are directly related to providing him a fair evidentiary hearing on his competency to be executed and to the pending injunction motion, both of which must be urgently addressed due to the timeline of Mr. Purkey's newly scheduled execution date and given that a *Ford* claim is not ripe until a time is set to execute the sentence. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644–45 (1998)).

    *Third*, Mr. Purkey will be irreparably harmed if he is not granted the expedited discovery requested. Death is the ultimate irreparable injury, and that is what will result if he is not

---

[5] Mr. Purkey has also requested that, in the alternative that the Court is not now inclined to grant an injunction through disposition of the merits of this case, he be granted expedited discovery while his Renewed Motion for Preliminary Injunction is pending so that he may supplement that motion.

afforded due process to obtain relevant evidence and prove his *Ford* claim. Defendants concede "that any harm Purkey would suffer if this Court denies his motion would be irreparable." Opp'n 8, ECF No. 27. Unbelievably, however, they argue that this third factor "weighs in" their favor, because Mr. Purkey's complaint should be dismissed in any event. *Id.* Given that the third factor of the "good cause" test is whether the plaintiff will be irreparably harmed without the expedited discovery and not whether the case may eventually be dismissed, the Court need not even entertain Defendants' argument. *Attkisson,* 113 F. Supp. 3d at 164.

*Fourth*, the burden on Defendants to comply with the expedited discovery requests is minimal. As addressed herein, the records requests are temporally limited and specific. Defendants previously represented that they would work to separate and preserve much of the relevant video footage, and they clearly have easy access to Mr. Purkey's updated medical and psychological records, since they submitted a hearsay declaration stating that a prison physician recently reviewed and relied on those same records. R. Woodman Decl. ¶ 11, Exs. 4–5, ECF No. 23-6; T. Watson Decl., ECF No. 27-2. The medical testing and imaging requested can be promptly scheduled and accomplished in a matter of days. R. Woodman Supp. Decl. ¶¶ 10–11, Exs. 5–6. And, contrary to Defendants' claims, Mr. Purkey is not insisting that Defendants pay for his medical testing and imaging at this time. The Federal Public Defender will pay the costs for the tests and imaging and will preserve for a later determination whether the BOP has the responsibility to reimburse those costs. Finally, any COVID-19 policies, procedures, and statistics should presumably be of relatively recent vintage, carefully tracked, limited in scope, and therefore simple to obtain and produce. Indeed, on June 16, 2020, BOP counsel represented that she would be able to send Mr. Purkey's counsel the COVID-19 policies "in writing . . . by tomorrow." R. Woodman Decl. ¶ 38, Ex. 52, ECF No. 23-6. Any time pressure placed on

13

Defendants to produce these materials is due to their own delay and does not render the requests overburdensome.

*Fifth*, the timing of Mr. Purkey's expedited discovery request is appropriate. Defendants have had months to produce the requested evidence through various channels. This, plus the immediacy of the need for this narrowly-tailored discovery in order to avoid irreparable harm (an immediacy for which Defendants are responsible), far outweighs any of Defendants' alleged concerns regarding the fact that there is not yet a ruling on their motion to dismiss.[6] While Defendants argue that this Court has held that the pendency of a motion to dismiss is the "most important" factor of the "good cause" test, citing *Guttenberg*, the court in *Guttenberg* merely held that, in that particular case, the plaintiff sought broad discovery that was not tied to the alleged purpose of the expedited discovery motion and had failed to timely file the motion, and, given the motion was finally filed only three weeks after defendant's motion to dismiss was filed, it appeared to simply be an attempt "to fend off a renewed motion to dismiss." *Guttenberg*, 26 F. Supp. 3d at 99. None of these circumstances apply here. To the extent the discovery requested now is "well in advance of typical discovery," that is largely of Defendants' own making, given they scheduled Mr. Purkey's execution with just thirty days' notice. Opp'n 9, ECF No. 27. Mr. Purkey's requests are timely because he has a scheduled execution date, rendering his *Ford* claim ripe.

---

[6] Even if the Court were to credit Defendants' arguments in the motion to dismiss, the proper result would be to transfer this matter to the Southern District of Indiana, not dismiss the action entirely. *See* Renewed Prelim. Inj. Mot. Reply 18–20. Thus, partaking in "early" discovery prior to a determination on the motion to dismiss would not be a useless endeavor, nor would it be "unjust" to Defendants. *Cf. Guttenberg*, 26 F. Supp. 3d at 99.

Mr. Purkey satisfies every factor of the "good cause" test for expedited discovery, and Defendants fail to demonstrate that even one of these factors weighs in their favor.[7]

### C. This Court Has the Authority to Grant the Relief Requested

As stated in Mr. Purkey's Renewed Motion for Preliminary Injunction and papers filed in support of that motion, this Court has the authority to grant the relief requested and should so exercise that authority. *See* Reply Brief in Support of Renewed Motion for Preliminary Injunction 4–10, filed on July 2, 2020.

### CONCLUSION

For the foregoing reasons, Mr. Purkey respectfully requests that the Court grant his Motion for Expedited Discovery and provide him the requested discovery on the timeline included in the Proposed Order (ECF No. 24-2). Plaintiff further understands that Defendants have requested an opportunity to meet and confer and to obtain corresponding discovery should the Court grant Mr. Purkey's motion in whole or in part. Opp'n 10, ECF No. 27. Although Defendants have never engaged substantively with Mr. Purkey's counsel regarding his pending requests, either in the FOIA process or otherwise, Plaintiff has been and remains willing to engage in meet and confer discussions regarding any legitimate issues, in accordance with this Court's rules. However, the Court should not enable Defendants to misuse the meet and confer process to further frustrate or delay Plaintiff's efforts to obtain relevant evidence in this case. As

---

[7] For the reasons stated in Plaintiff's Memorandum in Support of the Motion for Expedited Discovery at 7–12, filed on June 23, 2020 (ECF No. 24-1), Mr. Purkey has also demonstrated that he is entitled to expedited discovery under the *Notaro* test. *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142–43 (D.D.C. 2005) (*Notaro* approach requires that the party seeking expedited discovery demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.") (quoting *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982).

for Defendants' alternative request for reciprocal discovery, Defendants have never asserted any requests for discovery and failed to specify any requests in their Opposition. Accordingly, the issue of whether Defendants may be entitled to expedited discovery at this time is not ripe and, in any event, would need to be the subject of a separate motion under the Court's practices and procedures, not embedded in an opposition.

DATED: July 2, 2020

Respectfully Submitted,

*/s/Charles F.B. McAleer, Jr.*
Charles F.B. McAleer, Jr. (DC Bar #388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

*/s/Brian Fleming*
Brian Fleming (DC Bar #974889)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

*/s/Rebecca E. Woodman*
Rebecca E. Woodman (*pro hac vice*)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022

Facsimile: (417) 873-9038
Email: michelle_law@fd.org

**_Counsel for Plaintiff_**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 2nd day of July, 2020, I caused Plaintiff's Reply in

Support of Plaintiff's Motion for Expedited Discovery to be filed electronically with the Clerk of

the Court via CM/ECF, with all authorized parties being served electronically via CM/ECF.

> */s/Charles F.B. McAleer, Jr.*
> Charles F.B. McAleer, Jr. (DC Bar
> #388681)
> Miller & Chevalier Chartered
> 900 16th Street NW
> Washington, D.C. 20006
> Telephone: (202) 626-5963
> Email: CMcAleer@milchev.com

**Appendix A to Plaintiff's Reply in Further Support of Motion for Expedited Discovery in *Wesley Ira Purkey v. William P. Barr, et al.*, 1:19-cv-03570-TSC (D.D.C.)**

**Chronology of Plaintiff's Requests to Bureau of Prisons and Defense Counsel For Information, Records, Testing, and Imaging Relating to Claims and Issues in the Case During the Period August 29, 2019–Present[1]**

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| Aug. 29, 2019 | Counsel for Mr. Purkey Michelle M. Law | **First Request** for Bureau of Prisons ("BOP") death watch protocol (R. Woodman Decl. ¶ 10, Ex. 3). | BOP Senior Attorney Katherine Siereveld | Aug. 29, 2019: "**I will have to do some further research** to see if we have anything that is releasable, but specific directives such as that are usually found in Post Orders which are Law Enforcement Sensitive and cannot be released." [2] (R. Woodman Decl. ¶ 10, Ex. 3). | **No** |
| Sept. 17, 2019 | Counsel for Mr. Purkey Michelle M. Law | **First Request** for preservation and weekly disclosure of A Range surveillance videos of Mr. Purkey's cell; offered storage device (R. Woodman Decl. ¶ 11, Ex. 4). | BOP Senior Attorney Katherine Siereveld | Sept. 19, 2019: "**We do not have a mechanism** with which to provide you ongoing footage. Additionally, the preservation alone is quite voluminous, **but can be accomplished if necessary.** Are there specific time frames or days even that you are looking for? **At that point we could preserve what you need and then evaluate our ability to provide it through a properly filed FOIA request, discovery request, or subpoena.**" (R. Woodman Decl. ¶ 11, Ex. 4). | **No** |
| Sept. 24, 2019 | Counsel for Mr. Purkey Michelle M. Law | **Second Request** for disclosure of A Range surveillance videos of Mr. Purkey's cell; offered storage device again (R. Woodman Decl. ¶ 11, Ex. 5). | BOP Senior Attorney Katherine Siereveld | Sept. 24, 2019: "I forwarded this on to the appropriate office to see how far back they can go preserving the evening watch." (R. Woodman Decl. ¶ 11, Ex. 5). | **No** |
| Sept. 26, 2019 – Oct. 4, 2019 | Counsel for Mr. Purkey Michelle M. Law | **First Request** for medically ordered brain imaging (ordered by Dr. Bhushan Agharkar) and inquired about testing logistics; offered to pay cost of testing. (R. Woodman Decl. ¶ 15, Exs. 16, 17). | BOP Senior Attorney Katherine Siereveld | Without citing any policy or other authority, Ms. Siereveld imposed three conditions for the testing: (1) it had to be done on-site with BOP contractors; (2) a court had to enter an order for the testing; and (3) Mr. Purkey's defense counsel had to pay for the testing. (R. Woodman Decl. ¶ 15). | **No** |

---

[1] This chart is based on evidence previously submitted in support of Plaintiff's Renewed Motion for Preliminary Injunction ("Renewed Motion") dated June 22, 2020, evidence of additional relevant communications with the Bureau of Prisons or Defense Counsel that occurred after the filing of the Renewed Motion that are the subject of and are attached to the Supplemental Declaration of Rebecca Woodman dated July 2, 2020, submitted with Plaintiff's Reply in Support of the Motion for Expedited Discovery, and evidence submitted through the Declaration of Katherine Siereveld dated June 29, 2020 submitted with Defendants' Opposition to Plaintiff's Motion for Expedited Discovery.

[2] All instances of emphasis in the quotations contained in this chart have been added.

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| Oct. 9, 2019 | Counsel for Mr. Purkey Rebecca E. Woodman | **Third Request** for A Range surveillance videos of Mr. Purkey's cell; requested expedited processing (R. Woodman Decl. ¶ 12, Exs. 6–8). | FOIA Section, BOP Office of General Counsel | Oct. 10, 2019: "This acknowledges our receipt of your Freedom of Information Act (FOIA) request. . . . Your request meets the requirement to be processed on an expedited basis and **will be expedited** to the best of our ability. . . . Processing this request **may take up to six months**." (R. Woodman Decl. ¶ 13, Ex. 10). | **No** |
| Oct. 9, 2019 | Counsel for Mr. Purkey, Rebecca Woodman | **Second Request** for BOP death watch protocol; requested expedited processing (R. Woodman Decl. ¶ 12, Exs. 6–8). | FOIA Section, BOP Office of General Counsel | Oct. 10, 2019: "This acknowledges our receipt of your Freedom of Information Act (FOIA) request. . . . Your request meets the requirement to be processed on an expedited basis and **will be expedited** to the best of our ability. . . . Processing this request **may take up to six months**." (R. Woodman Decl. ¶ 13, Ex. 10). | **No** |
| Oct. 9, 2019 | Counsel for Mr. Purkey, Rebecca Woodman | **First Request** for Mr. Purkey's updated BOP medical and mental health records; requested expedited processing (R. Woodman Decl. ¶ 12, Exs. 6–8). | FOIA Section, BOP Office of General Counsel | Oct. 10, 2019: "This acknowledges our receipt of your Freedom of Information Act (FOIA) request. . . . Your request meets the requirement to be processed on an expedited basis and **will be expedited** to the best of our ability. . . . Processing this request **may take up to six months**."  (R. Woodman Decl. ¶ 13, Ex. 10). | **No** |
| Oct. 11, 2019 | Counsel for Mr. Purkey Rebecca E. Woodman | Request for timeline on disclosure of material requested through FOIA (R. Woodman Decl. ¶ 13, Ex. 12). | BOP Senior Attorney Katherine Siereveld | Oct. 16, 2019: "I understand your time constraints, but **I do not have the authority to circumvent the FOIA process. I will follow up with our FOIA folks and see if there is a more expedited time frame**." (R. Woodman Decl. ¶ 13, Ex. 12). | **No** |
| Oct. 25, 2019 | Counsel for Mr. Purkey Rebecca E. Woodman & Michelle M. Law | **Second Request** for medically ordered brain imaging (ordered by Dr. Bhushan Agharkar) (R. Woodman Decl. ¶ 15, Ex. 18). | *Ex parte* motion to District Court for S.D. Ind. | Motion **denied** November 20, 2019, stating the request for imaging was not made pursuant to a *Ford* claim.  *Purkey v. United States*, No. 2:19-cv-00414, ECF No. 76 (S.D. Ind. Nov. 20, 2019). | **No** |
| Nov. 11, 2019 | Counsel for Mr. Purkey Rebecca E. Woodman | **Fourth Request** for A Range surveillance videos; requested expedited processing (R. Woodman Decl. ¶ 13, Ex. 13). | BOP Senior Attorney Katherine Siereveld | Nov. 13, 2019: "I **do not have the authority to circumvent the FOIA process**, but please be assured that everyone involved is cognizant that time is of the essence. **I will forward your concerns along to the folks directly involved in the FOIA process**." (R. Woodman Decl. ¶ 13, Ex. 13). | **No** |
| Feb. 3, 2020 | Counsel for Mr. Purkey Rebecca E. Woodman | **Fifth Request** for A Range surveillance videos of Mr. Purkey's cell in the form of new FOIA request; requested expedited processing (R. Woodman Decl. ¶ 26, Ex. 28–30). | FOIA Section, BOP Office of General Counsel | Feb. 3, 2020: Email #1 "We determined the information you request is maintained in a Privacy Act protected system of records and requires written authorization from the subject of the record before it can be released. . . . **Your authorization was** | **No** |

2

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| | | | | **incomplete** because the date on the authorization was more than three months old." (R. Woodman Decl. ¶ 26, Ex. 31).<br><br>Feb. 3, 2020: Email #2<br>"Please **disregard my previous message** about the outdated Certification of Identity. Upon further review it looks like this is a **duplicate request** of 2020-00234. As such, your request is **not considered perfected** and has not been logged in or assigned a request number. Additionally, your request was **previously granted expedited** processing on October 10, 2019. A copy of the letter is attached." (R. Woodman Decl. ¶ 26, Ex. 32).<br><br>Feb. 3, 2020: Email #3 (RE: FOIA Request 1)<br>Upon R. Woodman's clarification, **accepting the new expedited requests** and stating that "If a new Certification of Identity is needed they will let you know." (R. Woodman Decl. ¶ 26, Ex. 34). | |
| Feb. 3, 2020 | Counsel for Mr. Purkey, Rebecca Woodman | **Third Request** for BOP death watch protocol in the form of new FOIA request; requested expedited processing (R. Woodman Decl. ¶ 26, Exs. 28–30). | FOIA Section, BOP Office of General Counsel | Feb. 3, 2020: Email #1<br>"We determined the information you request is maintained in a Privacy Act protected system of records and requires written authorization from the subject of the record before it can be released. . . . **Your authorization was incomplete** because the date on the authorization was more than three months old."<br>(R. Woodman Decl. ¶ 26, Ex. 31).<br><br>Feb. 3, 2020: Email #2<br>"Please **disregard my previous message** about the outdated Certification of Identity. Upon further review it looks like this is a **duplicate request** of 2020-00234. As such, your request is **not considered perfected and has not been logged** in or assigned a request number. Additionally, your **request was previously granted expedited** processing on October 10, 2019. A copy of the letter is attached."<br>(R. Woodman Decl. ¶ 26, Ex. 32). | **No** |
| Feb. 3, 2020 | Counsel for Mr. Purkey, | **Second Request** for Mr. Purkey's updated BOP medical and mental health records in the form of a new | FOIA Section, BOP Office | Feb. 3, 2020: Email #1<br>"Upon review it looks like this is a **duplicate request** of 2020-00234. As such, your request **is not considered** | **No** |

3

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| | Rebecca Woodman | FOIA request; requested expedited processing (R. Woodman Decl. ¶ 26, Exs. 28–30). | of General Counsel | **perfected and has not been logged** in or assigned a request number. Additionally, your **request was previously granted expedited processing** on October 10, 2019. . ." (R. Woodman Decl. ¶ 26, Ex. 33). Feb. 3, 2020: Email #2 "I will **forward this message to the processor.** If a new Certification of Identity is needed they will let you know." (R. Woodman Decl. ¶ 26, Ex. 35). | |
| Feb. 27, 2020 | Counsel for Mr. Purkey Michelle M. Law | Request to schedule defense expert Dr. Agharkar visit for examination of Mr. Purkey (R. Woodman Decl. ¶ 34, Ex. 43). | BOP Senior Attorney Katherine Siereveld | Mar. 16, 2020 (From Andrew Sutton): "This was **never scheduled and is now not considered** under the circumstances." (citing the COVID-19 pandemic) (R. Woodman Decl. ¶ 34, Ex. 43). | **No** |
| April 14, 2020 | Counsel for Mr. Purkey Brian J. Fleming | **Sixth Request** for A Range surveillance videos of Mr. Purkey's cell sent in a letter responding to Defendant's reply to Mr. Purkey's opposition to the motion to dismiss: "If timeliness and delay are matters of concern to Defendants, the simple solution would be for Defendants to ensure that the relevant government officials immediately and fully provide the requested information and documentation, as well as access for testing." (R. Woodman Decl. ¶ 28, Ex. 36). | AUSA Brian Casey | April 22, 2020: "Responding to your accusations point-by-point does not seem productive, so suffice it to say that we have reviewed your letter carefully and disagree with your assertions and conclusions. . ." "In response to your point that Ms. Woodman submitted an '**updated and renewed FOIA request**' dated February 3, 2020, we have specifically inquired about this request, and **the BOP has been unable to find any record of it**." (R. Woodman Decl. ¶ 29, Ex. 37). | **No** |
| June 15, 2020 | Counsel for Mr. Purkey, Rebecca Woodman | **Third Request** for Mr. Purkey's updated BOP medical and mental health records (R. Woodman Decl. ¶ 32, Ex. 39; R. Woodman Supp. Decl. ¶ 3). | BOP Senior Attorney Katherine Siereveld | No Response | **No** |
| June 15, 2020 | Counsel for Mr. Purkey, Rebecca Woodman | **Third Request** for medically ordered brain imaging (requested by Dr. Jonathan DeRight) (R. Woodman Decl. ¶ 32, Ex. 39; R. Woodman Supp. Decl. ¶ 3, Ex. 1). | BOP Senior Attorney Katherine Siereveld | June 23, 2020: "I know we discussed expert visits during our conversation, but **I don't recall if you have made arrangements for Dr. DeRight to come to the institution? I did not see any follow up information on these specific issues**." (R. Woodman Supp. Decl. ¶ 3, Ex. 1). | **No** |
| June 15, 2020 | Counsel for Mr. Purkey | Request to schedule defense expert Dr. DeRight visit for examination of Mr. Purkey (R. Woodman Decl. ¶ 32, | BOP Senior Attorney | June 23, 2020: "I know we discussed expert visits during our conversation, but **I don't recall if you have made arrangements for Dr. DeRight to come to the** | **No** |

4

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| | Rebecca E. Woodman | Ex. 39; R. Woodman Supp. Decl. ¶ 3, Ex. 1). | Katherine Siereveld | **institution? I did not see any follow up information on these specific issues.**" (R. Woodman Suppl. Decl. ¶ 4, Ex. 1). | |
| June 16, 2020 | Counsel for Mr. Purkey Rebecca E. Woodman | **First Request** for official written COVID-19 visitation policies by close of business. (R. Woodman Decl. ¶ 37, Ex. 50). | BOP Senior Attorney Katherine Siereveld | June 16, 2020: Email #1 **"We do not have anything written yet but I am working on it."** (R. Woodman Decl. ¶ 37, Ex. 51). June 16, 2020: Phone call Promised written official COVID-19 visitation policies **within the next hour or two.** Safety measures include: temperature checks, questions about symptoms, a mask (either one's own or provided by the facility), and a preference for non-contact visits." (R. Woodman Decl. ¶ 38, Ex. 53). June 16, 2020: Email # 2 "We are **still working on a plan** that will allow as much visitation as possible while still mitigating the risk of exposure to COVID19. I **will have something in writing for you by tomorrow**, but you can begin to schedule your legal visits as soon as you wish. The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID." (R. Woodman Decl. ¶ 38, Ex. 52). | **No** |
| June 19, 2020 | Counsel for Mr. Purkey Rebecca E. Woodman | **Second Request** for official written COVID visitation policies (R. Woodman Decl. ¶ 38, Ex. 54, at 2–3). | BOP Senior Attorney Katherine Siereveld | June 19, 2020: "As we discussed earlier, **I told you these would not be 'policies' and that we were working as quickly as possible** to work out a safe option to allow for as much of a contact visit possible under the circumstances. **While I regret that we have not been able to send you more in writing as of yet**, I encouraged you to schedule your visits with the unit team so that your schedule would not be adversely impacted." (K. Siereveld Decl., Ex. C). | **No** |
| June 20, 2020 | Counsel for Mr. Purkey Rebecca E. Woodman | **Third Request** for official written COVID visitation policies (R. Woodman Decl. ¶ 38, Ex. 54, at 1–2). | BOP Senior Attorney Katherine Siereveld | June 22, 2020: "As you are aware, the BOP website makes it clear that case-by-case exceptions for in-person legal visits are permitted, so long as the visiting attorney undergoes the same screening procedures as the staff. SCU staff have advised that you did not request an exception when your standing legal visit was canceled." (K. Siereveld Decl., Ex. B). | **No** |

5

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| June 20, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **First Request** for COVID testing data beyond what is available on BOP website (R. Woodman Decl. ¶ 38, Ex. 54, at 2). | BOP Senior Attorney Katherine Siereveld | June 24, 2020: "[T]he Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/." (R. Woodman Suppl. Decl. ¶ 5, Ex. 2). | **No** |
| June 20, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Fourth Request** for Mr. Purkey's updated BOP medical and mental health records (R. Woodman Decl. ¶ 38, Ex. 54, at 1–2). | BOP Senior Attorney Katherine Siereveld | June 26, 2020: "**I am unaware of any outstanding requests for medical and psychological records**, but if you can let me know when and how you requested them, that can help me track them down. As a general rule, the **two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process**." (R. Woodman Suppl. Decl. ¶ 9, Ex. 4, at 1–2). | **No** |
| June 24, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Fourth Request** for official written COVID visitation policies (R. Woodman Suppl. Decl. ¶ 4, Ex. 2, at 1–2). | BOP Senior Attorney Katherine Siereveld | June 24, 2020: "[T]he BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. . . I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. **It is unclear what additional protocols you are seeking**." (R. Woodman Suppl. Decl. ¶ 4, Ex. 2, at 1). | **No** |
| June 24, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Fourth Request** for medically ordered brain imaging (and initial request for blood tests) (R. Woodman Suppl. Decl. ¶ 4, Ex. 2, at 1–2). | BOP Senior Attorney Katherine Siereveld | June 24, 2020: "While **it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order**, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought? BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests." (R. Woodman Suppl. Decl. ¶ 6, Ex. 2, at 1).<br><br>June 25, 2020: "As a reminder, the **BOP cannot order or pay for testing which is not clinically indicated. I am** | **No** |

6

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| | | | | working to confirm that those costs are consistent with what they would be today." (R. Woodman Suppl. Decl. ¶ 6, Ex. 3, at 1). | |
| June 25, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Fifth Request** for official written COVID visitation policies (R. Woodman Suppl. Decl. ¶ 7 Ex. 4, at 2–4). | BOP Senior Attorney Katherine Siereveld | June 26, 2020: "As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU. This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff. The individual visiting rooms are wiped down before and after visits. "Additionally**,** to the extent possible, we are attempting to assign visiting spaces to each inmate. For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates. Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination." (R. Woodman Suppl. Decl. ¶ 8, Ex. 4, at 1–2). | **No** |
| June 25, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Second Request** for COVID testing data beyond what is available on BOP website (R. Woodman Suppl. Decl. ¶ 7, Ex. 4, at 2–4). | BOP Senior Attorney Katherine Siereveld | June 26, 2020: "I think there may be some confusion regarding the COVID-19 testing data you are seeking**. You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case.** If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests. That data is shown both in the aggregate and for each facility. The data is further explained on the webpage under the heading 'About the Data.'" (R. Woodman Suppl. Decl. ¶ 8, Ex. 4, at 1–2). | **No** |
| June 25, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Fifth Request** for medically ordered brain imaging (R. Woodman Suppl. Decl. ¶ 7 Ex. 4, at 2–4). | BOP Senior Attorney Katherine Siereveld | June 26, 2020: "**With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons. Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined.** You will receive the results which will have the names of the facilities and medical personnel as part of the records. To that end, I will let you know if any additional information is required to successfully schedule those tests. **The BOP does not pay for unnecessary outside tests on inmates which are not** | **No** |

7

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| | | | | clinically indicated. Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting. Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual." (R. Woodman Suppl. Decl. ¶ 9, Ex. 4, at 1–2). | |
| June 25, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Fifth Request** for Mr. Purkey's updated BOP medical and mental health records (R. Woodman Suppl. Decl. ¶ 9, Ex. 4, at 2–4). | BOP Senior Attorney Katherine Siereveld | June 26, 2020: "**I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down.** As a general rule, the **two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.**" R. Woodman Suppl. Decl. ¶ 9, Ex. 4, at 1–2). | **No** |
| June 25, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Seventh Request** for A Range surveillance videos of Mr. Purkey's cell (R. Woodman Suppl. Decl. ¶ 7, Ex. 4, at 3). | BOP Senior Attorney Katherine Siereveld | **No Response** | **No** |
| June 30, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Sixth Request** for medically ordered brain imaging; requested logistics of testing in light of COVID-19 (R. Woodman Suppl. Decl. ¶ 10, Ex. 5, at 1–2). | BOP Senior Attorney Katherine Siereveld | **No Response** | **No** |
| June 30, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Third Request** for COVID testing data beyond what is available on BOP website (R. Woodman Suppl. Decl. ¶ 10, Ex. 5, at 1–2). | BOP Senior Attorney Katherine Siereveld | **No Response** | **No** |
| June 30, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Sixth Request** for official written COVID visitation policies (R. Woodman Suppl. Decl. ¶ 10, Ex. 5, at 1–2). | BOP Senior Attorney Katherine Siereveld | **No Response** | **No** |
| June 30, 2020 | Counsel for Mr. Purkey Rebecca Woodman | **Sixth Request** for Mr. Purkey's updated BOP medical and mental health records (R. Woodman Suppl. Decl. ¶ 10, Ex. 5, at 1–2). | BOP Senior Attorney Katherine Siereveld | **No Response** | **No** |
| July 1, 2020 | Counsel for Mr. Purkey | **Seventh Request** for medically ordered brain imaging; (R. Woodman Suppl. Decl. ¶ 11, Ex. 6, at 1). | BOP Senior Attorney | **No Response** | **No** |

8

| Date of Request | Requestor | Requested Material | Addressee | Response | Requested Material Received? |
|---|---|---|---|---|---|
| | Rebecca Woodman | | Katherine Siereveld | | |

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:19-cv-03570-TSC |
| WILLIAM P. BARR, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## SUPPLEMENTAL DECLARATION OF REBECCA E. WOODMAN, ATTORNEY AT LAW

Rebecca E. Woodman, pursuant to 28 U.S.C. §1746(2), declares as follows:

1. I am an attorney representing Plaintiff Wesley I. Purkey ("Mr. Purkey" or "Plaintiff") in the above-captioned action ("Civil Action"), admitted to the Court *pro hac vice*. I am over eighteen (18) years old and competent to attest and declare to the matters set forth herein. Unless otherwise stated, I have personal knowledge regarding the facts set forth herein.

2. On June 22, 2020, I submitted a declaration detailing, in pertinent part, Mr. Purkey's defense team communications with Federal Bureau of Prisons ("BOP") Legal Counsel concerning matters pertaining to Mr. Purkey, including various requests for BOP medical and mental health records, "death watch" surveillance videos, the need for in-person expert visits and evaluations of Mr. Purkey as well as certain medical tests and imaging, and requests for written protocols, policies, and procedures concerning COVID-19 safety measures and testing at USP Terre Haute that would ensure safe access to USP Terre Haute by members of Mr. Purkey's defense team in the weeks leading up to his July 15, 2020 execution date. My previous declaration was filed on June 22, 2020 at ECF No. 23-6 in this matter. This supplemental declaration provides

updated information concerning additional correspondence with BOP regarding the above-mentioned matters since the date of my previous declaration. As set forth in my previous declaration, I possess the necessary qualifications to submit this supplemental declaration. R. Woodman Dec. ¶¶ 1-3 (ECF No. 23-6).

3.      As stated in my previous declaration, on June 15, 2020, prior to receiving notice of Mr. Purkey's new warrant, I emailed BOP Legal Counsel Siereveld regarding my outstanding request for Mr. Purkey's BOP records, attaching copies of all of my previous requests and emphasizing the importance of the records to the ability of our expert, Dr. Jonathan DeRight, to accurately assess and evaluate Mr. Purkey's current mental state and the extent of his deterioration, especially given Dr. DeRight last saw Mr. Purkey in August 2019. R. Woodman Dec. ¶¶ 14-15, Ex. 39 (ECF No. 23-6). In a separate email the same day, also prior to receiving notice of Mr. Purkey's new warrant, I emailed BOP Legal Counsel Siereveld about the need for Dr. DeRight to conduct an in-person follow up evaluation of Mr. Purkey. Ex. 1. I attached to the email a letter from Dr. DeRight setting forth the need to review complete records and for an up to date MRI, an EEG, and blood laboratory results which are necessary to assess Mr. Purkey's current abilities and disease progression. *Id.* As of June 22, 2020, the date of my previous declaration, I had received no response from BOP Legal Counsel Siereveld or any other BOP personnel in response to either of these outstanding requests.

4.      On June 23, 2020, BOP Legal Counsel Siereveld emailed a response to my June 15 email regarding the testing set forth in Dr. DeRight's letter, stating that she "went ahead and had our Medical start working on" getting Mr. Purkey scheduled for an MRI, EEG and blood work, and that she would need the specific parameters of the blood work needed. *Id.* The next day, I responded to BOP Legal Counsel, reminding her of our previous requests for the "BOP written

safety plan/protocol/policy relating to COVID-19" in order to determine if and when it is safe to schedule an expert visit, noting that I had requested these materials several times with no response, and that the materials were necessary to make that determination. Ex. 2. I also expressed appreciation for BOP's apparent openness to testing now, after previously refusing to allow this type of testing without a court order. *Id.* Further, I informed BOP Legal Counsel that, to the extent such testing would be performed by BOP personnel, we would first need information about who would be administering the testing, their qualifications, training, and experience, and the equipment that would be used for the testing that we required. *Id.* I also specifically set forth the testing we required in the email. Given the brief window of time before Mr. Purkey's scheduled execution date, I asked BOP Legal Counsel to provide this requested information before the close of business on June 26, 2020. *Id.*

5. On June 24, 2020, I received a response email from BOP Legal Counsel Siereveld, who referred me to the BOP website for "BOP's plan" for visitation during the COVID-19 pandemic. *Id.* The link BOP Legal Counsel provided for this visitation "plan" merely states that "[s]ocial visits are suspended" and that "[l]egal visits are suspended for 30 days, at which time the suspension will be re-evaluated." *See id.*; https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed July 2, 2020). The information on the webpage, even today, remains unchanged from when BOP first suspended all visitation in mid-March. It provides no information about safety measures for a scheduled and approved visit apart from a link to the form used to screen incoming visitors. The form asks just three questions: 1) have you traveled from or through China, Iran, South Korea, Italy, or Japan; 2) have you had close contact with anyone diagnosed with COVID-19 in the last 14 days; and 3) do you currently have a fever, chills, cough, or shortness of breath. The form is dated March 13,

3

2020 and contains no indication of having been updated since BOP's original suspension of all visitation on that date. *See* Visitor/Volunteer/Contractor COVID-19 Screening Tool, available at https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last accessed July 2, 2020). BOP Legal Counsel's June 24, 2020 email reiterated mask availability at USP Terre Haute and stated that "we have hand sanitizing stations available and plexiglass has been installed in the contact visitation booth." Ex. 2. Apart from this extremely limited information, BOP Legal Counsel provided no explanation for where and to whom the sanitizing stations would be available or how social distancing will be enforced at the various stages of visitation, including the process of checking in, going through security, and moving throughout the facility on the way to and from the visiting rooms. Instead, she ended her communication on the topic of COVID-19-related safety measures by stating, "[i] is unclear what additional protocols you are seeking." *Id.*

6.     Regarding the provision of medical testing, BOP Legal Counsel stated in this same June 24, 2020 email that it remained BOP's position that "any medical or psychological testing which is not clinically indicated (such as this) requires a court order" but that "recogniz[ing] the urgency of the time frame," BOP was willing to make an "exception" to the court order requirement if we did not yet obtain a court order—unless an order was issued denying our request for outside testing. *Id.* BOP Legal Counsel stated further that BOP staff would not be performing any of the tests, which would have to be performed by outside medical personnel, with the possible exception of blood tests. *Id.* In an email sent the next day, June 25, 2020, BOP Legal Counsel Siereveld advised that BOP "cannot order or pay for testing which is not clinically indicated." Ex. 3. Referring to an attached email chain on October 4, 2019 between herself and Michelle Law regarding costs of different tests discussed at that time, BOP Legal Counsel stated she was working

to confirm that the estimated costs therein were consistent with what they would be today. She also indicated that the security costs set forth in the earlier email correspondence with Ms. Law would likely remain the same, but that she was "running that to ground as well." *Id.*; *see also* R. Woodman Dec. ¶ 7, Ex. 17 (ECF No. 23-6). BOP Legal Counsel requested that I send her the specific parameters of the additional testing so that she could provide cost estimates and begin scheduling. Ex. 3.

7. I sent an email response to BOP Legal Counsel Siereveld the same day, June 25, 2020, requesting further information with respect to COVID-19, given that the "plan" outlined in all previous correspondence appeared to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown and remained insufficient to address our concerns. Ex. 4. I also requested further information regarding the medical testing of Mr. Purkey, including the hospital that would conduct the testing, whether the hospital had the equipment and personnel to conduct the requested testing, the logistics of transporting Mr. Purkey for the testing, and the safety precautions for doing so in light of the ongoing pandemic. I also confirmed the specific blood tests we were requesting. *Id.* Finally, I reminded BOP Legal Counsel of our prior, repeated requests for complete BOP medical records and videos that had been withheld. *Id.*

8. On June 26, 2020, BOP Legal Counsel responded by email that "sanitizing stations" will be placed "between the front entrance and the SCU [Special Confinement Unit]," but made no mention of the availability of such stations inside the facility. *Id.* BOP Legal Counsel also stated for the first time that "our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination" but acknowledged that there are only three non-contact visiting rooms. *Id.* This response fails to account for the possibility that the visiting rooms, even if apportioned in this way, would still be used by an unspecified number of different

5

individuals, given each prisoner would likely have visits from multiple people. BOP Legal Counsel did not elaborate on how BOP's "intent" would change in the event more than three prisoners have scheduled visits. Additionally, BOP Legal Counsel's email implied this arrangement regarding non-contact visits applied only to "social" visits. *Id.* Given BOP Legal Counsel's email the previous week stating a "preference" for non-contact visits, it is still unclear what if any arrangements the BOP is making for contact visits with members of the defense team, aside from a brief reference to plexiglass having been installed in one contact visitation booth.

9. With respect to our repeated and renewed requests for medical records and "death watch" surveillance videos, all of which I attached in email correspondence to BOP Legal Counsel as recently as June 15, 2020 (R. Woodman Dec. ¶¶ 14-15, Ex. 39 (ECF No. 23-6)), BOP Legal Counsel claimed in her June 26, 2020 email that she was "unaware of any outstanding requests for medical and psychological records[.]" Ex. 4. Despite having previously and repeatedly advised us that, in order to obtain such records for Mr. Purkey, we should utilize the FOIA process, and despite the fact that we did submit multiple FOIA requests, BOP Legal Counsel this time stated that "the two quickest ways" to obtain "medical and psych" files was to ask our client to request a copy of his own records through BOP staff, or "through the discovery process." *Id.* Regarding the requested testing, BOP Legal Counsel stated that the BOP "cannot provide you with specifics as to the logistics for security reasons," and asked us to let her know how we would like to proceed. *Id.*

10. On June 30, 2020, I sent an email to BOP Legal Counsel Siereveld advising her that we had identified University Hospital in Indianapolis as a location where all of our requested testing could be performed, and that we were in the process of confirming which days during the week of July 6, 2020 the hospital could perform the tests. Ex. 5. I informed BOP Legal Counsel

that we would provide that information to her once we confirmed it. *Id.* I also again requested information that would assure us that Mr. Purkey's health would be suitably and adequately protected during the process of transferring him to the hospital for the testing and again requested further information about our pandemic-related concerns and inquiries, given that the information we had received thus far remained insufficient to address those concerns regarding the safety of visiting USP Terre Haute and the effort to conduct executions in the midst of the pandemic. *Id.* I further informed BOP Legal Counsel that her stated lack of knowledge of our outstanding records request was neither credible nor made in good faith in light of my prior requests, and that her assertion now that we could obtain these records through our client, whom BOP was seeking to execute in the next two weeks, or through the discovery process, which defense counsel was actively opposing, was not a good faith response. *Id.*

11. On July 1, 2020, I emailed BOP Legal Counsel Siereveld and attached specific testing orders written by our expert, Dr. Thomas Hyde, M.D., Ph.D., and stated that we were seeking to confirm the testing at Methodist Hospital in Indianapolis for two days next week, on July 7 and July 9, 2020. I further informed BOP Legal Counsel that we would confirm specific scheduling with her so that necessary transportation arrangements for Mr. Purkey could be made. Ex. 6. To date, I have received no further response from BOP Legal Counsel.

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED: 7-2-2020      _____
REBECCA E. WOODMAN
ATTORNEY AT LAW
COUNSEL FOR MR. PURKEY

7

# Exhibit 1

Case 2:20ase-00365-vRSSTOLFTSCDocument 6-30-2FileColiled07017602020 Pagage3636 of 71 PageID #: 724

**Subject:** Re: Purkey- expert visitation

**Date:** Tuesday, June 23, 2020 at 12:48:07 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

Hi Rebecca,

Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.

Thanks,

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>

Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 2

| | |
|---|---|
| **Subject:** | Re: Purkey- expert visitation |
| **Date:** | Wednesday, June 24, 2020 at 3:25:57 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Rebecca Woodman |
| **CC:** | Brian Fleming, Chas McAleer, Brian Casey |
| **Attachments:** | WP.pdf, Scanning_Parameters_1.pdf |

Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order. While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1.   An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent

**Page 2 of 3**

of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 3

| **Subject:** | Re: Purkey- expert visitation |
|---|---|
| **Date:** | Thursday, June 25, 2020 at 1:01:58 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Rebecca Woodman |
| **CC:** | Rick Winter, Brian Fleming, Chas McAleer, Brian Casey |
| **Attachments:** | RE: Medical Imaging Tests for Wesley Purkey.eml |

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not clinically indicated. I am working to confirm that those costs are consistent with what they would be today. The security costs will likely remain the same, but I am running that to ground as well. Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order. While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after

previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com


---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this. I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution? I did not see any follow up information on these specific issues. I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802

**Page 2 of 3**

(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 4

**Subject:** Re: Purkey- expert visitation

**Date:** Friday, June 26, 2020 at 12:34:12 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

**CC:** Rick Winter, MichelleLaw, Brian Fleming, ChasMcAleer, Brian Casey

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking. You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case. If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests. That data is shown both in the aggregate and for each facility. The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*

*These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP**. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.*

As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU. This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff. The individual visiting rooms are wiped down before and after visits. Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate. For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates. Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down. As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons. Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined. You will receive the results which will have the names of the facilities and medical personnel as part of the records. To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated. Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting. Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual. Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m.  In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (*see* the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  *See* T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," *Politico* (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the  number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results.  We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting" certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested

says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a *Ford* claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff.  However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine);
Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated."  We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation.  That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us.  Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented.  We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of <u>all</u> of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not clinically indicated. I am working to confirm that those costs are consistent with what they would be today. The security costs will likely remain the same, but I am running that to ground as well. Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order. While

**Page 4 of 6**

it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's

evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 5

**Wednesday, July 1, 2020 at 15:05:59 Central Daylight Time**

**Subject:** Re: Purkey- expert visitation

**Date:** Tuesday, June 30, 2020 at 6:15:34 PM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**CC:** Rick Winter, MichelleLaw, Brian Fleming, ChasMcAleer, Brian Casey

Dear Katherine:

Thank you for your email on June 26, 2020 (1:34 p.m.). I respond as follows:

1. With respect to the issue of testing, we have already identified a facility at which all of the testing we have requested can be performed: the University Hospital at Indiana University in Indianapolis. We have confirmed that the hospital has the staff and the equipment to perform all of the requested tests. We are also confirming what days next week the hospital can perform the tests. Once we have that confirmation, we will let you know the days on which Mr. Purkey will need to be transported to the hospital. (The tests will have to be performed over a two-day period, so Mr. Purkey will need to be returned to the hospital for the second day of testing.)

2. With respect to the details regarding Mr. Purkey's transportation to the hospital, we understand there may be security issues, which is why we are not requesting those details. However, we do want details regarding how Mr. Purkey's health will be protected during the transfer given COVID-19 factors and request assurances that his health will be suitably and adequately protected during the process.

3. Leaving aside whether and to what extent the BOP should be responsible for paying or reimbursing the costs of the requested testing, the fact remains that, as far back as October 2019, Michelle Law made clear to you in repeated conversations and email communications that the Office of the Federal Public Defender would front the costs of the tests. That remains the case. Accordingly, the costs of the tests cannot be properly raised by the BOP as an impediment to next week's tests occurring.

4. With respect to our pandemic-related concerns and inquiries, the limited, general and vague information the BOP has provided regarding COVID-19 testing and results remain insufficient to address the questions and issues we have raised regarding USP Terre Haute. Indeed, we do not even know from you whether our client has been tested, when he was tested and what the results of any such tests were.

5. The email descriptions you have provided regarding certain COVID-19 safety measures USP Terre Haute is beginning to implement regarding visitations are similarly insufficient to address the concerns we have raised. You have not even indicated whether our client and any visitors will be permitted and/or required to utilize full PPE protection during any visits, leaving aside the potential adverse impact on the efficacy of medical examinations and testing performed with full PPE protection.

6. Your stated lack of knowledge "of any outstanding requests for medical and psychological records" is simply not credible and belies any suggestion of good faith engagement by the Bureau of Prisons on these issues. At your suggestion, we reiterated prior requests for medical records and surveillance information through FOIA requests in October 2019, and I specifically provided you with a copy of the FOIA requests prior to their submission. Additionally, on June 15, 2020, I provided you again with copies of all of the written requests we have made. For you to disclaim any awareness of prior requests from us in your June 26, 2020 email is simply indefensible.

7.  Having previously directed us to make our requests through the FOIA process (which we were subsequently told were being processed by the Bureau of Prisons on an expedited basis), your assertion now that our only two available avenues are through our client (whose life the Bureau of Prisons is attempting to terminate in approximately two weeks) or the discovery process in this case (which defense counsel are aggressively and actively opposing) is not a good faith response.

Please let me know if you have any questions regarding the foregoing.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Friday, June 26, 2020 at 12:34 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, MichelleLaw <Michelle_Law@fd.org>, Brian Fleming <bfleming@milchev.com>, ChasMcAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking.  You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case.  If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests.  That data is shown both in the aggregate and for each facility.  The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*
*These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP**. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.*
As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU.  This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff.  The individual visiting rooms are wiped down before and after visits.  Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate.  For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates.  Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

**Page 2 of 7**

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down.  As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons.  Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined.  You will receive the results which will have the names of the facilities and medical personnel as part of the records.  To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated.  Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting.  Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual.  Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m.  In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (*see* the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  *See* T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," *Politico* (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results. We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting" certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a *Ford* claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff.  However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine):

Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated." We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation. That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us. Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented. We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of all of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,

I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not clinically indicated. I am working to confirm that those costs are consistent with what they would be today. The security costs will likely remain the same, but I am running that to ground as well. Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.

Thanks,

Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>

Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order. While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute

**Page 6 of 7**

4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 6

| | |
|---|---|
| **Subject:** | Re: Purkey- expert visitation |
| **Date:** | Wednesday, July 1, 2020 at 5:04:54 PM Central Daylight Time |
| **From:** | Rebecca Woodman |
| **To:** | Katherine Siereveld |
| **CC:** | Rick Winter, MichelleLaw, Brian Fleming, ChasMcAleer, Brian Casey |
| **Attachments:** | Compilation of Dr. Hyde Medical Orders[1].pdf |

Dear Katherine:

Further to my email yesterday, Thomas M. Hyde, M.D., Ph. D., has issued the attached medical orders for the testing and imaging we have previously identified to you. My understanding is that the specific facility within the Indiana University Health System at which the testing and imaging will be performed is the Methodist Hospital in Indianapolis. We are seeking to confirm the scheduling of the testing and imaging for two days next week, possibly Tuesday, July 7 and Thursday, July 9. We will confirm with you the specific scheduling once we have confirmation so that you can make the necessary transportation arrangements for Mr. Purkey.

In the meantime, please let me know if you have any questions regarding the foregoing.

Sincerely,
Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Friday, June 26, 2020 at 12:34 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, MichelleLaw <Michelle_Law@fd.org>, Brian Fleming <bfleming@milchev.com>, ChasMcAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking. You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case. If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests. That data is shown both in the aggregate and for each facility. The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*
*These data are compiled from a variety of sources and reviewed by BOP Health Services staff*

*before documented for reporting.* **Not all tests are conducted by and/or reported to BOP***. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.*

As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU. This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff. The individual visiting rooms are wiped down before and after visits. Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate. For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates. Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down. As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons. Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined. You will receive the results which will have the names of the facilities and medical personnel as part of the records. To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated. Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting. Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual. Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m. In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (*see* the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  *See* T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," *Politico* (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the  number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results.  We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting" certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a *Ford* claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be

done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff. However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine);
Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated." We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation. That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us. Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented. We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of <u>all</u> of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**Page 4 of 7**

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer
<CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests
which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not
clinically indicated. I am working to confirm that those costs are consistent with what they would be today.
The security costs will likely remain the same, but I am running that to ground as well. Please let me know as
soon as possible the specific parameters of the additional testing which was not previously identified so I can
get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP
website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific
numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks
are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally,
we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We
have already begun successful visiting for the inmates who received execution dates. It is unclear
what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court
order. While it is still our position that any medical or psychological testing which is not clinically indicated
(such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an
exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order
was issued denying your request for the outside testing. Did the Court deny your request or was an order not
sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by
outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw
the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe
the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still

have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com